SOUTHERN PACIFIC TRANSPORTATION COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3493–69.    Filed December 31, 1980.

CONTENTS

| | Page |
|---|---|
| Headnote | 499 |
| Opinion (Introduction) | 505 |
| General Findings of Fact | 506 |
| I. *Issue (i)*: Rapid Amortization of Freight Cars | 515 |
| Findings of Fact | 515 |
| Opinion | 534 |
| II. *Issues (hh) and (9)*: Recovery Upon Merger of Previously Deducted Amounts | 548 |
| Findings of Fact | 549 |
| Opinion | 557 |
| III. *Issue (kk)*: Deduction of Timber Expenses | 567 |
| Findings of Fact | 567 |
| Opinion | 577 |

---

*Page*

IV. *Issues (w) and (x)*: Deductions Involving
Houston Depot ................................................. 586
Findings of Fact ............................................. 587
Opinion ........................................................ 594

V. *Issue (rr)*: Deductions Incident to Relocation
Projects ........................................................ 605
Findings of Fact ............................................. 605
Opinion ........................................................ 612

VI. *Issue (bbb)*: Deduction of Estimated Payroll
Taxes on Earned Vacation Pay .......................... 624
Findings of Fact ............................................. 625
Opinion ........................................................ 632

VII. *Issue (zz)*: Deduction of Penalties for
Violations of Federal Statutes ........................... 643
Findings of Fact ............................................. 643
Opinion ........................................................ 646

VIII. *Issue (ll)*: Freight Car Useful Life ...................... 655
Findings of Fact ............................................. 655
Opinion ........................................................ 660

IX. *Issue (yy)*: Deduction of Embankment Expenditures ... 672
Findings of Fact ............................................. 672
Opinion ........................................................ 680

X. *Issue (mm)*: Diesel Locomotive Useful Life ............. 687
Findings of Fact ............................................. 688
Opinion ........................................................ 702

XI. *Issue (g)*: Welded Rail ...................................... 709
Findings of Fact ............................................. 709
Opinion ........................................................ 717

XII. *Issues (l) and (ccc)*: Relay Rail .......................... 726
Findings of Fact ............................................. 726
Opinion ........................................................ 732

XIII. *Issue (aaa)*: Depreciation of Replacement Facilities..... 746
Findings of Fact ............................................. 746
Opinion ........................................................ 757

*Page*

XIV. *Issue (pp)*: Grading and Tunnel Bore Useful Life ..... 769
     Findings of Fact .............................................. 769
     Opinion ........................................................ 788

 XV. *Issues (pp) and (qq)*: Historical Costs as Tax Basis .... 807
     Findings of Fact .............................................. 808
     Opinion ........................................................ 826

XVI. *Issue (p)*: Adjustment for Interest and Taxes
     During Construction .......................................... 843
     Findings of Fact .............................................. 843
     Opinion ........................................................ 845

Conclusion ................................................................ 850

*Arnold I. Weber* and *Alan S. Beinhorn*, for the petitioner.
*James Booher, Vernon R. Balmes, Lawrence G. Becker, Eugene H. Ciranni, Randall G. Dick, Thomas F. Kelly, William E. Saul*, and *Nicholas G. Stucky*, for the respondent.

DRENNEN, *Judge*: In the statutory notice in this case, respondent determined income tax deficiencies as follows:

| TYE Dec. 31— | Deficiency |
| --- | --- |
| 1959 | $4,411,069.04 |
| 1960 | 5,986,337.91 |
| 1961 | 9,994,970.22 |

In its petition, petitioner placed all of the asserted deficiencies in controversy. Petitioner also alleged overpayments of income

taxes in each of the years at issue. The petition has been amended three times, and in the most recent amendment, dated February 9, 1979, petitioner alleges that, during the indicated years, it made overpayments of income taxes in not less than the following amounts:

| TYE Dec. 31— | Overpayment |
|---|---|
| 1959 | $15,252,000 |
| 1960 | 14,438,000 |
| 1961 | 15,531,000 |

Most of the issues raised by the pleadings have been conceded or otherwise settled by the parties. Various issues were presented for the Court's consideration in five extended trial sessions which took place over a 3-year period. For the most part, the contested issues were tried and briefed separately, although in some instances, related questions were tried and briefed together. As a result, the Court has been called upon to write 16 generally lengthy opinions to resolve the outstanding disputes. The legal questions involved in each opinion are stated just prior to the specific findings of fact relating to each opinion.

### GENERAL FINDINGS OF FACT

The record in connection with most of the issues in this case consists of extensive testimony and voluminous documentary evidence.[1] Given the scope of this record, we have found it necessary, in making the findings of fact relating to many of the issues, to summarize much of the material received in evidence and to state our conclusions as to the facts which this material tends to prove. While it was impossible to include in our findings the specific details as to all pertinent factual matters, we have taken all such information into consideration in deciding each issue.

Some of the general facts have been stipulated by the parties, and those facts, with associated exhibits, are incorporated herein by this reference.

---

[1] The transcript relating to all litigated issues contains more than 7,000 pages, with more than 1,000 exhibits received into evidence. The briefs filed by the parties as to all litigated issues contain more than 5,000 pages. While the parties filed some stipulations of fact, these documents provided the Court with very little help as stipulations of substantive facts, as required by Rule 91(a), Tax Court Rules of Practice and Procedure.

Petitioner Southern Pacific Transportation Co. is a corporation which was organized under the laws of the State of Delaware on February 20, 1969. Its principal offices are at One Market Plaza, San Francisco, Calif.

The present case was initiated by the filing of a petition in 1969 by the Southern Pacific Co., a corporation organized under the laws of the State of Delaware on March 21, 1947, hereinafter referred to as the former Southern Pacific Co., with its principal offices during the years at issue at 65 Market Street (now called One Market Plaza), San Francisco, Calif.

By order dated December 23, 1969, the Southern Pacific Transportation Co. was substituted as petitioner in this matter in lieu of the former Southern Pacific Co.[2]

The former Southern Pacific Co., as the common parent company of an affiliated group of companies, timely filed consolidated Federal income tax returns covering itself and all subsidiaries eligible to be included for the taxable years ended December 31, 1959, December 31, 1960, and December 31, 1961, with the District Director of Internal Revenue, San Francisco, Calif., on September 14, 1960, September 15, 1961, and September 17, 1962, respectively. (Extensions for filing the final returns had been granted.)

The former Southern Pacific Co. paid total amounts of $27,461,132.41, $19,140,819.54, and $34,184,088.78 in Federal income tax for the taxable years ended December 31, 1959, 1960, and 1961, respectively, on behalf of the consolidated group. None of the Federal income tax paid has been refunded by respondent.

Consents on Form 872, extending the statutory period for asserting deficiencies and making assessments ultimately to April 30, 1969, were timely and duly executed on behalf of the former Southern Pacific Co. and respondent for the taxable years ended December 31, 1959, 1960, and 1961.

The former Southern Pacific Co. was a successor to a Southern Pacific Co. organized under the laws of the State of Kentucky on March 17, 1884, hereinafter referred to as the predecessor Southern Pacific Co. On September 30, 1947, the former

---

[2]On Dec. 4, 1969, petitioner's motion for substitution of corporate petitioner after merger was filed with the Court. Respondent filed a consent to this motion on Dec. 22, 1969. Our order of Dec. 23, 1969, granted petitioner's motion.

In our various opinions in this case, the term "petitioner" is sometimes applied to the former Southern Pacific Co. and to relevant predecessor and subsidiary corporations.

Southern Pacific Co. received, pursuant to a "tax-free" plan of reincorporation, all of the assets of the predecessor Southern Pacific Co.

Among the assets of the predecessor Southern Pacific Co. received by the former Southern Pacific Co. in 1947 was the entire outstanding stock of, inter alia, the Central Pacific Railway Co., the Texas & New Orleans Railroad Co., the Pacific Electric Railway Co., the San Diego & Arizona Eastern Railway Co., the Northwestern Pacific Railroad Co., the El Paso & Southwestern Railroad Co. of Texas, the Holton Inter-Urban Railway Co., and the Visalia Electric Railroad Co., which thereupon became wholly owned subsidiaries of the former Southern Pacific Co.[3] The Northwestern Pacific Railroad Co. owned the entire outstanding stock of the Petaluma & Santa Rosa Railroad Co. The El Paso & Southwestern Railroad Co. of Texas owned the entire outstanding stock of the El Paso Southern Railway Co. Also among the assets of the predecessor Southern Pacific Co. received by the former Southern Pacific Co. in 1947 was a controlling interest in the outstanding stock of the St. Louis Southwestern Railway Co., which thereupon became controlled by the former Southern Pacific Co. The St. Louis Southwestern Railway Co. owned all the outstanding stock of the St. Louis Southwestern Railway Co. of Texas and the Dallas Terminal Railway & Union Depot Co.

In 1959, the Central Pacific Railway Co. was merged into the former Southern Pacific Co. In 1961, the Texas & New Orleans Railroad Co. was merged into the former Southern Pacific Co. as were the El Paso & Southwestern Railroad Co. of Texas and the El Paso Southern Railway Co.[4]

The former Southern Pacific Co. and all of the other above-named companies were engaged in operations as common carriers by railroad and were subject to the jurisdiction of the Interstate Commerce Commission. For the most part, during the years at issue all of the railroad lines of these companies, except

_____

[3]In 1947, the former Southern Pacific Co. received the outstanding stock of other companies, such as the Southern Pacific Railroad Co. and the El Paso & Southwestern Railroad Co. These companies had been merged into the former Southern Pacific Co. prior to the years in controversy. See our summary of petitioner's corporate history, *infra.*

[4]In 1965, after the years in controversy, the Pacific Electric Railway Co. was merged into the former Southern Pacific Co.

the lines of the St. Louis Southwestern Railway Co. and its subsidiaries, served as parts of a unified railroad system under common ownership and were known, collectively, as the Southern Pacific Lines.[5]

The railroad lines which now comprise the Southern Pacific Lines were constructed and placed in service at various times, some as early as the year 1853. Most of the construction dates from and after 1863, at which time construction began on the original Central Pacific railroad line from Sacramento across the Sierras to its meeting with the Union Pacific Railroad at Promotory in Utah. By 1870, this line and another line from Sacramento to the San Francisco Bay Area had been completed. In the early 1870's, construction was begun on the so-called Sunset Route, southward from San Francisco, into Los Angeles, then to Yuma in Arizona, across Arizona, New Mexico, and Texas, and into Louisiana to New Orleans. The original line over this route was completed and service commenced between San Francisco and New Orleans in 1883. In 1887, the line from the San Francisco Bay Area to Portland, Oreg., was completed and

---

[5]The Southern Pacific Lines were principally over the following routes:

(a) From San Francisco and the Bay Area in California through central California via Sacramento over and through the Sierra Nevada Mountains, across the State of Nevada via Reno, and into Utah, ending at Ogden, Utah.

(b) From San Francisco and the Bay Area and central California, through northern California, and through the State of Oregon, to Portland, Oreg. (by various routes).

(c) Connecting the above line through the Cascade Mountains in Oregon with the line in Nevada over the route from San Francisco to Ogden.

(d) Connecting with the above lines over the routes from San Francisco and the Bay Area, from Marin County in the Bay Area to the coast of northern California, along the Eel River.

(e) From San Francisco and the Bay Area down the coast of California to Los Angeles.

(f) From San Francisco and the Bay Area and central California down the San Joaquin Valley to southern California, with lines into Los Angeles, and continuing in a southeasterly direction to Yuma, Ariz., across the State of Arizona via Tucson, through the State of New Mexico, to El Paso, Tex., across the State of Texas through San Antonio and Houston, into Louisiana to New Orleans.

(g) The above route from San Francisco to New Orleans included alternative routes, in California along the west side of the San Joaquin Valley, in Arizona through Phoenix, and in Arizona and New Mexico, a southern route from Tucson via Douglas, in Arizona, to El Paso.

(h) Connecting at El Paso with the line over the above route from San Francisco to New Orleans was a line over a route to Santa Rosa and Tucumcari in New Mexico.

(i) In Texas and Louisiana there were routes connecting with the line over the route from San Francisco to New Orleans, such as south to Corpus Christi and north to Fort Worth and Dallas, in Texas, and to Shreveport, in Louisiana.

The St. Louis Southwestern Railway routes were principally from Waco and Corsicana, and from Lufkin, via Tyler, and from Fort Worth and Dallas, all in Texas, to Texarkana at the Arkansas border, through Arkansas and southeastern Missouri, into Illinois and to East St. Louis, Ill., and St. Louis, Mo.

placed in service. The so-called Golden State Route, with its line from El Paso to Tucumcari in New Mexico, was not completed and placed in service until after 1900. The line of the San Diego & Arizona Eastern Railroad, from the Imperial Valley in southern California, continuing ultimately into San Diego, Calif., was also completed and placed in service after 1900. Other new railroad lines were added around 1900, including lines of the Central Pacific (or of railroad companies whose assets were acquired by Central Pacific) in Oregon, California, and Nevada, and lines of the Arizona Eastern Railroad Co. and the El Paso & Southwestern Railroad Co. in Arizona and New Mexico.

An examination of petitioner's corporate history prior to the 1947 reorganization shows that numerous predecessors were involved in the creation of petitioner's present-day rail system. In summary form, a portion of that history is hereinafter set forth.

The Central Pacific Railroad Co. was originally organized under the laws of the State of California in 1861. The Central Pacific railroad lines ultimately included those of the Western Pacific Railroad Co. and the California & Oregon Railroad Co., both organized under the laws of California in the 1860's. The latter two companies, along with other railroad companies, were consolidated with the Central Pacific Railroad Co. during the 1870's. Until 1885, the Central Pacific, in addition to operating its own lines, operated certain lines leased from other railroad companies.

The Southern Pacific Railroad Co. was originally organized under the laws of California in 1865. The Southern Pacific Railroad Co. ultimately included among its railroad lines those of the San Francisco & San Jose Railroad Co., the California Pacific Rail Road Co., and the Northern Railway Co., all organized under the laws of California prior to 1872. The latter three companies were consolidated with the Southern Pacific Railroad Co. in 1870, 1898, and 1898, respectively. Additional railroad companies were involved in these and in other consolidations. A Southern Pacific Railroad Co. organized under the laws of the Territory of Arizona in 1878, and another organized under the laws of the Territory of New Mexico in 1879, were merged into the Southern Pacific Railroad Co. in 1902. Most of the Southern Pacific Railroad Co. railroad lines were leased to and operated by the Central Pacific Railroad Co. until 1885. The

remainder were operated by the Southern Pacific Railroad Co., itself. The Southern Pacific Railroad Co. also operated some lines leased to it by other railroad companies.

The Galveston, Harrisburg & San Antonio Railway Co. was organized under the laws of Texas in 1870. The Texas & New Orleans Railroad Co. was organized under the laws of Texas in 1875. Both of these railroad companies were organized in order to acquire the assets of earlier railroad companies in financial distress; however, they added their own railroad lines. Morgan's Louisiana & Texas Railroad & Steamship Co. was organized under the laws of Louisiana in 1877 to incorporate what had been a sole proprietorship. The Louisiana Western Railroad Co. was organized under the laws of Louisiana in 1878. During 1881–83, the Central Pacific Railroad Co. leased the portion of the line of the Galveston, Harrisburg & San Antonio Railway Co. east of El Paso. Except for that lease, these railroad companies operated their own lines until 1885, but as part of the same system as the lines operated by the Central Pacific.

The Oregon & California Railroad Co. was organized under the laws of Oregon in 1870, and was independently operated until 1887 when the predecessor Southern Pacific Co. leased and operated the lines of this railroad company.

The predecessor Southern Pacific Co., organized under the laws of Kentucky in 1884, would ultimately control the stock, directly or indirectly, at various times beginning in 1885, of all the railroad companies referred to above whose railroad lines were to become part of the Southern Pacific Lines. It at first became the operating railroad as to most of the lines by leasing the lines of the railroad companies which were or would become its affiliates. The predecessor Southern Pacific Co. did not directly own any railroad lines until 1907.[6]

---

[6]The parties do not agree on all aspects of petitioner's corporate history, and there is uncertainty in the record on various points. It would appear, however, that the dominant personalities and moving forces behind the Central Pacific Railroad Co. (CP) and the Southern Pacific Railroad Co. (SPRR), and other companies, were Mark Hopkins, Charles Crocker, Leland Stanford, and Collis P. Huntington, known as the "Big Four." Petitioner points out that, except for Mark Hopkins (who died in 1878), the same individuals were participants in the formation of the predecessor Southern Pacific Co., as a holding company, in 1884 and served as directors and officers of that corporation.

Petitioner believes the evidence indicates the Big Four were desirous of attaining a unified rail system. As we have noted in the text, CP operated a rail system comprised of a number of connecting lines in various western States and territories. The rail system grew rapidly and, by 1885, included lines which were leased from other railroad companies and operated by CP. Prior

In 1884, the San Antonio & Aransas Pass Railway Company was organized under the laws of Texas, as were the Houston & Texas Central Railroad Co. in 1889, the Texas Midland Railroad in 1892, and the Houston East & West Texas Railway Co. in 1892. The Iberia & Vermillion Railroad Co. and the Lake Charles & Northern Railroad Co. were organized under the laws of Louisiana in 1891 and 1906, respectively. The San Antonio & Aransas Pass Railway Co. and the Texas Midland Railroad were orginally independent, but the other named railroad companies were operated as part of the rail system described above.

There were additional early consolidations of railroad companies which would become parts of the Southern Pacific Lines. The South Pacific Coast Railway Co., organized under the laws of California in 1876, had consolidated with it a number of railroad companies in 1887. The Arizona & New Mexico Railway Co., organized originally in 1883, had another railroad company consolidated with it in 1911. The South Pacific Coast Railway Co. became part of the Southern Pacific system in 1887. The Arizona & New Mexico Railway Co. was originally independent. Its line came to be operated as part of the petitioner's rail system in 1924, when it became part of the El Paso & Southwestern system.

The El Paso & Southwestern Railroad Co. was organized under the laws of Arizona in 1900. The El Paso & Rock Island Railway Co. was organized under the laws of New Mexico in 1900. These two railroad companies were initially independent and remained so until 1924.

The Arizona Eastern Railroad Co. was organized under the laws of both New Mexico and Arizona in 1904. In 1910, several other railroad companies were consolidated with it. The Arizona Eastern Railroad Co. remained independent until 1910.

The San Diego & Arizona Eastern Railroad Co., organized under the laws of Nevada in 1931, is successor to the San Diego & Arizona Railway Co., organized under the laws of California

---

to 1885, SPRR leased lines to CP, operated its own lines, and leased and operated lines of other railroad companies. Some of these latter companies were subsequently consolidated with SPRR. Petitioner believes these facts indicate that a unified rail system was intended from the outset. Petitioner also states that the SPRR lines were operated in conjunction with the CP lines, and petitioner points out that, after 1885, the predecessor Southern Pacific Co. became the operator (by lease) of the lines of CP, SPRR, and other railroad companies.

in 1906. The San Diego & Arizona Railway Co.'s lines became a separately operated part of the petitioner's rail system upon completion of construction of its lines in 1919.

The Beaverton & Willsburg Railroad Co., organized in 1906, the Coast Line Railway Co., organized in 1905, and the Hanford & Summit Lake Railway Co., organized in 1910, operated their lines in connection with the lines of petitioner's rail system. The Beaverton & Willsburg Railroad Co. sold its assets to the predecessor Southern Pacific Co. in 1916. The Coast Line Railway Co. and the Hanford & Summit Lake Railway Co. sold their assets to the Southern Pacific Railroad Co. in 1916.

The Dawson Railway Co., organized in 1901, the El Paso & Southwestern Railroad Co. of Texas, organized in 1902, the El Paso & Northeastern Railroad Co., organized in 1896, the El Paso & Northeastern Railway Co., organized in 1897, the Alamagordo & Sacramento Mountain Railway Co., organized in 1898, and the Burro Mountain Railroad Co., organized in 1909, all were originally independent and, together with the Arizona & New Mexico Railway Co., El Paso & Southwestern Railroad Co., and El Paso & Rock Island Railway Co., became part of petitioner's rail system in 1924.

The Phoenix & Eastern Railroad Co. was organized in 1901 and was originally independent. Stock control was acquired by the predecessor Southern Pacific Co. in 1907.

The Porterville Northeastern Railway Co., organized in 1910, and the Southern Pacific Terminal Co., organized in 1901, were affiliates from their inception.

The New Mexico & Arizona Railroad Co., organized in 1882, and originally independent, leased its lines to the predecessor Southern Pacific Co. in 1899, and became controlled by the latter company in 1912.

The Inter-California Railway Co. was organized in 1904, and the Tucson & Nogales Railroad Co. was organized in 1909, both as affiliates from their inception. The Dayton-Goose Creek Railway Co. was organized in 1917, as an affiliate. The Franklin & Abbeville Railway Co. was organized March 16, 1903, as an affiliate, but it operated separate from the predecessor Southern Pacific Co. until 1925. The Houston & Shreveport Railroad Co. was organized in 1891, and remained independent until 1899.

In 1925, the Oregon & California Railroad Co. was merged into the predecessor Southern Pacific Co.

In 1934, the Dayton-Goose Creek Railway Co., the Franklin & Abbeville Railway Co., the Galveston, Harrisburg & San Antonio Railway Co., the Houston East & West Texas Railway Co., the Houston & Shreveport Railroad Co., the Houston & Texas Central Railroad Co., the Iberia & Vermillion Railroad Co., the Lake Charles & Northern Railroad Co., the Louisiana Western Railroad Co., the Morgan's Louisiana & Texas Railroad & Steamship Co., the San Antonio & Aransas Pass Railway Co., and the Texas Midland Railroad were merged into the Texas & New Orleans Railroad Co.

Also in 1934, the New Mexico & Arizona Railroad Co. and the Tucson & Nogales Railroad Co. were merged into the Southern Pacific Railroad Co. and the Phoenix & Eastern Railroad Co. and the Porterville Northeastern Railway Co. were merged into the predecessor Southern Pacific Co.

In 1935, the Inter-California Railway Co. sold its railroad assets located in the United States to the predecessor Southern Pacific Co. Also in 1935, the Arizona & New Mexico Railway Co. was merged into the El Paso & Southwestern Railroad Co.

In 1937, the South Pacific Coast Railway Co. was merged into the predecessor Southern Pacific Co. Also in 1937, the Alamagordo & Sacramento Mountain Railway Co. and the El Paso & Northeastern Railroad Co. were merged into the El Paso & Southwestern Railroad Co. Additionally, the El Paso & Northeastern Railroad Co. was merged into the El Paso & Southwestern Railroad Co. of Texas.

At the time of the 1947 reincorporation, the former Southern Pacific Co. received physical assets, including railroad properties of the above-named companies held by the predecessor Southern Pacific Co. Some of those assets had been purchased by the predecessor company. The former Southern Pacific Co. also received all of the outstanding stock in the above-named companies (and other companies) then held by the predecessor Southern Pacific Co.

In 1955, the El Paso & Southwestern Railroad Co., the El Paso & Rock Island Railway Co., and the Arizona Eastern Railroad Co. were merged into the Southern Pacific Railroad Co. Thereafter in 1955, the Southern Pacific Railroad Co. and the Dawson Railway Co. were merged into the former Southern Pacific Co.

All of the remaining railroad companies were ultimately

merged into the former Southern Pacific Co., with the exception of the San Diego & Arizona Eastern Railway Co.

With one exception, the issues are hereinafter dealt with in the order in which they were tried. Unless otherwise indicated, all section references throughout this opinion are to the Internal Revenue Code of 1954, as in effect during the years at issue.

## I. RAPID AMORTIZATION OF FREIGHT CARS[7]

This issue presents the following question for our consideration:

Whether the provisions of section 168 (in effect during the years 1959, 1960, and 1961), providing for the rapid amortization of facilities for which a certificate of necessity has been issued, apply to 4,550 freight cars certified in 1956, but not delivered to petitioner until after February 20, 1958.

### FINDINGS OF FACT

#### *Issue (i)*

Some of the facts relating to this issue have been stipulated by the parties, and those facts, with associated exhibits, are incorporated herein by this reference.

This issue involves freight cars of the former Southern Pacific Co., the Texas & New Orleans Railroad Co., and the Northwestern Pacific Railroad Co., hereinafter sometimes referred to collectively as petitioner.

Among the assets of the predecessor Southern Pacific Co. acquired by the former Southern Pacific Co. in the 1947 reincorporation was all of the stock of Southern Pacific Equipment Co. (SPEC). SPEC had been formed in 1920 for valid business reasons, and its officers and directors were different from petitioner's officers and directors. SPEC was organized primarily to construct, purchase, or otherwise acquire railroad rolling stock and equipment, including locomotives and freight cars, for petitioner. From 1920 on, petitioner (and its predecessor corporation) placed equipment orders for freight cars and locomotives with SPEC, and SPEC either built itself, or purchased from other manufacturers, the ordered equipment. It

---

[7]In trying and briefing this case, this issue was referred to by the parties as "*Issue (i)*."

was customary for SPEC to sublet to outside car builders the construction of freight cars that it was not itself equipped economically to construct.

SPEC built freight cars at shops in Sacramento, Calif., owned by petitioner under contractual arrangements whereby SPEC utilized petitioner's shops and employees and was charged for the use of the petitioner's facilities and labor. SPEC had no separate physical equipment or operating personnel. Petitioner charged the wages of shop employees engaged in work for SPEC against SPEC. SPEC reported no income or loss on its books and records, and it had no retained earnings.

In the period following World War II, the railroad industry, through the Association of American Railroads (AAR), became actively engaged in self-help efforts to increase the nation's freight car capacity in order to satisfy both commercial and defense requirements.

In 1950, Congress added section 124A to the 1939 Code, the predecessor of section 168 of the 1954 Code (discussed later). This legislation provided for the rapid amortization (extending over a 5-year period) of certain facilities which were "certified as necessary in the interest of national defense," and it stimulated the acquisition of freight cars by the railroads. The enactment of section 124A led the AAR to establish a freight car expansion goal. This goal served as an incentive to railroads and other car owners to buy cars, with their own or borrowed funds, to augment the carrying capacity of the fleet. The availability of the amortization benefits furthered the industry program by generating additional cash flow.[8]

By executive order, the President designated the Defense Production Administration (DPA), later the Office of Defense Mobilization (ODM), as the certifying authority for purposes of section 124A of the 1939 Code and section 168 of the 1954 Code.[9] The DPA and later the ODM delegated certain responsibilities with respect to domestic transportation facilities (including

---

[8]Additionally, the rapid amortization provision indirectly affected the financing of the freight cars. Under ICC accounting rules, tax amortization deductions reduce the amount of income tax which is charged against the book earnings of any given year and consequently increase book net income for the year. Book net income is important to a railroad's ability to arrange financing.

[9]See 4 J. Mertens, Law of Federal Income Taxation, sec. 23.131, n. 81 (1973).

freight cars) to the Defense Transport Administration, until it ceased to exist June 30, 1955, after which the Interstate Commerce Commission (ICC) became the delegate agency administering the Defense Mobilization program with respect to domestic transportation facilities.

On April 15, 1952, the DPA announced a freight car expansion goal (Number 68) to provide 436,000 freight cars by July 1, 1954. This goal was designed to meet 1954 traffic forecasts under conditions of partial mobilization. While defense requirements for additional cars were given a great deal of emphasis, consideration was also given to civilian requirements. All freight cars became part of a national pool[10] which served the civilian economy and, in turn, fulfilled the needs of the mobilization programs. However, to allow for the fact that some cars would have a use beyond the defense mobilization requirements, the certifying authorities often granted necessity certificates for only a portion of the cost of the new cars (85 percent in 1954). The establishment of the expansion goal by DPA permitted completion of action on applications for certificates of necessity allowing for rapid tax amortization. Certification, however, was only granted to cars whose construction began before the specified closing date.

The expansion goal was not achieved by July 1, 1954. In revision 1 (issued March 24, 1954), revision 2 (issued July 29, 1954), and revision 3 (issued January 14, 1955), the ODM extended the expansion goal for railroad freight cars to make eligible cars on which construction would begin on or before December 31, 1954, then June 30, 1955, and finally December 31, 1955.

Freight car orders placed with both carbuilders' shops and with railroad and private-line shops were at a low level in 1954 because railroad freight revenues were down, and there were indications that the shortage would become even more acute in the months ahead. The Interstate Commerce Commission was urging the railroads and car users to be more efficient in the use of existing equipment and to obtain more cars and had solicited and received the aid of the railroad associations in its efforts.

---

[10]A feature peculiar to railroad freight cars is that regardless of ownership they are part of a national freight car pool. Freight cars in service are interchanged among all the railroads, rather than unloaded and reloaded at junction points.

By June 1, 1955, the backlog of freight car orders was only 16,886 cars. In view of complaints about car shortages, a special meeting of the Association of American Railroads was held on June 24, 1955, in Chicago, to consider plans for increasing the railroad car fleet and improving its utilization.

In July 1955, a subcommittee of the Committee on Government Operations of the House of Representatives held hearings on the tax amortization program and the freight car shortage. The U.S. Senate's Interstate and Foreign Commerce Committee held similar hearings. Financial factors and an unfavorable allocation of steel to car builders were pointed to as a cause for the failure of the railroads to meet the 436,000-car expansion goal. It was also pointed out that the elimination of the rapid amortization tax incentive could result in a substantial reduction of new car orders.

On August 11, 1955, the ODM suspended issuing certificates of necessity for freight cars, while reviewing the freight car goal to determine whether adequate productive capacity existed to meet defense mobilization needs. The certification program was reinstated in late 1955, which helped induce the railroads to increase their orders for freight cars substantially. There was roughly a tripling of the number of cars on order. Many of the carbuilders were not prepared for these increased orders.

The certifying authorities considered carbuilders, both in-house and independent, to have a capacity to produce approximately 100,000 freight cars per year. This estimate assumed ideal or optimum conditions. However, it was understood by ODM that while the carbuilding industry could be said to have a capacity of 100,000 cars per year in terms of past actual production, the capability for any given year depended on many factors. For example, the product mix, i.e., the type or types of cars to be built, affected a builder's capability to produce. Some builders turned out only certain types of cars and might not be able to produce other types. The availability of car wheel sets, and components, generally, could have an effect on the ability to complete construction of cars. Some plants were not set up for freight car production, and some employees, although available, were not adequately trained. Strikes by employees of the builders or by employees of suppliers of components and materials (such as steel strikes in 1956 and 1959) could end production after it had begun. These factors could and, in

varying degrees, did affect the production capabilities of the carbuilders during this period.

The lead time from commencement of work on order to delivery of a freight car could be as much as 27 months in the case of new types of cars. The new car types would involve some lead time first for research and development and engineering and design work, and after that, there would be additional lead time necessary for procurement and production.

On September 29, 1955, the ODM announced the resumption of certification of railroad freight cars within the expansion goal (Number 68), and in revision 4, issued on the same date, modified that goal to include "cars for which firm orders have been placed, or, in the case of company built cars, for which construction has been authorized on or before December 31, 1955." On the same date, the ODM issued Defense Mobilization Order III–1, "Policy For The Establishment Of Expansion Goals For Tax Amortization," the first paragraph of which read:

1. Expansion goals are for the purpose of establishing a quantitative limit of expansion which may be covered by certificates of necessity.

On October 4, 1955, Commissioner Owen Clarke of the Interstate Commerce Commission wrote to the Association of American Railroads requesting that organization to assist in advising the railroad industry about the effect of the December 31, 1955, termination date on the issuance of certificates of necessity for freight car acquisitions. His letter stated the following regarding the requirements for issuing certificates of necessity:

Applications must be filed on or before December 31, 1955. Where the applicant is purchasing from a freight car builder, a firm order must be placed prior to December 31, 1955. This order must provide for the earliest possible delivery. Certificates will not be issued for freight cars where the applicant's order calls for delayed delivery. The Appendix "A" must bear the following notation or its equivalent:

"Firm order for the delivery of these _____ was placed on
                                        (Number of cases)
_____ with the builder, providing for delivery at the earliest
(Date of firm order)
possible date"

Where the applicant is constructing freight cars in its own shops, the Board of Directors must have authorized, prior to December 31, 1955, the construction of the freight cars covered by the application, such construction to begin at the

earliest possible date and to proceed without delay. In this case, the Appendix "A" will bear the following notation, or its equivalent:

"The Board of Directors authorized construction of _____
(Number of cars)
covered by the application on _____ , such construction to proceed without
(Date)
delay."

The roads [sic] should be advised that delays of delivery or construction, in and of themselves, will not invalidate a certificate but if such delays are the result of the applicant's action, which could have been avoided, such action will invalidate the certificate.

As of November 1955, the industry program to acquire freight cars, assisted by the Government's certification program, resulted in a backlog of orders for freight cars worth over $1 billion, the largest such backlog in the history of the railroad industry. Because of the obstacles to getting the cars on order manufactured and delivered, particularly the tremendous difficulty of obtaining steel at that time, it was expected by the Association of American Railroads that delivery of the cars could not be expected until 1957 at the earliest and might take longer.

As of December 31, 1955, there were 147,320 freight cars on order, and pending applications from railroads for necessity certificates covered 59,305 cars in excess of the 436,000 freight car expansion goal. On the recommendation of the Interstate Commerce Commission, the numerical limit of the ODM's freight car goal was increased to cover the 59,305 cars (which were, on December 31, 1955, either on firm order or authorized for construction). The goal was increased by ODM to 495,000 cars on April 27, 1956. At this time, both the carbuilders and ICC felt that even under optimum conditions, with construction proceeding smoothly without interruption because of material shortages and strikes, it would take approximately 2 years to produce the certified cars. If there were subsequent delaying events over which a railroad or the builders had no control, both the builders and the ICC believed completion of the freight car production program would take longer.

In the latter part of 1955, petitioner was advised by the Association of American Railroads that it should place firm orders for new freight cars by the end of the year if it wished to have the benefits of rapid amortization. Petitioner was advised of the number of freight cars that AAR studies indicated it

should acquire (over and above what petitioner then owned or had on order). The "seriousness of the existing and prospective shortage of freight cars" was emphasized. Petitioner was advised that further extension of the rapid amortization program for new freight car acquisitions was doubtful.

In October 1955, petitioner completed its own study of its freight car needs, which differed somewhat with the recommendations of the AAR but gave petitioner its own figures for freight car shortages.

On November 17, 1955, petitioner's board of directors approved acquisition of 10,700 new freight cars (6,600 boxcars, 1,050 flatcars, 1,550 gondolas, 500 covered hoppers, and 1,000 open hoppers) at a total cost originally estimated at $90,197,500, subject to escalator clauses to cover increases or decreases in costs of labor and materials. The board approved the president's proposal to place a firm order immediately with Southern Pacific Equipment Co. for acquisition of these 10,700 cars. The availability of rapid tax amortization served as an inducement to petitioner in the placement of these orders.

By purchase orders dated November 17, 1955, petitioner ordered the aforesaid 10,700 freight cars from SPEC. The purchase orders did not specify costs or delivery dates but did specify: "Cars to be delivered at the earliest possible date."

On November 18, 1955, the board of directors of SPEC accepted the orders from petitioner for the construction of 10,700 freight cars, and authorized and empowered the officers of SPEC to place orders for all necessary materials and supplies required for and entering into the construction of the cars to be constructed by SPEC. Orders were "to be placed with the company or companies presenting the bid most favorable to this Company, considering the lowest price or prices for the material and supplies and the ability and reliability of the bidder or bidders, financially or otherwise, to deliver the property."

On November 21, 1955, petitioner submitted to the Office of Defense Mobilization its application No. 97 for a necessity certificate, dated November 18, 1955, with respect to the above-described 10,700 freight cars. Among other things, the application stated:

The facilities described in Appendix A, consisting of 10,700 freight cars, are necessary to enable applicant more adequately to meet the present and prospective transportation requirements of the Armed Forces and national

defense production, and the essential needs of the civilian economy as well. It is estimated these cars will cost approximately $90,197,500. Without adequate railroad facilities, the industrial economy of the nation, upon which its security so vitally depends, would be seriously curtailed, and the ability of the Armed Forces to move men and material to strategic areas and points of need with promptness and efficiency would be seriously impeded.

      \*      \*      \*      \*      \*      \*      \*

The Board of Directors of applicant authorized construction of the 10,700 freight cars covered by the within application on November 17, 1955, such construction to proceed without delay, and on November 18, 1955, firm order for the delivery of these 10,700 freight cars was placed with Southern Pacific Equipment Company, the builder, providing for deliveries at the earliest possible dates.

      \*      \*      \*      \*      \*      \*      \*

\* \* \* The facilities described in Appendix A are all needed to enable applicant to meet the demands for railroad transportation incident to the national defense program and to place its transportation plant in a state of readiness for any eventuality, including full mobilization.

      \*      \*      \*      \*      \*      \*      \*

The facilities described in Appendix A are not replacements in any proper sense of the term. Under normal, peacetime conditions, and in the absence of the increased demands for transportation due to the defense effort and the necessity of maintaining the large Armed Forces required by today's unsettled international situation, such facilities would not be essential to enable applicant to meet all reasonable demands for transportation.

On December 30, 1955, petitioner, by letter, amended its application to increase the total estimated cost for the 10,700 cars to $91,435,000.

In practice, the certifying authorities did not deny timely applications for certificates of necessity on freight cars when the acquisitions were consistent with the mobilization goal, although its practice was not to certify cars ordered primarily for normal replacement purposes. In investigating an application for a certificate, the ODM, after a review of the application, referred it to the delegate agency with the requisite expertise for a report and recommendation. If it appeared that the applicant was carrying out the purposes for which the expansion goal had been established, the ODM certified the application. The ODM regarded the application and its attachments as an integral part of a certificate of necessity.

On February 24, 1956, the ODM issued Certificate of Necessity TA–NC–30812 to petitioner. This certificate read in part:

Pursuant to Section 168 of the Internal Revenue Code * * * and in response to application No. TA–30812 filed on November 21, 1955,

It Is Hereby Certified that subject to the conditions herein below set forth the facilities (excluding land) described in the attached Appendix A * * * are necessary in the interest of national defense during the emergency period, and that 85% of the cost of construction, reconstruction, erection, installation or acquisition thereof after December 31, 1949, is attributable to defense purposes.

Attached to the certificate of necessity was "Appendix A," which was identical to a similarly designated appendix to petitioner's application of November 21, 1955, with the exception of certain handwritten cost figures. However, the following language printed on the face of the certificate, which was a standard form used before the middle of 1955, was crossed off:

As to the described facilities which are to be constructed, reconstructed, erected, or installed, this certificate shall be valid only with respect to those facilities the construction, reconstruction, erection, or installation of which is begun before the expiration of 6 months after the date of this certificate; and as to the described facilities which are to be acquired, or which are to be acquired and installed, this certificate shall be valid only with respect to those facilities acquired or contracted for before the expiration of 6 months after the date of this certificate.

In its place, the following paragraph was typed in:

As to the described facilities which are to be constructed by the taxpayer, this certificate shall be valid only with respect to those facilities the construction of which has been authorized on or before December 31, 1955; and as to the described facilities which are to be acquired, this certificate shall be valid only with respect to those facilities acquired or for which firm orders are placed on or before December 31, 1955.

The ODM had eliminated the 6-month time condition in certificates of necessity issued petitioner and other railroads for administrative convenience because due to shortages of material, work stoppages, and the like, production could not be started within 6 months, and there had been numerous requests for extensions of time. As a result of this action by the ODM, there was no definite time limit specified in the certificates of necessity within which cars had to be acquired. In place of the old 6-month rule, ODM expected that cars would be produced as quickly as reasonably possible under the prevailing circumstances.

The certifying officer who issued certificate TA–NC–30812 expected petitioner to receive the 10,700 certified cars in

accordance with the normal industry practices for carbuilding and delivery. The ODM would not have issued the necessity certificate to petitioner if its application specifically called for delayed delivery since delayed deliveries were merely for the convenience of an individual applicant and the ODM sought to avoid unequal treatment within a given industry.

While it was not intended to penalize a railroad for delays over which it had no control, neither the ODM nor any delegate agency ever published any rules as to which delays in taking delivery would be regarded as ones which could have been avoided. Nor were any communications ever addressed to any applicants, individually or as a class, giving advice as to what conduct would be considered reasonable under the prescribed general rules.

In the beginning, petitioner estimated it could take 5 years to construct and acquire the 10,700 cars described in certificate TA–NC–30812 in view of the existing backlog and the prevailing conditions. There was no requirement that petitioner apprise the ODM of this estimate, and in its application of November 21, 1955, petitioner did not do so.

As of December 31, 1955, SPEC had a backlog of 13,937 freight cars on order from petitioner (the 10,700 cars ordered November 17, 1955, plus 3,237 freight cars previously ordered). The 3,237 freight cars, previously ordered by petitioner from SPEC, also were, or became, covered by necessity certificates.

The orders for 10,700 freight cars represented about 3 to 3½ times the normal acquisitions by petitioner in an average year. The 10,700 freight cars were ordered because petitioner was asked by the AAR and the ICC to help increase the nation's freight car fleet, and it was to petitioner's advantage to comply with this request while the certification program was operational. Were it not for this request, some of these freight cars might never have been acquired since they differed to some extent from the types of cars required by petitioner's customers.

The orders to SPEC for 10,700 cars also called for a much greater number of cars at one time than was customary in ordering freight cars. Ordinarily, petitioner placed freight car orders with outside builders in 200–, 300–, or 400–car lots.

As of the end of 1955, it was expected to take SPEC about a year to complete the backlog of 3,237 cars which were already on order before the placement of the orders for the 10,700 cars

covered by certificate TA–NC–30812. Upon completion of the back order, it was anticipated that SPEC would proceed with construction of all of the 10,700 cars except for those cars not suitable for construction at SPEC's Sacramento shops. Whether or not more rapid deliveries could be obtained by spreading petitioner's orders among several carbuilders was dependent upon their backlog of orders from other railroads and the availability of labor and materials. At the end of 1955, the total order national backlog was 147,320 cars.

The procedures followed in the placing of orders by petitioner with SPEC were, when the process was completed, essentially similar to the procedures followed in placing orders with outside manufacturers. The orders placed by petitioner with SPEC for the 10,700 certified cars did not contain certain provisions that are standard in freight car orders placed with independent carbuilders (e.g., provisions regarding procedures for determining price, regarding car specifications, or regarding delivery dates). No bids were obtained before these orders were placed, and costs were based on estimates furnished by petitioner's purchasing department. However, the equipment orders placed by petitioner with SPEC in November 1955 were in accordance with petitioner's established practices. Under petitioner's procedures, SPEC would follow petitioner's specifications when it was building the car itself; and in those instances when SPEC was subcontracting construction, it was SPEC which obtained bids and placed detailed orders with the outside car manufacturers. It was anticipated at the time the orders were placed that SPEC would build those cars which it was physically set up to build (e.g., boxcars) and subcontract the building of other cars.

On March 2, 1956, in a letter supporting his recommendation to increase the goal, Commissioner Clarke advised the ODM that the railroads had been responding to the "dire need for cars" and had filed applications for certifications covering car construction which exceeded the ODM goal by 59,305 cars. He pointed out that the shortage of steelplate was having an adverse effect on freight car production, although he anticipated greater allocations to the builders. Assuming the requisite steel to be available, Commissioner Clarke believed "the backlog of orders could be liquidated within 18 months." He stated he was convinced that, unless certification (and rapid tax amortization) were granted to the 59,305 cars exceeding the goal, freight car

production would "materially decrease." Commissioner Clarke's estimate of production time assumed optimum conditions.

On March 28, 1956, Senator Richard L. Neuberger of Oregon wrote the ODM, asking for data regarding the "actual increase in capacity which will result from the purchase of the cars for which the Southern Pacific Company was granted its certificate." The ODM's reply to Senator Neuberger, dated May 18, 1956, stated petitioner had reported "that on January 1, 1956 it owned 75,749 cars * * * . By the end of 1957, when 10,511 new cars will have been received, the Southern Pacific Co.'s fleet will have increased to 82,346 cars after the retirement and reclassification of 3814 cars. This will represent a gain of 6597 cars, or nearly 9 percent, in the two years of acquisition."

On April 27, 1956, the ODM increased the freight car goal to 495,000 cars. This increase permitted the ODM to certify as eligible for amortization all pending applications covering the purchase of freight cars for which firm orders were placed or construction authorized by December 31, 1955. No further applications would be accepted, and the ODM closed this goal on April 27, 1956.

On May 7, 1956, Victor E. Cooley, Deputy Director of the ODM, testified before the Senate Interstate and Foreign Commerce Committee that, in view of the fact that the applications for certification had exceeded the previous 436,000–car goal by nearly 60,000, the ODM had adopted a new goal of 495,000 cars to include all of the applications. He pointed out that there were 147,000 cars on order with the builders, "but it will be at least a year and a half before all can be completed." He predicted "a net figure of about 2,100,000 available cars toward the end of 1957." Deputy Director Cooley's estimate of production time assumed ideal conditions.

During 1956, a total of 3,068 freight cars were acquired by petitioner, all of them covered by certificates of necessity. Of that number, 180 were part of the 10,700 cars covered by certificate TA–NC–30812; the remaining cars were part of the existing backlog when the 10,700 cars were ordered and were covered by other necessity certificates. Because of the backlog of previously ordered cars and because of disruptions to production such as that caused by a steel strike in 1956, SPEC and the outside builders, to which SPEC had sublet some of its work,

were not able to start the construction of any significant quantity of the 10,700 freight cars until 1957.

In 1957, petitioner took delivery of 4,990 freight cars from SPEC, most of them constructed by that company; 4,491 of those 4,990 freight cars were part of the 10,700 cars, and almost all of the rest were covered by previously issued certificates of necessity.

Petitioner's board of directors held a meeting on February 20, 1958. For the information of the directors, a memorandum was prepared which referred to "the substantial falling off in traffic volume" and suggested discontinuing or deferring certain activities. The memorandum recommended that petitioner defer the acquisition of 4,550 of the freight cars covered by certificate TA–NC–30812. The recommendations contained in this informational document did not receive the approval of the directors.[11] Shortly after the meeting, petitioner engaged in activities directly contrary to the courses of action proposed in the memorandum. The directors made no decision to delay construction of the 4,550 freight cars,[12] and petitioner continued to acquire the certified cars.

Petitioner's executive department, in reviewing proposals for acquisition of freight cars, had to consider them in the light of all capital programs. As of 1955, for example, petitioner had to consider other very costly programs already undertaken such as the dieselization of the railroad (acquisition of diesel locomotives to replace the old steam locomotives) and the construction of the Great Salt Lake fill (a certified roadway project). And there were various other projects, or planned projects, to improve the roadway properties. Specific programs for capital expenditures, such as the program to acquire the 10,700 freight cars, were presented to the directors for approval only if the executive department had concluded that funds would be available.

Petitioner had to finance most of its equipment acquisitions and other capital expenditures because as a railroad it had a very slow capital turnover. It generated cash slowly and did not have enough cash to cover the capital expenditures. Debt was

---

[11]The evidence does not establish that the directors ever saw the memorandum or discussed its contents.

[12]As discussed subsequently, it is respondent's position that these 4,550 freight cars do not fall within the purview of sec. 168.

maturing each year and had to be paid in cash. Cash had to be paid annually into sinking funds of mortgage bonds. And roughly $10 million cash was required per year to make the downpayments in financing equipment acquisitions. Finally, cash was needed each year to pay dividends.[13]

Before any freight cars could be delivered, petitioner had to complete its financial arrangements so that payment could be made to the carbuilder. Generally, about 80 percent of the purchase price was financed; at least 20 percent of the cost had to be paid at once with cash funds of the company to make equipment trust certificates legal for certain types of investors.

The purchase of freight cars by petitioner from SPEC entailed customary financing through both equipment trusts and conditional sales, as in the case of purchases from outsiders. There was no effort by petitioner to arrange financing for all of the 10,700 certified cars at the beginning of the program, since it was not feasible to arrange financing for deliveries to occur several years later.

During the period 1956 to 1962, petitioner was advised by investment bankers that, generally, petitioner should not try to finance more than about $10 million of equipment acquisitions quarterly (about $40 million per year) because a great number of equipment trust obligations were being sold by other railroads and there was limited demand for them. On those occasions when petitioner financed more than $40 million of equipment acquisitions in a given year, the additional financing was managed principally by the use of conditional sales agreements. Petitioner's inability to arrange financing at one time for all of the freight cars on order had the effect of spreading out the construction of all cars on order.

In 1956, Moody's Investors Service lowered its rating for petitioner's equipment trust certificates from Aa to A. In the financial community and among investors, such a reduction is regarded as a warning signal about petitioner's credit and a cause of concern to potential investors, as to the security of petitioner's certificates. It thus became necessary for petitioner

---

[13]The payment of dividends by petitioner was important to its ability to borrow money. Like other capital intensive utilities, railroads have to borrow money in large quantities, and the payment of dividends supports the equity base upon which the ability to borrow money is dependent.

to avoid overcommitment and to strengthen its financial position.

In 1957, petitioner's treasurer, John B. Reid, conducted a study of petitioner's financial condition. He was concerned that petitioner's certificates might be removed from various States' lists of lawful investments for institutional lenders. He was also concerned that the credit rating reduction was causing an increase in interest rates, adding to petitioner's costs of borrowing. Further, the credit rating was believed to have an adverse effect on the popularity of petitioner's stock, and the resultant decrease in equity was viewed as indirectly affecting petitioner's ability to finance projects.

From 1946 through 1957, petitioner's debt (including fixed charges), particularly petitioner's debt for new equipment acquisitions, had increased substantially. Reid concluded that petitioner's credit problems could be solved by reducing fixed charges on these debts and that the only practical way to accomplish such a reduction was to keep new borrowing to a minimum until earnings increased in response to the capital improvements that had already been made.

From 1956–58, petitioner's annual freight revenues dropped by about $25 million, an adverse financial development which had not been anticipated in 1955 when petitioner approved the ordering of the 10,700 cars. Restricted financial capacity and shipper demands for other types of freight cars[14] led petitioner to give a higher priority to some noncertified cars, although petitioner continued to acquire freight cars covered by certificate TA–NC–30812. It was essential for the successful operation of petitioner's business that it respond to the demands of its shippers for the new types of freight cars being developed. Although petitioner's freight revenues did not begin to improve until late 1958, petitioner continued to increase its ownership of freight cars and honor its commitment to help increase the industry's freight car fleet. Petitioner never canceled, deferred, or in any manner modified the orders it had placed with SPEC.

Petitioner's earnings remained at a low level for several years, and there was no significant upward trend discernible until 1962.

---

[14]Starting in 1957 or 1958, petitioner's shipping customers began to demand highly specialized types of cars, such as trailer flatcars, covered hoppers, open hoppers, insulated boxcars, and ore cars.

Indebtedness in relation to earnings remained on the high side, as evidenced by the fact that the reduced rating on petitioner's equipment trust certificates was continued until, in late 1962, it was increased to Aa. Petitioner had borrowed as much as it could on its low level of earnings without further weakening the company's position. During the period 1956 through 1963, petitioner spent approximately $375 million for equipment acquisitions, of which about $285 million (approximately 75 percent of the total cost) was financed. The balance was paid for in cash. In view of the level of earnings during 1956 through 1961, petitioner could not prudently have financed the acquisition of more equipment of all types than it did during those years. Petitioner's cash flow would have been adequate to finance the acquisition during 1956 and 1957 of 4,550 freight cars acquired after February 20, 1958, but the use of the cash for that purpose would have prevented expenditures for other significant purposes. Because of the credit situation, it would not have been financially prudent for petitioner to have arranged for the acquisition at an earlier date of the 4,550 cars. While petitioner also acquired noncertified cars during the period 1956 through 1961, all such cars were ordered by petitioner from outside manufacturers, with no interruption of the production of those of the 10,700 cars being constructed by SPEC.

From 1956 through 1963, petitioner acquired 21,206 certified and noncertified cars at a total cost of $262,140,360. The yearly acquisitions were as follows:

| | | | | Certificate TA–NC–30812 | |
| | Total cars | Total certified | Total | Cars for which amortization: | |
| Year | acquired | cars | cars | Allowed | Disallowed[1] |
|---|---|---|---|---|---|
| 1956 | 3,068 | 3,068 | 180 | 180 | --- |
| 1957 | 4,990 | 4,840 | 4,491 | 4,491 | --- |
| 1958 | 2,349 | 1,529 | 1,529 | 1,479 | 50 |
| 1959 | 1,500 | 1,300 | 1,300 | --- | 1,300 |
| 1960 | 1,965 | 1,100 | 1,100 | --- | 1,100 |
| 1961 | 1,607 | 1,100 | 1,100 | --- | 1,100 |
| 1962 | 2,146 | --- | --- | --- | --- |
| 1963 | 3,581 | 1,000 | 1,000 | --- | 1,000 |
| | 21,206 | 13,937 | 10,700 | 6,150 | [2]4,550 |

[1] This chart reflects respondent's final position, adopted by trial time, that 4,550 of the freight cars covered by certificate TA–NC–30812 cannot benefit from the rapid amortization provisions of sec. 168.

[2] With regard to these cars, the cost basis as to which respondent has disallowed amortization totals $461,000 for the 50 cars delivered in 1958, $15,356,000 for the 1,300 cars delivered in 1959, $13,101,500 for the 1,100 cars delivered in 1960, $13,312,300 for the 1,100 cars delivered in 1961, and $8,464,200 for the 1,000 cars delivered in 1963.

During 1957 and 1958 there were indications that, because of increased labor and operating costs at the Sacramento plant, and the fact that outside carbuilders were beginning to solicit business at decreased prices, SPEC was becoming noncompetitive with the outside carbuilders. Because the estimates showed costs of manufacturing at the Sacramento shops of the remainder of the 10,700 cars would be greater than the cost of acquiring the cars from outside builders, SPEC decided to subcontract the remainder to the independent carbuilders. The first such subcontracting occurred in May 1958. SPEC stopped constructing the certified freight cars at the Sacramento shops in May 1958. SPEC, itself, built 3,850 of the 10,700 freight cars at the Sacramento shops. The remaining 6,850 were manufactured by other carbuilders.

All of the 4,550 cars here in issue were built by outside carbuilders under subcontracts made by SPEC after February 20, 1958. Details of the transactions involving these 4,550 cars that were a part of the 10,700 certificated cars are as follows:

| Order No. | No. of cars | Month subcontracting authorized and/or ratified | Dates delivered | Builder |
|---|---|---|---|---|
| *1958* | | | | |
| P–3117–A | 50 | 5/58 | 7/58–9/58 | Texas & New Orleans RR Co. |
| Total 1958 | 50 | | | |
| *1959* | | | | |
| P–3110 | 100 | 11/58 | 2/59–3/59 | General American Transportation Co. |
| P–3113–B | 500 | 1/59 | 5/59–9/59 | Pacific Car & Foundry |
| P–3119 | 700 | 1/59 | 9/59–12/59 | Pacific Car & Foundry |
| Total 1959 | 1,300 | | | |

*1960*

| | | | | |
|---|---|---|---|---|
| P–3119–A | 100 | 1/59 | 1/60 | Pacific Car & Foundry |
| P–3119–B | 500 | 4/59 | 2/60– 4/60 | Pacific Car & Foundry |
| P–3119–C | 500 | 4/59 | 8/60–10/60 | Pacific Car & Foundry |
| Total 1960 | 1,100 | | | |

*1961*

| | | | | |
|---|---|---|---|---|
| P–3119–D | 600 | 7/60 | 1/61– 3/61 | Pacific Car & Foundry |
| P–3105 | 500 | 7/60 | 4/61–12/61 | Pacific Car & Foundry |
| Total 1961 | 1,100 | | | |

*1963*

| | | | | |
|---|---|---|---|---|
| P–3117 | 400 | 10/62–2/63 | 3/63– 8/63 | Gunderson Bros. |
| P–3117–20 | 350 | 7/63–8/63 | 8/63–11/63 | Gunderson Bros. |
| P–3115–21 | 250 | 2/63–3/63 | 11/63–12/63 | Bethlehem Steel Co. |
| Total 1963 | 1,000 | | | |

On April 8, 1959, petitioner forwarded to the Office of Defense Mobilization a suggested scope amendment of necessity certificate TA–NC–30812 covering the 10,700 freight cars at issue. Petitioner desired to amend the certificate to reflect (1) an increase in estimated expenditures due to increased labor and materials costs and (2) some mechanical changes to some cars, such as the addition of hydra-cushion underframes, the deletion of auto loaders, and changes in length of cars. The scope amendment was approved by the ODM on June 16, 1959.[15]

On January 30, 1963, petitioner forwarded to the Office of Emergency Planning, successor to the Office of Defense Mobilization, a further suggested scope amendment of necessity certificate TA–NC–30812 covering the 10,700 cars. Petitioner desired to amend the certificate to substitute 250 drop-door hopper cars for 250 drop-bottom gondola cars. The major differences between the two types of cars were the dimensions (length and height) and the weight-carrying capacity. Weight-carrying capacity had to be "increased due to requirements of

---

[15]In processing scope amendments, the ODM was not concerned with the cost of facilities because the investment was being made with private capital and would be reviewed by the Internal Revenue Service in the process of auditing the tax return. Extensions of time, however, required a complete reevaluation. The ODM would determine whether the extension would serve to accomplish its objectives or put the applicant in a preferential position. The ODM never attempted to verify actual acquisition dates because it did not have the staff for this function. It relied on delegate agencies. Ultimately, the Internal Revenue Service would verify time limits on acquired certified facilities in the process of auditing tax returns.

shippers for cars capable of carrying heavier loads." This scope amendment was approved by the Office of Emergency Planning on August 12, 1963.

In approving the above scope amendments, the Office of Defense Mobilization and Office of Emergency Planning issued letters to respondent each of which included a paragraph which said the amendment was "not to be construed as extending the time within which construction is to be begun or acquisition effected beyond the time limit set forth in the original certificate." This paragraph was standard language that was included in all cases where an extension of time was not the subject of the scope amendment.

Petitioner, not having received any indication from any source as to a specific time limit on the construction of the cars at issue, viewed the granting of the scope amendments as evidencing that the certifying authorities believed reasonable progress had been made by petitioner to the dates of the amendments.

On its returns for 1959–61 and later years, petitioner claimed deductions for amortization of emergency facilities, based on 85 percent of the cost of 10,700 freight cars described in Certificate of Necessity TA–NC–30812, as amended. In the statutory notice of deficiency, respondent disallowed these deductions, in part. The explanation for this adjustment read:

It is determined that 5,250 freight cars out of a total of 10,700 cars purchased by you do not qualify for emergency amortization under Certificate of Necessity (ODM–78) No. TA–N–C–30812, because firm orders were not placed for their acquisition prior to December 31, 1955, as required by the Certificate, and your Board of Directors deferred acquisition of a substantial portion of the cars in contravention of the intent of the Certificate and the directives of the Office of Defense Mobilization.

In his pretrial statement, respondent conceded this adjustment with respect to 700 cars. As a result, respondent now contests the amortization of only 4,550 freight cars, representing those of the 10,700 certified cars the delivery of which, respondent claims, was deferred by petitioner "to and beyond February 20, 1958."[16]

---

[16]The instant case (docket No. 3493–69) involves petitioner's taxable years 1959, 1960, and 1961. The question presented by this issue also arises in petitioner's taxable years 1962 through 1968, which years are covered by petitions filed in docket Nos. 7501–72 and 7502–72 (1962–65) and in docket Nos. 8646–72, 8647–72, and 8648–72 (1966–68). For the reasons given in our opinion, our fact findings herein cover matters occurring subsequent to the years involved in docket No. 3493–69.

OPINION

*Issue (i)*

In its consolidated income tax returns for the years 1959, 1960, and 1961, petitioner claimed deductions for amortization of emergency facilities under section 168, which, during the years at issue, provided in pertinent part:

Every person, at his election, shall be entitled to a deduction with respect to the amortization of the adjusted basis * * * of any emergency facility (as defined in subsection (d)), based on a period of 60 months. * * * The amortization deduction above provided with respect to any month shall, except to the extent provided in subsection (f), be in lieu of the depreciation deduction with respect to such facility for such month provided by section 167. * * *

Section 168(d)(1) defined "emergency facility" as "any facility, land, building, machinery, or equipment, or any part thereof, the construction, reconstruction, erection, installation, or acquisition of which was completed after December 31, 1949, and with respect to which a certificate under subsection (e) has been made."

Section 168(e)(1) provided:

In the case of a certificate made on or before August 22, 1957, there shall be included only so much of the amount of the adjusted basis of such facility * * * as is properly attributable to such construction, reconstruction, erection, installation, or acquisition after December 31, 1949, as the certifying authority, designated by the President by Executive Order has certified as necessary in the interest of national defense during the emergency period, and only such portion of such amount as such authority has certified as attributable to defense purposes. Such certification shall be under such regulations as may be prescribed from time to time by such certifying authority with the approval of the President. * * *

In 1955, petitioner had applied to the certifying authority, in this instance the Office of Defense Mobilization (ODM), for a certificate of necessity for the acquisition of 10,700 freight cars. This certificate was issued by the ODM in 1956 (certificate TA–NC–30812), and the 10,700 freight cars were constructed and delivered to petitioner during the period 1956–63. Petitioner claims that the rapid amortization provisions of section 168 (in effect during the years at issue) apply to each of the 10,700 cars. Respondent contends that those provisions do not apply to 4,550

freight cars (out of the certified 10,700) which were constructed and delivered after February 20, 1958.[17] According to respondent, the acquisition of cars after December 31, 1957, did not comply with the terms of the certification, and hence, the 4,550 cars were not covered thereby.[18]

Neither section 168 nor the congressional committee reports[19] which accompanied its enactment deal with the question of how promptly a certified facility must be acquired.[20] The same may be said of the immediate predecessor of section 168 under the 1939 Code, section 124A, and the committee reports relating to that provision.[21] And this pattern also holds true for section 124, I.R.C. 1939, a provision similar to section 124A.[22]

The parties are in accord that in order to qualify for a section 168 deduction, a taxpayer must receive a determination from a certifying authority that the facility is necessary in the interest of national defense. See sec. 168(e)(1); cf. *United States v. Allen-Bradley Co.*, 352 U.S. 306 (1957).[23] The parties agree that only

---

[17]Of these 4,550 freight cars, 1,000 were acquired by petitioner in 1963, subsequent to the taxable years at issue (1959–61). As we point out below in our opinion, both parties tried and argued this question as though the eligibility of these 1,000 cars for amortization were at issue herein.

[18]In the notice of deficiency, respondent disallowed amortization on 5,250 cars. In a pretrial report and on brief, respondent conceded that amortization is allowable on an additional 700 cars. We can find no explanation for this concession in the record, respondent explaining on brief that the reason is irrelevant. Petitioner suggested in its pretrial report that the additional 700 cars which were apparently delivered sometime in 1958 were delivered on orders that were subcontracted by SPEC prior to Dec. 31, 1957.

[19]See the congressional committee reports for the 1954 Code: H. Rept. 1337, 83d Cong., 2d Sess. A53, and S. Rept. 1622, 83d Cong., 2d Sess. 206.

The committee reports state that sec. 168, I.R.C. 1954, corresponds to, and makes no substantive change in, sec. 124A, I.R.C. 1939. Sec. 168 was amended in 1957 and 1958 and was repealed, effective Jan. 1, 1977. The repeal of sec. 168, however, does not prevent petitioner from taking the amortization deductions sought herein. See sec. 1951(b)(4)(B), Pub. L. 94–455 (Tax Reform Act of 1976).

[20]Nor do the regulations promulgated under sec. 168 give any consideration to this question. See secs. 1.168–1 through 1.168–7, Income Tax Regs.

[21]See S. Rept. 2375, 81st Cong., 2d Sess. (1950), 1950–2 C.B. 483, 526. (Sec. 124A, I.R.C. 1939, was introduced in the Senate.)

[22]Sec. 124, I.R.C. 1939, which authorized the amortization of emergency facilities during World War II, served as a basis for sec. 124A, I.R.C. 1939. See S. Rept. 2375, *supra*, 1950–2 C.B. at 526. Sec. 124 was added to the 1939 Code by the Second Revenue Act of 1940 (76th Cong., 3d Sess.). The congressional committee reports associated with sec. 124 also do not consider the matter of the timeliness of the acquisitions. See H. Rept. 2894, 76th Cong., 3d Sess. (1940), 1940–2 C.B. 496, 523–526; S. Rept. 2114, 76th Cong., 3d Sess. (1940), 1940–2 C.B. 528, 534–535; H. Rept. 3002 (Conf.), 76th Cong., 3d Sess. (1940), 1940–2 C.B. 548.

[23]See *Pazery v. Commissioner*, T.C. Memo. 1963–345; cf. *Penn-Dixie Steel Corp. v. Commissioner*, 69 T.C. 837 (1978), a case involving sec. 169.

the certifying authority has discretion to determine whether a facility is necessary in the interest of national defense and, therefore, is eligible for certification; neither the Commissioner of Internal Revenue nor this Court has the jurisdiction to make such a determination. See *Gray v. Commissioner*, 16 T.C. 262, 267 (1951).[24]

The parties are further in agreement that, in ascertaining whether the provisions of section 168 are to be applied in a given instance, respondent must determine whether the taxpayer has complied with the terms of the certification. Respondent's determination of compliance relates to such matters as the identity of the facilities, the cost of the facilities, and (if regarded as a relevant factor by the certifying authority) the dates of construction and acquisition.[25]

The parties agree that, in exercising his jurisdiction, respondent is bound by all conditions imposed by the certifying

---

[24]Both parties assume that this Court is not empowered to attack the decision of the certifying authority in issuing the certificate at issue or to otherwise question the merits of the certificate. Both rely on *Gray v. Commissioner*, 16 T.C. 262 (1951), wherein we concluded, in discussing a predecessor of sec. 168, that "We have no authority to determine whether the facilities in question were necessary in the interest of national defense during the emergency." (16 T.C. at 267). No question regarding the validity or appropriateness of certificate TA–NC–30812 is before us, only a question of interpretation. Nevertheless, we note that, on occasion, this Court has differed with a certifying authority. See *Arkansas-Oklahoma Gas Co. v. Commissioner*, 17 T.C. 1208 (1952) (Court-reviewed), revd. 201 F.2d 98 (8th Cir. 1953), and *National Lead Co. v. Commissioner*, 23 T.C. 988 (1955) (Court-reviewed), revd. 230 F.2d 161 (2d Cir. 1956), reversal upheld 352 U.S. 313 (1957). In the *National Lead* case, the Court of Appeals stated that the determination of the certifying authority could not be challenged in the Tax Court, citing *F.P.C. v. Idaho Power Co.*, 344 U.S. 17, 20–21 (1952). In addition to the cases cited above, see *American Twist Drill Co. v. Commissioner*, 11 T.C. 200 (1948); compare *National Steel Corp. v. United States*, 190 Ct. Cl. 31, 419 F.2d 398 (1969).

[25]In this connection, the regulations of the Office of Defense Mobilization provided (in part):

Sec. 4. Procedures and responsibilities—

(i) Necessity Certificates. Upon approval of an application, a Necessity Certificate will be forwarded to the Commissioner of Internal Revenue and will constitute conclusive evidence of certification by the Certifying Authority that the facilities therein described are necessary in the interest of national defense and of the portion of the adjusted basis upon which the amortization deduction * * * shall be computed. The Certifying Authority will not certify the accuracy of the cost of any facility nor of any date relative to the construction, * * * or acquisition thereof. It will be incumbent upon taxpayers electing to take the amortization deduction to establish to the satisfaction of the Commissioner of Internal Revenue the identities of the facilities, the costs thereof, and the dates relative thereto. [ODM Regs. 1, 19 Fed. Reg. 747 (1954).]

Respondent points out that he is not limited to a ministerial verification of costs or acquisition dates since the interpretation and application of given certificates may raise complex factual issues. Cf. *American Twist Drill Co. v. Commissioner, supra*, requiring a determination of the certifying agency's intentions.

authority in the certificate, including any time limitations. See 4 J. Mertens, Law of Federal Income Taxation, sec. 23.132 (1973 rev.); cf. H. Reiling, "Income Tax Problems in National Defense," 29 Taxes 1044 (1951). Additionally, the parties concur that the intent of the certifying authority when it issued a given certificate can be significant for purposes of interpreting the certificate. Respondent has acknowledged his lack of authority to "revise, supplement, or enlarge the scope of" a certificate. Rev. Rul. 54–214, 1954–1 C.B. 298, 299.[26]

What is in dispute here is whether petitioner acquired the freight cars covered by certificate TA–NC–30812 within the time limit imposed by the certifying authority when it granted the certification. It is clear that the certificate, itself, contains no stated time limitation. In fact, the certifying authority expressly removed a standard provision calling for acquiring or contracting for the freight cars "before the expiration of 6 months after the date of this certificate." However, respondent argues that, when the ODM issued certificate TA–NC–30812, it expected petitioner to acquire all of the certified cars within a reasonable time—at least by the end of 1957.[27] Respondent also argues that petitioner deliberately deferred delivery of 4,550 cars beyond a reasonable time,[28] and, in so doing, was not in

---

[26]Rev. Rul. 54–214, 1954–1 C.B. 298, deals with sec. 124, I.R.C. 1939, a predecessor of sec. 168, I.R.C. 1954. In Rev. Rul. 70–594, 1970–2 C.B. 301, respondent listed Rev. Rul. 54–214 among several "post–1952 rulings dealing primarily with engineering matters [sic]" and stated that the listed rulings, "although not specifically revoked or superseded, are not considered determinative with respect to future transactions."

[27]Respondent suggests that, when it applied for certification, petitioner had a 5-year program or plan to acquire the 10,700 cars and, had the ODM known of this, the agency would not have approved petitioner's application. The facts do not show any such program or plan. Respondent may have reference to a 5-year forecast made by petitioner in July 1955, but this projection related to petitioner's long-term freight car *requirements* and was made well before the special orders for the 10,700 cars were placed. After the placement of these orders, there is some evidence that petitioner estimated, in view of the existing backlog and the prevailing conditions at the end of 1955, it might take as long as 5 years to acquire the certified cars on order. But this estimate was not tantamount to a formalized acquisition program.

[28]Respondent appears to attach some special significance to the date Feb. 20, 1958. He seems to be of the view that petitioner's board of directors made a formal decision on that day to defer the acquisition of the 4,550 cars at issue. As can be seen from our findings, we do not believe any such decision was made. While the evidence shows that a memorandum was prepared for a directors' meeting held on Feb. 20, 1958, and that the memorandum contained various recommendations, including one to defer acquisition of the 4,550 cars, the evidence does not disclose whether the directors ever saw, let alone discussed, that document. What the record does disclose, however, is that subsequent actions taken by petitioner are inconsistent with the recommendations contained in the memorandum. We have concluded, based on all

compliance with the implicit requirements of the certificate of necessity. As a result, respondent contends petitioner may not avail itself of the benefits of section 168.[29]

Relative to the intent of the ODM in issuing this certificate, respondent argues that, when the ODM issued certificate TA-NC–30812, the ODM intended "to impose a time limit or condition" on petitioner for obtaining the certified cars. According to respondent, the ODM wanted petitioner to acquire the cars in 18 to 24 months, or no later than December 31, 1957. We have carefully scrutinized the record, and we find no support for an acquisition deadline of December 31, 1957.

Respondent claims that the ODM's intent in this regard is manifested in various official statements and documents, some of which are discussed in our findings of fact. He points to statements made to Congress in 1956 by an ODM official in which it was estimated that, under optimum conditions, it would take "at least a year and a half" to complete construction of the approximately 147,000 cars then on order. He refers to correspondence in 1956 between the ODM and the Interstate Commerce Commission in which it was estimated that, in the best of circumstances, it would take from 18 months to 2 years to complete construction of the backlog of certified freight cars. Respondent also makes reference to a March 28, 1956, letter from the ODM to Senator Richard L. Neuberger in which the ODM reported petitioner's statement that it would receive 10,511 new freight cars by the end of 1957.

These estimates were optimistic predictions, based on the assumption that there would be no factors beyond the control of the railroads which would serve to inhibit prompt acquisition of the cars. As can be seen from our findings and the discussion below, the conditions which developed did not favor the acquisition of the certified cars in as rapid a manner as had been predicted. The prevailing circumstances were less than optimum, and factors over which petitioner had little, if any, control caused it to depart from its early estimates.

---

evidence of record, that petitioner's board of directors made no formal decision on Feb. 20, 1958, to postpone acquiring 4,550 certified freight cars. Accordingly, for purposes of this issue, we do not regard that date as one of particular importance.

[29] In lieu of the deductions under sec. 168, respondent states that petitioner is "entitled to deductions [under section] 167 for depreciation with respect to the cost-basis of these 4,550 cars."

Respondent also points to the testimony of the ODM official who issued petitioner's certificate as supporting respondent's conclusion that the ODM intended petitioner to acquire the 10,700 certified cars by December 31, 1957. However, while that ODM official testified that he expected petitioner to acquire the 10,700 cars in accordance with the normal industry practices for carbuilding and delivery and that he would not have issued a certificate where an application called for delayed delivery, he did not elaborate on what he would consider to be normal industry practices. It is also clear from the record in this case that the ODM would not hold an individual railroad responsible for delaying factors which affected an entire industry. The certifying agency did not wish to penalize a railroad for delays occasioned by prevailing conditions over which the railroad had no control, such as those due to shortages of steel, labor strikes, economic changes, and subsequent financing problems.

Respondent further contends that the language of certificate TA–NC–30812, itself, shows that the ODM intended petitioner to acquire the cars by December 31, 1957. He refers to language indicating that production would proceed "without delay" and that car orders would provide for deliveries "at the earliest possible dates." This language is certainly not specific, and furthermore, it is taken from an attachment to the certificate which contains portions of petitioner's own application.

We agree that the language of the necessity certificate is significant in any inquiry regarding the manifested intent of the ODM. And, in this regard, it must be noted that the standard time-limitation language was deliberately removed from petitioner's certificate. That provision was replaced with language which required only that construction should be authorized and firm orders should be placed on or before December 31, 1955, terms with which petitioner complied. Nothing in the certificate implies the existence of a deadline for obtaining the cars. The removal of the standard language from the certificate effectively eliminated any definite time limit. In place of the old 6-month rule, there was substituted a rule of reason in the expectation that freight cars would be acquired as quickly as possible under the prevailing circumstances.[30]

---

[30]In light of this fact, we are unable to agree with respondent that petitioner must prove herein a specific intent on the part of the ODM that the certificate was to be effective with

Another factor which militates against an intent on the part of the ODM that all of the certified cars be acquired by December 31, 1957, is the financial factor involved, which we will discuss more in detail later. We do not believe that either the ODM or the ICC was oblivious to the fact that for petitioner to add 10,700 additional cars to its existing fleet in such a short period would have required it to commit all of its cash and funds available for additions and improvements to this program at the expense of its normal operating needs and to the detriment of its customers. The necessity for petitioner to remain financially sound and to meet the needs of its users was certainly as important to the national defense as the addition of a specified number of cars to the freight car fleet. We believe the ODM took this factor into consideration in not fixing a specific deadline for delivery of the cars. Its purpose in issuing the certificate under the prevailing circumstances was to encourage the railroads to increase the number of freight cars available within a reasonable time, unless changing circumstances mandated a crash program.[31] As stated by the ODM in its policy statement issued September 29, 1955 (DMO–III–1, see findings of fact), the expansion goals were for the purpose of establishing a quantitative limit of expansion that may be covered by the certificates.

If the ODM in fact intended petitioner to acquire the cars by the end of 1957, it seems unlikely to us that the agency would have granted petitioner's scope amendment in 1959. Petitioner asked the ODM in 1959 to amend certificate TA–NC–30812 to reflect additional costs and some mechanical changes relating to the certified cars. In approving these amendments, the ODM made no mention of the timing of petitioner's acquisitions under the certificate.[32]

It is true that the ODM did not have procedures for verifying

---

regard to cars delivered after Dec. 31, 1957. We think it is sufficient that petitioner has shown that the ODM did not intend to *preclude* such cars from the certification.

[31]There was no war in progress when the certification program under discussion was begun. Therefore, an immediate increase in the number of freight cars was not as necessary in the circumstances of the present case as it was in the wartime conditions dealt with in *United States v. Allen-Bradley Co.*, 352 U.S. 306 (1957).

[32]The letter from the ODM to petitioner which approved the amendments contained a standard paragraph stating the ODM was not extending "the time limit set forth in the original certificate." We doubt, however, that this standard clause had any particular significance in petitioner's instance since certificate TA–NC–30812 did not set forth a time limit.

acquisition dates and that it left such verification to the Internal Revenue Service. Nevertheless, it would not have required verification, as such, for the ODM to take note of the date of the necessity certificate and the date of the application for the scope amendment and to call to petitioner's attention any obvious anomalies in the progress of its acquisitions.[33]

From time to time in the performance of its duties, the certifying authority was called upon to determine whether a railroad's proposed acquisition schedule was compatible with the mobilization goal. Since such matters *were* within its purview, the failure of the agency to give any indication of disapproval to petitioner's progress could fairly be viewed as tacit approval. In any event, we do not find the ODM's action in granting the amendment consistent with respondent's assertions regarding that agency's intent.

None of the items of record to which respondent has directed our attention show that the ODM ever manifested an intent that petitioner was required to have the certified cars delivered by the end of 1957. If the ODM in fact intended to impose a time limit of any sort on petitioner (a point not established by the record herein), such intent was never disclosed. Respondent is relying on the general rule that an administrative agency's interpretation of its own regulation or other directive is controlling unless plainly erroneous or inconsistent with the directive. *Bowles v. Seminole Rock Co.*, 325 U.S. 410, 414 (1945); see generally 73 C.J.S., Public Administrative Bodies and Procedure, secs. 69, 105, and 106 (1951). However, neither the ODM nor any delegate agency ever published any rules specifically indicating what it expected in the way of promptness or indicating what delaying factors would be considered acceptable. Nor were any communications ever addressed to any applicant advising as to what conduct would be considered reasonable under the prescribed general rules.

We believe it is a necessary corollary to the general rule stated above that, in order for an agency's interpretation to be binding in a given situation, it must be clearly made a matter of public

---

[33]We are unable to agree with any suggestion by respondent that the agency staff would ignore such matters in considering a scope amendment. While respondent correctly points out that the staff of the ODM had been sharply reduced at the time of the granting of the amendment, we do not see why an extensive staff was necessary for this purpose.

record such that all affected parties are aware of it. See *Udall v. Tallman*, 380 U.S. 1, 16–18 (1965). On the facts of record in this case, we are unable to conclude that the ODM adequately manifested any intent to have petitioner acquire the certified cars by a specific date.[34]

Furthermore, we do not agree with respondent that petitioner acted unreasonably or delayed unnecessarily in acquiring the certified cars through the years at issue.[35]

Initially, some industry-wide problems stood in the way of rapid acquisition of the cars. There was a rather serious shortage of steel, and the Defense Production Administration allocated only a small amount of steel to the freight car builders. This shortage was compounded by steel strikes, particularly one in 1956. The inability of the car builders to obtain adequate amounts of steel, combined with the limited supply of component parts, had an obvious negative impact on the production capacity of the builders.

While some estimates were made that the railroad car building industry had an annual production capacity of 100,000 cars, these estimates assumed ideal conditions; various factors, in addition to those mentioned above, could act to limit actual production of certified freight cars. The reinstatement of the certification program in 1955 caused a tripling of the number of cars on order, producing the largest backlog in history. Many builders were not prepared for the increased orders. Some builders were set up to produce only certain types of railroad cars, and their facilities were inadequate (and their employees insufficiently trained) for the freight car construction occasioned by the certification program. Leadtime on new types of cars, involving research, development, engineering, and design

---

[34]Nor is there any indication in the record that the agency imposed a "non-specific cutoff date," as respondent urges. See 17A C.J.S., Contracts, sec. 358, (1963); 77 C.J.S., Sales, sec. 149(b)(3)(1952).

[35]Respondent argues that events occurring subsequent to the date the ODM issued certificate TA–NC–30812 are irrelevant in determining the agency's intent at that time. We do not disagree with this concept as a general proposition. However, we have found herein that it was the intent of the ODM that petitioner should acquire the certified cars as quickly as possible under the prevailing circumstances. Therefore, in making a determination of whether petitioner's acquisition of the cars was compatible with the certifying agency's intent when it issued the certificate, it becomes essential to give consideration to conditions which existed subsequent to the date of issuance and to determine whether petitioner's actions were reasonable under those circumstances.

work, plus additional leadtime for procurement and production could be as much as 27 months. Furthermore, carbuilders could be affected by strikes, accidents, and other contingencies beyond their control. In short, at the beginning of 1956, the builders were operating at considerably less than full capacity, and it could be expected that it would take 2 years and more to complete manufacture of the cars on order.

When petitioner placed its order for 10,700 cars in 1955, it caused SPEC to have a backlog of 13,937 cars.[36] The rather large order for the 10,700 cars was about 3 times the number of cars petitioner customarily ordered in a year and was many times greater than the number of cars petitioner customarily ordered at one time. Given the size of the order and the industry-wide problems discussed above, SPEC was not able to start construction of a significant quantity of the 10,700 cars until 1957. Subsequently, when the cost of producing the cars at SPEC's Sacramento shops proved prohibitive, it became necessary to find other builders for the certified cars.

As mentioned before, financial factors played a significant role in the timing of freight car acquisitions. Petitioner and other railroads generated cash very slowly. Petitioner's cash flow was generally completely absorbed for such things as the payment of maturing debts (which had to be paid in cash) and was available only to a limited extent for capital projects like freight car acquisitions. At the same time that petitioner was committed to acquiring the 10,700 certified cars, petitioner had other demands on the funds it had available for capital programs. One such project was the Great Salt Lake fill (a certified roadway project). Other programs involved the acquisition of diesel locomotives and the improvement of various roadway properties. Petitioner could approve specific capital expenditures only when the funds were available.[37]

Because of the limited availability of cash, petitioner custom-

---

[36]Respondent suggests that petitioner incurred no legal commitment or economic detriment when it placed the orders for the 10,700 cars with its wholly owned subsidiary because the transactions were not the equivalent of an arm's-length transaction with an independent car builder. Our examination of the evidence relating to SPEC and to the customary procedures followed by petitioner in the placement of freight car orders has led us to a contrary conclusion, as shown by our findings. The record does not support this contention by respondent.

[37]There was no requirement that petitioner give the 10,700 cars priority over other certified facilities. Further, we believe it would not have been realistic or reasonable to expect petitioner

arily obtained the requisite funds for freight car acquisitions through financing arrangements. These arrangements had to be completed before any cars could be delivered. For the most part, petitioner financed the cars by means of equipment trusts. To a much more limited degree, conditional sales agreements were used. It was clearly not feasible for petitioner to arrange for acquisition of the 10,700 cars all at once. Petitioner was advised that it could not, consistent with sound financial practice, finance more than approximately $40 million of its annual equipment acquisitions through equipment trusts.

In 1956, petitioner's credit rating was reduced. To strengthen its financial position, petitioner found it necessary to avoid overcommitment. Petitioner had to keep its borrowing to a minimum until its earnings increased in response to the capital improvements that had already been made.

This restricted financial capacity and shipper demands for other types of freight cars led petitioner to give priority to some cars that were not certified. Some customers were requesting that petitioner acquire freight cars of a rather specialized nature. These cars were not within the scope of the 1956 certification. In view of petitioner's need for an improvement in earnings, it was essential to respond to the demands of the shippers for these noncertified cars. Even during this economically difficult period, however, deliveries of the certified cars continued.

There was no discernible upward trend in petitioner's earnings until 1962. In that year, petitioner's credit rating improved. In view of the level of petitioner's earnings during the period here involved, petitioner could not prudently have financed the acquisition of more equipment of all types than it did through the years at issue. While petitioner's cash flow theoretically could have financed the 10,700 certified cars at issue before December 31, 1957 (assuming they could all be built by then), it seems fairly certain that the acquisition of those cars would have prevented expenditures for other significant purposes and would have had a detrimental effect on petitioner's economic position.

From our examination of the record, we have concluded, in

---

to regard the prompt acquisition of the cars as a matter of such precedence that other essential capital projects had to be ignored.

view of the prevailing conditions, that petitioner did not delay acquisition of the certified cars during the years here in issue for reasons that could have been reasonably avoided. Rather, in extending the acquisition of the cars over a period which continued through the years at issue, petitioner was responding to developments beyond its control in a reasonable manner and was following a financially prudent course of action.[38] We do not believe petitioner was compelled under the terms of the necessity certificate to react any differently to the existing conditions. We therefore reject any suggestion that the extended period of acquisition was, in itself, incompatible with the certification or otherwise precluded petitioner from obtaining the benefits of section 168 for its freight car acquisitions through the years at issue.[39]

Here, we have a situation where the Government offered a tax incentive to taxpayers producing certified facilities and in practice never denied a timely application that was consistent with the mobilization goal. In such a circumstance, we do not see how the Government can justify withdrawing the promised tax benefit because of a taxpayer's failure to comply with an unspecified time limitation. The denial of the benefit seems to us to be particularly inappropriate where, as here, the evidence shows that the facilities were acquired in a reasonable period of time and that the acquisition of the cars was consistent with

---

[38]Petitioner also claims that its actions were consistent with the requirements of the delegate agency, the Interstate Commerce Commission. According to petitioner, the ICC would not have approved the acquisition of additional equipment by a railroad to the detriment of its economic viability. Petitioner states the ICC could have required petitioner to fulfill shipper needs first and could have refused to approve the issuance of equipment obligations beyond petitioner's reasonable capability. While we are unable on the state of the record before us to verify petitioner's specific assertions in this regard, we find that petitioner's conclusions comport with the general statutory provisions relating to the ICC. See, e.g., 49 U.S.C. sec. 1(21) which provides in part that the ICC should not authorize acquisition of facilities when the expense will "impair the ability of the carrier to perform its duty to the public."

[39]Respondent is of the view that, in extending the acquisition of cars over a number of years, petitioner was merely purchasing its normal complement of freight cars during that period and should therefore not be entitled to a tax benefit premised on augmenting the national freight car fleet. Petitioner has shown to our satisfaction that it did not order the cars in question simply to satisfy its customary business needs. Not all of the 10,700 cars were required to meet petitioner's estimated requirements, and, in acquiring them, petitioner not always served its own best business interests. The ordering of these cars resulted in substantial financial commitment on top of petitioner's previous financial commitments, to the detriment of petitioner's credit standing. Petitioner would not have ordered the 10,700 cars in 1955 had it not been urged to do so by the Interstate Commerce Commission through the Association of American Railroads and had the benefits of rapid tax amortization not been available to it.

prudent fiscal management. There is no evidence relating to the years at issue which shows deliberate delays in obtaining the certified cars for the sole purpose of meeting expenses of a less critical nature or of serving petitioner's administrative convenience. We find nothing in the record which establishes that petitioner, through the year 1961, conducted its affairs in such a manner that it must be precluded from enjoying the tax benefit that was promised to it in 1956.

We recognize that, in enacting section 168, Congress did not intend the period for acquisitions of certified facilities to be open-ended and without limitation. However, in a case where no time limit is specified, the determination of whether given facilities were acquired within a proper time frame under the statute must depend on an analysis of whether the acquisitions were reasonably prompt under the prevailing conditions.

In accordance with the preceding discussion, we hold that petitioner is entitled to rapid amortization of the 3,550 freight cars (out of the 4,550 in dispute) which were acquired by petitioner through 1961, the last of the tax years at issue herein.

---

The remaining 1,000 of the cars certified under certificate TA-NC–30812 were acquired *after* 1961 and are technically not at issue in this case.[40] They are at issue, however, in other docketed cases since the question discussed herein arises as well in petitioner's taxable years 1962 through 1968, which years are also the subject of petitions filed with the Court. See note 16 *supra.* Each of these petitions places at issue the availability of section 168 amortization for freight cars under certificate TA-

---

[40]In this regard, sec. 168(b) provided:

The election of the taxpayer to take the amortization deduction and to begin the 60-month period with the month following the month in which the facility was completed or acquired, or with the taxable year succeeding the taxable year in which such facility was completed or acquired, shall be made by filing with the Secretary or his delegate, in such manner, in such form, and within such time, as the Secretary or his delegate may by regulations prescribe, a statement of such election.

Petitioner elected 60-month amortization under sec. 168(b), "commencing such amortization with the month following that in which the facilities were acquired." As a result, while the record is not clear on this point, it is possible that petitioner did not claim rapid amortization for some cars acquired in 1961 (e.g., those delivered in December) on its tax return for that year. Such cars would also not be at issue herein; but, as we point out subsequently, the conclusions we reach today should be dispositive with regard to these cars.

NC–30812 acquired between 1958 and 1963. The applicability of section 168 to the 1,000 cars delivered in 1963 must necessarily be resolved in the cases dealing with the later docketed years, and we have no intention of deciding that issue here. However, our conclusion herein regarding 3,550 of the 4,550 cars in dispute should be dispositive, to that extent, of the section 168 question arising in the docketed cases for these later years. See *Commissioner v. Sunnen*, 333 U.S. 591 (1948); *Lea, Inc. v. Commissioner*, 69 T.C. 762 (1978).

Nevertheless, on brief, both parties have suggested that we express our views with respect to the 1,000 cars acquired by petitioner in 1963 in the belief that it might dispose of this issue for the later years without further trial. At the trial of this issue, the parties presented evidence pertinent to all docketed years, covering circumstances arising before and after the years at issue herein. Both parties have argued this case on brief as though the eligibility for amortization of the 1,000 cars delivered in 1963 was at issue herein.

In the hope that it may promote settlement of this issue for subsequent years,[41] we express the following views.

We have examined the evidence relating to all 4,550 disputed cars. We are not convinced that the 1,000 cars delivered in 1963, in contrast to the 3,550 cars delivered through 1961, were acquired as quickly as possible under the prevailing circumstances, as required by the ODM. The delay in obtaining the 1,000 freight cars was such that, in our view, the 1963 acquisitions were incompatible with the intent of the certifying authority when it issued the necessity certificate.

Of particular significance is the fact that petitioner did not acquire *any* certified freight cars during the year 1962; nor did SPEC subcontract for construction of any of these cars in 1961 or until October of 1962. Petitioner's failure to do so was inconsistent with a pattern that it had established over the previous 12 years. Petitioner *did* acquire 2,146 cars during 1962, but not one of them was covered by a necessity certificate. Moreover, by the year 1962, some of the conditions which had

---

[41]On brief, petitioner states that "so far as petitioner is presently aware, there are no further facts unique to the years after 1962 which would have to be proven at a trial of the same question for later years." Petitioner points out that "Facts as to cost basis, etc., should not require trial."

inhibited acquisitions in the prior years appear to have become much less of a problem. The scarcity of steel and components, the huge backlogs of car orders, the inadequately trained employees—none of these factors appear from the evidence to have had the negative impact on car construction in 1962 that they had in the earlier years. While economic matters continued to be a consideration throughout this period, petitioner's financial problems lessened in their severity during 1962. Nothing in the record suggests that the postponement of deliveries was occasioned by factors affecting the entire railroad industry, and we are of the impression that petitioner delayed acquisitions of certified cars for a year for reasons of its own administrative convenience.[42] If this is so, we do not believe petitioner would be entitled to rapid amortization under section 168 for the 1,000 certified freight cars it received in 1963.

We decide this issue in favor of petitioner for the years here involved.

## II. RECOVERY UPON MERGER OF PREVIOUSLY DEDUCTED AMOUNTS[43]

This issue presents the following question for our consideration:

Whether, to the extent certain amounts deducted by petitioner's predecessor during 1915 to 1924 were recovered when the Texas & New Orleans Railroad Co. was merged into petitioner in 1961, the tax benefit rule applies to include the previously deducted amounts in petitioner's gross income under section 61.

---

[42]We do not find support for petitioner's position in the fact that, in 1963, the Office of Emergency Planning, the successor to the ODM, granted petitioner's request to amend certificate TA-NC-30812 to increase the dimensions and weight-carrying capacity of 250 cars. Unlike the situation involving the 1957 scope amendment, which was considered and approved by the ODM, the record does not advise us with any particularity of the workings and procedures of the Office of Emergency Planning. Further, we have some difficulty in seeing how any action by the Office of Emergency Planning can serve to indicate the breadth of its predecessor's certification. The mere granting of the scope amendment in 1963 does not convince us that the delivery of freight cars in that year would be viewed by the original certifying authority as compatible with its intent when it issued the necessity certificate in 1956.

[43]In trying and briefing this case, this issue was referred to by the parties as "Issues (hh) and (9)."

## FINDING OF FACT

### *Issues (hh) and (9)*

Some of the facts relating to this issue have been stipulated by the parties, and those facts, with associated exhibits, are incorporated herein by this reference.

Upon the organization of the predecessor Southern Pacific Co. in 1884, the company proceeded to acquire the outstanding stock of a number of railroad companies, including that of the Texas & New Orleans Railroad Co. and the Galveston, Harrisburg & San Antonio Railroad Co. By the end of 1885, the predecessor Southern Pacific Co. (PSP) had acquired over 90 percent of the outstanding stock of said companies and subsequently acquired all of the outstanding stock.

PSP, as common parent company of an affiliated group of companies, as defined by the various Revenue Acts prior to 1939 and by the Internal Revenue Code of 1939, filed consolidated Federal tax returns, covering itself and all subsidiaries eligible to be included, for all years that Federal tax returns were required to be filed, through the period ended September 30, 1947, when its existence ceased upon consummation of a plan of reincorporation, discussed below.

The San Antonio & Aransas Pass Railroad Co. (SA & AP) was incorporated in 1884 under the laws of the State of Texas. In 1890, SA & AP defaulted in the payment of certain liabilities, and its properties were taken over and its operations continued by court-appointed receivers.

In 1892, a plan of reorganization was adopted, and the properties of SA & AP were released from receivership by court order. The plan provided for issuance of $21,600,000 par value first mortgage 4-percent, 50-year gold bonds of $1,000 denomination each, carrying interest from January 1, 1893. Some of the bonds were issued in exchange for the entire outstanding capital stock and previously outstanding bonds of SA & AP. For reasons not important here, all of the new bonds were guaranteed as to payment of both principal and interest by PSP. In 1899, PSP became the beneficial owner of all the stock of SA & AP.

As a result of action taken by the State of Texas in 1903, PSP

was forced to divest itself of ownership and control of SA & AP. This action is described in a report[44] of the Interstate Commerce Commission (ICC) as follows:

> Prior to 1903 the Southern [PSP] owned all of the stock of the Aransas [SA & AP], and had guaranteed payment of the principal and interest of $17,544,000 of its 50-year 4% bonds, dated January 1, 1893. By force of a decree of the District Court of Travis County, Tex., rendered December 14, 1903, the Southern was enjoined from owning or controlling any of the stock of the Aransas so long as it owned or controlled any of the stock of Galveston, and accordingly, the Southern disposed of its interest in the Aransas, but its liability as guarantor of the principal and interest on the bonds has continued.

During the years 1915 to 1924, it became necessary for PSP to honor its guarantee and pay interest on the SA & AP bonds.

On March 26, 1919, PSP sent a letter to the Commissioner of Internal Revenue, which read as follows:

> Dear Sir:
>
> The Southern Pacific Company has guaranteed both the principal and interest of the outstanding bonds of the San Antonio & Aransas Pass Railway Company (hereinafter called the Railway Company), aggregating $17,544,000 par value. At the time that this guaranty was made the Southern Pacific Company controlled the Railway Company through ownership of the latter's capital stock. Subsequently, the Southern Pacific Company was forced by the State of Texas to sell this stock for the reason that the San Antonio & Aransas Pass Railway was a line competitive with the railroads controlled by the Southern Pacific Company.
>
> During the calendar year 1918 the Southern Pacific Company paid for the account of the Railway Company interest coupons aggregating $645,090., which amount the Southern Pacific Company, for reasons stated below, proposed to charge to Profit and Loss in its accounts for the calendar year 1918.
>
> The property of the Railway Company, as shown in the 26th Annual Report of the Railroad Commission of Texas for the year 1917, was valued as follows, viz:

|  |  |
|---|---|
| Valuation by Railroad Commission of Texas | $13,970,335.05 |
| Valuation for State and County tax assessments | 13,327,709.00 |

> According to the former valuation, which is the higher of the two, the property is worth $3,573,664.95 less than the par value of the outstanding mortgage bonds, which aggregate $17,544,000.
>
> In 1905 the Southern Pacific Company received from the Railway Company

---

[44]Finance Docket No. 4499, *Control of San Antonio & Aransas Pass Railway by Southern Pacific Co. and Galveston, Harrisburg & San Antonio Railway Co.*, published at 94 ICC 701, 702.

income bonds to the amount of $3,898,000 par value, in the discharge of the indebtedness then existing from the latter to the former company. In 1910, as there was no prospect of the collection of any part of the debt evidenced by these income bonds, the Southern Pacific Company wrote down their book value to the sum of $194,900., which represented 5% of their face value. The reason for not writing off the entire amount was that it was desired to carry them at nominal value for the purpose of record.

The advances made by the Southern Pacific Company to the Railway Company from the date of settlement in 1905 to December 31, 1917, together with interest thereon aggregated $4,993,593.98.

The May 1918 balance sheet, which is the latest in our files of the Railway Company, shows that current and deferred assets practically offset current and deferred liabilities, the former amounting to $1,557,356.81 and the latter to $1,613,334.39. The indebtedness of the Southern Pacific Company is not carried as current or deferred liabilities, but as long term debt, and therefore not included in the liabilities mentioned, of $1,613,334.39.

The financial condition of the Railway Company clearly indicates that worthlessness of its indebtedness for current advance. In other words, the guaranty hereinbefore referred to has resulted in the Southern Pacific Company now having to pay all the coupon interest on the bonds of the Railway Company, with no possibility of ever being reimbursed for such advances.

Please advise, under the circumstances outlined above, whether Southern Pacific Company can deal with the amount of these advances made to the Railway Company in 1918, which it proposes to charge to profit and loss, as a deduction in its return of annual net income, and oblige.

On April 5, 1920, PSP received the following reply to its letter of March 26, 1919:

Reference is made to your letter of March 26, 1919, from which it appears that the Southern Pacific Company guaranteed both the principal and interest of the outstanding bonds of the San Antonio & Aransas Pass Railway Company aggregating $17,544,000 par value. At the time the guaranty was made the Southern Pacific Company controlled the Railway Company through ownership of its capital stock. Subsequently, the Southern Pacific Company was forced by the State of Texas to sell this stock for the reason that the San Antonio & Aransas Pass Railway was a line competitive with the railroads controlled by the Southern Pacific Company.

During the calendar year 1918, the Southern Pacific Company paid for the account of the Railway Company interest coupons aggregating $645,090, which amount the Southern Pacific Company "proposes to charge to profit and loss in its accounts for the calendar year 1918."

In 1905, the Southern Pacific Company received from the Railway Company income bonds to the amount of $3,898,000 par value, in the discharge of the indebtedness then existing from the latter to the former company. In 1910, as there was no prospect of the collection of any part of the debt evidenced by these income bonds, the Southern Pacific Company wrote down their book value to the sum of $194,900, which represented five per cent of their face

value. The reason for not writing off the entire amount was that it was desired to carry them at a nominal value for the purpose of record. The advances made by the Southern Pacific Company to the Railway Company from the date of settlement in 1905 to December 31, 1917, together with interest thereon, aggregated $4,995,593.98.

The Railroad Commission of Texas for the year 1917 has valued the property of the Railway Company at $3,573,664.95 less than the par value of the outstanding mortgage bonds, which aggregate $17,544,000. It appears that not only is there no present prospect that the Railway Company will be able to pay these bonds at maturity, but also there is no prospect that the advances made by the Southern Pacific Company to the Railway Company and carried by the Southern Pacific Company in its books of account as a "long term debt" will ever be paid. Therefore, the company for the year 1918 proposes to charge to profit and loss the amount of the interest which it was compelled to pay during 1918 upon bonds of the San Antonio & Aransas Pass Railway Company.

From the facts stated, it is obvious that the payment made by the Southern Pacific Company in 1918 was not a voluntary expenditure but was made in the discharge of an obligation. Since the Southern Pacific Company had guaranteed the payment of the interest upon the bonds of the Railway Company, the payment by the Southern Pacific Company of such interest is deductible from gross income in the return of the Southern Pacific Company, provided the amount were shown as a payment by the Southern Pacific Company. It appears, however, that the company prefers to charge it as a loss to the profit and loss account. There does not appear to be any reason why the company should not so treat the item and deduct it from gross income as a loss sustained during the taxable year.

It is, therefore, held that the payment under the guaranty of interest of the insolvent principal is a legal deduction from gross income of the corporation making the payment, either as an operating expense or as interest, or as a bad debt, provided it is charged off the books of account of the guarantor.

Respectfully,

Commissioner.

Consistent with this ruling, PSP claimed and was allowed the following income tax deductions for payments made under its guarantee agreement:

| Period ended | Deduction allowed |
|---|---|
| June 30, 1915 | $696,627.67 |
| June 30, 1916 | 493,966.20 |
| Dec. 31, 1916 | 344,109.60 |
| Dec. 31, 1917 | 339,090.40 |
| Dec. 31, 1918 | 641,446.00 |
| Dec. 31, 1919 | 697,338.00 |
| Dec. 31, 1920 | 425,164.00 |
| Dec. 31, 1921 | 48,664.00 |

|            |       |             |
|------------|-------|-------------|
| Dec. 31, 1922 | ..................................... | $195,759.00 |
| Dec. 31, 1923 | ..................................... | 204,380.00 |
| Dec. 31, 1924 | ..................................... | 72,080.00 |
| Total | ............................................. | 4,158,624.87 |

While the payments made pursuant to the guarantee were eliminated from PSP's open account of amounts due from SA & AP, both PSP and SA & AP, subsequent to the years of payment, recognized SA & AP's continuing obligation to reimburse PSP.

SA & AP filed separate income and excess profits tax returns for the years 1913 to March 31, 1925. The consolidated return of PSP and its affiliates for 1925 included SA & AP for the period April 1 to December 31, 1925, and for all subsequent years until SA & AP ceased to exist in 1934.

In 1924, SA & AP directors approved a lease of all SA & AP properties to the Galveston, Harrisburg & San Antonio Railway Co. (GH & SA) pursuant to which the GH & SA would take over all SA & AP assets and assume SA & AP liabilities, amounts owed to PSP excepted. GH & SA would operate SA & AP and pay SA & AP an annual rent. Also in 1924, PSP sought to purchase SA & AP capital stock in an attempt to reacquire control of SA & AP.

In 1925, the ICC approved both the GH & SA lease and the PSP reacquisition, stating:

> That the acquisition by the Southern Pacific Company of control of the San Antonio and Aransas Pass Railway Company by purchase of the capital stock of that company, as set forth in the application and report aforesaid, be, and the same is hereby, approved and authorized.
>
> That the Galveston, Harrisburg & San Antonio Railway Company be, and it is hereby, authorized to acquire control of the railroad of the San Antonio and Aransas Pass Railway Company in accordance with the terms of the lease described in the application and report aforesaid.

PSP formally reacquired control of SA & AP in 1925. PSP anticipated increased profitability for SA & AP and the ability of SA & AP to meet its interest obligations.

In 1926, the SA & AP stockholders approved an assignment of the GH & SA lease to the Texas & New Orleans Railroad Co. (T & NO), subject to the approval and authorization of the ICC. The T & NO lease would include provisions identical to those in the

GH & SA lease. The assignment of the lease to T & NO was subsequently approved by the ICC.[45]

Upon reacquisition of control of SA & AP by PSP, the two companies decided generally to discontinue all intercompany interest on open accounts between PSP and its solely controlled and separately operated affiliated companies, and to cancel and write out of the books of account all unearned intercompany interest on open accounts, and also on notes and bonds which the creditor companies were carrying in "Transit in suspense." It was intended that all unpaid interest on SA & AP income bonds accrued to January 29, 1926, were to be written out of the accounts. As a result, all SA & AP notes payable to PSP were transferred to open account.

In 1932, the SA & AP stockholders (and the stockholders of other companies controlled by PSP) authorized and approved the conveyance of all SA & AP properties to T & NO upon the terms and conditions contained in a certain "Plan of Consolidation of Texas and Louisiana Companies," subject to approval and authorization by the ICC. Under the plan, T & NO agreed to pay the total indebtedness of the companies to PSP (which totaled $40,299,797.91 at December 31, 1931) and PSP also received 596,464 shares of stock of T & NO in exchange for its stock in the merged companies. The ICC subsequently approved the merger, noting the T & NO would assume SA & AP's indebtedness and that SA & AP's accounts would "be carried without change into the books of [T & NO.]"[46] The plan of consolidation was carried out during 1934.

In the 1934 consolidation, 13 PSP affiliates, including SA & AP, merged with T & NO and ceased to exist. As constituted after the consolidation, T & NO was a solvent corporation. The 1934 post-consolidated book balance sheet of T & NO included balances in the book accounts of SA & AP at the time of the consolidation for open account amounts payable to PSP, including the amounts owing as a result of PSP's payments of interest during the years 1915–24 pursuant to its guarantee.

After the 1934 merger, the intercompany open accounts

---

[45]Finance Docket 5809 by order dated Dec. 28, 1926. See *Lease of Southern Pacific Lines in Texas and Louisiana*, 177 ICC 504.

[46]Decision dated Jan. 10, 1934, in Finance Docket No. 9689, *Southern Pacific (Texas & Louisiana Lines) Consolidation*, 199 ICC 47.

between PSP and T & NO showed that T & NO's account payable to PSP exceeded PSP's account receivable from T & NO by $10,738,931.42. Included in this amount was the $4,158,624.87 debt which SA & AP owed to PSP and which T & NO assumed. Through 1942, this $10,738,931.42 remained on the T & NO books as the net debt owed by T & NO to PSP.

As of December 31, 1943, the balance of indebtedness shifted from T & NO to PSP. As of that date, T & NO books reflected an account receivable from PSP of $1,131,797.29, and the PSP books reflected an account payable to T & NO in the amount of $11,870,728.71, or a difference of $10,738,931.42. Beginning in 1943 and continuing until the 1961 merger discussed below, this $10,738,931.42 amount appeared on the PSP and T & NO books as a net debt owed by PSP to T & NO. Officials of PSP recognized and considered equalizing these accounts from time to time but for various reasons relating to excess profits and capital stock taxes took no action. The $10,738,931.42 difference remained on the books up to the time of the 1961 merger.

In 1947, the former Southern Pacific Co. (FSP) was organized under the laws of Delaware.[47] On September 30, 1947, pursuant to a plan of reincorporation, FSP received all of the assets of PSP, including the T & NO stock owned by PSP.

Upon consummation of the 1947 plan of reincorporation, FSP became the common parent company of the same affiliated group of companies of which PSP had been the common parent company, as that term was then defined in section 141(d), I.R.C. 1939, and, commencing with the period beginning October 1, 1947, continued to file consolidated Federal tax returns.[48]

In 1960, the stockholders of FSP and T & NO authorized a plan of merger, subject to ICC approval, pursuant to which FSP would acquire all the assets and assume all the obligations of T & NO. By decision dated September 12, 1961,[49] the merger of the properties and franchises of the T & NO into FSP for ownership,

---

[47]The former Southern Pacific Co. (FSP), is the taxpayer in the years presently before the Court and is sometimes referred to herein as petitioner. FSP is the immediate predecessor to the Southern Pacific Transportation Co., which was organized under the laws of Delaware in 1969.

[48]T & NO was included as an affiliate in the consolidated Federal tax returns filed by PSP and by FSP.

[49]Finance Docket No. 21261, *Southern Pacific Co. merger, etc., Texas & New Orleans Railroad Co., et al.*, 312 ICC 598.

management, and operations was approved and authorized, the ICC stating, in part:

The plan of merger is governed by an agreement dated August 22, 1960, between Southern Pacific and the three named subsidiaries. The agreement has been submitted to and approved by stockholders of all of the applicant companies, subject to this Commission's approval. Under the plan, Southern Pacific will acquire all the assets and assume all the obligations of the three subsidiary companies. Upon cancellation of the outstanding capital stock of each, all of the properties of the three merging subsidiaries will be vested in Southern Pacific. * * * The agreement further provides that on and after such date all obligations between Southern Pacific and the other merging companies, or between the merging companies, shall be deemed to be cancelled and discharged, other than those bonds which were issued by Texas and New Orleans and upon the effective date of the merger are owned by Southern Pacific.

*    *    *    *    *    *    *

Since the transaction involves no change in the scope of the Southern Pacific transportation enterprise, applicants propose that the accounts of the merging subsidiaries be carried over intact into the consolidated accounts of the surviving parent, Southern Pacific, as shown in the constructed balance sheet submitted. The accounting for the transaction will not be approved at this time, but will be reserved for consideration upon submission of appropriate journal entries as required by our order herein.

The merger of T & NO into FSP was consummated on October 31, 1961. At that time, the $10,738,931.42 open account balance remaining on the books was eliminated in the postmerger book balance sheet of FSP by a debit entry to the intercompany open account. FSP Co. in its postmerger book balance sheet also reflected an addition of $15,721,458.22 ($15,853,323 in the constructed balance sheet) by credit to its book retained income.[50] Included in the amount thus credited was the $4,158,624.87 amount reflecting the SA & AP debt.

For tax purposes, the 1961 merger of the T & NO into the former SP Co. has been treated as a "tax-free" reorganization by both petitioner and respondent. The above-described book credit to retained earnings was covered by Schedule M of the consolidated return for the year 1961, wherein $9,738,931.42 (including the $4,158,624.87 amount) was shown as recorded in

---

[50]This amount was, according to the decision of the ICC approving the merger a "Net credit resulting from elimination of surplus and/or deficits of subsidiary companies at dates of acquisition, to reinstate indebtedness assumed by Texas & New Orleans previously written off by Southern Pacific but not forgiven."

book account 798, retained income—unappropriated, for "Open account indebtedness of S.A. & A.P. Ry. Co. assumed by T & NO RR Co. written off by SP Co. but not forgiven," and $862,000 was shown as recorded in book account 796, other capital surplus, as "Difference between book value of Texas Midland stock and advances on SP Co. books," both as elements in an overall increase of $242,756,093.24 in total FSP book capital surplus and retained income from December 31, 1960, to December 31, 1961, for purposes of reconciling book and tax accounting.

In his statutory notice of deficiency, respondent stated as to this issue (in part):

Southern Pacific Company realized ordinary income in the amount of $6,897,831.00 upon satisfaction of indebtedness due it from Texas and New Orleans Railroad Company at the time of the merger of Texas and New Orleans into Southern Pacific Company under the provisions of sections 11 and 332 of the Internal Revenue Code and the regulations thereunder and Regulations 1.1502–41(b).

The adjustment consists of the following amounts: Advances to San Antonio and Aransas Pass Railway Company from 1913 to 1924 and assumed by Texas and New Orleans upon merger into it of San Antonio and Aransas Pass. Written off by Southern Pacific, but not forgiven .................. $5,303,293.00

Other questions raised by this issue have been conceded by respondent. Further, owing to respondent's concessions, only $4,185,624.87 is now involved in the above-described adjustment.

In his "Third Amendment to Answer," filed June 28, 1973, respondent claims that petitioner is estopped "from denying that the original bad debt deductions claimed by petitioner and allowed by respondent were erroneous deductions in the years taken."

OPINION

*Issues (hh) and (9)*

During the years 1915–24, PSP had to make good on its guarantee of interest payments on SA & AP bonds. Consistent with a 1920 ruling obtained from the Commissioner of Internal Revenue, PSP deducted on its tax returns for those years the total amount of $4,158,624.87, reflecting amounts it had expended in connection with the guarantee of SA & AP bond interest. At the end of the 1915–24 period, the $4,158,624.87 remained as an outstanding debt which SA & AP owed to PSP.

Respondent argues that since T & NO was a solvent corporation in 1961 and had sufficient retained earnings to pay the $4,158,624.87 obligation, when T & NO was merged into FSP in 1961 this outstanding SA & AP indebtedness to PSP was satisfied. Accordingly, since PSP had previously deducted the $4,158,624.87 amount in its 1915–24 income tax returns, respondent views FSP as realizing ordinary income to that extent in 1961.

Respondent relies upon the tax benefit rule, which provides that, where an amount which was deducted from gross income in a prior year is recovered in a later year, the amount is includable in gross income in the year of recovery if a tax benefit was realized from the deduction. *Unvert v. Commissioner*, 72 T.C. 807 (1979), on appeal (9th Cir., Nov. 5, 1979); *Merchants Nat. Bank v. Commissioner*, 199 F.2d 657, 659 (5th Cir. 1952), affg. 14 T.C. 1375 (1950); *Mayfair Minerals, Inc. v. Commissioner*, 56 T.C. 82, 86 (1971), affd. 456 F.2d 622 (5th Cir. 1972); *Alice Phelan Sullivan Corp. v. United States*, 180 Ct. Cl. 659 (1967); 381 F.2d 399, 401–402 (1967).[51] See also *Rosen v. Commissioner*, 71 T.C. 226 (1978), affd. 611 F.2d 942 (1st Cir. 1980), wherein we stated (p. 229):

It has long been established that the receipt of money or property which might not otherwise be regarded as income may nevertheless constitute income within the meaning of the statute (section 61, I.R.C. 1954, and corresponding provisions of prior law) if it represents the repayment, restoration, or return of an item which the taxpayer had deducted in an earlier year. The general concept has often been referred to as the "tax benefit rule." [Fn. ref. omitted.]

In *Mayfair Minerals, Inc. v. Commissioner, supra,* we pointed out the rationale for the tax benefit rule (p. 86):

The reason for this rule is clear. "When recovery or some other event which is inconsistent with what has been done in the past occurs, adjustment must be made in reporting income for the year in which the change occurs. No other system would be practical in view of the statute of limitations, the obvious administrative difficulties involved, and the lack of finality in income tax liability, which would result." *Estate of William H. Block*, 39 B.T.A. 338, 341

---

[51]In *Estate of Munter v. Commissioner*, 63 T.C. 663 (1975), we stated (p. 671):

"While the rule is judicial in origin, it is applied to specific situations by certain Code provisions. See, for example, secs. 111, 1245, and 1250. Where not codified, the judicial rule continues. * * * "

See also *Rosen v. Commissioner*, 71 T.C. 226, 230 n. 7 (1978), affd. 611 F.2d 942 (1st Cir. 1980). The present case involves an application of the judicial rule.

(1939), affirmed sub nom. *Union Trust Co. v. Commissioner*, 111 F. 2d 60 (C.A. 7, 1940), certiorari denied 311 U.S. 658 (1940).

Petitioner argues that the tax benefit rule cannot apply in this case because the deduction by PSP of the $4,158,624.87 at issue during the years 1915–24 was erroneous as a matter of law.

It is well settled, as both parties acknowledge, that the tax benefit rule can be applied only where the prior deduction was legally proper. In those instances where the prior deduction was not properly allowable under the applicable law, the Commissioner may not make an adjustment to the taxpayer's gross income for the year in which the deducted amount is recovered. *Streckfus Steamers, Inc. v. Commissioner*, 19 T.C. 1, 8 (1952); *Canelo v. Commissioner*, 53 T.C. 217, 226–227 (1969), affd. on another issue 447 F.2d 484 (9th Cir. 1971). See also *Kingsbury v. Commissioner*, 65 T.C. 1068, 1087–1088 (1976); *Twitchco, Inc. v. United States*, 348 F. Supp. 330, 335 (M.D. Ala. 1972).[52] This exception to the rule is premised on the notion that—

the statute of limitations requires eventual repose. The "tax benefit" rule disturbs that repose only if respondent had no cause to question the initial deduction, that is, if the deduction was proper at the time it was taken. * * * [*Canelo v. Commissioner, supra* at 226–227.]

In an attempt to prevent petitioner from avoiding the application of the tax benefit rule under the theory of the above-cited cases, respondent raises, by an amendment to his answer, the defense of "duty of consistency" or "quasi-estoppel." By means of this defense, respondent seeks to preclude petitioner from contending herein that the prior deductions were improperly taken.

The "duty of consistency" doctrine operates to negate the exception to the tax benefit rule enunciated in the *Streckfus Steamers* and *Canelo* cases "where the taxpayer, either deliberately or unintentionally, misleads the Commissioner through erroneous representations of fact in his returns, and the Commissioner, consequently, allows the statute of limitations to run on adjustments of taxable income on the misleading returns." *Mayfair Minerals, Inc. v. Commissioner, supra* at 91. In such a case, the taxpayer "is estopped to contend that the

---

[52]The Commissioner may, of course, disallow the deduction in the year in which it was taken, but only if he is not foreclosed from doing so by the statute of limitations.

recovery * * * does not constitute taxable income because of the fact that the deduction may have been erroneously claimed and allowed in [the prior year]." *Faidley v. Commissioner*, 8 T.C. 1170, 1173 (1947). As a result, "In situations where the duty of consistency or quasi-estoppel applies, a taxpayer is required to follow the tax-benefit rule even though the original deduction was erroneous." *Mayfair Minerals, Inc. v. Commissioner*, *supra* at 89.

We believe that respondent's reliance on this doctrine is misplaced in the present circumstances and that petitioner is not precluded from attempting to establish the legal impropriety of the prior deductions. The doctrine of "duty of consistency" or "quasi-estoppel" does not apply where all pertinent facts are known to both the Commissioner and the taxpayer. "It is said that when both parties know the facts, there is no reason to estop the taxpayer from changing his position with respect to the transaction." *Bartel v. Commissioner*, 54 T.C. 25, 32–33 (1970). This would seem to be particularly true where the crucial facts are known to both parties and the erroneous deductions are due to a mutual mistake of law. Cf. *Mayfair Minerals, Inc. v. Commissioner*, *supra* at 93; *Sugar Creek Coal & Mining Co. v. Commissioner*, 31 B.T.A. 344, 347–348 (1934).[53] See *Crosley Corp. v. United States*, 229 F.2d 376, 381 (6th Cir. 1956).

As can be seen from our findings, PSP's deduction of the amount at issue during the period 1915–24 was consistent with a 1920 ruling by the Commissioner that, under the applicable law, the payments by PSP during the year 1918 on behalf of SA & AP were properly deductible. Petitioner is not now claiming that any of the pertinent facts which PSP represented to be true at the time of the deductions or any of the facts which the Commissioner relied upon at that time do not accurately reflect the events bearing on the question of deductibility.[54] Petitioner's

---

[53]*Sugar Creek Coal & Mining Co. v. Commissioner*, 31 B.T.A. 344, 346 (1934), points out: "Estoppel is not an element of income but only a doctrine affecting liability. * * * It does not create a right but only affects remedy. The burden is upon the party asserting it to establish both the facts relied on to support it and the necessity in fairness for its application."

[54]In its 1919 ruling request, PSP made certain representations concerning SA & AP's financial condition and PSP's expectation that it would not be reimbursed for its advances. These representations may seem to be at variance with petitioner's assertion herein that PSP was not entitled to deduct its payments as worthless debts. In our consideration of the worthlessness question, we have taken into account only those facts known at the time to both

position herein is merely that, given those facts, the deductions were legally impermissible during the years 1915–24. Thus, the question to be resolved is simply whether PSP made a legal error in taking the deductions and respondent made a legal error in allowing the deductions.

Accordingly, under the authority discussed above, we are not presented here with a situation which calls for an estoppel. Petitioner is not precluded from asserting that the deductions were not allowable and contending that, as a result, the tax benefit rule is not applicable herein.

*Unvert v. Commissioner, supra,* and other cases which have applied quasi-estoppel on the theory of "duty of consistency" are distinguishable. In those cases, either the Commissioner was not apprised of the actual facts at the time of the deduction or the taxpayer in the year of recovery attempted to change the controlling facts and shift his position. Here, both PSP and the Commissioner were aware of the controlling facts when the deductions were taken, and petitioner has not attempted to change the controlling facts.[55]

We therefore turn to the question of whether PSP correctly took the deductions on its 1915–24 returns under the then-applicable law.[56]

---

PSP and the Commissioner and we have assumed the accuracy of all factual representations made in PSP's ruling request. (In this regard, it should be noted, however, that PSP's beliefs regarding reimbursement are not necessarily determinative of the question of worthlessness or of other matters bearing on deductibility.) To the extent petitioner's assertions herein may be at variance with the foregoing facts, they have had no bearing on our conclusions herein. Accordingly, we are referring in the text above only to those representations of PSP which are pertinent to our consideration of the legality of the deductions. Significantly, respondent does not claim that he was not fully apprised of the relevant facts or that he was in any way misled by PSP through erroneous representations of such facts.

[55]In *Unvert v. Commissioner,* 72 T.C. 807 (1979), decided subsequent to the submission of the briefs as to this issue, the taxpayer argued that he erroneously deducted an amount as interest on his 1969 return and that, as a result, the recovery of the amount in 1972 was not includable in his income for 1972 under the tax benefit rule. In deciding that the duty of consistency precluded a shift of position as to the 1969 deduction after the statute of limitations had run, we concluded in *Unvert* that the declaration on the 1969 return (that the deducted amount was interest) was a factual misrepresentation which the Commissioner had accepted as true.

In contrast, the deductions involved in the instant case were based on facts known to the Commissioner, and the record herein would not support a finding that the Commissioner was in any way misled. As can be seen from the discussion above, we are presented here with the question of whether there was an erroneous deduction based on a mistake of law made by both the taxpayer *and* the Commissioner. As we pointed out in *Unvert,* the duty of consistency has no application where such a mistake of law precipitated the deduction.

[56]Clearly, we must examine the law as it stood at the time of the prior deductions to determine "if respondent had no cause to question the initial deduction, that is, if the deduction

In 1892, PSP guaranteed the payment of principal and interest on certain SA & AP bonds. During the years 1915–24, PSP had to make good on its guarantee of the interest payments, and PSP deducted on its income tax returns the amounts it expended in that regard. The record is not clear as to the specific nature of the deductions claimed by PSP on its returns during the 1915–24 period. The Commissioner's ruling letter appears, at the end, to give PSP three alternative theories for deducting the payments.[57] When taken as a whole, however, the tenor of the ruling letter seems to suggest, as petitioner notes, that the Commissioner viewed the payments as interest deductions. Our examination of the record leads us to conclude that PSP deducted the amounts at issue either as interest or as a business expense.

We do not believe PSP took the deductions as worthless debts in view of the evidence of record that both SA & AP and PSP, subsequent to the years of the deductions, recognized the continuing obligation of SA & AP (and later T & NO) to reimburse the amounts advanced. Since PSP continued to look to SA & AP to pay the debt and since SA & AP in fact continued to operate, it seems unlikely to us that PSP would have chosen to base its deductions on a worthlessness theory.

Our conclusion in this respect is bolstered by our view that under the prevailing legal principles, the propriety of deducting the amounts in question as worthless debts, given the factual circumstances outlined above, was at best questionable.

First, it would appear to be at least arguable that PSP would not have been regarded as "charging off" the debt during the taxable year of the deduction, as required by the applicable statutes.[58]

---

was proper at the time it was taken." *Canelo v. Commissioner*, 53 T.C. 217, 227 (1969), affd. on another issue 447 F.2d 484 (9th Cir. 1971).

[57]In his ruling letter of Apr. 5, 1920, dealing with the year 1918, the Commissioner of Internal Revenue, after reviewing the pertinent facts, concluded—

"that the payment under the guaranty of interest of the insolvent principal [SA & AP] is a legal deduction from gross income of the corporation making the payment [PSP], either as an operating expense or as interest, or as a bad debt, providing it is charged off the books of account of the guarantor."

[58]The "charging off" of worthless debts was a requirement of sec. 234(a)(5), Revenue Act of 1924; sec. 234(a)(5), Revenue Act of 1921; and sec. 234(a)(5), Revenue Act of 1918. A "charge off" was also a prerequisite to deductibility under the earlier statutory provisions. See sec. 12(a), Revenue Act of 1916; sec. II G(b), Tariff Act of 1913; cf. *Mason Machine Works Co. v.*

To effect a "charge off," a taxpayer was required to take some affirmative action to show that the debt was no longer considered an asset. Merely writing off the amount of the debt from the relevant account was insufficient if the taxpayer's treatment of the outstanding obligation was otherwise incompatible with the ascertainment of worthlessness. For example, a taxpayer would not be regarded as having satisfied the "charge off" requirement where the debt had not been completely eliminated from all asset accounts. *Fairless v. Commissioner*, 67 F.2d 475 (6th Cir. 1933), affg. 19 B.T.A. 304 (1930); *O. S. Stapely Co. v. Commissioner*, 13 B.T.A. 557 (1928); *Stifel v. Commissioner*, 7 B.T.A. 1060 (1927); *Milling Moore Mercantile Co. v. Commissioner*, 5 B.T.A. 1060 (1927); *Mason Machine Works Co. v. Commissioner*, 3 B.T.A. 745 (1926); *Lasater v. Commissioner*, 1 B.T.A. 956 (1925). See 5 J. Mertens, Law of Federal Income Taxation, sec. 30.18 (1975 rev.).

We believe it is doubtful, in light of the mutual recognition of the continuing obligation for reimbursement, that PSP "charged off" the SA & AP debt in the manner contemplated by the cited authority. See also *Ames v. Commissioner*, 1 B.T.A. 63, 68 (1924). In this regard, we note that while respondent does not specifically address this question,[59] he does, in developing other arguments, repeatedly state on brief that the $4,158,624.87 debt owed by SA & AP to PSP continued to be carried on PSP's (and later FSP's) books as an account receivable through the year 1961. Respondent thereby lends credence to the view that the debts were not properly "charged off."

Second, even assuming PSP "charged off" the SA & AP debts during the pertinent taxable years, it is highly unlikely that PSP would have been entitled to base its deductions on a worthlessness theory. In *Portland Railway, Light & Power Co. v. Commissioner*, 1 B.T.A. 1150 (1925), the taxpayer sought to deduct as worthless, debts owed to it as a result of advances it

---

*Commissioner*, 3 B.T.A. 745 (1926).

Statutory authorization for the deduction of partial bad debts began with the Revenue Act of 1921. Prior to the Revenue Act of 1921, a taxpayer could deduct a bad debt only if it was wholly worthless. H. Rept. 350, 67th Cong., 1st Sess. (1921) 1939–1 C.B. (Part 2) 168, 177; *Mason Machine Works Co. v. Commissioner, supra.*

[59]Respondent has made no argument on brief regarding the legality of PSP's 1915–24 deductions, ostensibly preferring to rely on his estoppel theory. Consequently, we do not know whether respondent thinks the deductions were proper when taken and, if so, why.

had made to a corporation, pursuant to a guarantee, during the years 1915 to 1924. In denying the deduction, the Board stated (p. 1153):

The taxpayer in this appeal alleges that the [debtor] railway company was insolvent; that [the taxpayer] was forced to advance the sums of money in question to pay the interest and sinking-fund requirements of the bonds which it had guaranteed, and is, therefore, entitled to deduct such payments. The Board decided, however, in the *Appeal of Winthrop Ames*, 1 B.T.A. 63, that advances for operating expenses or advances otherwise made to a corporation and carried as a charge against that corporation without any attempt to liquidate the debtor corporation or otherwise terminate the transaction, may not be charged off as worthless debts or as advances so long as the corporation to which such advances are made continues as an active corporate entity, is not actually adjudged bankrupt, and no effort is made to close or liquidate the account. To the same effect is the *Appeal of Steele Cotton Mill Co.*, 1 B.T.A. 299. [In *Ames*, the debtor corporation was "a going business unable to meet its current liabilities from liquid assets and indeed not expected to do so." 1 B.T.A. at 71.]

In our view, PSP would have been precluded, pursuant to the rationale of the *Portland Railway* case, from deducting its payments on SA & AP's behalf as worthless debts. And this result would have obtained even accepting the assertions made by PSP in its ruling request concerning PSP's expectation that it would not secure repayment. *Portland Railway, Light & Power Co. v. Commissioner, supra; Ames v. Commissioner, supra; Peabody Coal Co. v. Commissioner,* 18 B.T.A. 1081 (1930), affd. 55 F.2d 7 (7th Cir. 1931).[60]

For these reasons, we have concluded when PSP took the deductions on its tax returns, it did so on the basis that the amounts were allowable either as interest or as operating expenses of PSP's business.

---

[60]Petitioner points out that the Commissioner used its ruling letter to PSP as a basis for the subsequently published S.M. 1298, 2 C.B. 113 (1920), declared obsolete by Rev. Rul. 70–293, 1970–1 C.B. 282. Like the ruling letter to PSP, the S.M. advances three alternative theories for deducting interest payments paid pursuant to a guarantee. In *Portland Railway, Light & Power Co. v. Commissioner,* 1 B.T.A. 1150 (1925), an excerpt from which is quoted above in the text, the Board of Tax Appeals declined to follow S.M. 1298 on the worthlessness question. Although the Board regarded the ruling as factually distinguishable, our present analysis does not convince us that such factual differences as may exist in the ruling would warrant a result different from the one reached by the Board in the *Portland Railway* opinion. We believe the Board of Tax Appeals correctly enunciated the principles of law applicable at all times here pertinent. Further, as will be seen from the discussion which follows, we view S.M. 1298 as inaccurately reflecting the state of the law in other respects as well.

Since 1913, the Federal income tax statutes have contained provisions allowing for the deduction of interest.[61] These similarly worded provisions have consistently been construed from the outset as permitting a taxpayer to deduct only his own interest payments and not interest paid on behalf of another person or entity. See, e.g., *Griffin v. Commissioner*, 7 B.T.A. 1094 (1927); *Colston v. Commissioner*, 21 B.T.A. 396, 399 (1930), affd. sub nom. *Colston v. Burnet*, 59 F.2d 867, 869–870 (D.C. Cir. 1932).

Deductions for interest have been denied even in those cases where the payment was required by virtue of the taxpayer's status as a guarantor; despite the guarantee arrangement, the taxpayer has not been viewed as paying his own obligation. See *Simon v. Commissioner*, 36 B.T.A. 184 (1937); *Eskimo Pie Corp. v. Commissioner*, 4 T.C. 669, 675–676 (1945), affd. per curiam 153 F.2d 301 (3d Cir. 1946); *Nelson v. Commissioner*, 281 F.2d 1, 4–5 (5th Cir. 1960), affg. T.C. Memo. 1958–179;[62] *Rushing v. Commissioner*, 58 T.C. 996, 999–1000 (1972) (Court-reviewed).[63]

---

[61]Under sec. 163(a), I.R.C. 1954, a corporation is "allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." To the same effect, with substantially the same language, see sec. 23(b), I.R.C. 1939. These provisions in the 1954 and 1939 Codes had their origin in the Tariff Act of Oct. 3, 1913, which permitted a corporation to deduct for income tax purposes "the amount of interest accrued and paid within the year on its indebtedness." (Sec. II G(b).) Subsequently, the Revenue Act of 1916 allowed a corporate deduction for "the amount of interest paid within the year on its indebtedness." (Sec. 12(a).) Two years later, the Revenue Act of 1918 permitted a corporation to deduct "all interest paid or accrued within the taxable year on its indebtedness." (Sec. 234(a)(2).) The 1918 language was employed in the Revenue Act of 1921 (sec. 234(a)(2)), in the Revenue Act of 1924 (sec. 234(a)(2)), and in subsequent revenue acts. Separate provisions in the earlier statutes provided for the deduction of interest by individuals and were similar to the quoted corporate provisions.

[62]In *Putnam v. Commissioner*, 352 U.S. 82 (1956), the Supreme Court held that losses sustained by a guarantor were not deductible as losses sustained in a transaction entered for profit. Because a guarantor, upon his payment, becomes a creditor of the primary obligor, the Court reasoned that any resulting loss to the guarantor must arise from the worthlessness of the debt owed him. The only deduction open to the guarantor in *Putnam*, therefore, was a bad debt loss. *Nelson v. Commissioner*, 281 F.2d 1, 4–5 (5th Cir. 1960), extended this rationale to cover a guarantor's interest payment. The Court of Appeals regarded the guarantor in *Nelson* as a creditor of the primary obligor for the interest paid on the latter's behalf since interest "is an incident of the principal and when accrued and payable is an indebtedness no different from that of the principal." 281 F.2d at 5. As a result, consistent with *Putnam*, the guarantor's payments were not deductible as interest.

[63]In *Rushing v. Commissioner*, 58 T.C. 996, 999–1000 (1972) (Court-reviewed), we referred to, but did not follow, our prior decision in *Sherman v. Commissioner*, 18 T.C. 746 (1952). To the extent that *Sherman* can be regarded as adopting a position inconsistent with that found in the cases cited in the text, such inconsistency was effectively eliminated when the Supreme Court handed down its decision in *Putnam v. Commissioner*, supra, 4 years later. See *Nelson v. Commissioner*, supra; *Rushing v. Commissioner*, supra; *Abdalla v. Commissioner*, 69 T.C. 697, 707 (1978) (Court-reviewed); *Hynes v. Commissioner*, 74 T.C. 1266 (1980). Accordingly, we view

In the present case, it is stipulated that PSP's payments of the interest on the SA & AP bonds were not made on PSP's own obligations; PSP was complying with the requirements of the guarantee arrangement it had with SA & AP. In accordance with the above-cited authority, we conclude that the payments at issue were not properly deductible by PSP as interest.

Nor do we believe the payments made by PSP would have been deductible as operating expenses of PSP's business. The advances were made with the understanding that SA & AP would be obligated to reimburse PSP. PSP was therefore making nondeductible loans to SA & AP. *Glendinning, McLeish & Co. v. Commissioner*, 24 B.T.A. 518, 523 (1931), affd. 61 F.2d 950 (2d Cir. 1932); *Cochrane v. Commissioner*, 23 B.T.A. 202, 207–208 (1931); *McMillan v. Commissioner*, 14 B.T.A. 1367, 1370–1371 (1929).[64]

In sum, we conclude PSP was not legally justified in deducting the $4,158,624.87 amount at issue. Therefore, in accordance with the principles set forth in *Streckfus Steamers, Inc. v. Commissioner, supra*, and *Canelo v. Commissioner, supra*, the present case does not present a proper instance for the application of the tax benefit rule.[65]

We decide this issue for petitioner.

---

the cases cited in the body of our opinion as controlling herein (see *Golder v. Commissioner*, T.C. Memo. 1976–150, affd. 604 F.2d 34 (9th Cir. 1979)), and we do not regard the short-lived *Sherman* case as an authoritative reflection of the state of the law at the time the deductions at issue were taken.

[64]Moreover, even if the financial condition of SA & AP were such that reimbursement was not a realistic expectation, PSP's payments would not have been deductible as a business expense. See, generally, the discussion in *Roussel v. Commissioner*, 37 T.C. 235 (1961), and *Eskimo Pie Corp. v. Commissioner*, 4 T.C. 669 (1945), affd. per curiam 153 F.2d 301 (3d Cir. 1946), and the authorities cited therein.

[65]In view of this conclusion, it is not necessary to discuss various additional arguments advanced by petitioner in support of its position that the tax benefit rule is inapplicable herein, some of which would require a detailed analysis of the financial and tax accounting records of PSP and FSP and their subsidiaries from 1915 to 1961. In part, petitioner argues: (1) Since petitioner and its predecessors have always filed consolidated returns and since there was no accretion to the consolidated unit from outside sources as a result of the merger, no taxable income should be recognized; (2) the merger was tax free and would not activate the tax benefit rule (see *Nash v. United States*, 398 U.S. 1 (1970)); (3) since T & NO overpaid its open account to PSP in 1943 and became a creditor of PSP, the SA & AP obligation was satisfied at that time rather than in 1961; and (4) the income tax benefit realized by PSP as a result of the deductions taken in 1915 to 1924 was more than offset by the tax disadvantage of having the $4,158,624.87 amount eliminated from capital as preacquisition accretions in computing equity-invested capital for excess profits tax purposes.

### III. Deduction of Timber Expenses[66]

This issue presents the following question for our consideration:

Whether timber expenses incurred by petitioner are expenses of management deductible as ordinary and necessary business expenses under section 162 or whether they are expenses directly related to cutting contracts under section 631(b); and, if the latter, whether such expenses are applied as a reduction of capital gain under the contracts (as reported by petitioner) or as a reduction of petitioner's ordinary income.

#### FINDINGS OF FACT

##### *Issue (kk)*

Some of the facts relating to this issue have been stipulated by the parties, and those facts, with associated exhibits, are incorporated herein by this reference.

Among the assets of the predecessor Southern Pacific Co. received by the former Southern Pacific Co. in the 1947 reincorporation was all of the outstanding stock of the Southern Pacific Land Co. (SPLC).

SPLC had been incorporated under the laws of the State of California on February 1, 1912. In 1912 and in 1930, various predecessors[67] of petitioner transferred real property to SPLC. This real property consisted principally of what the companies called "outlying" acreage, i.e., alternate sections of land adjacent to railroad rights-of-way. Much of the land was located in the timber country of northern California and bore timber. During the years at issue (1959, 1960, and 1961), all of the real property held by SPLC was located within the State of California.

From the outset (and continuing through the years at issue), the SPLC lands were managed by the land department of the predecessor Southern Pacific Co. and, subsequently, by the land department of the former Southern Pacific Co.

---

[66]In trying and briefing this case, this issue was referred to by the parties as "*Issue (kk).*"

[67]These predecessor corporations, including the Central Pacific Railway Co., had been authorized by Congress to construct railroad lines. In various acts of Congress, they were granted rights-of-way and alternate sections of adjacent land: Act of July 1, 1862, as amended by an Act of July 2, 1864. Act of July 25, 1886. Act of July 27, 1866. Act of March 3, 1871.

Between the years 1916 and 1949, the land department was actively engaged in a program of trying to dispose of the acreage owned by SPLC and other land-grant properties under the jurisdiction of the department, including timberlands. During this period, the land department did not permit any timber cutting on the lands under its jurisdiction, and between 1916 and 1949, no cutting leases were executed. Even buyers were not permitted to enter upon the land to cut timber until the contracts were paid in full.

During the period 1912 to 1949, SPLC transferred substantial outlying timberland acreage to outsiders. In 1949, SPLC withdrew from the practice of actively selling its timber holdings, and thereafter, except for isolated accommodation transactions, transfers of outlying timber acreage were made by SPLC only to governmental authorities (Federal, State, or local) or to utilities, under threat of condemnation.

The decision by the land department to withdraw the SPLC properties from sale (and also certain lands of the former Southern Pacific Co.) was made to permit a study of whether such sales should continue or whether a land management program should be commenced.

A preliminary study in 1949 determined that the SPLC timber holdings would benefit by a management program. In 1951, SPLC adopted such a program with respect to its timberlands in Northern California which called for limited cutting of timber on a sustained yield basis. Under this method, old and mature trees are permitted to be cut on a given section of land, but only to the extent they will be replaced by new trees.

The 1951 management program was undertaken to conserve timber, to increase the productivity of the land, to generate income for SPLC from timber sales, and, indirectly, to generate freight revenues for the former Southern Pacific Co. In order to implement this program, the land department employed photogrammetrists to conduct a timber survey and hired additional graduate foresters and experienced woodsmen.

During 1952, a further study was undertaken to determine the volume of timber on the SPLC lands and to estimate the allowable annual cut on a sustained yield basis. The study determined that it would take 30 years to achieve removal of all of the old and mature trees, and it was estimated that 64 million

board feet could be cut each year (and would be replaced each year).

SPLC adopted this program of cutting timber on a sustained yield basis, and continued it through 1959, 1960, and 1961.

Annual timber sales were negotiated for the disposition of the allowable cut (i.e., 64 million board feet per year). These sales resulted in an annual harvesting program which was designed to average the calculated sustained production of the forest properties. The only reasons for exceeding allowable cut were fire damage, storm damage, insect damage, and other miscellaneous causes.

During the years at issue, SPLC held approximately 1,900,000 acres of outlying land in California. Of this land, over 700,000 acres were in the timber country of northern California. This timber acreage had been held essentially intact since 1949. Over half of the acreage was considered to contain merchantable timber of excellent to marginal quality.

During the years at issue, SPLC was operating in its first 30-year cutting cycle, in which overmature trees and trees in danger of death from insects and disease were to be cut. This 30-year period was established because the U.S. Forest Service was operating under a 30-year development program. Because of the checkerboard ownership pattern,[68] it was essential for road-planning purposes that SPLC cooperate with the Forest Service.

While the primary purpose of the timber program was the production of income, there were several long-term benefits that accrued from the annual harvesting activity. The harvesting served to regenerate the forest by stimulating growth in the remaining timber stand and it improved the general health of the stand by eliminating trees that were overmature, dying, and subject to insect attack. Fire hazard was reduced by the removal of dead trees.

During 1959, 1960, and 1961, a timber sale was commenced in the following manner: Discussions would be held between the chief forester and the district foresters regarding the most appropriate places to have a sale of timber. Relying on the

---

[68]The sections of timberlands owned by SPLC were generally square or rectangular in shape and were often adjoined on all four sides by national forest land owned by the Federal Government. Usually a section of SPLC land would meet other SPLC sections only at its corners. On a map, therefore, the parcels of forest land owned by SPLC tended to form a checkerboard pattern.

district foresters' field knowledge of the property and information available from SPLC files, certain locations for timber sales were designated. Thereafter, formal "assignment" letters were sent out to the district directors designating the areas within their districts where cutting contracts should be obtained.

Typically, in a year prior to entering into a contract of sale with a purchaser, SPLC's headquarters offices in San Francisco would have sent one or more "assignment" letters to its pertinent district, asking the district personnel to cruise and appraise timber on acreage described in the letter according to section, township, and range. This involved reconnaissance, line running, marking, cruising, and appraising, and the results of this activity were rendered in written reports referred to as "timber sale offerings." These written reports served as the basis for offering specific timber in specific areas and specific prices to customers.[69]

The field reconnaissance conducted by the district personnel was rather extensive. They would go through an area for the purpose of gaining a general impression of the character of the timber, the topography, the roads, the stand conditions, the status of the section corners, and the accessibility of the timber. Aside from its primary purpose of providing information relative to a sale, a reconnaissance also gave the district forester a knowledge of conditions in the area that would affect its future management. Following the field reconnaissance was line running, involving the surveying of boundary lines. No contracts entered into during the years in issue involved a requirement that the purchaser survey the boundaries of the sales area.

SPLC maintained maps for each township showing land ownership and survey information from SPLC sources and from outside sources like the U.S. Forest Service. Other maps showed what areas had been logged and remained to be logged. As a survey was made in preparation for timber sales, the year of the survey and the points determined by the survey were marked on the township maps.

The timber sale contracts described the land on which timber was to be cut by subdivision, section, township, and range. If

---

[69]To the extent that offers to sell were accepted by regular purchasers and contracts entered into, or sale contracts entered into by reason of bids, the formal contractual arrangements followed the reconnaissance, line running, marking, cruising, and appraising of the property.

property lines were not readily ascertainable from prior surveys, it was necessary at times for SPLC employees to perform extensive surveying to delineate the property boundaries involved in the contracts in order to avoid cutting timber upon adjacent lands. This involved locating the corner points of the original survey on the ground and either running lines between the corners or, where a sale involved an area well within a section, flagging a temporary cutting line. In addition to their use in a sales context, line-running surveys were also useful in preventing trespass upon SPLC lands, in the granting of easements, and in the establishment of the number of productive acres available for purposes of management.

After the survey, the district forester and his assistant would go into the area in which the timber was to be offered for sale and mark with a paint stripe each tree that was to be cut. This marking was a time-consuming process, and it was limited only to those areas where there was a sale in the immediate offing. SPLC chose to be specific about the individual trees it would allow to be cut in order to prevent indiscriminate cutting by purchasers and to assure that the trees left after the cutting would be suitable for future sales of timber. Marking also gave the foresters control over the forest stand that would remain after logging, for management purposes.

Thereafter, an employee would perform a timber cruise (i.e., an onsite examination of timberland) to determine the quantity and quality of the timber to be sold. From an examination of the number, size, species, and quality of the trees to be cut, he estimated the volume of timber on the tract to be cut. The information obtained from a timber cruise was included in a written report.

The report of the timber cruiser generally included data on the volume of trees by species and on the volume of trees anticipated to remain after the sale. It included a map showing existing and proposed roads, and it contained a description of the condition of the boundary references. Also generally contained in the report was information regarding (1) the quality and character of the timber by species, including defects and breakage, (2) the average number of logs per tree, including average diameters, (3) the fire damage to the timber, (4) the status of reproduction in the area, (5) the status of site and soil improvements, (6) the potential inclusion of other SPLC lands in

the logging unit, (7) the nature of occupancy on the land, (8) the status of water and minerals, and (9) the potential of the area for recreational use.

On most occasions, a cruise was conducted primarily to gain data pertinent to a sale of timber, although the acquisition of this data produced information which was useful in managing the land. On some occasions, cruises were conducted solely for the purpose of reporting on everything within a given section of land. Such cruises, unrelated to timber sales, produced data that was used primarily for management purposes, and the cost of such cruises is not included in the amounts in issue.

Appraising the timber to be cut was the final step of a district forester in response to the "assignment" letter. He calculated the sales prices by grade, using the Forest Service printed statement of price recovery and overrun percentages. The appraisal was very similar to that which the Forest Service used.[70]

The district forester forwarded the foregoing information (including the report of the timber cruiser) with his letter of transmittal outlining his plan for the sale to the headquarters office. This information was used to prepare a sales offering.

While appraisals were prepared primarily as part of the contract process, they had incidental uses outside of a sales context. They were used to establish the value of timber at the time of a discovered trespass in collecting from the trespasser. They were used in connection with land condemnation cases. They were used in property tax matters.

Following the cruise and appraisal, the headquarters office would make a proposal to a purchaser. If the proposal was accepted, the contract would be prepared and would be submitted to the purchaser for signature. It would then be submitted to the SPLC board of directors and to the executive committee of the former Southern Pacific Co. for approval. A copy of the contract was then forwarded to the district forester. He had the responsibility to see that its terms were complied with.

During the years at issue, employees of the land department

---

[70]The appraisal was made using a discount procedure. The starting point was the price of the milled lumber. To arrive at the selling price, the milled lumber price was reduced by costs incurred by the purchaser. During 1959–61, road construction costs and road maintenance costs were subtracted from the milled lumber price in arriving at the selling price of timber.

and SPLC tried to negotiate the cutting contracts for a 1-year term but very often made them for a 2-year term (but never more than 2 years). Under extraordinary circumstances, a contract would be extended for another logging season. The usual purchasers of timber were operators who had established mills along the railroad and who, in prior years, had been customers for the purchase of timberland.

After the contract had been executed and the purchaser began cutting timber, employees scaled (i.e., measured the quantity of) the cut timber, determined the volume cut, and transmitted the log-scale books and log-scale journal sheets to the headquarters office. The hours spent scaling were reported when it was necessary to make a computation to determine if the purchaser was to pay the cost of the scaling.

Scaling records have value apart from their principal use in billing the purchaser. They are used in adjusting property tax records, in updating inventories, in checking on the efficiency and the quality of the cruise, and in checking on the efficiency of personnel.

The foresters exercised a great deal of control over the felling of timber by purchasers in order to prevent damage to the remaining stand in both the felling and yarding operations. Yarding is the process of moving fallen logs to the roadside. To control damage caused by yarding, the foresters would locate the skid trails of the hauling machinery and determine whether there was damage to the reserve stand, to young growth, or to the soil. If such damage existed, discussions would be held with the operator of the logging operation for the purpose of minimizing the damage.

After felling and yarding were completed, the purchaser was required to cut water bars or ditches across the skid trails to prevent erosion. In addition, slash disposal by the purchaser (i.e., the cutting of damaged young trees) was required in order to prevent insect buildup and to reduce the fire hazard.

During the years at issue, the forestry activities of reconnaissance line running, marking, cruising, appraising, scaling, and inspection were engaged in primarily because of timber sales arising under the cutting contracts in question. While to some extent a portion of these activities served long-term management goals in addition to their immediate sales-related purpose, the forestry work, to a very substantial degree, would not have

been required were it not for an actual or potential contract for sale of timber. The fulfillment of management goals was frequently fortuitous, an incidental benefit which flowed from activities that were necessary for preparing or carrying out specific sales contracts. Essentially, the above-described forestry activities were occasioned by and necessitated by the timber sales, and most of the forestry work at issue fulfilled only sales-related goals. Only a small portion of these activities was totally unrelated to the cutting contracts and served solely a management purpose.

It is stipulated that the SPLC timber sale contracts are predominantly cutting contracts to which section 631(b), I.R.C. 1954, applies. (This section is discussed in our opinion, *infra.*) The issue presently under discussion involves only such stumpage sale cutting contracts.[71]

In the consolidated income tax returns filed by the former Southern Pacific Co. and its affiliates for 1959, 1960, and 1961, SPLC reported the following amounts as timber "expenses of sale":

| Year | Amount |
|------|--------|
| 1959 | $133,487.89 |
| 1960 | 261,888.24 |
| 1961 | 68,524.61 |

The foregoing amounts include both (1) expenses incident to sales under cutting contracts to which section 631(b) applies, and (2) expenses not within the scope of section 631(b) (e.g., amounts paid to contractors to log timber for SPLC's own account, and costs of Christmas tree sales). The latter expenses are stipulated by the parties to be within the purview of section 631(a) and to be deductible as ordinary and necessary business expenses. The present issue involves a controversy only as to the expenses attributable to timber sales qualifying for treatment under section 631(b). The expenses attributed to section 631(a) and section 631(b) during the years at issue are as follows:

---

[71] Sec. 631(b), as pointed out later, relates to contracts for the disposal of timber where the "owner retains an economic interest" in the timber. The timber sale contracts involved in the instant case (commonly referred to as "cutting contracts") provided for the sale of growing timber ("on the stump") by the thousand board feet, measured after it was cut. SPLC was paid an agreed amount ("stumpage price") for each thousand board feet cut.

| Year | Amounts attributable to sec. 631(a) sales | Expenditures in controversy attributable to sec. 631(b) sales |
|------|------------------------------------------|----------------------------------------------------------------|
| 1959 | $67,969.47 | $65,518.42 |
| 1960 | 237,231.96 | 24,656.28 |
| 1961 | 35,066.84 | 33,457.77 |

The gains from the sales under the cutting contracts at issue were reported as section 631(b) capital gains on the tax returns, and the expenses incident to such sales were offset against these gains.[72]

In the consolidated returns for the years at issue, SPLC reported the following as (1) total quantity of timber sold, expressed in thousands of board feet, (2) gross receipts from total timber sales, and (3) total quantity of timber sold under contracts qualifying for section 631(b) treatment, expressed in thousands of board feet:

| | Total quantity | Gross receipts | Sec. 631(b) quantity |
|------|---------------|----------------|----------------------|
| 1959 | 90,683 | $1,878,720.06 | 89,000.50 |
| 1960 | 51,181 | 877,217.16 | 47,181.18 |
| 1961 | 66,636 | 1,313,448.61 | 66,191.00 |

The amounts set out above under the heading "Expenditures in Controversy Attributable to Sec. 631(b) Sales" are stipulated by the parties to be the amounts at issue herein. To compute these amounts, the total quantity of timber (expressed in thousands of board feet) sold during 1959, 1960, and 1961 under section 631(b) contracts was multiplied by a figure representing average cost (per thousand board feet of timber) during each year. The average cost figures which were used for the years at issue are as follows:

| Year | Average cost per thousand board feet |
|------|--------------------------------------|
| 1959 | $0.71 |
| 1960 | 0.50 |
| 1961 | 0.50 |

---

[72] On the books of SPLC, however, these expenses had been included in an operating expense account.

The average cost for 1959 ($0.71 per thousand board feet of timber) was derived by totaling the daily salaries of the employees engaged in activities relating to the section 631(b) timber sales and by multiplying that figure by the estimated total days these employees spent engaged in the activities of cruising, appraising, marking, scaling, and inspection. The figure thus obtained was divided by the total quantity of board feet of timber scaled during 1959. In this manner, a cost of $0.71 per thousand board feet cut was calculated for that year.[73]

The average cost for 1960 and 1961 ($0.50 per thousand board feet of timber) was derived from the 1959 computation above, except that work days relating to the inspection function were eliminated from the calculation.[74]

The petition filed in this case claims, inter alia, an overpayment of tax due to "Commissioner's failure to allow claims for deduction of costs of cruising, marking, and other expenses in connection with timber." In this regard, the petition states:

(1) For each of the taxable years ended December 31, 1959, 1960 and 1961, Southern Pacific Land Company incurred expenses in cruising and marking timber and other activity pertaining to its standing timber.

(2) In the consolidated returns for the taxable years ended December 31, 1959, 1960 and 1961, Southern Pacific Land Company inadvertently treated the foregoing as expenses incident to sale of timber pursuant to cutting contracts and offset them against section 631(b) capital gains.

(3) On audit certain adjustments were made, but the Commissioner's agents

---

[73]Petitioner argues that this method of calculation on the returns for the years at issue came about as a result of a Revenue Service audit of prior years and does not reflect petitioner's thinking. Respondent contends that the ongoing audit did not influence the employees of the former Southern Pacific Co. who prepared the returns. Our conclusions herein are based on the facts of record, and we give little significance to the question of where the calculation originated. For the years 1954 through 1958, all of the expenses incident to SPLC's stumpage sales under cutting contracts were deducted on the consolidated income tax returns as ordinary and necessary business expenses. Upon audit of these returns, respondent disallowed "direct costs of timber sales" as ordinary deductions and applied them to offset income from timber sales. These direct costs were calculated by multiplying the timber cut in the year by a rounded average cost per thousand board feet of $0.70. This average cost was calculated with 1959 figures under the method above described. In 1964, the former Southern Pacific Co., as parent of the consolidated group, paid a deficiency based in part upon the foregoing method of adjustment, reserving the right to file claims for refund (which claims were, in fact, filed in 1968).

[74]Our findings herein relating to the dollar amounts at issue and to the board feet scaled during the years at issue are based on the stipulations of the parties. When these stipulated figures are employed in the calculations above described, the average costs for 1959, 1960, and 1961 are approximately $0.73, $0.52, and $0.51, respectively. In our consideration of this issue, we have relied on the stipulated amounts.

erroneously continued to treat amounts of $65,518.42, $24,656.28, and $33,457.77 as such sales expenses to be offset against section 631(b) capital gains for the taxable years ended December 31, 1959, 1960 and 1961, respectively.

(4) The Commissioner has failed to allow claims by Southern Pacific Land Company for deduction of the foregoing amounts as ordinary and necessary business expenses for the taxable years ended December 31, 1959, 1960 and 1961.

## OPINION

### Issue (kk)

During the years 1959, 1960, and 1961, petitioner[75] received proceeds of sales under cutting contracts falling within the purview of section 631(b). That section, in the circumstances therein specified, provides for capital gains treatment of the proceeds from the disposal of timber of certain cutting contracts with a retained economic interest.[76] See sec. 1.631-2(a)(2), Income Tax Regs. Also during 1959, 1960, and 1961, petitioner incurred expenses in the form of salaries for forestry work performed by its employees.

As a general rule, "ordinary and necessary expenses" of a taxpayer's business are deductible under section 162. However, even if related to a business, such expenses are treated as capital expenditures when they are incurred in the acquisition or disposition of a capital asset. Capital expenditures "are added to the basis of the capital asset with respect to which they are incurred, and are taken into account for tax purposes either through depreciation or by reducing the capital gain (or

---

[75]The term "petitioner" includes, in context, the Southern Pacific Land Co.

[76]SEC. 631. GAIN OR LOSS IN THE CASE OF TIMBER, COAL, OR DOMESTIC IRON ORE.

(b) DISPOSAL OF TIMBER WITH A RETAINED ECONOMIC INTEREST. —In the case of the disposal of timber held for more than 6 months before such disposal, by the owner thereof under any form or type of contract by virtue of which such owner retains an economic interest in such timber, the difference between the amount realized from the disposal of such timber and the adjusted depletion basis thereof, shall be considered as though it were a gain or loss, as the case may be, on the sale of such timber. In determining the gross income, the adjusted gross income, or the taxable income of the lessee, the deductions allowable with respect to rents and royalties shall be determined without regard to the provisions of this subsection. The date of disposal of such timber shall be deemed to be the date such timber is cut, but if payment is made to the owner under the contract before such timber is cut the owner may elect to treat the date of such payment as the date of disposal of such timber. For purposes of this subsection, the term "owner" means any person who owns an interest in such timber, including a sublessor and a holder of a contract to cut timber.

increasing the loss) when the asset is sold." *Woodward v. Commissioner*, 397 U.S. 572, 574–575 (1970).

Thus, if the forestry expenses at issue in the present case were incurred in connection with a timber transaction described in section 631(b),[77] the provisions of section 162 will not apply. Instead, the expenses will be viewed either as additions to basis[78] or as selling expenses applied in reduction of the amount realized on the sale.[79] Clearly, the expenses will not be currently deductible. *Woodward v. Commissioner, supra.*[80]

Petitioner's position is that the forestry activities were not directly related to the sales of timber but were primarily directed at carrying out its timber management program, even though some of the activities may have had some incidental connection with the sales of timber. Accordingly, petitioner contends that the full amount of the salaries paid for forestry work is deductible against ordinary income as a section 162 business expense. Respondent's position is that the allocated expenses here involved are directly related to the sales of timber under section 631(b) and must be offset against the price received for the timber, thus reducing the capital gain realized on the disposal of the timber.

Respondent's position, herein, follows the one taken by him in Rev. Rul. 71–334, 1971–2 C.B. 248, dealing with expenses directly related to timber disposals under section 631(b), and in Rev. Rul. 58–266, 1958–1 C.B. 520, dealing with expenses directly related to disposals under the predecessor of section 631(b), section 117(k)(2) of the 1939 Code. Both of these rulings conclude that direct expenditures are to be applied as offsets to the capital gains from such disposals.

Rev. Rul. 71–334 provides in part:

---

[77]It is unnecessary here to draw any distinction between transactions which involve the sale of a capital asset and transactions which, under the Code, are treated *as though* they involve such a sale. See *Davis v. Commissioner*, 74 T.C. 881 (1980) (Court-reviewed), a case arising under sec. 631(c).

[78]See our discussion *infra* of *United States v. Regan*, 410 F.2d 744 (9th Cir. 1969), cert. denied 396 U.S. 834 (1969).

[79]See the cases cited *infra* in note 86.

[80]In an alternative argument, petitioner contends that, even if the instant expenses are considered to be directly related to the sec. 631(b) timber disposals, they are nonetheless currently deductible. For the reasons given subsequently in this opinion, we believe petitioner is in error.

In connection with a disposal of timber, so as to produce the maximum income therefrom, the taxpayer expended certain amounts directly attributable to the disposal for:

(1) advertising the timber for disposal;

(2) cruising to determine the quantity and quality of timber to be disposed of;

(3) marking or otherwise designating the timber for cutting;

(4) marking seed trees to be retained;

(5) scaling, measuring, or otherwise determining the quantity of timber cut;

(6) fees paid to consulting foresters, selling agents, and others for services directly related to the timber disposal;

(7) supervising or checking performance under the contract; and

(8) other expenses directly attributable to the disposal.

$$* \qquad * \qquad * \qquad * \qquad * \qquad * \qquad *$$

It has been the consistent position of the Internal Revenue Service, in connection with transactions qualifying for capital gain or loss treatment, that selling expenses are treated as an offset to the selling price. [Citations omitted.] Since the selling expenses in a sale of a capital asset are considered in arriving at income subject to a capital gain tax, it is reasonable to give like consideration to direct expenses in connection with income from leases. * * *

$$* \qquad * \qquad * \qquad * \qquad * \qquad * \qquad *$$

* * * it is held that expenditures directly attributable to a disposal of timber subject to the provisions of section 631(b) of the Code are reductions of the "amount received" for the purpose of computing gain or loss from such disposal.

On the question of whether or not an expenditure is directly related to a timber cutting contract, Rev. Rul. 71-334 provides:

Whether any expenditure is directly attributable to a disposal of timber is to be determined largely on the strength or persuasiveness of the facts of each particular case and how closely related are the activities in connection with which the expenditure is incurred to the disposal of the timber.

Respondent argues the evidence establishes that a substantial portion of forestry activity was directly attributable to the disposal of timber under the cutting contracts. While respondent seems to admit that some portion of the salaries at issue were paid for work that was management oriented, he contends that petitioner expended not less than the stipulated amounts ($65,518.42 in 1959, $24,656.28 in 1960, and $33,457.77 in 1961) on activities that were directly related to the section 631(b) contracts. Accordingly, respondent concludes that no portion of these amounts is deductible as a management expense.

Petitioner views the evidence as showing the forestry activities to be primarily management oriented and only incidentally related to sales. In this regard, petitioner believes the instant

case is similar to *Union Bag-Camp Paper Corp. v. United States,* 163 Ct. Cl. 525, 325 F.2d 730 (1963).[81] There the Government argued that, to the extent of 5 percent of the total cutting contract receipts in that case, the taxpayer's expenses were to be applied to offset capital gains from the disposition of timber. In refusing to accept the Government's allocation, the court stated (163 Ct. Cl. at 545, 325 F.2d at 741):

> The record shows that during 1949 plaintiff's [taxpayer's] employees did spend a small part of their time negotiating sales prices for cutting contracts, designating areas to be cut, marking certain trees to be left standing, making casual checks as to quantities of timber cut, and occasionally inspecting the areas involved after cutting had been completed. * * * The record further shows, however, that the foregoing activities were only incidental to overall forest management activities, and that, even the complete elimination of the contract activities would have affected total management expenses in nominal amounts. * * *

In *Union Bag-Camp Paper Corp v. United States, supra,* the facts were quite different from those we have found here. In that case, the taxpayer had acquired timberlands solely for the purpose of assuring itself of a constant source of its raw material, woodpulp. The expenses of negotiating and supervising cutting contracts were only a nominal portion of its overall forest management expenses which were in issue, and the sale of timber under cutting contracts was only incidental to the primary purpose for acquiring and managing timberlands. In this case, SPLC had been in the business of selling its timberlands outright until it realized that it would be more efficient and profitable to sell the timber through cutting contracts. Selling timber at a profit was SPLC's principal objective. As can be seen from our extensive findings relating to the reconnaissance, line-running, marking, cruising, appraising, scaling, and inspection activities, the evidence of record demonstrates that basically these forestry activities resulted from and were in furtherance of the disposal of timber under section 631(b) cutting contracts. While to some extent a portion of these activities served long-term management goals in addition to their immediate sales-related purpose, the forestry work, to a

---

[81]*Drey v. United States,* an unreported District Court opinion (E.D. Mo. 1960, 61–1 USTC par. 9116, 7 AFTR 2d 333), also relied on by petitioner to establish the unrelated nature of petitioner's expenditures, is not supportive of petitioner's contentions for reasons discussed below.

very substantial degree, would not have been required were it not for an actual or potential contract for the sale of timber. In this respect, the instant case is distinguishable, as well, from *Wilmington Trust Co. v. United States*, 221 Ct. Cl.___ , 610 F.2d 703 (1979), a more recent opinion of the Court of Claims touching upon this question.

In contrast to the *Union Bag* and *Wilmington Trust* cases, the forestry activities at issue in the case at bar were engaged in primarily *because of* the timber sales, and in most instances, the fulfillment of management goals was merely an incidental benefit of such activities. Here, as our findings indicate, the major portion of the forestry salaries was paid for work that had an immediate connection with, and bore a close, casual, and proximate relationship to, the section 631(b) timber disposals. We therefore view such expenditures as directly related to the timber sales and as coming within the purview of Rev. Rul. 71–334.

Further, we agree with respondent that petitioner expended not less than the stipulated amounts for this purpose. The amounts stipulated to be at issue for the years 1959, 1960, and 1961, are, respectively, $65,518.42, $24,656.28, and $33,457.77. These figures were calculated by multiplying the total quantity of timber SPLC sold in each year under section 631(b) contracts by an average cost. As shown by our findings, the average cost figure in each year was based on the total number of days SPLC's forestry employees engaged, during 1959, in the specific activities of cruising, appraising, marking, and scaling. The 1959 average cost figure also took into account the days spent in the inspection function. The evidence does not establish that time spent in other activities relating to the section 631(b) contracts, i.e., reconnaissance and line running (and in 1960 and 1961, inspection), entered into the computation of average cost.

The record does not apprise us with precision of the extent to which, under section 631(b), all forestry functions served a sales purpose and the extent to which they did not.[82] Nevertheless, it is clear that these functions served such a sales purpose to a very substantial degree. For this reason and for the reason that time

---

[82]This deficiency in the record must of necessity work to petitioner's detriment since it has the burden of proof as to this issue. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142, Tax Court Rules of Practice and Procedure.

spent by employees in significant activity related to the cutting contracts was not considered in computing the dollar amounts set out above, we are of the opinion, based on all the evidence before us, that these stipulated figures reflect no less than the minimum amount spent by petitioner on salaries for work occasioned by the section 631(b) timber sales.

Petitioner adopted the formula discussed herein for the purpose of attributing portions of the total forestry salaries to activities directly related to the section 631(b) contracts and, by necessary implication, to attribute the remainder of the salaries to activities not so related. In using this formula (regardless of where it originated), petitioner has adopted a method of allocation which petitioner cannot now repudiate without establishing it to be unreasonable and erroneous. The evidence of record does not do so, and we must hold petitioner to the allocation method it employed.

Under Rev. Rul. 71–334, the stipulated amounts, reflecting those forestry salaries directly attributable to disposals of timber under section 631(b), are properly offset against the gain from such disposals.

Petitioner makes the additional argument that the timber sales, themselves, were a management tool and, therefore, that even sales-related expenditures should be deductible under section 162. We cannot agree. It seems clear to us that the timber sales were conducted for the sales revenue they produced for SPLC and indirectly for the freight revenues produced for the former Southern Pacific Co. All sales-related activity was directed at consummating sales of timber and not at achieving some obscure management goal. The fact that some portion of petitioner's forestry activities was incidently related to management does not convert the timber sales into a management activity.

In support of its position, petitioner cites *Alabama Mineral Land Co. v. Commissioner*, 28 B.T.A. 586 (1933). That case involved the deduction of cruising expenses as ordinary and necessary business expenses by a trader in timber and timberlands. We regard that case as having limited precedential value because it predates the statute at issue and does not involve sales which are related to cutting contracts, as does the case at bar. Petitioner also regards the *Union Bag* opinion as supportive of its position, but for the reasons given above (and for the reasons

given subsequently in this opinion), we find that case not to be controlling. Other authority and evidence cited by petitioner are not adequate to convince us that the sales at issue herein were primarily a management tool and that expenses attributable to such sales are thereby deductible under section 162.

Petitioner would have us conclude that Rev. Rul. 713–334 and Rev. Rul. 58–266 are not accurate reflections of· the law. Petitioner makes reference to congressional committee reports associated with the Revenue Act of 1954 and argues that these reports are in conflict with the position adopted by the respondent in his rulings. Petitioner asserts that these reports support its view that, even where expenditures are directly attributable to the disposal of timber under the provisions of section 631(b), they are deductible against ordinary income and are not in any way to be applied as a reduction of the capital gains from such disposal.

We have carefully considered the pertinent legislative history. See H. Rept. 1337, 83d Cong., 2d Sess. 59, A67 (1954); S. Rept. 1622, 83d Cong., 2d Sess. 229, 337 (1954); H. Rept. 2543, 83d Cong., 2d Sess. 33 (1954). While language can be found in those reports which would tend to support petitioner's argument, the legislation which was being considered did not deal directly with the deductibility of the expenses associated with timber contracts as "ordinary and necessary expenses" under section 162. As a result, the reports have little significance in the present circumstances and clearly do not stand as authority for the proposition petitioner advances.

More importantly, the reports seem to be concerned with expenses which differ, for the most part, from the forestry expenses at issue herein. The reports discuss property taxes, insurance costs, costs of administering timber leases, costs of timber measurement, and interest on loans attributable to timber. The reports do not seem to be dealing with expenses, such as we are concerned with here, which are directly related to and occasioned by the specific disposals of timber to which the statute is directed. Many of the expenses discussed in the committee reports are of the type that usually are deductible from ordinary income by any taxpayer regardless of the context in which incurred (such as interest and property taxes). Other expenses dealt with in the reports which might have a sales connotation (such as the costs of timber measurement) are of the

type that usually would have been deductible from ordinary income prior to the enactment of section 117(k)(2) because the gains from timber disposals had previously been taxed at ordinary rates. We believe the committee reports are concerned with preserving for the owners of timberlands the right to deduct as ordinary expenses such expenses as are not directly related to the timber disposals covered by the statute. We do not read the reports as suggestive of an intent to preserve as deductions from ordinary income those expenses which are directly related to the specific transactions being accorded capital gains treatment under the Code.

We do not agree with petitioner that the committee reports are supportive of its position, and we do not believe an extended law review article discussion of our reasoning is either necessary or justified in this lengthy opinion.

We conclude that, under the relevant case authority, petitioner is required to treat its forestry expenses as a reduction of its gains under the cutting contracts and not as a reduction of its ordinary income. This conclusion finds support in a decision of the Court of Appeals for the Ninth Circuit (to which an appeal in this case would normally lie). See *United States v. Regan*, 410 F.2d 744 (9th Cir. 1969), cert. denied 396 U.S. 834 (1969), a case involving section 631(b). There, the court held that expenses "directly related to the acquisition and disposal of timber" pursuant to a contract to which section 631(b) applies are required by the Code to be added to basis.

The pertinent statutory language found in section 631(b) is as follows:

the difference between the amount realized from the disposal of such timber and the *adjusted depletion basis* thereof, shall be considered as though it were a gain or loss, as the case may be, on the sale of such timber. [Emphasis added.]

As to the meaning of "adjusted depletion basis," section 612 provides:

the basis on which depletion is to be allowed in respect of any property shall be the adjusted basis provided in section 1011 * * *

In section 1011, the following language appears:

The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis (determined under section 1012 * * * ), adjusted as provided in section 1016.

Section 1016, entitled "Adjustments to Basis," states:

Proper adjustment in respect of the property shall in all cases be made * * * for expenditures * * * properly chargeable to capital account * * *

After reviewing these provisions of the Code, the Court of Appeals in *United States v. Regan, supra,* concluded that "when all of the pieces are pasted together, we can see that section 631(b) contains a direction to include capital expenses as an addition to the cost of the timber to reach 'adjusted depletion basis.' " 410 F.2d at 746. To a similar effect, regarding the term "adjusted depletion basis" in section 631(c), see our recent opinion in *Davis v. Commissioner,* 74 T.C. 881 (1980) (Court-reviewed).[83]

Other cases, decided before *Regan,* ostensibly support petitioner's position. None of these cases, however, gives any consideration to the term "adjusted depletion basis" appearing in section 631(b) (and in its predecessor section under the 1939 Code). See, e.g., *Union Bag-Camp Paper Corp. v. United States,* 163 Ct. Cl. 525, 325 F.2d 730 (1963); *Drey v. United States,* an unreported opinion (E.D. Mo. 1960, 7 AFTR 2d 333, 61–1 USTC par. 9116); *Ransburg v. United States,* 281 F. Supp. 324 (S.D. Ind. 1967). In *Regan,* the Court of Appeals expressly took issue with the Court of Claims' conclusion in the *Union Bag* case that section 631(b) did not require the offsetting of related expenses. *Regan* called this conclusion "dicta," and stated that it was "not persuaded, as was the Court of Claims, that Congress intended to give timber cutters a tax bonanza instead of a capital gains benefit." 410 F.2d at 746. In a later case, *Casey v. United States,* 198 Ct. Cl. 232, 459 F.2d 495 (1972), the Court of Claims agreed with the approach adopted by the Ninth Circuit, in a case which presented the same facts as *Regan.*[84]

We agree with the view expressed in the *Regan* opinion that the *Union Bag* case incorrectly concluded that expenses directly related to a section 631(b) transaction are deductible under section 162. Cf. *Davis v. Commissioner, supra.* We note that recently the Court of Claims turned down an opportunity to

---

[83]While *Davis v. Commissioner, supra,* deals with disposals of coal under sec. 631(c) and related royalty expenses and is therefore distinguishable, the case is nonetheless supportive of the position adopted herein.

[84]Cf. *Coors v. Commissioner,* 60 T.C. 368, 403 (1973), affd. 519 F.2d 1280 (10th Cir. 1975).

reaffirm that position. See *Wilmington Trust Co. v. United States, supra.*[85]

Accordingly, we hold that an offset against capital gains is necessary here. It is not critical for our present purposes to determine whether the expenses at issue should be viewed as additions to basis (like the expenses in *Regan* and *Davis*) or as selling expenses to be applied in reduction of the proceeds of the section 631(b) cutting contracts (like the expenses in Rev. Rul. 71–334).[86] On the facts of this case, the result would be the same. What *is* significant is that there is clearly no justification for applying these expenses in reduction of petitioner's ordinary income.

Consistent with the foregoing discussion, we conclude and hold that petitioner must apply the respective amounts of $65,518.42, $24,656.28, and $33,457.77, during the years 1959, 1960, and 1961, to offset its capital gains under the section 631(b) cutting contracts.

We decide this issue for respondent.

## IV. DEDUCTIONS INVOLVING HOUSTON DEPOT[87]

This issue presents the following questions for our consideration:

Whether, as a result of a transaction involving the sale of certain property to the United States in 1959:

---

[85]In *Wilmington Trust Co. v. United States*, 221 Ct. Cl.     , 610 F.2d 703 (1979), the Court of Claims found it unnecessary to reach the question of whether *Union Bag-Camp Paper Corp. v. United States*, 163 Ct. Cl. 525, 325 F.2d 730 (1963), should be overruled insofar as it holds that, under the Code, the expenses there at issue would be deductible *in any event* (i.e., even if directly attributable to cutting contracts). The Government had argued that the *Union Bag* case was incorrect in this respect. The court said it did not have to address this question because of its conclusion that the expenses in *Wilmington Trust* were incurred primarily to maintain and improve the timber, without regard to timber sales. See 610 F.2d at 708.

[86]It has long been established that, in a capital gains context, selling expenses are to be offset against the selling price (i.e., are a reduction of "amount realized") rather than applied as an addition to the basis of the property sold. See, e.g., *Thompson v. Commissioner*, 9 B.T.A. 1342, 1345–1346 (1928); *Giffin v. Commissioner*, 19 B.T.A. 1243 (1930); *Hunt v. Commissioner*, 47 B.T.A. 829, 839 (1942); *Davis v. Commissioner*, 4 T.C. 329 (1944), affd. 151 F.2d 441 (8th Cir. 1945), cert. denied 327 U.S. 783 (1946); *South Texas Properties Co. v. Commissioner*, 16 T.C. 1003, 1010 (1951); and *Ward v. Commissioner*, 20 T.C. 332, 340–343 (1953), affd. 224 F.2d 547 (9th Cir. 1955). See also *Lanrao, Inc. v. United States*, 422 F.2d 481 (6th Cir. 1970); *Estate of Machris v. Commissioner*, 34 T.C. 827, 829 (1960); *General Spring Corp. v. Commissioner*, a Memorandum Opinion of this Court dated July 27, 1953.

[87]In trying and briefing this case, this issue was referred to by the parties as "*Issues (w) and (x).*"

(a) Petitioner may deduct the adjusted basis of its Houston depot under section 165 or section 167; or

(b) Petitioner may deduct the fair market value of its Houston depot as a charitable contribution under section 170.

## FINDINGS OF FACT

### Issues (w) and (x)

Some of the facts relating to this issue have been stipulated by the parties, and those facts, with associated exhibits, are incorporated herein by this reference.

In March 1958, the Texas & New Orleans Railroad Co. (T & NO)[88] owned a contiguous parcel of land in Houston, Tex., consisting of 31.701 acres. A railroad passenger station and related facilities known as the Grand Central Passenger Station had been constructed on the 31.701-acre parcel and opened for use on September 1, 1934. The multistory station building also contained office space used by the T & NO. (The said station building and related facilities are hereinafter sometimes referred to as the "Houston depot" or as the "improvements.")

In March of 1958, at the request of the U.S. Post Office Department (hereinafter sometimes referred to as Post Office), negotiations commenced between officials of the Post Office and officers of the T & NO with respect to possible acquisition by the Post Office of a portion of the 31.701 acres.

The Post Office Department was considering the construction of new mail-handling facilities in Houston. It had already purchased large parcels of property in the vicinity of the Houston depot and had constructed a two-story masonry structure adjacent to it for handling parcel post.

In March of 1958 at a meeting in the offices of the Houston postmaster, T & NO officials were advised that the Post Office was considering the construction of additional mail-handling facilities in the area of the Houston depot. The T & NO officials indicated that the depot site might be available. Railroad passenger traffic had declined since the passenger station was

---

[88]During the periods here in issue and all times relevant to this issue, the Texas & New Orleans Railroad Co. (T & NO) was a wholly owned subsidiary of the former Southern Pacific Co.

opened in 1934, and the depot building was larger in size than was needed for passenger traffic in 1958.[89] While some of the property on the depot site was vital to railroad operations, the T & NO officials believed the depot and the underlying land could be sold if a satisfactory price and other terms could be arranged and if substitute facilities were provided.

The Post Office Department initially expressed interest in purchasing from the T & NO a 14.58-acre parcel of this property, including the passenger station and related facilities situated thereon. The Post Office Department had no use for these facilities and it was its intention to demolish them in order to build a postal facility. The representatives of the T & NO were made aware of this fact.

After preliminary investigation, including the obtaining of appraisals by both parties, the representatives of the T & NO and the Post Office began negotiations relating to the sale of the 14.58-acre parcel by the T & NO to the Post Office. While the appraisers differed somewhat in their approaches to the problem and the appraised values varied to some extent, the appraisers of both parties suggested a value for the 14.58-acre parcel and the improvements thereon of somewhere in the vicinity of $3 million.

In preliminary negotiations, the T & NO quoted to the Post Office a price of approximately $3 million for the 14.58-acre parcel, including the improvements. In light of this price, the Post Office reassessed its needs and determined that its requirements might be reduced from 14.58 acres to 10.66 acres.

At a meeting held between T & NO and Post Office representatives on August 6, 1958, the Post Office representatives informed the T & NO that they were interested in only 10.66 acres of the T & NO property and that the improvements then on the property were without value to the Post Office. At this meeting, the representatives of the T & NO were informed that the Post Office would be willing to spend something over a million dollars for the 10.66-acre tract, as well as provide new passenger and division office facilities for the T & NO and severance damages on the remaining property, but that the Post Office would not pay anything for the depot building. The Post

---

[89]The T & NO's Houston passenger facility in June of 1958 was servicing four pairs of trains daily. When it was constructed in September of 1934, it serviced 26 pairs of trains daily.

Office was willing, however, to take the depot with the property on the assumption that the salvage would offset the cost of wrecking, or to give the T & NO the option of demolishing the building and delivering to the Post Office the cleared property.

Upon deliberation, the T & NO reassessed its position and determined to make a counteroffer to the Post Office in the amount of $2,122,000. This counteroffer was presented to the Post Office representatives by the representatives of the T & NO at a meeting in Washington on November 4, 1958. At that meeting, the Government officials advised that, while the appraisals of both parties were close, the Post Office could not spend $2,122,000 for a Houston site and had only $1,600,000 for that purpose. The parties understood that the Post Office did not want, and would pay nothing for, the depot. T & NO was informed that the Post Office would also not be able to provide a replacement railroad station. The T & NO officials were asked to consider this new proposal. Although disappointed, the T & NO officials decided on the next day to advise the Post Office Department of their willingness to accept the $1,600,000.[90]

Also on the following day, the Post Office Department wrote to the T & NO that "unless you are willing to negotiate further within the next three weeks and to agree on a price commensurate with fair market value for the sale of [the 10.66 acres at the depot site] to the Government, it will be necessary for this Department to institute condemnation against your property for the purpose of acquisition." The reason for the writing of this letter is not clear, although it apparently was not written at T & NO's request.

On November 14, 1958, T & NO, "in recognition of the Post Office Department's right of eminent domain as referred to in [the] letter of November 5," advised the Post Office by letter that T & NO would enter into a sales contract with the Post Office Department under which the 10.66-acre tract of land in question would be conveyed to the Post Office in consideration of payment by the Post Office of $1,115,000 for the land being taken, and of $485,000 for severance damages to the adjacent

---

[90]In the course of their negotiations, each of the parties obtained appraisal reports relating to valuation of the land and improvements, and various offers and counteroffers were made. Petitioner believes that the amount which T & NO ultimately received reflected the fair market value of the underlying land.

land. The sales contract would have to contain a number of provisions, including:

1. Land (passenger station and division office building to be abandoned by Railroad in place and with no value recognized by Post Office Department) to be conveyed * * * . Railroad reserves the right to demolish the passenger station and division office building and recover the salvage if it elects to do so.

At that time, T & NO officials anticipated that there would be no taxable gain as a result of the sale and expected that they would be entitled to a deduction for an abandonment loss. In their inter sese communications regarding the negotiations, they used a figure of approximately $236,000 as the tax benefit from a deduction of the $455,000 depreciated value of the building as an abandonment loss.

The Post Office Department, in a letter dated November 24, 1958, stated it would prepare formal contracts embodying the terms of sale in T & NO's November 14, 1958, letter. The Post Office Department subsequently submitted a proposed agreement, and the parties negotiated certain modifications. One change involved the deletion of a provision calling for the sale of "buildings and improvements."

On May 14, 1959, the T & NO and the Post Office Department, in the name of the United States of America, entered into an agreement of sale, which, among other things, at paragraph 9 provided:

9. This sale does not cover any of the buildings or other improvements upon the property described in section 1 hereof, and Seller reserves the right, subject to the conditions hereinafter specified, to demolish or remove all or any part of said buildings and other improvements. Seller shall remove from the premises on or before November 30, 1959, all railroad trackage, umbrella-type train sheds, concourse enclosures, auxiliary buildings, and furniture and air-conditioning equipment in the passenger station and division office building now located on the premises to be conveyed. Seller will lose the right to remove or demolish all other buildings and improvements, or parts thereof, upon the aforesaid premises if it does not notify the Government on or before August 1, 1959 which buildings, improvements, or parts thereof, it intends to demolish or remove, and if it does not thereafter complete the removal and demolition of said buildings, improvements, or parts thereof, included within the notice, plus the resulting debris, from the site on or before the possession date of November 30, 1959. * * * Any buildings or improvements on the property which seller does not elect to remove and the removal of which is not completed within the time specified above, shall automatically revert to the Government and shall be the absolute property of the Government, and the Government

shall be free to remove said buildings or improvements, at its own expense, or otherwise use or dipose of them as it deems fit.

The agreement further provided in part:

> 2. The price is one million six hundred thousand dollars ($1,600,000), covering both the land conveyed and damages to the remaining land of Seller, * * *

T & NO had not contemplated replacement of the Houston depot until the Post Office opened negotiations for the purchase of the property under discussion. A passenger facility of some sort was essential to T & NO's business in Houston during the period here in question. T & NO gave consideration to joining other railroads in using the Union Depot in Houston but could not make satisfactory arrangements. T & NO thereupon began construction of a new railroad station to replace the Houston depot. The substitute station was built one block west of the Houston depot at an overall cost of $241,389.31 and was a single-story structure containing 2,950 square feet of space as compared with the Houston depot's 63,775 square feet.[91]

On July 23, 1959,[92] T & NO wrote the Post Office Department, as follows:

> Under provisions of Article 9 of Agreement of Sale covering acquisition by Post Office Department of portion of Southern Pacific's passenger station property at Houston, it is required that notice be given to the Department on or before August 1, 1959, with respect to any buildings, improvements, or parts thereof now existing within the limits of the property to be acquired by the Department which Southern Pacific wishes to remove for its account prior to possession date of November 30, 1959.
>
> After full consideration, determination has been made that Southern Pacific does not desire to remove for its account any buildings or other improvements on the site beyond those items specifically enumerated in Article 9; namely, all railroad trackage, umbrella type train sheds, concourse enclosures, auxiliary buildings (of which there are none), and furniture and air-conditioning equipment in the main passenger station building. * * *

The T & NO did not remove the improvements on the property

---

[91]The substitute facility was placed in service on Oct. 26, 1959, on which date T & NO ceased using the depot building.

[92]It is noted that the deed conveying the property under discussion was executed on Sept. 28, 1959, and included a recital, as called for by the agreement of sale, that T & NO must give notice by Aug. 1, 1959, as to its intentions regarding its reservations in the improvements. The precise wording of the deed was dictated by the agreement of sale, and it was considered inappropriate to revise that language.

other than those above enumerated because the cost of demolition would have exceeded the salvage value of the improvements.

By deed dated September 28, 1959, the Texas & New Orleans Railroad Co. conveyed the 10.66 acres to the United States of America for and on behalf of the Post Office Department.[93] The deed included among its recitals a provision similar to paragraph 9 of the agreement of sale quoted above.

In accordance with the requirements of the agreement of sale and the deed, the Post Office Department, in 1959, paid to the Texas & New Orleans Railroad Co. $1,600,000. Payment was made in the following manner: $160,000 on May 26, 1959, and $1,440,000 at the closing on September 30, 1959. Of this amount, $485,000 was treated by the T & NO as severance damages to its remaining acreage.[94] T & NO treated the remaining $1,115,000 as received for the sale of land only, reporting no gain or loss.[95] T & NO incurred selling expenses of $7,794.65.

The sale transaction under discussion herein was negotiated by the parties at arm's length. The officials of the Post Office Department and of the T & NO agreed to a sale of the 10.66 acres for a price which both parties agreed was fair for the underlying land alone. The Post Office acquired this parcel in order to have postal facilities constructed thereon. It had no use for the existing improvements (the Houston depot). The United States Government paid for neither the improvements on the 10.66 acres nor the substitute passenger station.

As of the date of the sale of the 10.66 acres to the United States in 1959, only 25 years had expired of the estimated 60-year useful life of the Houston depot.

Shortly after the surrender of possession of the property by the T & NO on or about November 30, 1959, the Post Office caused the remaining improvements (the Houston depot) to be

---

[93]For ease of discussion, we sometimes hereinafter refer to this transfer as having been made to the Post Office Department. There is no dispute among the parties as to whether there was a qualified donee for purposes of sec. 170(c)(1).

[94]The parties have stipulated that this amount was correctly treated as a reduction in the T & NO's basis in the remaining acreage, which basis exceeded $485,000, and that consequently the receipt of the severance damages did not result in a taxable gain to the T & NO.

[95]There was no gain for Federal income tax purposes because the stated amount was exceeded by petitioner's tax basis in the land.

entirely removed by demolition in order to permit construction of the postal facilities.[96]

The Texas & New Orleans Railroad Co. claimed an ordinary deduction of $389,246.13 in the consolidated return filed by the former Southern Pacific Co. affiliated group for the year 1959, which amount was at that time thought, on the basis of preliminary data, to be the adjusted basis of the improvements on the 10.66 acres which remained when possession was given to the Post Office. This deduction was claimed on a schedule headed "Texas and New Orleans Railroad Company—Special Obsolescence Losses Year 1959 of Depreciable Property Included in Depreciation Reserve for Accounting Purposes," and was specifically identified as "Retire passenger depot and appurtenances. Depot site sold to U.S. Post Office Department." Because for book purposes all retirements of roadway properties are charged to the depreciation reserve, this deduction was also shown in the Schedule M reconciliation of tax accounting with book accounting as "unusual road property retirement."

For the purposes of this issue, the parties have stipulated that the cost of construction of the portion of the Houston depot facilities which remained on the 10.66-acre parcel conveyed to the U.S. Government when possession was given to the Post Office Department was $661,715.51 and that the adjusted basis of those facilities is $481,497.88. The adjusted basis of those improvements which were removed prior to the transfer of possession of the 10.66 acres to the Post Office is not included in the $481,497.88 figure.[97]

In his statutory notice, respondent denied the claimed retirement deduction. It is the respondent's position herein that the Texas & New Orleans Railroad Co. was entitled to a loss under section 1231 of the Internal Revenue Code of 1954 of $200,560.75, computed as follows:

---

[96]In the Houston depot at the time possession of the 10.66 acres was transferred to the Post Office Department were two murals with a total fair market value in 1959 of $6,250. Before having the building demolished, the Post Office Department removed the murals from the walls and put them in storage.

[97]Subsequent references in our opinion to the "Houston depot" or to "improvements" relate, unless otherwise indicated, to the improvements which remained on the land when possession was given to the Post Office.

| | | |
|---|---|---|
| Consideration received by T & NO ............... | | $1,115,000.00 |
| Less: Expenses of sale .............................. | | 7,794.65 |
| Net consideration received ......................... | | 1,107,205.35 |
| Basis of land ......................... | $826,268.22 | |
| Adjusted basis of improvements ......................... | 481,497.88 | 1,307,766.10 |
| Loss ............................................... | | (200,560.75) |

## OPINION

### Issues (w) and (x)

In 1958, petitioner[98] was approached by the Post Office Department which was looking for land on which to build a mail-handling facility in the area of petitioner's Houston depot. Petitioner expressed a willingness to sell the needed property, and extensive negotiations followed. Petitioner was willing to give up the Houston depot property, including the depot facility, itself, since petitioner's diminishing passenger business at that time obviated the need for a large passenger station. The Post Office, however, did not want to acquire the depot and declined to pay for it or for a substitute passenger facility. Ultimately, as detailed in our findings, the parties entered into an arm's-length sales transaction, and petitioner moved its passenger operations from the Houston depot to a new passenger station which it had constructed. The land was sold to the Post Office with the depot still on it; the Post Office immediately demolished the building.

Petitioner claims that, as a result of this transaction, it retired the Houston depot and is therefore entitled to a deduction under the provisions of section 1.167(a)–8, Income Tax Regs.[99]

---

[98] The term "petitioner" includes, in context, the Texas & New Orleans Railroad Co.

[99] Sec. 1.167(a)–8 Retirements.

(a) *Gains and losses on retirements.* For the purposes of this section the term "retirement" means the permanent withdrawal of depreciable property from use in the trade or business or in the production of income. The withdrawal may be made in one of several ways. For example, the withdrawal may be made by selling or exchanging the asset, or by actual abandonment. In addition, the asset may be withdrawn from such productive use without disposition as, for example, by being placed in a supplies or scrap account. The tax consequences of a retirement depend upon the form of the transaction, the reason therefor, the timing of the retirement, the estimated useful life used in computing depreciation, and whether the asset is accounted for in a separate or multiple asset account. Upon the retirement of assets, the rules in this section apply in determining whether gain or loss will be recognized, the amount of such gain or loss, and the basis for determining gain or loss:

(1) Where an asset is retired by sale at arm's length, recognition of gain or loss will be subject to the provisions of sections 1002, 1231, and other applicable provisions of law.

There can be no doubt that petitioner did retire the depot in the sense that there was a "permanent withdrawal of depreciable property from use in the trade or business." Sec. 1.167(a)–8(a). The question before us relates to the tax consequences which flow from that retirement. The resolution of this question turns on the manner in which the retirement was effected. Under section 1.167(a)–8, an asset can be retired by selling it (sec. 1.167(a)–8(a)(1)), exchanging it (sec. 1.167(a)–8(a)(2)), or abandoning it (sec. 1.167(a)–8(a)(4)).[100]

Petitioner seeks herein to obtain an ordinary deduction pursuant to section 1.167(a)–8, Income Tax Regs., for its adjusted basis in the retired depot.[101] A deduction of that nature on the facts before us is available to petitioner only if it can show an abandonment, as that term is used in section 1.167(a)–

---

(2) Where an asset is retired by exchange, the recognition of gain or loss will be subject to the provisions of sections 1002, 1031, 1231, and other applicable provisions of law.

(3) Where an asset is permanently retired from use in the trade or business or in the production of income but is not disposed of by the taxpayer or physically abandoned (as, for example, when the asset is transferred to a supplies or scrap account), gain will not be recognized. In such a case loss will be recognized measured by the excess of the adjusted basis of the asset at the time of retirement over the estimated salvage value or over the fair market value at the time of such retirement if greater, but only if—

(i) The retirement is an abnormal retirement, or

(ii) The retirement is a normal retirement from a single asset account (but see paragraph (d) of this section for special rule for item accounts), or

(iii) The retirement is a normal retirement from a multiple asset account in which the depreciation rate was based on the maximum expected life of the longest lived asset contained in the account.

(4) Where an asset is retired by actual physical abandonment (as, for example, in the case of a building condemned as unfit for further occupancy or other use), loss will be recognized measured by the amount of the adjusted basis of the asset abandoned at the time of such abandonment. In order to qualify for the recognition of loss from physical abandonment, the intent of the taxpayer must be irrevocably to discard the asset so that it will neither be used again by him for sale, exchange, or other disposition.

[100]These three provisions apply to instances, like the present one, where the taxpayer *parts with* the retired asset. It is also possible for a taxpayer to *retain* an asset and effect its retirement. See sec. 1.167(a)–8(a)(3), Income Tax Regs., which applies to situations "Where an asset is permanently retired from use in the trade or business or in the production of income but is not disposed of by the taxpayer or physically abandoned (as, for example, when the asset is transferred to a supplies or scrap account)." To a similar effect, see sec. 1.167(a)–8(a). As we point out, petitioner did not retain the depot among its assets. Since sec. 1.167(a)–8(a)(3) by its own terms does not apply to an asset which is "disposed of by the taxpayer or physically abandoned," that provision has no application in the case at bar.

[101]Although we are dealing here with regulations issued in connection with sec. 167, an abandonment loss deduction is within the purview of sec. 165. *Coors Porcelain Co. v. Commissioner*, 52 T.C. 682, 692 (1969), affd. 429 F.2d 1 (10th Cir. 1970); *Offshore Operations Trust v. Commissioner*, T.C. Memo. 1973–212; *Golden Gate Disposal Co. v. Commissioner*, T.C. Memo. 1979–199.

8(a)(4). Under the sale and the exchange provisions above cited, the adjusted basis is applied in a manner which would preclude the taking of the sought ordinary deduction.[102]

Petitioner has not established that it is entitled to an ordinary abandonment loss deduction.[103] The law is now clear that, when a taxpayer parts with improvements to real estate in connection with the sale of the underlying land, the taxpayer is not entitled to deduct the adjusted basis of the improvements as an ordinary abandonment loss unless he can establish that he reached a decision to abandon the improvements independently of, and not as an integral part of, the sale of the land. *Fox v. Commissioner*, 50 T.C. 813 (1968), affd. per curiam in an unreported order (9th Cir. 1970). See also *Standard Linen Service, Inc v. Commissioner*, 33 T.C. 1 (1959); *Simmons Mill & Lumber Co. v. Commissioner*, T.C. Memo. 1963–185. Compare *Storz v. Commissioner*, 68 T.C. 84, 97–98 (1977), revd. on another issue 583 F.2d 972 (8th Cir. 1978); *Reeder v. Commissioner*, T.C. Memo. 1980–165; *Tanforan Co. v. United States*, 313 F. Supp. 796 (N.D. Cal. 1970), affd. 462 F.2d 605 (9th Cir. 1972); cf. *United California Bank v. Commissioner*, 41 T.C. 437 (1964), affd. per curiam 340 F.2d 320 (9th Cir. 1965).[104]

A taxpayer may not take an ordinary abandonment loss deduction where his decision to abandon improvements is arrived at because of his decision to sell the underlying land. When an abandoment is motivated by an offer to purchase, the relationship of the claimed abandonment to the sale precludes an ordinary loss deduction. *Fox v. Commissioner, supra.* Cf. *Standard Linen Service, Inc. v. Commissioner, supra*; *Simmons Mill & Lumber Co. v. Commissioner, supra.* On the other hand, where the decision to abandon is arrived at for reasons unconnected

---

[102]See the discussion later regarding the treatment accorded adjusted basis in a sales context. (Clearly, there was no "exchange" involving the depot, and the parties do not suggest there was.)

[103]Were we writing on a clean slate we might reach the opposite conclusion. It is not clear from the evidence that the depot, per se, was sold or that any consideration was received for it; thus par. 8(a)(1) of sec. 1.167(a), Income Tax Regs., would not seem to be applicable. While the transaction does not fit comfortably in par. 8(a)(4) of the regulations, it would seem to fit there better than in any of the other subparagraphs of par. 8(a) because petitioner did simply walk away from the building. However, as noted in the discussion that follows, the case law has engrafted an exception on the physical abandonment provision which the facts in this case cannot escape.

[104]See also *Witkowski v. Commissioner*, T.C. Memo. 1978–25.

with the sale, an ordinary deduction may be taken. *Reeder v. Commissioner, supra.* Cf. *Storz v. Commissioner, supra.*

Our findings show that the retirement of the Houston depot was not an isolated act that occurred independently of the sale. It was the offer to purchase the underlying land which motivated petitioner to decide that the depot would no longer be used in its business and should be retired from such use. While the evidence of record shows diminishing use of that facility by petitioner and by the public, and suggests that a depot, in that form, was no longer needed in petitioner's business operations, it was not until the Post Office began its efforts to buy the property that petitioner decided it would terminate its operations at the depot. We believe it is quite clear on this record that the retirement of the Houston depot was motivated by the offers made by the Post Office and would not have occurred had it not been for the sale transaction.

It is not necessary for us to decide the difficult question of whether the Post Office actually purchased the Houston depot when it acquired the underlying land. Pursuant to the principles outlined in the *Fox* case, it is possible to view improvements as having been disposed of as an integral part of the sale of the underlying land even where the improvements are technically not included in the sale transaction. Cf. *Simmons Mill & Lumber Co. v. Commissioner, supra.*

In *Fox*, the taxpayers entered into an option agreement with a buyer for the sale of improved land owned by the taxpayer. The buyer did not want the improvements and would have paid the same price for the land with or without them. While the form contract executed by the parties contained a reference to the purchase of improvements, a rider specifically permitted the taxpayers to "remove any or all improvements or salvage from the property." 50 T.C. at 815. Although the taxpayers had the intention initially of moving the improvements, it became apparent, after the buyer exercised the option, that it would be too expensive to do so. As a result, the improvements were not removed by the taxpayers, and they claimed an abandonment loss in the amount of the unrecovered basis of the improvements (less certain salvage).

Although the claimed abandonment in *Fox* appeared on its face to be an integral part of the sale, the taxpayers argued that, at the time of the sale of the underlying land, they intended to

utilize the improvements and their decision to abandon them was reached subsequent to, and independently of, the sale of the land. We acknowledged in our opinion that, even on those occasions when "the sale of the underlying property may be the generating force for a taxpayer's determination as to what to do with the improvements," a taxpayer may still be entitled to an ordinary loss deduction where he can show that, "at the time the transaction which resulted in the alleged abandonment took place," his "state of mind" was such that he had a "fixed and meaningful intent to utilize" the improvements and that "there was a reasonable likelihood that such utilization would occur." *Fox v. Commissioner, supra* at 818–819.

The taxpayers in the *Fox* case did not have the requisite intent to utilize the improvements and, as a result, could not take an ordinary loss deduction. We concluded that the unrecovered basis of the improvements should be considered only as an adjustment to the price paid by the buyer, thereby reducing the taxpayers' gain on the sale.

The facts of the present case are similar to those of the *Fox* case in all significant respects. Here, as in *Fox*, the buyer sought to purchase only the underlying land and did not want, and was unwilling to pay for, the improvements. Petitioner, like the taxpayers in *Fox*, in consummating the sale, retained the right to remove the improvements at issue but did not do so. The evidence of record in this case does not show that petitioner had any intention of utilizing the depot at the time of the sale. Instead, in view of the fact that petitioner was planning to use a replacement facility, the evidence clearly establishes a contrary intent.[105]

Petitioner has attempted to distinguish *Fox* on small factual points which do not appear to be of controlling significance. We do not regard the facts of this case as sufficiently different from those of the *Fox* case to warrant a different conclusion.[106]

---

[105]Compare *Reeder v. Commissioner*, T.C. Memo. 1980–165, wherein we stated:

"In view of petitioners' initial and continuing interest in utilizing the improvements on the Rinehart Farm, the abandonment of such improvements was not an integral part of the sale, but was independent of the petitioners' conveyance of the land to [the buyer]."

[106]The principal difference in the facts in *Fox v. Commissioner*, 50 T.C. 813 (1968), affd. per curiam in an unreported order (9th Cir. 1970), and this case is that in *Fox* the taxpayers were motivated to make the sale by the attractiveness of the price offered (which might have

We hold that petitioner retired the Houston depot as an integral part of a sale transaction and that, pursuant to the holding of this Court in the *Fox* case, the adjusted basis of the depot must be added to the adjusted basis of the property sold to determine petitioner's gain or loss on the sale. Cf. *Standard Linen Service, Inc. v. Commissioner*, 33 T.C. at 18.

Accordingly, we agree with respondent's position that petitioner is not entitled to an ordinary abandonment loss but is entitled to a loss under section 1231 in the amount of $200,560.75.[107]

For the first time on brief, petitioner makes the additional argument that it may take the sought deduction as an obsolescence adjustment to remaining useful life. Petitioner's contentions in this regard are apparently based on sections 1.167(a)-9 and 1.167(a)-1(b), Income Tax Regs. Petitioner did not raise this matter in its pleadings nor did it address this question at trial, and neither the Court nor respondent was aware that this argument would be made. Under these circumstances, we are inclined to view the matter as not being properly before us. *Estate of Horvath v. Commissioner*, 59 T.C. 551, 555-557 (1973).

Even if we were to give consideration to petitioner's "useful life" theory, petitioner would have to show the applicability herein of section 1.167(a)-8(a)(3), Income Tax Regs. See *Coors Porcelain Co. v. Commissioner*, 52 T.C. 682, 692-694 (1969), affd. 429 F.2d 1 (10th Cir. 1970). As we have pointed out above, that regulatory provision has no application on the facts of this case. Petitioner has not established that the present case is a proper instance in which to apply the regulations on which he relies or that the application of those provisions to such relevant facts as may be of record will produce the deduction which petitioner seeks. Cf. *United California Bank v. Commissioner*, 41 T.C. 437, 455-456 (1964), affd. per curiam 340 F.2d 320 (9th Cir. 1965).

Petitioner makes the alternative argument that, as a result of the transaction at issue, it made a contribution to the U.S. Post

---

covered the value of the improvements as well) while here, the purchase price appears to have covered the value of the land only. However, this was not the basis for the Court's decision in *Fox*. See also *Simmons Mill & Lumber Co. v. Commissioner*, T.C. Memo. 1963-185.

[107] While our conclusion in this respect is based on the case authority cited in the body of the opinion, we note that this result is not incompatible with the provisions of sec. 1.167(a)-8(a)(1), Income Tax Regs.

Office for which petitioner is entitled to a deduction under section 170.[108]

Petitioner's alternative argument is based on the assumption that the Court, in concluding petitioner would not be entitled to an ordinary abandonment loss deduction, would base its conclusion on a finding that petitioner transferred the depot to the Post Office along with the underlying land. As a result, petitioner's contentions under section 170 proceed from that factual premise. However, as can be seen from our discussion of the abandonment loss issue it was not necessary for us to make such a finding.[109]

Obviously, if petitioner never effected a transfer of the depot to the Post Office, the statutory requirements of a "contribution or gift * * * to or for the use of * * * the United States," and of "payment * * * made within the taxable year" would not be satisfied.[110]

Further, even if we were to conclude that petitioner *did* transfer the depot to the Post Office, the statutory requirements would still not be met.

Inherent in the above-quoted language (and in the language

---

[108]SEC. 170. CHARITABLE, ETC., CONTRIBUTIONS AND GIFTS.

(a) ALLOWANCE OF DEDUCTION.—

(1) GENERAL RULE.— There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary or his delegate.

\* \* \* \* \* \* \*

(c) CHARITABLE CONTRIBUTION DEFINED.— For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of—

(1) A State, a possession of the United States, or any political subdivision of any of the foregoing, or the United States or the District of Columbia, but only if the contribution or gift is made for exclusively public purposes.

[109]Petitioner's primary position, of course, is that the depot was not transferred to the Post Office but was abandoned in place.

[110]It is a basic requirement of the statute that there be a completed gift within the taxable year. See, e.g., *Gagne v. Commissioner*, 16 T.C. 498 (1951). At one point on brief, petitioner appears to be suggesting that a transfer of the depot may not have been necessary; petitioner seems to be of the view that its act of releasing its right to reclaim the depot on July 23, 1959, prior to the execution of the deed, qualifies as a contribution because the release was of great value to the Post Office.

Petitioner does not develop this argument, and the evidence does not suggest what value, if any, might be ascribed to this claimed contribution. We therefore give no consideration to this contention. We do note in passing, however, that petitioner's right to reclaim the improvements was to be released in any event by operation of the deed on Aug. 1, 1959, and we are unable to see how petitioner's letter of release, 1 week earlier, would have the significance petitioner seems to attach to it.

of section 170(c)(1) which permits a deduction "only if the contribution or gift is made for exclusively public purposes"), is a requirement that a *benefit* be conferred by a taxpayer upon the U.S. Government (or upon the general public). *Doty v. Commissioner*, 62 T.C. 587, 590–593 (1974); *Markham v. Commissioner*, 39 B.T.A. 465, 471–472 (1939). In the *Doty* and *Markham* cases, we disallowed charitable deductions where the alleged governmental donee had not been benefited. See in this regard Rev. Rul. 77–232, 1977–2 C.B. 71, discussing the necessity under section 170(c)(1) for a governmental donee to "benefit from the contributions" and stressing the need for "contributions [to] be used in furtherance of whatever public functions the [donee] might perform.[111] See also *Citizens & Southern National Bank of S. C. v. United States*, 243 F. Supp. 900, 905 (W.D. S.C. 1965), allowing a deduction under section 170(c)(1) in view of the "extraordinary public benefit."[112] Under section 170, a showing that a claimed contribution has benefited a qualified donee is clearly a prerequisite to deductibility. See *Tate v. Commissioner*, 59 T.C. 543, 550–551 (1973); *Thriftimart, Inc. v. Commissioner*, 59 T.C. 598, 615 (1973). Petitioner does not disagree.

In addition, it has been held that, in order to support a claimed deduction for a charitable contribution, a taxpayer must show an *intent* to benefit the donee. See *Mason v. United States*, 513 F.2d 25 (7th Cir. 1975), in which the court, in a case arising under section 170, discussed the "critical question" of whether the taxpayer "intended to confer a benefit on the charity." 513 F.2d at 28.[113] See also *Knott v. Commissioner*, 67 T.C. 681, 689–691 (1977), wherein we allowed a corporation to take a deduction under section 170, noting that the individuals in control of the corporation "intended" to transfer valuable property rights to a foundation; and *Denver & Rio Grande Western Railroad Co. v. Commissioner*, 38 T.C. 557, 584 (1962), wherein we allowed a deduction under section 170(c)(1), observing "that it was the purpose of the petitioner * * * that the [contributed] locomotive

---

[111]Cf. Rev. Rul. 79–323, 1979–2 C.B. 106.

[112]See *Scharf v. Commissioner*, T.C. Memo. 1973–265, allowing a deduction under sec. 170(c)(1) in view of the "benefits inuring to the general public from the donation."

[113]See *Morton v. Commissioner*, T.C. Memo. 1979–484, allowing a deduction under sec. 170(c)(1), in view of the taxpayers' "intention of benefiting the general public."

was to be displayed at a place where it would be to the benefit of the * * * community and to the public generally."[114]

Initially, we should point out that petitioner has not been completely clear as to the nature of the contribution it claims to have made. Petitioner's clearest statement is made on reply brief, wherein it states that the gift "was in terms of not requiring the Post Office to pay consideration in the full amount which would have had to be paid by the Post Office if it had proceeded to condemnation of the property in question." Petitioner further states that the gift was not of the improvements (the depot); instead "the gift * * * was in generously foregoing its legal right to insist upon receiving full cash value for the improvements."

The difficulty with this argument is the scant evidence in the record relating to condemnation. The evidence before us estab-

---

[114]The extensive case law dealing with sec. 170 makes it clear that the term "charitable contribution," as it is used in sec. 170, is synonymous with the word "gift." *DeJong v. Commissioner*, 36 T.C. 896, 899 (1961), affd. 309 F.2d 373, 376–379 (9th Cir. 1962). See *Seed v. Commissioner*, 57 T.C. 265, 275 (1971), and the cases cited therein; *Knott v. Commissioner*, 67 T.C. 681, 689 (1977). In *Commissioner v. Duberstein*, 363 U.S. 278 (1960), the Supreme Court discussed the word "gift," as it is used in sec. 102(a), and held that for purposes of that section, a qualified gift must proceed from "detached and disinterested generosity * * * out of affection, respect, admiration, charity or like impulses." Where a transfer was made out of moral or legal duty or proceeded from "'the incentive of anticipated benefit' of an economic nature," the "gift" designation would not apply. The Supreme Court stated that "the most critical consideration * * * is the transferor's 'intention.'" 363 U.S. at 285. The principles applied in *Duberstein* with regard to the meaning of the word "gift" in sec. 102(a), have been held to be equally applicable in a sec. 170 context. *DeJong v. Commissioner, supra*; *Wolfe v. Commissioner*, 54 T.C. 1707 (1970); *Rhodes v. Commissioner*, T.C. Memo. 1977–33.

While the *Duberstein* criteria remain viable today with regard to determining whether an *individual* has made a charitable contribution under sec. 170, doubt has been cast as to appropriateness of applying the *Duberstein* tests to ascertain whether a *business entity* is entitled to a sec. 170 deduction. For example, see the following cases questioning or rejecting the *Duberstein* criteria: *United States v. Transamerica Corp.*, 392 F.2d 522 (9th Cir. 1968); *Stubbs v. United States*, 428 F.2d 885 (9th Cir. 1970); *Allen v. United States*, 541 F.2d 786 (9th Cir. 1976); *Singer v. United States*, 196 Ct. Cl. 90, 449 F.2d 413 (1971). See also *Crosby Valve & Gage Co. v. Commissioner*, 380 F.2d 146 (1st Cir. 1967), affg. on other grounds 46 T.C. 641 (1966), cert. denied 389 U.S. 976 (1967). These cases reflect the growing tendency to regard requirements of detached and disinterested generosity as too restrictive for a business entity. See the discussion of this point in *Dockery v. Commissioner*, T.C. Memo. 1978–63. See also in this connection *Marquis v. Commissioner*, 49 T.C. 695, 702 (1968). The courts have not followed a consistent pattern in this area. See *Perlmutter v. Commissioner*, 45 T.C. 311, 317 (1965).

It is not necessary for us in the present case to decide which of the various tests may be applicable herein. Before that question can be reached, it is essential that there first be a showing that petitioner complied with the statutory requirement of "a contribution or gift to or for the use of * * * the United States * * * for exclusively public purposes" by conferring a benefit on the United States. Since petitioner does not prevail on this preliminary question, we need not consider whether the additional requirements of sec. 170 have been satisfied.

lishes neither the likelihood of condemnation proceedings nor the probable result of such proceedings.[115] Nor does the record contain anything to show that the value of the alleged "gift" (not asserting a potential claim) would be measured by the fair market value of the depot, as petitioner seems to suggest. In view of the state of the record, we are unable to give any consideration to petitioner's assertion that the foregoing of legal rights in this instance was a benefit amounting to a gift for purposes of section 170.

However, petitioner also appears to be making another argument. At trial and in its opening brief, petitioner seems to take the position that a "bargain sale" was made to the Post Office. Under that theory, which presumes that petitioner transferred the depot to the Post Office along with the land,[116] the amount petitioner received in the sale transaction is subtracted from the total fair market value of the land and the depot. Cf. *Waller v. Commissioner*, 39 T.C. 665 (1963). The difference between these two amounts is petitioner's contribution under section 170(c)(1), the theory being that the Post Office was benefited to that extent.

Consistent with the preceding discussion, before we are able to conclude a gift was made for purposes of section 170(c)(1), we must first determine if the United States in fact received a benefit to the extent of the difference. Since petitioner attributes this difference to the fact that the Government received the depot at no cost, the question to be resolved is whether the transfer of the depot resulted in a benefit to the Post Office.

In this regard, we believe it is significant that the Post Office manifested complete disinterest in the depot and paid nothing for it in the sale transaction. The Post Office wanted the land only for purposes of constructing a mail-handling facility. Thus, the receipt of the land with the depot on it was not advantageous to the Post Office. The depot was actually a liability; before the Post Office could use the site for its intended purpose,

---

[115]We are inclined to agree that the Post Office would have had to pay a higher price had it condemned the land and the improvements. But that is not what happened. There is no solid evidence that the Post Office would have condemned had agreement not been reached, and there is no evidence that petitioner intended to make a gift to the United States by foregoing a condemnation proceeding.

[116]For purposes of the instant discussion, we accept this premise.

it had to have the structure demolished. More than likely, any benefit resulting from the transfer inured to petitioner, given the fact that petitioner was saved the expense of razing the depot, when it failed to remove all improvements within the time allotted.[117] Thus, even accepting the premise that there was a transfer of the Houston depot, we are unable to conclude from the evidence of record in this case that petitioner conferred the requisite benefit upon the U.S. Post Office.[118] Additionally, we are unable to view the transfer of the depot as one made "for exclusively public purposes," as required by the statute, when it was clear to all concerned that the depot would not be so used. Further, it seems unlikely to us that petitioner can justifiably claim it had the intention of benefiting the United States since petitioner knew the Post Office did not want the depot and would have to demolish it.

Although the petitioner did not begin the negotiations, petitioner was nonetheless willing to give up the properties at issue. If petitioner was unhappy with what it was being offered, it was not required to continue negotiations or consummate the transaction. We believe that the depot was transferred to the Post Office as part of a commercial transaction in which petitioner negotiated for the best terms it could obtain given the circumstances.[119] The fact that petitioner came to view these terms as unfavorable does not by itself justify a deduction under section 170. Moreover, the commercial nature of the transaction herein is another element serving to defeat petitioner's contention that it made a charitable contribution under section 170. *Audigier v. Commissioner*, 21 T.C. 665, 670 (1954); see also *Grinslade v. Commissioner*, 59 T.C. 566, 574 (1973).[120]

Whether petitioner is viewed as having abandoned the depot

---

[117]Compare *Scharf v. Commissioner*, T.C. Memo. 1973–265; cf. *Strandquist v. Commissioner*, T.C. Memo. 1970–84.

[118]Our conclusion that the U.S. Post Office received no benefit does not suggest that the depot had no objective value. See *McGuire v. Commissioner*, 44 T.C. 801 (1965). However, questions of valuation become pertinent under sec. 170 only after the statutory requirements have been satisfied. In view of our holding that these requirements have not been met, we need not reach the matter of fair market value.

[119]The fact that petitioner may have been partially motivated to accept the Post Office offer because it thought it would be entitled to an abandonment loss for tax purposes is irrelevant.

[120]See *Strandquist v. Commissioner*, T.C. Memo. 1970–84, in which the Court held an alleged gift was an integral part of a commercial transaction and was not within the intendment of sec. 170.

or as having transferred it to the Post Office, petitioner has not satisfied the requirements of section 170 and is entitled to no deduction thereunder.

We decide this issue for respondent.[121]

## V. Deductions Incident to Relocation Projects[122]

This issue presents the following question for our consideration:

Whether, upon relocation of segments of its railway line by governmental authorities for highway construction at the cost of those authorities, petitioner may deduct its basis in the track material replaced either as:

(a) An abandonment loss under section 165; or

(b) A retirement under the retirement-replacement-betterment method of accounting for depreciation, thus deductible under section 167.

### FINDINGS OF FACT

#### Issue (rr)

Some of the facts relating to this issue have been stipulated by the parties, and those facts, with associated exhibits, are incorporated herein by this reference.

This issue involves relocation projects of the former Southern Pacific Co. and the Texas & New Orleans Railroad Co., hereinafter sometimes referred to individually or collectively as petitioner.

During the taxable years 1959, 1960, and 1961, petitioner participated with governmental bodies in several projects which involved the relocation of petitioner's railroad lines. Four projects are at issue herein and are designated the Yountville project, the Mountain View project, the Houston project, and the Corpus Christi project.

The relocation projects at issue, with the exception of the

---

[121]Petitioner argues that the two murals which the Post Office removed from the Houston depot and placed in storage were a deductible charitable contribution to the United States to the extent of their stipulated fair market value ($6,250 in 1959). Respondent does not discuss these murals on brief, and we therefore assume he does not dispute this deduction under sec. 170.

[122]In trying and briefing this case, this issue was referred to by the parties as "Issue (rr)."

Corpus Christi project, came about as a result of State highway construction. State authorities undertaking highway improvements and needing additional acreage found it more expedient to seek to move a railway line which was contiguous to the highway than to seek additional acreage from the nonrailroad contiguous owners. In the Yountville and Mountain View projects, petitioner conveyed right-of-way real property (on which the existing rail line was located) to the State of California, and the State in turn conveyed substitute right-of-way real property (on which the relocated rail line was constructed) to petitioner. In the Houston project, to the same end, petitioner and the State of Texas granted easements or licenses in their respective properties to each other.

The Corpus Christi project was occasioned by the removal of a city-owned bridge at the entrance to the Port of Corpus Christi. Petitioner had used the bridge to provide railroad service to the port area lying south of the ship channel. A new bridge approximately 3.8 miles to the west had been constructed by public authorities, and the removal of the existing bridge required that petitioner be provided with an alternate route.

All of the projects at issue were completed with the approval of the Interstate Commerce Commission (ICC), where such approval was required.

As described more fully below, each of the four projects at issue came about as the result of an agreement between petitioner and a governmental entity (i.e., the State of California and agencies of the State of Texas). Because the governmental entities had the power to condemn, some of petitioner's personnel thought that condemnation might result if an agreement was not reached.

The agreements relating to each of the projects at issue and the dates on which they were entered into are as follows:

| Date of agreement | Railroad[123] | Project location |
|---|---|---|
| Sept. 16, 1958 | SP | Yountville, Calif. |
| Jan. 5, 1959 | T & NO | Houston, Tex. |
| Apr. 15, 1960 | SP | Mountain View, Calif. |
| May 27, 1960 | T & NO | Corpus Christi, Tex. |

---

[123]In the tables in these findings, the designation "SP" refers to the former Southern Pacific Co., and the designation "T & NO" refers to the Texas & New Orleans Railroad Co.

Pursuant to these agreements, petitioner performed the work of dismantling the original railway line and constructing the replacement line. Costs incurred by petitioner were reimbursed by the governmental body involved. The States of California and Texas reimbursed petitioner for the costs petitioner incurred in constructing the replacement railroad lines at Yountville, Mountain View, and Houston. In each of these projects, there was credit given by petitioner against amounts payable by the States in an amount equal to the assigned salvage value of the materials recovered and retained by petitioner. In the Corpus Christi project, the track materials recovered upon dismantling the old rail line were retained by the city, and some of the materials (to the extent feasible) were used by the city in helping construct new rail line on the substitute right-of-way.

The agreement relating to the Yountville project provided that 7,521 feet of branch main track in the vicinity of Yountville, Calif., would be removed and replaced by approximately 6,875 feet of track at a location averaging about 300 feet southwest of the replaced track.

The State of California agreed: (a) To "pay the entire cost and expense of the highway changes and railroad relocation and reimburse Railroad for any cost incurred by Railroad"; (b) to perform all necessary grading and install drainage and fences on the new railroad right-of-way; (c) to grant title to track and all other railroad facilities located on the new right-of-way to the railroad; and (d) to make payments of costs within 30 days of receipt of bills from petitioner.

Petitioner agreed to perform the relocation on the Yountville project with its own forces. On completion of the railroad tracks in the new location, petitioner agreed to "remove and/or relocate existing trackage * * * and credit salvage recovered therefrom to the State." Petitioner agreed, as the final step, to convey the old right-of-way to the State. Both parties agreed to maintain their facilities at their respective new locations.

The agreement relating to the Mountain View project provided for the relocation of 935 feet of track at Mountain View, Calif., in order that the track and a new road would pass beneath a freeway. The new track was to be 232 feet longer than, and a maximum of 325 feet distant from, the old track. The provisions of this agreement were similar to those contained in the Yountville agreement.

The agreement relating to the Houston project provided for the removal of an existing railroad bridge, the construction of a new railroad bridge, and the relocation of a portion of petitioner's tracks, in order to accommodate the construction of a highway. The relocated 913.7-foot roadbed was parallel to, and 35 feet north of, the old 913.7-foot roadbed. The provisions of this agreement were similar to the provisions in the Yountville agreement.

The agreement relating to the Corpus Christi project called for the governmental bodies which were a party to the agreement to construct an interchange yard, a new line of track approximately 5 miles long, and to improve existing trackage owned by one of the governmental bodies on the north side of the ship channel.

Petitioner and another railroad agreed to construct a railroad yard to be jointly owned and operated by them. Petitioner agreed to remove certain portions of its track adjacent to the removed bridge, as well as certain track located in Corpus Christi. Other track, terminals, and freight yards were to be shifted by petitioner to the new joint yard. The governmental bodies involved in that project agreed to bear all of the costs and expenses incurred by petitioner on the project. The agreement further provided that rail and other track material recovered from the project by petitioner were to be furnished to the governmental bodies (in fact, the city of Corpus Christi).

Basically, the above-discussed agreements made by petitioner with the various governmental entities called in each instance for the removal of an original line and the relocation of that line as part of one project.[124] In substance, pursuant to these agreements, petitioner transferred an operating railway line to a governmental body and in turn received an operating railway line as a substitute for the line given up. The substitute line performed the function for petitioner that the original line had performed. The relocation projects did not alter petitioner's position in any essential way, either operationally or economically. The relocated railway line was substantially a continuation of

---

[124]In the Corpus Christi project, additional property was relocated, but the record does not provide us with adequate detail with respect thereto. From the evidence which is available, we have concluded that the Corpus Christi project was in all significant respects similar to the other projects under discussion. See note 137 *infra*. Accordingly, our conclusions regarding the substance of the transactions apply equally to each of the relocation projects at issue.

the original line; it was not substantially different in character from the original line replaced.

Petitioner used the retirement-replacement-betterment method of accounting in accordance with the accounting requirements of the ICC as set forth in the Uniform System of Accounts for Railroad Companies, for property in their track accounts (which accounts included rail, ties, and ballast) for the years 1959, 1960, and 1961. Under this method, no depreciable life or salvage value is determined at time of installation of the track. The full initial cost of the track as an original installation is capitalized, as are the costs of later additions and betterments. When any rail or other track element is replaced with rail or other track element of the same weight, the capital account is not disturbed. Instead, operating expenses are debited in the amount of the cost of the replacement rail or other track element and cost of labor expended in the replacement, reduced by the assigned salvage value of the rail or other track material recovered. Such assigned values are charged to materials and supplies. When rail or other track element is replaced with rail or other track element of better quality, the same procedure is followed except that an amount reflecting the betterment is added to the capital account. When rail is retired without replacement, the cost or other amount recorded for the asset retired as reflected in the capital account is removed from the capital account and is charged to expenses, reduced by the assigned salvage value of the rail recovered.

The Interstate Commerce Commission's 1957 issue of its Uniform System of Accounts for Railroad Companies prescribed special rules regarding contributions by governmental agencies towards the cost of constructing railroad tracks and facilities. For the years 1959, 1960, and 1961, those special rules included provisions covering the crediting of amounts representing donations and grants to account 734, "donations and grants." The amounts representing donations and grants so credited to account 734 were also debited to appropriate property accounts.[125] Where the cost of new railroad line constructed at

---

[125]The pertinent instructions in effect during 1959 through 1961 required the following accounting treatment of relocation projects paid for by governmental agencies in sec. 10.01-2(c)(3):

"(3) *Public Improvement projects other than joint projects.* In connection with public improvement projects which do not involve joint use by the carrier and others of the facilities

the expense of the States exceeded the cost of the old railroad line, the excess was accounted for, during the years at issue, as a donation to the railroad (as, for example, was the case in the Yountville Project).[126] Donation accounting is not in controversy in this issue.

The accounting rules of the Interstate Commerce Commission require, in the case of exchanges of real property, that the cost of the acreage conveyed become the recorded cost of the acreage acquired.[127] In instances where existing railroad track upon old rights-of-way are replaced by construction of new railroad track upon new rights-of-way without any participation by governmental agencies, the old railroad track is retired as in a retirement without replacement and the investment in the new railroad track is capitalized as an original installation.

The controversy in this issue relates to rail line facilities consisting of track assets (rail and other track material) accounted for under the retirement-replacement-betterment (RRB) method of accounting, capital investments for which are recorded in primary property accounts for book purposes.

Generally, incident to a relocation project, petitioner would make a bookkeeping entry which would reduce the track investment (property) account by the book value (cost) of the removed material. Concurrently, petitioner would make a balancing debit (addition) to the operating expense account. Subsequently, to account for the completion of construction,

---

after completion of the projects such as reconstruction and relocation of tracks and appurtenant facilities at the expense of governmental agencies, the ledger value of the property retired shall be credited and the cost of constructing the new property shall be charged to the appropriate accounts of this classification. The sum contributed by the governmental agencies unless contract specifies otherwise shall be applied first to reduce or cancel the amount that otherwise would be charged to operating expenses or depreciation reserve in accounting for the retirements, and the remainder, if any, representing cost of railroad property only, shall be credited to account 734, "Donations and grants—Cr." The projects here referred to are those such as occur in connection with the carrying out of flood control, reclamation and other public projects where it becomes necessary to abandon a part of the line of road and relocate it."

[126]The Interstate Commerce Commission's 1962 issue of its Uniform System of Accounts required the clearing of balances carried in account 734. In making such clearance, amounts representing donations for property then in service, the cost of which was included in property investment account, was to be credited to the property investment account.

[127]There is no controversy with respect to the real estate exchanged under this issue; petitioner acknowledges that no deduction is allowable for the real estate transferred to the governmental authorities. There is also no controversy under this issue with respect to facilities subject to ratable depreciation.

petitioner would make a bookkeeping entry which would increase the property account. The amount of the entry was equal to the amount previously subtracted from the property account (i.e., the book value of the *removed* track material). Further, petitioner would make a balancing credit (subtraction) to the operating expense account.[128] While all of the entries were not made simultaneously (and sometimes occurred in different years), their net effect was to result in no change in the track investment account and no change in the operating expense account. The book cost of the removed material remained on petitioner's books after the completion of the relocation project, and the entries made to the operating expense account amounted to a wash and did not increase or decrease that account.[129]

In its bookkeeping, petitioner did not reduce the book value of the removed rail by the salvage value of any removed rail which it retained.[130] Petitioner's agreements with the governmental entities called for petitioner to be reimbursed for the expenses which it incurred in connection with a relocation project. On those occasions when petitioner (and not the Government) retained the rail which had been removed in the course of a project, the salvage value of such rail was allowed as a credit against the amounts to be reimbursed by the Government. In such instances, petitioner would add the salvage value of the retained rail to its materials and supplies account.

In its consolidated income tax returns for the taxable years 1959, 1960, and 1961, petitioner deducted, in connection with relocation projects during those years, some of the amounts which petitioner had subtracted from the track investment accounts when it dismantled the original railway lines (i.e., petitioner deducted the book value of some of the removed materials). In claims for refund filed for the years at issue, petitioner claimed additional such amounts as deductions. Some

---

[128]In the case of property subject to ratable depreciation, the balancing debits and credits were made to the depreciation reserve.

[129]In those instances when the offsetting entries to the operating expense account occurred in different years, the debits to that account relating to the removed rail were, in effect, claimed as deductions on petitioner's tax return. Respondent's adjustments with respect thereto are involved in the present controversy.

[130]Because the existing railroad line must continue in service until the replacement line is ready for service, customarily the materials in the existing line cannot be installed in the newly constructed line. This was true in the Yountville, Mountain View, and Houston projects.

of these claimed deductions have now been resolved by stipulation of the parties. The remaining deductions have not been allowed by respondent. The amounts remaining in controversy (and the years and projects to which they relate) are set forth below:

| Year | Railroad | Location of project | Amounts deducted in returns and disallowed | Additional amounts in claims and not allowed | Totals[1] |
|------|----------|---------------------|--------------------------------------------|----------------------------------------------|-----------|
| 1959 | SP | Yountville, Calif. | $19,105.07 | --- | $19,105.07 |
| 1960 | T & NO | Corpus Christi, Tex. | 75,508.12 | $62,904.20 | [2]138,412.32 |
| 1961 | T & NO | Houston, Tex. | --- | 4,536.58 | 4,536.58 |
| 1961 | SP | Mountain View, Calif. | --- | 4,346.22 | 4,346.22 |

[1]The amounts shown in this column constitute tax basis with respect to which petitioner is claiming a deduction herein. The amounts in controversy are limited to the tax basis of track assets (i.e., rails, ties, ballast, and other track materials) involved in four relocation projects.

[2]This figure reflects the proper amount in controversy for 1960 with respect to this project, although it varies from the amount deducted on petitioner's 1960 tax returns. The parties agree that the total tax basis with respect to these rail line facilities is $138,412.32.

OPINION

*Issue (rr)*

During the years 1959, 1960, and 1961, petitioner participated with governmental entities in several projects which involved the relocation of small segments of petitioner's railway lines.

Three of the relocation projects at issue herein came about as a result of State highway construction when real property on which a railway line was located was needed for highway improvements. The fourth relocation project at issue, the Corpus Christi project, was occasioned by the removal of a city-owned bridge used by petitioner, which necessitated that petitioner be provided with an alternate route for its railway line.

In each instance, petitioner performed the work of dismantling the original railway line and constructing the replacement line. Costs incurred by petitioner were reimbursed by the governmental body involved.[131]

[131]In three of the projects, petitioner retained the track materials it recovered in dismantling its line, and the reimbursement from the Government was reduced by the salvage value of the

Petitioner employed the retirement-replacement-betterment method of accounting, which we have described in our findings of fact. We have also set forth in our findings the entries made by petitioner on its books to reflect the accounting for these four projects. The end result of the book entries was to leave the property accounts and the operating expense accounts as they were before the entries were made; i.e., the property accounts still included the cost of the replaced track assets and the operating expense account was neither increased nor decreased as a result of these transactions. In other words, after the reversing entries were made, the books did not reflect either a gain or a loss upon the removal and replacement of the track assets involved in any of these four projects.

Petitioner argues that the amounts by which it initially reduced its property accounts for the track materials removed (that is, the cost bases of those items) are deductible either as abandonment losses under section 165 (allowing deductions for losses sustained during the taxable year) or as retirements under section 167 (allowing depreciation deductions).[132] We do not agree with petitioner that the dismantling of its railway lines in

retained materials. However, in the Corpus Christi project, the recovered materials were retained by the city, and the reimbursements to petitioner were not reduced.

[132]In this opinion, we discuss the applicability of both sec. 165 and sec. 167. While abandonment losses are clearly within the purview of sec. 165 (*Coors Porcelain Co. v. Commissioner*, 52 T.C. 682, 692 (1969), affd. 429 F.2d 1 (10th Cir. 1970); *Offshore Operations Trust v. Commissioner*, T.C. Memo. 1973–212), respondent does not argue and we do not consider whether a taxpayer retiring or abandoning property accounted for under the retirement-replacement-betterment method of accounting is precluded from taking deductions under the loss provisions of sec. 165 and is required to take the deductions only under the depreciation provisions of sec. 167. This appears to be the view adopted in *Boston & Maine Railroad v. Commissioner*, 206 F.2d 617, 622 (1st Cir. 1953), revg. 16 T.C. 1517, 1551–1554 (1951).

To some extent, similar considerations can affect deductibility under both of these sections. It is not always critical, when a taxpayer abandons or retires assets, to ascertain which of the two provisions applies. For example, a taxpayer's failure to show a permanent discarding of the assets and their permanent withdrawal from use will defeat a deduction under sec. 165 *and* sec. 167. *Seaboard Coast Line Railway Co. v. Commissioner*, 72 T.C. 855, 892–894 (1979), on appeal (5th Cir., Feb. 29, 1980); *Louisville & Nashville Railroad Co. v. Commissioner*, 66 T.C. 962, 1004–1007 (1976), on appeal (6th Cir., June 2, 1978). (Note that grading was involved in *Seaboard* and in *Louisville & Nashville*. Grading is not accounted for under the retirement-replacement-betterment method, and when it is retired or abandoned, the resultant deduction appears to be "more in the nature of a loss deduction under section 165 than a depreciation deduction under section 167." *Spartanburg Terminal Co. v. Commissioner*, 66 T.C. 916, 938 (1976).)

As in the *Seaboard* and *Louisville & Nashville* cases, it is unnecessary in the present case to make a determination of which of these sections properly applies to the deductions at issue. As

connection with the relocation projects gave rise to the deductions petitioner seeks to take herein. On the facts of this case, we hold that neither section 165 nor section 167 can be availed of to support the claimed deductions.

Petitioner's first contention appears to be that the amounts at issue represent abandonment losses deductible under section 165. That provision allows "as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." Cf. sec. 1.165–2(a), Income Tax Regs.

Initially, we believe that a deduction under section 165 is not available because petitioner has failed to demonstrate that it sustained a loss in these transactions. As petitioner readily agrees, the objective of these projects was to relocate petitioner's tracks at no cost to petitioner so the governmental authorities could use petitioner's original rights-of-way for their own purposes. It is clear that this is what happened, and petitioner suffered no economic loss on any of the projects after they were completed. Petitioner would have us bifurcate the transactions for both economic and bookkeeping purposes, treating the removal of its original tracks as one transaction and the replacement with the new tracks as separate transactions. The removal of the original tracks would thus be an abandonment of those track materials, as the initial bookkeeping entries suggest. However, we see no reason or justification for treating these projects as though they involved two separate transactions, removal and replacement. They were each entered into as complete projects and probably would not have been agreed upon without encompassing the cost-free replacement aspect as well as the removal. Viewed as such, we fail to understand how petitioner could have sustained a loss, either actually or bookwise, that would qualify as a deduction under section 165. Cf. *Los Angeles & Salt Lake Railroad Co. v. United States*, 86 Ct. Cl. 87, 21 F. Supp. 347 (1937).

But even if the amounts at issue constitute losses under section 165, we believe petitioner is precluded from taking any deduction with respect thereto by virtue of the provisions of section 1031.

---

can be seen from the discussion which follows, neither sec. 165 nor sec. 167 can be availed of herein to support petitioner's claim.

Section 1031 provides that "No gain or loss shall be recognized if property held for productive use in trade or business or for investment * * * is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment."[133] In *Koch v. Commissioner*, 71 T.C. 54 (1978), we stated (pp. 63–64):

The basic reason for allowing nonrecognition of gain or loss on the exchange of like-kind property is that the taxpayer's economic situation after the exchange is fundamentally the same as it was before the transaction occurred. "[I]f the taxpayer's money is still tied up in the same kind of property as that in which it was originally invested, he is not allowed to compute and deduct his theoretical loss on the exchange, nor is he charged with a tax upon his theoretical profit." H. Rept. 704, 73d Cong., 2d Sess. (1934), 1939–1 C.B. (Part 2) 554, 564; *Jordan Marsh Co. v. Commissioner*, 269 F.2d 453, 455–456 (2d Cir. 1959), revg. a Memorandum Opinion of this Court on another point; *Biggs v. Commissioner*, 69 T.C. 905, 913 (1978). The rules of section 1031 apply automatically; they are not elective. Cf. *Horne v. Commissioner*, 5 T.C. 250, 256 (1945). The underlying assumption of section 1031(a) is that the new property is substantially a continuation of the old investment still unliquidated. *Commissioner v. P. G. Lake, Inc.*, 356 U.S. 260, 268 (1958).

Cf. *Starker v. United States*, 602 F.2d 1341, 1352 (9th Cir. 1979).

It is not disputed by the parties that, as to the rail lines involved in the instant relocation projects, both the original railroad lines and the lines which replaced them were "held for productive use in [petitioner's] trade or business." But there is disagreement on the question of whether there was an "exchange" of "like kind" property.

Again, in making this determination, we are not disposed to treat each project as though it were comprised of various distinct and unrelated transactions. Petitioner would have us look separately at the individual steps of the relocation projects

---

[133]SEC. 1031.EXCHANGE OF PROPERTY HELD FOR PRODUCTIVE USE OR INVESTMENT.

(a) Nonrecognition of Gain or Loss From Exchanges Solely in Kind.— No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.

*        *        *        *        *        *        *

(d) Basis.— If property was acquired on an exchange described in this section, section 1035(a), section 1036(a), or section 1037(a), then the basis shall be the same as that of the property exchanged, decreased in the amount of any money received by the taxpayer and increased in the amount of gain or decreased in the amount of loss to the taxpayer that was recognized on such exchange. * * *

and hold that, although the reciprocal transfers of right-of-way properties were within the purview of section 1031, the transactions involving track were not exchanges under that Code provision. Petitioner points out that on three occasions it retained the track it salvaged from the original line and did not transfer it to the governmental bodies; therefore, there could be no exchange. On the Corpus Christi project, when petitioner did not retain the track, petitioner asks us to conclude there was a sale of the track to the city of Corpus Christi.

Petitioner is ignoring the basic agreements it made with the governmental entities, calling in each instance for the removal of the original railway line and the relocation of that line as part of one project. We believe we have no alternative, based on the record before us, but to view the "successive steps" of each relocation project as "integrated parts of a single transaction" in which one operating railway line was exchanged for another operating line. *Century Electric Co. v. Commissioner*, 15 T.C. 581, 592 (1950), affd. 192 F.2d 155 (8th Cir. 1951), cert. denied 342 U.S. 954 (1952).

In the *Century Electric* case, which involved the predecessor of section 1031 under the 1939 Code, the Court of Appeals stated (192 F.2d at 159)—

the controlling policy and purpose of the section * * * [is] the nonrecognition of gain or loss in transactions where neither is readily measured in terms of money, where in theory the taxpayer may have realized gain or loss but where in fact his economic situation is the same after as it was before the transaction. * * *

The transaction here involved may not be separated into its component parts for tax purposes. Tax consequences must depend on what actually was intended and accomplished rather than on the separate steps taken to reach the desired end. * * *

The evidence herein establishes that each relocation project at issue constituted an exchange within the purview of section 1031. The various components of each project were clearly "interdependent parts of an overall plan." *Biggs v. Commissioner*, 69 T.C. 905, 914 (1978), on appeal (5th Cir., Oct. 23, 1978). See

also *Barker v. Commissioner*, 74 T.C. 555, 566 (1980). In substance,[134] pursuant to the agreements signed by petitioner and each of the governmental bodies, petitioner transferred an operating railway line to the Government, and the Government in turn transferred an operating railway line to petitioner as a substitute for the line given up. The substitute line performed the function for petitioner that the original line had performed. After each relocation project, petitioner was in essentially the same position that it was in before the project, both operationally and economically.

When each of the relocation projects involved in the present case is viewed in its entirety, it becomes apparent that in the three instances when petitioner retained the track materials, petitioner was in effect being partially reimbursed by the governmental bodies for work performed in connection with the projects. This is the only reasonable conclusion that can be drawn from the fact that the amount of actual reimbursement made to petitioner was reduced by the salvage value of the retained track assets. In the one instance when petitioner did retain track materials, there was no such reduction in the reimbursement from the governmental body. The manner in which the parties dealt with the dismantled track is fully consistent with our conclusion that petitioner transferred each railway line, including all of the components which made it operational, to the governmental body involved in each transaction. In every instance, it is readily apparent that, under the pertinent agreements, the parties regarded the Government as entitled to the recovered track materials. Government retention of the track in connection with the Corpus Christi project is further verification of that fact. Nothing in the record supports petitioner's contention that the Corpus Christi project involved a sale of track assets to the city;[135] the retention of track materials on that occasion was merely one of the elements necessarily involved in the exchange of one operating railway line for another.

In light of the foregoing discussion, there can be little doubt

---

[134]The general rule in a sec. 1031 context is that substance is to prevail over form. *Biggs v. Commissioner*, 69 T.C. 905, 914 (1978), on appeal (5th Cir., Oct. 23, 1978). Compare *Barker v. Commissioner*, 74 T.C. 555, 561, 566 (1980).

[135]Compare *City Investing Co. v. Commissioner*, 38 T.C. 1 (1962).

that these exchanges of railway lines involved "like kind" properties, as that term is used in section 1031(a).[136] The money received by petitioner related to its construction costs and was an essential part of the contractual arrangements for the exchanges; petitioner was merely being reimbursed. See *Biggs v. Commissioner, supra* at 914, 917. If the governmental bodies had paid an *unrelated* party to construct the railway lines to be used in the exchanges, there would be no question that section 1031(a) would apply; the fact that petitioner performed the necessary work does not make that provision any less applicable. Cf. *124 Front Street, Inc. v. Commissioner*, 65 T.C. 6, 17–18 (1975). This is particularly true in the present case where undoubtedly petitioner was best suited to perform the relocation work. Looking, as we must, at the totality of the transaction (i.e., at what petitioner gave up and at what petitioner received), we believe it is clear that the instant exchanges involved "like kind" properties within the contemplation of the statute. *Biggs v. Commissioner, supra.*

It appears from our findings that petitioner's economic situation after each project was "fundamentally the same as it was before the transaction occurred" (*Koch v. Commissioner, supra*), and that the replacement railway line was "substantially a continuation of the old investment still unliquidated." *Commissioner v. P. G. Lake, Inc.*, 356 U.S. 260, 268 (1958).[137] As a

---

[136]It is of no relevance to our present inquiry whether or not the acquired property was of superior quality to the property given up. Sec. 1.1031(a)–1(b), Income Tax Regs., provides in part:

"As used in section 1031(a), the words "like kind" have reference to the nature or character of the property and not to its grade or quality. One kind or class of property may not, under that section, be exchanged for property of a different class or kind. The fact that any real estate involved is improved or unimproved is not material, for that fact relates only to the grade or quality of the property and not to its kind or class. * * * "

In *Koch v. Commissioner*, 71 T.C. 54 (1978), we observed (p. 65):

"Significantly, as the standard for comparison, section 1031(a) refers to property of a like—not an identical—kind. The comparison should be directed to ascertaining whether the taxpayer, in making the exchange, has used his property to acquire a new kind of asset or has merely exchanged it for an asset of like nature or character."

Further, because the totality of a transaction is determinative, it is not crucial for purposes of sec. 1031 for the types of assets acquired in a particular exchange to match in all respects the types of assets given up. See, e.g., *Asjes v. Commissioner*, 74 T.C. 1005 (1980); Rev. Rul. 72–549, 1972–2 C.B. 472. Cf. *Boise Cascade Corp. v. Commissioner*, T.C. Memo. 1974–315. Nor do the respective locations of properties involved in an exchange have any bearing on the applicability of sec. 1031. Rev. Rul. 68–363, 1968–2 C.B. 336.

[137]In making our findings, we have drawn logical inferences from the evidence in the record

result, we hold that the various transactions and events comprising each relocation project in this case "were part of an integrated plan intended to effectuate an exchange of like kind properties, the substantive result of which was an exchange within the meaning of section 1031." *Biggs v. Commissioner*, *supra* at 914–915.[138] Accordingly, the losses, if any, would not be recognized.[139]

Alternatively, petitioner relies on section 167 to support its

---

which relates to these points. Such evidence was not extensive and, because petitioner bears the burden of proof under Rule 142(a), Tax Court Rules of Practice and Procedure, it was necessary, where deficiencies in the record were found to exist, to resolve any doubts in respondent's favor.

[138]In support of its view that it is entitled to a loss under sec. 165, petitioner cites Rev. Rul. 57–450, 1957–2 C.B. 137. That ruling discusses two situations involving a railroad and a governmental body and the substitution of one rail line for another.

In the first factual situation, the ruling states that "the newly constructed properties on the new right of way are drastically different in character from the properties abandoned," although no specifices are provided in this respect, and the ruling concludes that the railroad "is entitled to an abandonment loss deduction to the extent of any loss actually suffered in the taxable year" under sec. 165. (To a similar effect, see G.C.M. 21171, 1939–1 C.B. (Part I) 169, which was clarified and restated under current law in Rev. Rul. 57–450, prior to the years at issue herein.)

We are unable to regard Rev. Rul. 57–450 as particularly authoritative in the present circumstances because neither of the factual situations outlined therein is on all fours with the facts of the instant case. Further, the ruling does not elaborate on the legal basis for its conclusions. Nevertheless, in view of the fact that petitioner has not established the substitute properties at issue to be "drastically different in character" from the original properties, we regard the relocation projects in the present case to be more similar to the relocations described in the second part of Rev. Rul. 57–450. With regard to the second factual situation, the ruling concludes that no sec. 165 deduction is allowable because "the result was an exchange of property held for productive use solely for property of a like kind within the purview of sec. 1031(a) of the Code, with no gain or loss recognized." To the extent that the ruling has any application in the case at bar, we do not consider it to be supportive of petitioner's position.

[139]In an alternative argument, petitioner advances the proposition that sec. 1033, and not sec. 1031, is applicable on these facts and that petitioner's loss is therefore not barred. Sec. 1033 provides in part that "if property (as a result of its * * * condemnation or threat or imminence thereof) is compulsorily or involuntarily converted * * * into property similar or related in service or use to the property so converted, no gain shall be recognized." The section does not operate to preclude the recognition of a loss.

We do not believe we can apply sec. 1033 in this case because the evidence before us does not go into the subject of condemnation in any depth, and the record as to this issue is therefore inadequate to sustain the requisite finding that the conversion resulted from the property's "condemnation or threat or imminence thereof." As to the nature of the evidence required, see, e.g., *Warner v. Commissioner*, 56 T.C. 1126, 1136–1137 (1971), affd. without published opinion 478 F.2d 1406 (7th Cir. 1973), cert. denied 415 U.S. 915 (1974); *Ranier Companies, Inc. v. Commissioner*, 61 T.C. 68, 75–77 (1973), affd. in part and revd. in part in an unpublished opinion (9th Cir. 1975); *Balistrieri v. Commissioner*, T.C. Memo. 1979–115; *Forest City Chevrolet v. Commissioner*, T.C. Memo. 1977–187, affd. without published opinion 577 F.2d 722 (1st Cir. 1978); *Stone v. Commissioner*, T.C. Memo. 1973–26.

Petitioner has failed to satisfy its burden of proof regarding sec. 1033. Rule 142(a), Tax Court Rules of Practice and Procedure; *Welch v. Helvering*, 290 U.S. 111 (1933). Moreover, petitioner

claims and argues that the amounts at issue, if not deductible as losses, are deductible as depreciation.

Under section 167, a depreciation deduction for property used in the trade or business is allowed under certain methods of depreciation specified in the statute or under "any other consistent method" which produces a reasonable annual allowance for the exhaustion, and wear and tear of the property.[140]

It is well settled that the retirement-replacement-betterment (RRB) method, employed by petitioner in accounting for the assets under discussion, is essentially a method of depreciation, and, as such, it is an acceptable method for calculating a "reasonable allowance" for the purposes of section 167. See *Boston & Maine Railroad v. Commissioner*, 206 F.2d 617 (1st Cir. 1953), revg. on other grounds 16 T.C. 1517 (1951); *Chesapeake & Ohio Railway Co. v. Commissioner*, 64 T.C. 352, 361–366 (1975); *Louisville & Nashville Railroad Co. v. Commissioner*, 66 T.C. 962, 993–995 (1976), on appeal (6th Cir., June 2, 1978), and the cases cited therein. See also *Spartanburg Terminal Co. v. Commissioner*, 66 T.C. 916, 936–937 (1976).

---

has not directed us to any authority, and we have found none, which holds that the applicability of sec. 1033 in a given fact situation prevents us from relying on sec. 1031 in that situation to bar recognition of a loss.

[140]To the extent pertinent for our present discussion, sec. 167 provides:

SEC. 167. DEPRECIATION

(a) GENERAL RULE . There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

    (1) of property used in the trade or business, or

    (2) of property held for the production of income.

(b) USE OF CERTAIN METHODS AND RATES .—For taxable years ending after December 31, 1953, the term "reasonable allowance" as used in subsection (a) shall include (but shall not be limited to) an allowance computed in accordance with regulations prescribed by the Secretary or his delegate, under any of the following methods:

    (1) the straight line method,

    (2) the declining balance method, using a rate not exceeding twice the rate which would have been used had the annual allowance been computed under the method described in paragraph (1),

    (3) the sum of the years-digits method, and

    (4) any other consistent method productive of an annual allowance which, when added to all allowances for the period commencing with the taxpayer's use of the property and including the taxable year, does not, during the first two-thirds of the useful life of the property, exceed the total of such allowances which would have been used had such allowances been computed under the method described in paragraph (2).

Nothing in this subsection shall be construed to limit or reduce an allowance otherwise allowable under subsection (a).

We have explained how the RRB method works in our findings of fact and will not repeat the explanation here.

In *Boston & Maine Railroad v. Commissioner, supra,* the court explained the difference between RRB accounting and straight-line depreciation, pointing out that under the RRB method—

there are no annual depreciation charges as such, and hence no annual adjustments are made in the book values of the various assets. * * *

* * * The assumption is that once the system is functioning normally and the retirements are staggered fairly regularly, the charges to expense on account of equipment wearing out or otherwise disappearing from service are spread out and stabilized and hence will approximate the results under straight-line depreciation. * * * However, under the retirement system the total capital account (i.e., the book value of the assets) is always higher, since under that system no adjustments are made in this account until an item is actually retired. [206 F.2d at 619.]

In the *Chesapeake & Ohio* case, *supra* at 360, we observed that the annual deduction for "depreciation" under the retirement-replacement-betterment method "consists of two elements: (1) The cost of replacements including the replacement component of betterments (plus labor cost and less salvage value), and (2) the cost of retirements without replacement (plus labor cost and less salvage value)."

In sum, the retirement-replacement-betterment method is a method of depreciation and, in the circumstances described above, is an appropriate means for determining the allowable depreciation deduction under section 167.

Under the RRB method, the only way petitioner would be entitled to a depreciation deduction for the amounts claimed would be by showing that its track and track elements that were removed were retired without replacement.

Again, petitioner would have us scrutinize only certain aspects of each relocation project rather than analyze each project as a whole. We believe, in this context as well, it is essential to look at each relocation project in its entirety and not break it down into its component parts. Indeed, when petitioner's book accounting for the entire transaction is examined, it is apparent that even petitioner, once it had made all pertinent entries, regarded each project as a unit and not as a series of independent transactions.

It is further apparent from an examination of petitioner's books that the asset accounts and the operating expense account were, ultimately, unchanged as a result of the relocation projects. Once petitioner had made all book entries relating to

the projects, nothing in the balances (as stated in the relevant accounts) indicated that anything had occurred; petitioner's investment in the original railway line continued as the investment in the line which was substituted for it, and petitioner showed no operating expenses on its books relating to the relocation projects. It is clear from the foregoing entries that, in applying the RRB method to the projects at issue, petitioner did not show any retirements on its books.

Petitioner argues that only a portion of its accounting under the RRB method is pertinent for tax purposes and urges the Court to look only at the entries in which amounts were subtracted from the asset accounts and added to the operating expense account. We are told that the subsequent entries reversing the foregoing debits and credits constitute a mere "book accounting convention" and are of "no relevance whatsoever" and should be ignored. We disagree because we believe that the totality of the pertinent entries correctly reflects what was intended to and did actually happen. There was a substitution or replacement for the removed assets which was intended to and did make petitioner whole with no cost to it. The reversing book entries correctly reflected this, and in the end, did not show any retirement under the RRB method.

The restoration of the amounts at issue to the relevant asset accounts shows that petitioner's position was unchanged as a result of the relocation projects.[141] In this respect, petitioner's book entries reflect the reality of the transactions and the substance of events which have a bearing on the tax consequences flowing from the relocation projects.[142] We do not view

---

[141]An examination of petitioner's books on an annual basis would, as to some of the claimed depreciation deductions, suggest that retirements had in fact occurred since the offsetting entries were not made until a *subsequent* year. However, deductibility under sec. 167 is not determined by the existence of a mere bookkeeping entry. Even the fact that such an entry may have been in accordance with Interstate Commerce Commission rules is not necessarily controlling as to its effect for tax purposes. *Louisville & Nashville Railroad Co. v. Commissioner*, 66 T.C. at 1001. It is clear that deductibility under sec. 167 is dependent upon the proper application of a method of depreciation (sec. 1.167(b)-0, Income Tax Regs.), and that under petitioner's method of depreciation, the RRB method, there must be an actual retirement before a sec. 167 deduction is permitted. *Chesapeake & Ohio Railway Co. v. Commissioner*, 64 T.C. 352, 362–363 (1975). We have concluded herein, regarding the track materials under discussion, that no such retirements occurred during any of the years before the Court and that, as petitioner applied the RRB method, no such retirements appeared on its books.

[142]Petitioner points out that, under ICC accounting regulations, in instances where railroad

the facts of this case as establishing that petitioner permanently terminated the use of the railway lines in its business; rather, the lines were merely relocated and continued in operation. While petitioner may have terminated its use of some specific assets and, in one sense, can be said to have retired them from service, it clearly did not effect retirements for RRB purposes. Petitioner had no intention of having the lines "disappear from service" (see *Boston & Maine Railroad v. Commissioner, supra,* 206 F.2d at 619), and petitioner effected the relocations in such a manner as to remain in the same operational and economic position.

Given the circumstances of this case, we do not agree with petitioner that the relocations or substitutions under discussion were the equivalent of (or in any way involved) retirements under the RRB method of accounting. Accordingly, under the authorities discussed above, these amounts are not proper deductions under section 167.

This result is fully consistent with the provisions of section 1031(d), quoted in note 133. Under section 1031(d), where property is acquired in an exchange described in section 1031, the basis of the acquired property is the same as the basis of the property exchanged (with certain adjustments when appropriate).

The obvious impact of this rule, as far as section 167 is concerned, is to permit a taxpayer to continue to depreciate the acquired property in basically the same manner as the taxpayer depreciated the property it gave up. Cf. *Century Electric Co. v. Commissioner,* 15 T.C. at 595, 192 F.2d at 160.[148] Thus, when section 1031 applies to an exchange, the rule of subsection (d) operates to prevent an extraordinary depreciation deduction by limiting a taxpayer to essentially the section 167 deductions that

---

track upon old rights-of-way is replaced by track on new rights-of-way *without governmental participation,* the old track is retired under the RRB method and the investment in the new track is capitalized as an original installation. The fact that this procedure was not followed in connection with the instant relocation projects is further indication that there were no actual retirements and that the present situation, involving substitutions of entire railway lines pursuant to agreements with outside entities, is not comparable.

[148]See also *Molbreak v. Commissioner,* 61 T.C. 382, 390–391 (1973), in which the Court pointed out that, in determining the holding period of an asset under sec. 1223(1), property acquired in a sec. 1031(a) exchange is considered to have been held for the period for which the taxpayer held the property given up.

would have been available to him had the exchange not taken place.

The fact that the present case involves RRB depreciation, and not ratable depreciation, does not justify a different rule. In fact, petitioner's book entries under the RRB method, as described above, were compatible with the requirements of subsection (d).

It is clear that the allowance of the depreciation deductions claimed herein would conflict with the provisions of section 1031(d) and that, for this additional reason, we must conclude that the relocation projects at issue, as exchanges falling within the scope of section 1031(a), do not permit deductions for depreciation under section 167.[144]

We decide this issue for respondent.

## VI. DEDUCTION OF ESTIMATED PAYROLL TAXES ON EARNED VACATION PAY[145]

This issue presents the following question for our consideration:

Whether, under section 461, petitioner may accrue and deduct in 1961 an estimate of its 1962 payroll taxes on vacation pay earned by its employees in 1961 and paid to them in 1962.

---

[144]Petitioner argues that it would have a zero tax basis in the relocated lines by virtue of sec. 362(c), which provides "if property other than money * * * is acquired by a corporation * * * as a contribution to capital, and * * * is not contributed by a shareholder as such, then the basis of such property shall be zero." As a result, petitioner claims if it does not get a retirement deduction in the years before the Court, it will never get one for the properties at issue.

We disagree. Petitioner's tax basis in the property it received in each exchange is equal to the basis of the property it gave up. Exchanges like the ones involved in the instant case are in the nature of reimbursements, rather than contributions to capital. See the discussion in the portion of this opinion entitled, "*Issue (aaa)*: Depreciation of Replacement Facilities." Further, the amounts appearing on petitioner's books (which are the amounts that theoretically would be the subject of any future retirement deductions under the RRB method) do not reflect what was received from the governmental agencies; these amounts are in essence a continuation of the book values of the original lines.

Petitioner has not convinced us that it would have a zero tax basis in the substituted railway lines. It is clear from respondent's briefs that he does not regard sec. 362(c) as applicable in the present circumstances and he would not rely on that section to deny any subsequent retirement deductions relating to the property at issue. Further, we do not believe it would be proper to allow petitioner to write off the basis of the replaced property for tax purposes at this time on this theory and leave that basis in the property account for book and possibly ratemaking purposes.

[145]In trying and briefing this case, this issue was referred to by the parties as "*Issue (bbb)*."

## FINDINGS OF FACT

### *Issue (bbb)*

Most of the facts relating to this issue have been stipulated by the parties, and those facts, with associated exhibits, are incorporated herein by this reference.

Among the affiliated companies included in the consolidated Federal income tax return filed by the former Southern Pacific Co. for the taxable year ended December 31, 1961, were the companies listed below. The following listing includes only those affiliates as to which there is a controversy between the parties regarding the issue presently under discussion:

Former Southern Pacific Co. (merged with Texas & New Orleans Railroad Co.)
Northwestern Pacific Railroad Co.
Pacific Electric Railway Co.
Petaluma & Santa Rosa Railroad Co.
San Diego & Arizona Eastern Railway Co.
Southern Pacific Pipe Lines, Inc.
Union Terminal Warehouse
Visalia Electric Railroad Co.
Southern Pacific Transport Co.
St. Louis Southwestern Railway Co.

The former Southern Pacific Co. and its affiliates (except for Southern Pacific Pipe Lines, Inc.) were subject to the Railroad Retirement Tax Act (RRTA)[146] and to the Railroad Unemployment Insurance Act (RUIA).[147] For the year 1962 (and for several years preceding 1962), these corporations were required to pay an RRTA tax equal to a specified percentage of that portion of each employee's monthly earnings which did not exceed $400, and the corporations were similarly required to make an RUIA contribution equal to a specified percentage of that portion of each employee's monthly earnings which did not exceed $400.

---

[146]Secs. 3201–3233, I.R.C. 1954. See especially sec. 3201.
[147]45 U.S.C. sec. 351 et seq. See especially sec. 358.

Southern Pacific Pipe Lines, Inc., was subject to the Federal Insurance Contribution Act (FICA)[148] and to the Federal Unemployment Tax Act (FUTA).[149] For the year 1962 (and for several years preceding 1962), Southern Pacific Pipe Lines, Inc., was required to pay a FICA tax equal to a specified percentage of that portion of each employee's annual earnings which did not exceed $4,800, and the corporation was required to pay a FUTA tax equal to a specified percentage of that portion of each employee's annual earnings which did not exceed $3,000.

The above-named companies are sometimes hereinafter referred to collectively as petitioner. The amounts payable by these companies under RRTA, RUIA, FICA, and FUTA are sometimes hereinafter referred to collectively as payroll taxes.

During the years 1954 through 1961, petitioner charged on its books to appropriate operating expense accounts the wages and salaries which it paid. Payroll taxes were charged to railway tax accruals. Petitioner employed the accrual method of accounting and in each year estimated and accrued the amounts that would be paid to its employees in the subsequent year while they were on vacation. These accrued estimates of vacation pay were also charged to appropriate operating expense accounts (except in 1954).

The accounting rules prescribed by the Interstate Commerce Commission required charging vacation pay accruals to approximately 200 separate operating expense accounts. Such charges had to be made monthly. To minimize bookkeeping, the practice was adopted of utilizing a "standing reserve" for estimated vacation pay and related payroll taxes liabilities, which was distributed among all those accounts, and thereafter no further accounting with respect to those accounts was necessary unless the original estimates were revised.

This practice of using a "standing reserve" technique called for actual payments during the year to be charged to operating expenses, rather than cleared through the reserve, and as a consequence, monthly entries to the approximately 200 separate accounts were kept to a minimum. The final result for each year was the same as if actual payments had been cleared through

---

[148]Secs. 3101–3126, I.R.C. 1954. See especially sec. 3121.
[149]Secs. 3301–3311, I.R.C. 1954. See especially sec. 3306.

the reserve and detailed monthly charges to those accounts had been made, i.e., total charges to operating expense for the year equaled the amount of the accrued estimated liability adjusted to correct prior year over- or under-accruals.

Because of the use of the "standing reserve" technique, the initially established "reserve" for estimated vacation pay liabilities in 1954, as thereafter revised, was increased or decreased annually by the amount by which subsequent year estimates were in amounts greater or lesser than the "reserve" as it stood at the time of each estimate. The "reserve" amount as revised annually represented the amount of estimated liability accrued for each year.[150]

For book accounting purposes, petitioner estimated and accrued in each year the payroll taxes attributable to the accrued vacation payments. Because actual payment of both the vacation pay and the related payroll taxes was deferred until the following year, the estimated vacation pay and related payroll taxes were credited, for balance sheet purposes, to "unaudited liabilities." In 1961, under new instructions from the Interstate Commerce Commission, the payroll taxes attributable to accrued vacation pay began to be credited to "other taxes accrued."

To estimate the proper amount of these payroll taxes to accrue in a given year, the companies subject to the Railroad Retirement Tax Act and the Railroad Unemployment Insurance Act developed and employed a formula. The amounts actually paid during the year under RRTA and RUIA were divided by the gross payroll for the year, and the result[151] was multiplied by the amount of the following year's vacation pay accrued during the year. This formula may be represented as follows:

$$\frac{RRTA + RUIA}{Gross\ payroll} \times Vacation\ pay\ accrual = \begin{array}{l} Payroll\ taxes \\ attributable\ to \\ vacation\ pay \end{array}$$

This formula produced an estimate of the subsequent year's payroll taxes attributable to the subsequent year's vacation pay.

The same procedure was followed by Southern Pacific Pipe

---

[150]Periodic testing showed the amounts estimated for vacation pay to be close to the amounts actually expended on such pay.

[151]This figure could vary considerably from year to year because annual payroll taxes and annual gross payroll were subject to change from one year to the next.

Lines, Inc., with reference to the Federal Insurance Contribution Act and the Federal Unemployment Tax Act, to which that company was subject.

The foregoing formula was designed to produce an estimated combined RRTA and RUIA (or FICA and FUTA) rate less than the statutory rate[152] to adjust automatically for the fact that actual earnings could be in excess of the earnings base.[153] If the statutory rate increased, the effect thereof was estimated by applying a factor (the percentage which the estimated combined rate was of the statutory combined rate) to the amount of the rate increase, and the lesser estimated rate increase was used. The estimated combined rate was applied to the estimated liability for the following year's vacation pay to produce a figure representing an estimate of the payroll taxes that would be payable on the vacation pay.

At the end of 1961, petitioner had no way of knowing or estimating how many employees, at the time they took their vacations in 1962, would have earnings which exceeded the base amounts enumerated in the respective payroll tax statutes.[154]

The schedule, on page 629, relating to the year 1961, shows amounts appearing on the books (in various accounts) of the relevant companies. For the purposes of this case, these amounts have been assembled into the following categories: (1) Accrued Estimate of Vacation Pay for 1962; (2) Accrued Estimate of Payroll Taxes Payable in 1962 on 1962 Vacation Pay; (3) Annual Payroll (including Accrued Estimate of Vacation Pay for 1962); and (4) Payroll Taxes on Annual Payroll (including Accrued Estimate of Payroll Taxes Payable in 1962 on 1962 Vacation Pay).[155]

It was impossible for petitioner to check the accuracy of its accrued estimates of the payroll taxes at issue since no records

---

[152]The combined statutory rate for RRTA and RUIA was 10.50 percent in 1961. The combined statutory rate for FICA and FUTA was 6.10 percent in 1961.

[153]For example, in 1961, the estimated payroll tax rate used by the former Southern Pacific Co. (including the Texas & New Orleans Railroad Co.) to calculate liability for payroll taxes attributable to vacation pay was 8.134 percent.

[154]As we have pointed out earlier in our findings, payroll taxes were payable only on employees' earnings below the maximum amounts specified in these statutes.

[155]For book purposes during the years 1954 through 1961, payroll taxes were accrued in the same year as the wages and salaries to which they related. Payroll taxes relating to accrued vacation pay were accrued in the same year the vacation pay was accrued.

| | (1) Accrued estimate of vacation pay | (2) Accrued estimate of payroll taxes on vacation pay | (3) Annual payroll [incl. col. (1)] | (4) Payroll taxes on annual payroll [incl. col. (2)] |
|---|---|---|---|---|
| Former Southern Pacific Co. (merged with Texas & New Orleans Railroad Co.) | $16,396,900 | $1,333,754 | $331,396,454 | $25,330,591 |
| Northwestern Pacific Railroad Co. | 224,286 | 17,988 | 4,477,972 | 359,364 |
| Pacific Electric Railway Co. | 407,344 | 32,699 | 8,610,754 | 641,579 |
| Petaluma & Santa Rosa Railroad Co. | 3,601 | 289 | 79,101 | 8,892 |
| San Diego & Arizona Eastern Railway Co. | 43,170 | 3,462 | 924,533 | 66,321 |
| Southern Pacific Pipe Lines, Inc. | 68,743 | 1,780 | 1,570,716 | 28,115 |
| Union Terminal Warehouse | 20,137 | 2,011 | 773,323 | 67,728 |
| Visalia Electric Railroad Co. | 2,770 | 222 | 92,222 | 7,899 |
| Southern Pacific Transport Co. | 172,206 | 13,301 | 4,107,922 | 280,622 |
| St. Louis Southwestern Railway Co. | 1,200,000 | 102,000 | 26,224,225 | 2,007,890 |

were kept to show how much of the payroll taxes actually paid on an employee's earnings related to that employee's vacation pay.

The computations on the books of accrued payroll taxes on accrued vacation pay were made without any specific reference to payroll tax returns. These computations were made by an accounting officer, and the payroll tax returns were prepared independently by payroll accounting personnel.

In preparing and filing payroll tax returns, petitioner reported employer tax liability with reference to the period for which wages and salaries generating the payroll tax liability were paid. In the case of payroll taxes on vacation pay, these taxes were reported with reference to the period in which the vacations were taken by the employees.

The payroll tax returns did not separately identify any amounts of payroll tax as relating to wages and salaries attributable to vacation pay. Vacation pay was not separately identified or identifiable in payroll accounting. Vacation pay consisted simply of a continuation of regular wages and salaries, and only the operating departments knew whether the employees receiving wages and salaries for any payroll period were on vacation.

The parties have settled an issue in this case involving the question of whether the amounts accrued for book purposes by petitioner for estimated vacation pay should be allowed as deductions for income tax purposes for the year of accrual as reported in the consolidated returns. Such deductions have been claimed for tax purposes since 1949. The parties have agreed that such deductions shall be allowed beginning with the year 1961.

The year 1961 was chosen as the year of transition because in that year labor contracts were amended to make the right of employees to vacations fully vested at the end of the current year without any possibility of forfeiture.[156]

The parties have further agreed that the provisions for full vesting set forth in the January 18, 1961, amendment to the

---

[156]While there are a few employees as to whom full vesting of rights occurred in other years, the parties have agreed that, for tax purposes, all employees are to be regarded as having received fully vested rights to vacation pay in 1961. Beginning in that year, an employee's eligibility for the subsequent year's vacation was determined in the current year. The length of vacation prescribed and eligibility prerequisites varied among different employee groups.

agreement with the Brotherhood of Locomotive Engineers may be taken as representative for purposes of this case. That amendment changed section 8 of the agreement to read as follows:

> The vacation provided in this Agreement shall be considered to have been earned when the employed has qualified under Section 1 hereof [setting forth vacation rights]. If an employee's employment status is terminated for any reason whatsoever, including but not limited to retirement, resignation, discharge, non-compliance with a union-shop agreement, or failure to return after furlough he shall at the time of such termination be granted full vacation pay earned up to the time he leaves the service including pay for vacation earned in the preceding year or years and not yet granted, and the vacation for the succeeding year if the employee has qualified therefor under Section 1. If an employee thus entitled to vacation or vacation pay shall die the vacation pay earned and not received shall be paid to such beneficiary as may have been designated, or in the absence of such designation, the surviving spouse or children or his estate, in that order of preference.

Under the union contracts, petitioner was not required to release an employee for a vacation. If petitioner did not release an employee for a vacation in any part of the year, it was obligated to pay the employee a cash allowance in lieu of vacation. While it was the policy of petitioner to encourage all its employees to take their earned vacation leave, there was no way of knowing or estimating at the end of 1961 how many employees would in fact receive a cash allowance in lieu of a vacation.

In filing the consolidated income tax return for the year 1961, petitioner did not deduct the accrued estimates of payroll taxes attributable to 1962 vacation pay.[157] Only those payroll taxes actually paid during the year were deducted.[158]

In its petition filed with the Court on July 9, 1969, petitioner did not claim the payroll taxes at issue as a deduction. However, in an amendment to petition filed with the Court on May 23, 1973, petitioner stated:

---

[157]The difference between book accounting and return reporting was shown in Schedule M of the consolidated return as "payroll taxes accrued but not paid." The Schedule M reconciliation amount reflected the amount by which taxable income as reported was greater or less than book net income.

[158]The deduction on the return for payroll taxes included the amounts actually paid during 1961 in connection with vacation pay received by employees during the year. As a result, the deduction for payroll taxes included the amounts accrued on the books in 1960 as payroll taxes payable in 1961 on 1961 vacation pay.

. The Commissioner erred in failing to allow deduction of payroll taxes with respect to accrued obligations of members of the former Southern Pacific Company consolidated group to pay employee compensation, in the amounts of $134,846.00 and $70,523.00 for the taxable years ended December 31, 1959 and 1961, respectively.

In view of the settlement of the issue involving the deduction of estimated vacation pay accruals and in view of the facts of record that have been developed as to this issue, the petitioner, on March 13, 1975, filed an additional amendment to petition. Petitioner's claim as to this issue now relates only to the year 1961, and petitioner now asserts that the former Southern Pacific Co. and its affiliates are entitled to deduct for 1961 the following amounts representing the 1961 book accruals of payroll taxes on estimated vacation pay:

| | |
|---|---:|
| Former Southern Pacific Co | $1,333,754 |
| Northwestern Pacific Railroad Co | 17,988 |
| Pacific Electric Railway Co | 32,669 |
| Petaluma & Santa Rosa Railroad Co | 289 |
| San Diego and Arizona Eastern Railway Co | 3,462 |
| Southern Pacific Pipe Lines Inc | 1,780 |
| Union Terminal Warehouse | 2,011 |
| Visalia Electric Railroad Co | 222 |
| Southern Pacific Transport Co | 13,301 |
| St. Louis Southwestern Railway Co | 102,000 |
| Total | 1,507,476 |

OPINION

*Issue (bbb)*

Petitioner employed the accrual method of accounting and, during the taxable year 1961, estimated and accrued the amounts that would be paid to its employees as vacation pay in 1962. Under union contracts, the employees' rights to the 1962 vacations vested in 1961. On its 1961 consolidated income tax return, petitioner deducted the accrued vacation pay, and respondent now agrees that the deduction is allowable.

For 1961 book accounting purposes, petitioner estimated and accrued the payroll taxes attributable to the accrued 1962 vacation pay. These payroll taxes would become due in 1962 when the employees were paid for their vacations. On its consolidated income tax return for the year 1961, petitioner did

not deduct these accrued payroll taxes. By amendments to petition, the deductibility of these amounts has been placed in issue. Petitioner now contends that, under the accrual method of income tax accounting, the accrued payroll taxes relating to 1962 vacation pay were allowable deductions in 1961. Respondent contends the payroll taxes do not qualify for deduction in 1961 under section 461 and the regulations thereunder.[159]

Section 461(a) states the general rule that a taxpayer is allowed a deduction in "the taxable year which is the proper taxable year under the method of accounting used in computing taxable income." The regulations elaborate on this general provision. For accrual basis taxpayers such as petitioner, section 1.461–1(a)(2), Income Tax Regs., provides as follows:

Under an accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy. * * * While no accrual shall be made in any case in which all of the events have not occurred which fix the liability, the fact that the exact amount of the liability which has been incurred cannot be determined will not prevent the accrual within the taxable year of such part thereof as can be computed with reasonable accuracy.

The "all of the events" test appearing in the quoted portion of the regulations was first enunciated in *United States v. Anderson*, 269 U.S. 422 (1926), wherein the Supreme Court stated (pp. 440–441):

Only a word need be said with reference to the contention that the tax upon munitions manufactured and sold in 1916 did not accrue until 1917. In a technical legal sense it may be argued that a tax does not accrue until it has been assessed and becomes due; but it is also true that in advance of the assessment of a tax, all the events may occur which fix the amount of the tax and determine the liability of the taxpayer to pay it. In this respect, for purposes of accounting and of ascertaining true income for a given accounting period, the munitions tax here in question did not stand on any different footing than other accrued expenses appearing on appellee's books. * * *

It is apparent from the *Anderson* holding and from the principles set forth in the regulations[160] that petitioner must

---

[159]There is no dispute as to the deductibility of the amounts at issue under sec. 162.

[160]In addition to the portion of the regulations quoted above, see also sec. 1.446–1(c)(1)(ii), Income Tax Regs., which provides in pertinent part:

"Generally, under an accrual method, income is to be included for the taxable year when all the events have occurred which fix the right to receive such income and the amount thereof can be

satisfy two requirements before it can properly deduct the accrued payroll taxes during the taxable year at issue:

(1) All of the events which determine petitioner's liability must have occurred during 1961. See *World Airways, Inc. v. Commissioner*, 62 T.C. 786, 797 (1974); *Thriftimart, Inc. v. Commissioner*, 59 T.C. 598, 611–613 (1973); *Oberman Manufacturing Co. v. Commissioner*, 47 T.C. 471, 477 (1967). This requirement prevents the deduction of an expenditure that might never be made. *World Airways, Inc. v. Commissioner*, supra at 802; *Mooney Aircraft, Inc. v. United States*, 420 F.2d 400, 406 (5th Cir. 1969).

(2) Petitioner must be able to estimate with reasonable accuracy during 1961 the amount of the expenditure to be made in the subsequent year. See *World Airways, Inc. v. Commissioner*, supra at 797, 805; see also *Crescent Wharf & Warehouse Co. v. Commissioner*, 59 T.C. 751, 759–760 (1973), revd. on another point 518 F.2d 772 (9th Cir. 1975). This requirement provides an element of certainty, although it is not essential that the precise amount of the expenditure be definitely ascertained. *Peoples Bank & Trust Co. v. Commissioner*, 50 T.C. 750, 755 (1968); see also *Brown v. Helvering*, 291 U.S. 193 (1934), *Harrold v. Commissioner*, 192 F.2d 1002, 1006 (4th Cir. 1951).

The failure to satisfy either requirement of this two-step test is fatal to petitioner's claim. *Crescent Wharf & Warehouse Co. v. Commissioner*, supra at 759. See *Wien Consolidated Airlines, Inc. v. Commissioner*, 528 F.2d 735 (9th Cir. 1976), affg. 60 T.C. 13 (1973).

We conclude that petitioner has not satisfied the first requirement above (that the liability be fixed) and is, therefore, not entitled to accrue and deduct the payroll taxes at issue. We need not decide whether petitioner has satisfied the second requirement (that the amount of the liability be reasonably estimable).

We believe it is significant that each of the taxes at issue had a maximum salary base upon which they were computed (RRTA: $400 monthly; RUIA: $400 monthly; FICA: $4,800

---

determined with reasonable accuracy. Under such a method, deductions are allowable for the taxable year in which all the events have occurred which established the fact of the liability giving rise to such deduction and the amount thereof can be determined with reasonable accuracy."

annually; and FUTA: $3,000 annually). At the end of 1961, petitioner had no way of knowing which employees would take their vacations at a time when their earnings would exceed the base amounts. Theoretically, at least, it was possible for *all* employees' earnings (exclusive of vacation pay) to exceed the base amounts with the result that no payroll taxes would be owing on the 1962 vacation pay. It is, therefore, clear that, at the end of 1961, all of the events which determined petitioner's liability for payroll taxes on 1962 vacation pay had not occurred. As we observed above, it was possible that a substantial portion of the vacation pay would not be subject to a payroll tax at all.

In *Turtle Wax, Inc. v. Commissioner*, 43 T.C. 460 (1965), the taxpayer, a corporation employing an accrual method of accounting, sought to accrue and deduct in 1958 and 1959 the amounts to be paid to its employees in 1959 and 1960, respectively, as vacation pay. In holding that the taxpayer could not properly accrue these amounts, we stated (43 T.C. at 466–467):

Under an accrual method of accounting, the deduction of an item depends upon whether all the events have occurred which determine the liability of the taxpayer to pay it; a liability does not accrue as long as it remains contingent. *United States v. Anderson*, 269 U.S. 422; *Brown v. Helvering*, 291 U.S. 193; and *Denver & Rio Grande Western Railroad Co.*, 38 T.C. 577, 572.

* * * We think it follows that on December 31, 1958 and 1959, the liability for vacation pay was still *contingent* on completing the 1,800 hours of service and *all the events* had not yet occurred which would determine petitioner's liability to pay the amounts of $7,393.80 and $2,467.33, respectively.

In the case at bar, as in the *Turtle Wax* case, it was essential to have certain information about each employee before there could be a determination of the liability to pay the amounts sought to be accrued. In both cases, this information could be obtained only in the year subsequent to the year in which the accrual was attempted. In *Turtle Wax*, it was necessary to ascertain whether or not the employee's hours of employment had exceeded the minimum requirement for purposes of vacation pay. In the instant case, it was necessary to ascertain whether or not the employee's earnings had exceeded the maximum requirement for purposes of payroll taxation. The present case is similar to the *Turtle Wax* case in that the liability to pay the amounts in issue is contingent on an event which will occur in the year subsequent to the year before the Court; prior to the occurrence of that event, the petitioner's liability to pay the amounts cannot be determined. It follows that the amounts

involved herein, like the amounts at issue in *Turtle Wax*, cannot properly be accrued. See also *Tennessee Consolidated Coal Co. v. Commissioner*, 15 T.C. 424, 431 (1950).

Basically, petitioner's argument is that there is no substantive difference between the accrued vacation pay and the related payroll taxes. Petitioner contends that since the vacation pay was vested and accruable and thereby qualified for a deduction, the same treatment should be accorded the payroll taxes at issue under basic accrual concepts.

Regardless of the close relationship between the two items, we have concluded that the contingencies and uncertainties associated with petitioner's estimated liability for the payroll taxes at issue are too great to permit their deduction. In addition to *Turtle Wax, Inc. v. Commissioner, supra*, see, e.g., *World Airways, Inc. v. Commissioner, supra* at 802, and *Trinity Construction Co. v. United States*, 424 F.2d 302, 305 (5th Cir. 1970). By the end of 1961, petitioner's liability to pay the vacation pay had become fixed. But its liability to pay tax thereon had not become fixed and could not become fixed until the vacation pay was paid and it could be determined whether all or a part of it was in excess of the amount of wages on which the tax had to be paid.

In *Union Pacific Railroad Co. v. United States*, 208 Ct. Cl. 1, 16–22, 524 F.2d 1343, 1348–1352 (1975), an accrual basis taxpayer sought to accrue and deduct on its 1942 tax return the payroll taxes which were to be paid in 1943 on 1943 vacation pay. The 1943 vacation pay had been earned and accrued in 1942. In disallowing the claimed payroll tax deductions, the Court of Claims noted that the tax statutes at issue subjected to tax only the first $300 of compensation paid to any employee in any calendar month. The court pointed out that the taxpayer therefore did not know at the end of 1942 the extent to which its employees' 1943 vacation pay would be taxed under these statutes. In response to the taxpayer's claim that, even with the $300 ceiling, it was able in 1942 to estimate the amount of the payroll taxes with reasonable accuracy, the court stated (524 F.2d at 1351–1352):

While the amount of a tax may be reasonably estimated and need not be precisely known, liability for the tax must have attached and cannot be approximated or estimated. "[T]he fact that the percentage of items which will be paid can be estimated with reasonable accuracy is not sufficient to support

accruals. The individual items must represent fixed liabilities." *Denver & Rio Grande Western Railroad Co. v. Commissioner, supra* [38 T.C. 557, 572]. The accruability test is not whether there is certainty of payment, or if a reasonable estimate can be made, but whether there is certainty of liability. *Trans-California Oil Co.*, 37 B.T.A. 119, 127 (1938). Here, liability was not certain or fixed. The effect of the $300 provision was to make the liability for tax uncertain, until the time when the employee actually went on vacation or received both pay and vacation pay. Liability for payroll tax was thus under the "all events" test not certain or fixed in 1942. *Texaco-Cities Service Pipe Line Co. v. United States, supra* [170 F. Supp. 644, 645]: *Helvering v. Russian Finance & Construction Corp.*, 77 F.2d 324, 327 (2d Cir. 1935).

In *Eastman Kodak Co. v. United States*, 209 Ct. Cl. 365, 370–378, 534 F.2d 252, 256–260 (1976), the Court of Claims reached a similar result in a case involving the FICA tax which, during the year there at issue, subjected only the first $4,800 of an employee's annual compensation to tax. In disallowing the claimed payroll tax deduction, the court stated (534 F.2d at 260):

Although this case differs from *Union Pacific* in that the tax ceilings are yearly rather than monthly, the principle remains the same. Plaintiff cannot demonstrate that it knew in December 1964 when a given employee would take his 1965 vacation. Thus Kodak could not know in 1964 whether the employee would take the vacation before or after said individual employee's salary reached the 1965 ceiling. Plaintiff could not determine precisely as of the end of 1964, the fact of tax liability on vacation pay earned by each individual employee. * * *

Petitioner cites various cases to support its claimed deduction, including *United States v. Anderson, supra; United States v. Olympic Radio & Television, Inc.*, 349 U.S. 232 (1955); *Texaco Cities Service Pipe Line Co. v. United States*, 145 Ct. Cl. 274, 170 F. Supp. 644 (1959); *Thriftimart, Inc. v. Commissioner, supra*. These and other cases cited by petitioner are inapposite. In the case at bar, liability was not determinable until a specific condition was satisfied. "All of the events" necessary to establish liability in 1961 did not occur in that year. In none of the cases relied upon by petitioner was a deduction permitted where a similar unsatisfied condition prevented the fixing of liability. Given this crucial distinction, we are unable to agree that the cases cited by petitioner are supportive of petitioner's position. It is well settled that "the accrual of an item of expense is improper where the liability for such item in the taxable year is contingent upon the occurrence of future events." *Putoma Corp. v. Commissioner*, 601 F.2d 734, 739 (5th Cir. 1979), affg. 66 T.C. 652, 660 (1976). The reason for this rule is simply that "When

\* \* \* the obligation to pay is contingent upon the happening of some future event, there is no certainty that it will be paid or will accrue." *Helvering v. Russian Finance & Construction Corp.*, 77 F.2d 324, 327 (2d Cir. 1935). We believe this rule is particularly applicable on the facts of the instant case.

Petitioner cites section 446(a) and section 1.446–1(a)(1), Income Tax Regs., for the proposition that "taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books," and petitioner argues that since it had been using the accrual method in accounting for the payroll taxes at issue for book purposes, it should properly employ that method for tax purposes as well. We do not believe petitioner's argument stands up in the face of section 1.446–1(c)(1)(ii), Income Tax Regs., which provides that, for a taxpayer under the accrual method "deductions are allowable for the taxable year in which all the events have occurred which establish the fact of the liability giving rise to such deduction and the amount thereof can be determined with reasonable accuracy." This portion of the regulations under section 446 employs language which is similar to that appearing in section 1.461–1(a)(2), Income Tax Regs., and, for the reasons given in the preceding discussion, the amounts at issue in this case do not qualify for a deduction under either regulatory provision.[161]

Petitioner cites section 463,[162] which was added to the Code in 1974, to support its contentions. That section, with qualifications not here pertinent, permits an accrual basis taxpayer to elect to deduct the subsequent year's vacation pay (if otherwise deductible under section 162) by making a "reasonable addition to an account representing the taxpayer's liability for vacation pay earned by employees before the close of the taxable year." In enacting this section, Congress was reacting to the strict requirements of Rev. Rul. 54–608, 1954–2 C.B. 8, which held that "No accrual of vacation pay can take place until the fact of

---

[161]See also the portion of this opinion entitled, *"Issue (g)*: Welded Rail," in which we conclude that the manner in which petitioner accounted for certain welding costs on its books is not determinative under sec. 446 of the question of the deductibility of those costs.

[162]Sec. 463, entitled "Accrual of Vacation Pay," was added to the Code by Pub. L. 93–625, sec. 4(a), and it is effective (with some exceptions) for taxable years beginning after Dec. 31, 1973. Its provisions are therefore not applicable to the year currently before us.

liability to a specific employee has been clearly established and the amount of the liability to each individual employee is capable of computation with reasonable accuracy." Petitioner suggests that the enactment of section 463 was an implicit rejection of the concepts underlying Rev. Rul. 54–608, and that, in view of this rejection, it is improper in the instant case to regard specific information such as was required in the ruling as necessary for the accrual and deduction of the payroll taxes at issue.

We believe a careful reading of the pertinent Senate Finance Committee report shows that Congress was not rejecting any of the underlying concepts which served as a basis for the revenue ruling. Instead, it is readily apparent that Congress was making an exception to the established accrual rules by permitting the deduction of certain amounts which were nonaccruable because they did not represent a fixed liability:

> The application of Revenue Ruling 54–608 results in the denial of a deduction in a year where the accrual of vacation pay has not been clearly fixed with respect to specific employees. * * *
>
>     *    *    *    *    *    *    *
>
> The committee's bill provides for an election by a taxpayer who computes his income by the accrual method of accounting to obtain a deduction as a trade or business expense * * * *for both the vested and contingent amounts of vacation pay* * * * which were earned by the taxpayer's employees before the close of the taxable year and payable during that year or within 12 months thereafter. * * *
>
>     *    *    *    *    *    *    *
>
> If a taxpayer is deducting vested vacation pay liabilities with respect to a vested plan, he need not make the election provided in the bill in order to continue to deduct the vested liabilities.
>
> [S. Rept. 93–1375, pp. 7–10 (1974), 1975–1 C.B. 522, 523. Emphasis supplied.]

Furthermore, section 463(a) states that a taxpayer's "liability for vacation pay earned before the close of the taxable year shall include amounts which, because of contingencies, would not (but for this section) be deductible under section 162(a) as an accrued expense." It is beyond question that section 463 allows the accrual of an otherwise nonaccruable item.

There is nothing in the legislative history associated with

section 463 which suggests that Rev. Rul. 54–608 is an improper interpretation or application of the law.[163] We believe it is fairly obvious that, if specificity were not a requirement of the law, Congress would not have found it necessary to enact special legislation negating that requirement for vacation pay accruals.[164]

Even if we were to assume, arguendo, that basic accrual concepts do not require specificity of the nature described in the revenue ruling in connection with vacation pay,[165] it would not automatically follow that specific information is not required to support the deduction of payroll taxes relating to the vacation pay. In the case of payroll taxes, as we have noted before, there is much more uncertainty as to what amounts, if any, will be deducted. The deduction of vacation pay, unlike payroll taxes, is not dependent upon an employee's earnings being below a specified salary base.

Petitioner, referring to various revenue rulings dealing with FICA and FUTA, argues that respondent has taken inconsistent positions over the years on the question of whether payroll taxes are accruable as a deduction. Only one of these rulings deals precisely with the question of accruability of FICA and FUTA taxes attributable to earned vacation pay. Rev. Rul. 69–587, 1969–2 C.B. 108, holds that such payroll taxes are deductible by an accrual method employer only when they are actually paid. Other rulings provide more general rules for accruability, and in the case of FUTA, acknowledge the deductibility of at least a portion of the taxes prior to actual payment. See Rev. Rul. 74–70, 1974–1 C.B. 116, restating under current law positions previously taken in Rev. Rul. 70–507, 1970–2 C.B. 104, and G.C.M. 19692, 1938–1 C.B. 148. Compare I.T. 2960, XV–1 C.B. 98.[166]

---

[163]See the discussion of Rev. Rul. 54–608, 1954–2 C.B. 8, and related rulings in *Union Pacific Railroad Co. v. Commissioner*, 208 Ct. Cl. 1, 19–20, 524 F.2d 1343, 1350 (1975).

[164]Petitioner's argument that the payroll tax on vacation pay is so closely related to the vacation pay that they should be accrued and deducted in the same year has appeal. However, we believe an act of Congress would be necessary to permit it.

[165]Our opinion in *Turtle Wax, Inc. v. Commissioner*, 43 T.C. 460, 466–467 (1965), is, by necessary implication, contrary to the stated assumption.

[166]Petitioner also makes reference to a memorandum, dated Oct. 26, 1973, from the Commissioner of Internal Revenue to the Assistant Secretary for Tax Policy, entitled "Legislative Proposal Concerning Railroad Retirement Taxes." In this memorandum, respondent states that RRTA tax, unlike FICA, is determined when the employee's services are

While the express language of these rulings is not generally favorable to the petitioner's case, petitioner has attempted to develop a theory which follows in part and rejects in part the positions taken in the rulings. Petitioner argues at length that, under this theory, respondent cannot consistently deny the accrual and deduction of the FICA, FUTA, RRTA, and RUIA taxes at issue.

We find it unnecessary to apply petitioner's theory or to find a consistency in the respondent's many rulings. Our reasons are twofold. First, the result we reach today is fully consistent with the result reached in the only ruling directly on point. Rev. Rul. 69–587, *supra*. Second, none of the rulings cited above, including Rev. Rul. 69–587, discusses the effect of the factors which we have considered significant in reaching our conclusions herein. As a result, while we have carefully examined all of the respondent's rulings which bear on this question, we have not relied upon them in making our determination.[167]

To summarize, we conclude and hold that the estimated payroll taxes which petitioner seeks to accrue and deduct in 1961 do not qualify under section 461 because they fail to satisfy the first requirement (fixed liability) of the two-step test found in *United States v. Anderson*, 269 U.S. at 440–441, and in sec. 1.461–1(a)(2), Income Tax Regs.[168] See also *World Airways, Inc. v. Commissioner*, 62 T.C. at 797. As our discussion herein has

---

rendered, on a "when earned" basis. Petitioner takes the position that this is an incorrect interpretation of the law, maintaining that all four of the taxes involved herein are on an equal footing and are deductible under basic accrual concepts. We have been unable to ascertain the basis for the position taken by respondent in the memorandum.

[167]Some of the cited revenue rulings may fall within the scope of the alternative argument made by the respondent as to this issue. That argument is subsequently discussed.

[168]We therefore do not reach the question of whether petitioner could calculate the amount of the payroll taxes with reasonable accuracy at the end of 1961. Even assuming that petitioner could do so, the deduction of the taxes at issue is not permissible where there is no certainty of liability. *Union Pacific Railroad Co. v. United States*, 524 F.2d at 1351; *Eastman Kodak Co. v. United States*, 209 Ct. Cl. 365, 378, 534 F.2d 252, 260 (1976); *Oberman Manufacturing Co. v. Commissioner*, 47 T.C. 471, 477 (1967).

As described in our findings, petitioner employed a formula to predict the amount of payroll taxes attributable to the 1962 vacation pay. While it is true that, under the technical requirements for accrual, the amount of these payroll taxes must be calculable with some certainty, it would seem to be needlessly time consuming to require an employer with as many employees as petitioner and its affiliates to make a precise calculation. Petitioner's method of determining the payroll tax due by use of its formula appears to have been conservative and reasonably accurate; at least respondent does not appear to have challenged the amount of the tax which was deducted for the year of payment and which, as we understand it, was the same amount petitioner accrued on its books by means of the formula approach.

shown, all of the events which determined petitioner's liability for the 1962 payroll taxes did not occur in 1961. See *Union Pacific Railroad Co. v. United States*, 524 F.2d at 1348–1352; *Eastman Kodak Co. v. United States*, 534 F.2d at 256–259; *Turtle Wax, Inc. v. Commissioner*, 43 T.C. at 466–467. Petitioner may, therefore, not deduct the amounts at issue in 1961.

Respondent has made an additional argument to support his view that the payroll taxes at issue cannot be accrued in 1961. His alternative position is that liability for payroll taxes does not become fixed under the law until the wages to which they relate are paid. In support of this contention, respondent makes reference to various statutory and regulatory provisions and to case authority, including the opinion of the Supreme Court in *Otte v. United States*, 419 U.S. 43, 55 (1974). See also Rev. Rul. 69–587, 1969–2 C.B. 108.

Petitioner contends that, in making this argument, respondent has confused an employer's liability to remit payroll taxes to the Government (which arises when wages are actually or constructively paid) with the employer's liability to pay the taxes (which petitioner claims arises when the wages to which they relate are earned).[169]

In view of our determination herein that petitioner's liability to pay the payroll taxes did not arise in 1961 and in view of the fact that we are not called upon herein to determine the precise moment in 1962 when petitioner's liability was fixed (since only the year 1961 is before us), it is not essential, for the purpose of deciding this case, for us to consider respondent's alternative argument. Even if we were to reject respondent's position that payroll taxes accrue only when wages are paid, it would remain our view that the payroll taxes involved in the instant case were not accruable in 1961.

We decide this issue for respondent.

---

[169]As to these contentions by the parties, see *Eastman Kodak Co. v. United States*, 209 Ct. Cl. at 372–375 534 F.2d at 257–258, and *Osio v. United States*, an unpublished opinion (C.D. Cal. 1977, 40 AFTR 2d 77–5826, 77–2 USTC par. 9624).

## VII. Deduction of Penalties for Violations of Federal Statutes[170]

This issue presents the following question for our consideration:

Whether the monetary penalties incurred and paid by petitioner during its taxable years 1959 through 1961 as a result of violations of the Safety Appliance Act (45 U.S.C. secs. 1–16) and the Twenty-Eight Hour Act (45 U.S.C. secs. 71–74) are deductible under section 162 as ordinary and necessary business expenses.

### FINDINGS OF FACT

#### *Issue (zz)*

Some of the facts relating to this issue have been stipulated by the parties, and those facts, with associated exhibits, are incorporated herein by this reference.

This issue involves penalties incurred by the former Southern Pacific Co., the Texas & New Orleans Railroad Co., the Northwestern Pacific Railroad Co., and the St. Louis Southwestern Railway Co., hereinafter sometimes referred to collectively as petitioner.

Account 551, under the Interstate Commerce Commission's (ICC) issue of the Uniform System of Accounts for Railroad Companies applicable to the years in controversy, reads, in pertinent part, as follows:

551. Miscellaneous Income Charges.

This account shall include items, not provided for elsewhere, properly chargeable to income account during the fiscal year. Among the items which shall be included in this account are:

\*       \*       \*       \*       \*       \*       \*

Penalties and fines for violation of the Interstate Commerce Act or other Federal and State laws when not specifically provided for elsewhere. \* \* \*

In accordance with the ICC accounting requirements, the former Southern Pacific Co. and certain of its subsidiaries, including the Texas & New Orleans Railroad Co., debited to Account 551 (and to similar accounts for nonrailroad companies)

---

[170]In trying and briefing this case, this issue was referred to by the parties as "*Issue (zz)*."

and deducted as an expense for book purposes amounts representing the described fines and penalties.

In the consolidated returns filed by the former Southern Pacific Co. for years 1959, 1960, and 1961, the fines and penalties incurred and paid by the Texas & New Orleans Railroad Co. were deducted as "Other Deductions" in computing income tax liability. However, the fines and penalties incurred and paid by the former Southern Pacific Co. and its other subsidiaries were eliminated as deductions for tax reporting purposes and were instead shown as Schedule "M" items on the tax returns. On audit of said returns for the years 1959 through 1961, respondent disallowed the deductions claimed with respect to the Texas & New Orleans Railroad Co.

By amended petition, petitioner seeks a redetemination allowing the deductions claimed by the Texas & New Orleans Railroad Co. as well as a determination that those penalties incurred and paid by the former Southern Pacific Co. and other of its subsidiaries are deductible for tax purposes as ordinary and necessary business expenses.

Petitioner, by stipulation, advises that it is proceeding with this issue, for purposes of this case, only with respect to deductions claimed by reason of penalties incurred due to violations of 45 U.S.C. secs. 1–16 (Safety Appliance Act) and 45 U.S.C. secs. 71–74 (Twenty-Eight Hour Act [Care of Animals in Transit]).

As a result of the foregoing stipulation, deductions of penalties for violation of other statutes are not here involved. The deductibility of the following amounts in the indicated years remains at issue:

| Company | 45 U.S.C. secs. 1–16 (Safety Appliance Act) | 45 U.S.C. secs. 71–74 (Twenty-Eight Hour Act) |
|---|---|---|
| *1959* | | |
| Former Southern Pacific Co ......... | $3,500 | $700 |
| Texas & New Orleans Railroad Co ............................ | 1,000 | 300 |
| Northwestern Pacific Railroad Co ............................ | 1,250 | --- |
| St. Louis-Southwestern Railway Co ............................. | 250 | --- |
| Total ................................. | 6,000 | 1,000 |
| *1960* | | |
| Former Southern Pacific Co ......... | 6,230 | 700 |
| Texas & New Orleans Railroad Co ............................ | 3,750 | 300 |
| Total ................................. | 9,980 | 1,000 |
| *1961* | | |
| Former Southern Pacific Co ......... | 6,000 | 100 |
| Texas & New Orleans Railroad Co ............................ | 3,550 | 300 |
| Northwestern Pacific Railroad Co ............................ | 750 | --- |
| St. Louis-Southwestern Railway Co ............................. | 500 | --- |
| Total ................................. | 10,800 | 400 |

Violations of 45 U.S.C. secs. 71–74, hereinafter the Twenty-Eight Hour Act, result from the willful and knowing continuous confinement of animals in railroad cars beyond the specified statutory time limit.[171] Petitioner used due care in attempting to comply with the statute; however, various day-to-day occurrences in operations made compliance difficult. For example, clerical employees of petitioner sometimes erroneously recorded the time the animals to be transported were loaded on cars; employees at times failed to take into account the additional unloading time required when the animals were loaded on piggyback cars; and sometimes the train carrying the animals would be intentionally delayed in order to allow another of petitioner's trains to use the railroad track because, in petition-

---

[171] A more detailed description of this statute is included in our discussion *infra*.

er's opinion, the movement of that other train was of greater importance.

Petitioner also used due care in seeking to avoid violations of the Safety Appliance Act. However, this statute imposes a strict liability standard and petitioner found it was not always capable of identifying and correcting all conditions, the existence of which would constitute violations of the statute.[172] Petitioner incurred penalties during the years at issue for various violations of the statute including operation of trains on which the coupling and uncoupling apparatus was inoperative, the handhold on cars was insecure, or the handbrake was in disrepair and inefficient.

Violations of both the Twenty-Eight Hour Act and the Safety Appliance Act constitute a problem for the entire railroad industry.

## OPINION

### Issue (zz)

This issue involves the deductibility of monetary penalties incurred by petitioner for violation of 45 U.S.C. secs. 1–16 (Safety Appliance Act), and 45 U.S.C. secs. 71–74 (Twenty-Eight Hour Act [Care of Animals in Transit]).

Both parties argue that the issue is to be decided under section 162(f), which provides:

No deduction shall be allowed under subsection (a) for any fine or similar penalty paid to a government for the violation of any law.

Section 162(f) was enacted as a part of the Tax Reform Act of 1969, but was specifically made applicable to all taxable years to which the 1954 Code applies.[173] The purpose of this provision was to reflect the rule of various court decisions in which certain fines and penalties were held to be nondeductible. S. Rept. 91–552, 91st Cong., 1st Sess. (1969), 1969–3 C.B. 429, 596–598; Conf. Rept. 91–782, 91st Cong., 1st Sess. (1969), 1969–3 C.B. 644, 676–678. Prior to the enactment of section 162(f), a number of

---

[172]A more detailed description of this statute is included in our discussion *infra*.

[173]Sec. 902(c), Pub. L. 91–172, 83 Stat. 711, 1969–3 C.B. 147:

"Section 162(f) of the Internal Revenue Code of 1954 (as added by subsection (a)) shall apply to all taxable years to which such Code applies. * * * "

business expenses had been disallowed by the courts on the ground that allowance of the deductions would be contrary to Federal and State public policy. See S. Rept. 91-552, *supra*, 1969-3 C.B. at 596-597; *Tank Truck Rentals, Inc. v. Commissioner*, 356 U.S. 30 (1958). Compare *Commissioner v. Tellier*, 383 U.S. 687 (1966).

The taxable years for which the deductions here in issue were claimed are 1959-61, 8 to 10 years before the enactment of section 162(f). It can be argued that section 162(f), per se, cannot affect petitioner's tax liability for the years here involved despite the fact that Congress specifically made section 162(f) retroactive. Fortunately, we need not answer this conundrum in this opinion because we believe the penalties here involved are not deductible under either the law as it existed in the years 1959-61 or under section 162(f).

The basic issue is whether the penalties incurred and paid by petitioner during its taxable years 1959 through 1961 due to violations of the Safety Appliance Act and the Twenty-Eight Hour Act are deductible under section 162(a) as ordinary and necessary business expenses.

The Safety Appliance Act imposes an obligation on railroads engaged in interstate commerce to ensure that trains are equipped with specified operating and safety equipment and that such equipment is in good operating condition. A civil penalty of $250 for each violation of the act detected by the Interstate Commerce Commission is imposed upon the violating carrier and is recoverable by the United States. The purpose of the statute is to protect employees of the carrier and others who might come in contact with the train from injury which might result due to defective safety or operating equipment. *Baltimore & Ohio Railway Co. v. Jackson*, 353 U.S. 325 (1957); *Clark v. Atlantic Coast Line Railroad*, 244 F.2d 368 (D.C. Cir. 1957).

The Twenty-Eight Hour Law provides that animals being transported in interstate commerce by rail cannot be confined for a period longer than 28 hours (36 hours if a release is executed by the shipper) without unloading the animals into pens for a period of at least 5 hours to allow rest, water, and feeding. The act imposes a civil penalty, recoverable by the United States, of not less than $100 nor more than $500 for each knowing and willful violation thereof. The purpose of the Twenty-Eight Hour Act is, as its title implies, to prevent cruelty

to animals in transit. *B. & O. Southwestern Railroad v. United States*, 220 U.S. 94 (1911).

We have found that petitioner used all due care in attempting to comply with both of the Federal statutes in question and that, in the context of its daily operations, said violations were unavoidable and, further, that violations of the Twenty-Eight Hour Law and the Safety Appliance Act are commonly incurred by the railroad industry in general. Thus, the penalties incurred constituted ordinary and necessary expenses of doing business within the *general* meaning of those terms. *Welch v. Helvering*, 290 U.S. 111 (1933). However, in *Tank Truck Rentals, Inc. v. Commissioner, supra*, the Supreme Court, after acknowledging that the fines incurred by the taxpayer for violation of a State highway weight limitation law were unavoidable in the profitable operation of its truck-leasing business, nevertheless held that a finding of "necessity" could not be made if the allowance of the deduction would serve to frustrate a sharply defined public policy proscribing certain modes of conduct evidenced by a governmental declaration thereof.

In *Tank Truck Rentals*, the statutes involved were penal statutes enacted to protect the highways from damage and to ensure the safety of all persons using them. The Court found that the fines exacted for violating these statutes were punitive and for the purpose of enforcing the law, and disallowed the deduction because to allow it would frustrate the State policy by reducing the sting of the penalty prescribed by the State legislature. While the statutes here involved are civil and exact "penalties" instead of "fines," the objective of the penalties was the same as the fines in *Tank Truck Rentals*: to enforce the law and protect employees from injury due to defective safety equipment and to prevent cruelty to animals in transit. We find no distinction between the "penalties" involved here and the "fines" involved in *Tank Truck Rentals* to justify a conclusion that allowing the deduction of these penalties for Federal income tax purposes would result in any less frustration of public policy than would have resulted from allowing the deduction of the fines involved in that case. In *Commissioner v. Heininger*, 320 U.S. 467, 473 (1943), the Court said: "Where a taxpayer has violated a federal or a state statute and incurred a fine or penalty he has not been permitted a tax deduction for its payment."

The Supreme Court, in the most recent of these cases dealing with public policy, *Commissioner v. Tellier, supra,* reiterated the problem in this area—whether to disallow expenses which are ordinary and necessary under their traditional definitions when Congress clearly intended to tax only net income or to permit the public policy of a government to be frustrated by allowing deductions for such expenditures. The Court reviewed its earlier decisions and distilled therefrom the essence of the public policy doctrine.

Only where the allowance of a deduction would "frustrate sharply defined national or state policies proscribing particular types of conduct" have we upheld its disallowance. *Commissioner v. Heininger,* 320 U.S., at 473. Further, the "policies frustrated must be national or state policies evidenced by some *governmental* declaration of them." *Lilly* v. *Commissioner,* 343 U.S., at 97. (Emphasis added.) Finally, the "test of nondeductibility always is the severity and immediacy of the frustration resulting from allowance of the deduction." *Tank Truck Rentals* v. *Commissioner,* 356 U.S. 30, 35. In that case, as in *Hoover Motor Express Co.* v. *United States,* 356 U.S. 38, we upheld the disallowance of deductions claimed by taxpayers for fines and penalties imposed upon them for violating state penal statutes; to allow a deduction in those circumstances would have directly and substantially diluted the actual punishment imposed. [383 U.S. at 694.]

We therefore conclude that under the judicial law as it existed in 1959–61 the penalties paid by petitioner for violations of the Safety Appliance Act and the Twenty-Eight Hour Act are not deductible. And we reach the same conclusion if we apply section 162(f) of the Code to this issue.

Section 162(f), enacted as part of the Tax Reform Act of 1969 but made applicable to all taxable years to which the 1954 Code applies, prohibits deductions under section 162(a) for "any fine or similar penalty paid to a government for the violation of any law."

The penalties in question were incurred by petitioner due to violations of Federal statutes and as such would seem to fall within the language of the section. Moreover, section 1.162–21(b)(1)(ii), Income Tax Regs., defines a fine or similar penalty as including an amount paid as a civil penalty imposed by Federal, State, or local law. And section 1.162–21(c), Income Tax Regs., example (5) provides that a penalty invoked on account of a violation of the Safety Appliance Act is nondeductible.[174]

---

[174]These regulations were adopted subsequent to the trial of this issue. Petitioner, on supplemental brief, challenges their validity and contends that the enactment of these

Petitioner contends respondent's regulations constitute an erroneous interpretation of the law and as such are invalid, and that the penalties involved herein are deductible because they do not fall within the ambit of section 162(f). Petitioner begins with the premise that a "fine" is an extraction due to a violation of a criminal statute and "penalty" is one imposed on account of a civil infraction. Petitioner cites no authority for the proposition nor have we found any cases justifying such characterization. We are not convinced that this distinction between fine and penalty is appropriate. See *Middle Atlantic Distributors, Inc. v. Commissioner*, 72 T.C. 1136, 1143 (1979), a case decided subsequent to the filing of the briefs as to this issue, in which the words "fine" and "penalty" are not differentiated in the manner suggested by petitioner. See also section 1.162–21(b), Income Tax Regs., in which no distinction is made. However, respondent has not questioned this characterization either at trial or on brief and for purposes of this proceeding we shall accept the correctness of this premise.[175] Petitioner claims that section

---

regulations was precipitated by this proceeding. Petitioner additionally challenges the propriety of these regulations alleging that respondent committed a technical violation of 5 U.S.C. sec. 553 when promulgating these regulations.

Because we do not rely on respondent's regulations in reaching our conclusion herein, we need not consider either of petitioner's arguments. See *Uhlenbrock v. Commissioner*, 67 T.C. 818, 822 n. 4 (1977). However, we feel it incumbent upon us to note in passing that we find both of petitioner's challenges unpersuasive and lacking substance.

Respondent acts totally within his authority when promulgating regulations with retroactive applicability (sec. 7805(b)), and indeed probably has no other choice but to apply them retroactively when the statutory provision itself is given retroactive effect.

Petitioner's second argument alleges a violation of the Federal Administrative Procedure Act's requirement that a Federal regulatory agency in the exercise of its rulemaking power must publicly announce all *proposed substantive rules and allow opportunity for interested* parties to comment thereon. Petitioner contends that respondent's regulations which were adopted in T.D. 7345, filed Feb. 19, 1975, were modifications of those which were proposed on Dec. 6, 1972 (37 Fed. Reg. 25936). Petitioner believes that said modifications included new material which must again be publicly announced as proposed rules before their adoption. It is true that Treasury regulations constituting substantive rules must be promulgated in accordance with the requirements of 5 U.S.C. sec. 553. See *Eastern Kentucky Welfare Rights Org. v. Simon*, 506 F.2d 1278 (D.C. Cir. 1974), vacated on other grounds 426 U.S. 26 (1976). We believe the proper application of 5 U.S.C. sec. 553 is to require public notice of proposed regulations and any modifications thereof if, but only if, said modifications constitute *new substantive matter*. In the instant case, the modifications made by respondent did not consist of such new substantive material but rather constituted a mere elaboration of the matter contained in the originally proposed rule and consequently, no further notice requirement was imposed by 5 U.S.C. sec. 553.

[175] A penalty has been defined as "the suffering * * * which is annexed by law or judicial decision to the commission of a crime or public offense * * *; a sum of money made

162(f) does not preclude the deduction of all civil penalties imposed by any law but only those which are "similar" to fines imposed by criminal statutes. It alleges that the penalties imposed under the Safety Appliance Act and the Twenty-Eight Hour law do not possess the requisite similarity and thus concludes said penalties are deductible.

We agree that the literal language of section 162(f) implies the existence of penalties imposed by law which are not within the intended scope of section 162(f) because Congress must have had some reason for including the word "similar" in the statute. Since that reason is not altogether clear from the wording of the statute and since respondent's regulations make no distinction between penalties based upon the word "similar," we deem it appropriate to look to the legislative history to discover the meaning intended by Congress. See *Gilbert v. Commissioner*, 241 F.2d 491 (9th Cir. 1957). Unfortunately, S. Rept. 91–552, *supra*, 1969–3 C.B. at 596–598, which accompanied the legislation enacting section 162(f), is both cryptic and somewhat ambiguous. However, Congress did make it clear that it was attempting to codify the general judicial position with regard to the deductibility of fines and penalties which existed at that time. See S. Rept. 91–552, *supra*, 1969–3 C.B. at 597; Conf. Rept. 91–782, *supra*, 1969–3 C.B. at 676. Two years later, the Senate Finance Committee attempted to more clearly explain what was meant to be included within the definition of "fines and similar penalties." See S. Rept. 92–437, 92d Cong., 1st Sess. (1971), 1972–1 C.B. 600. Specifically, the committee, which had proposed section 162(f) by amendment to the House bill,[176] disclaimed any intent, at the time of the section's enactment, to limit the application of section 162(f) to criminal "penalties" and stated that its intent was to "disallow deductions for payments of sanctions which are imposed under civil statutes but which in general terms serve the same purpose as a fine exacted under a

recoverable in a civil action by the state * * * for the less serious offenses not mala in se"; whereas a fine is "a sum formerly paid as compensation or for exemption from punishment but now imposed as punishment for a crime—distinguished from *forfeiture* and *penalty*." Merriam Webster's Third New International Dictionary (1971). See S. Rept. 92–437, 92d Cong., 1st Sess. (1971), 1972–1 C.B. 559, 600, impliedly supporting petitioner's position.

[176]See H.R. 13270, sec. 903(a), reported by the Senate Finance Committee Nov. 21, 1969, as a substitute for H.R. 13270 passed by the House Aug. 8, 1969, and signed into law as sec. 902(a) of Pub. L. 91–172, Dec. 30, 1969.

criminal statute." S. Rept. 92–437, *supra*, 1969–3 C.B. at 600. The Committee also said at page 600:

On the other hand, it was not intended that deductions be denied in the case of sanctions imposed to encourage prompt compliance with requirements of law. Thus, many jurisdictions impose "penalties" to encourage prompt compliance with filing or other requirements which are really more in the nature of late filing charges or interest charges than they are fines. It was not intended that this type of sanction be disallowed under the 1969 action. Basically, in this area, the committee did not intend to liberalize the law in the case of fines and penalties.[177]

Thus, Congress, by use of the word "similar," was not intending to distinguish between criminal and civil sanctions, but rather was intending to make a distinction between different types of civil penalties. If a civil penalty is imposed for purposes of enforcing the law and as punishment for the violation thereof, its purpose is the same as a fine exacted under a criminal statute and it is "similar" to a fine. However, if the civil penalty is imposed to encourage prompt compliance with a requirement of the law, or as a remedial measure to compensate another party for expenses incurred as a result of the violation, it does not serve the same purpose as a criminal fine and is not "similar" to a fine within the meaning of section 162(f). See *Middle Atlantic Distributors, Inc. v. Commissioner*, *supra*.

The statutory creation of this distinction comports with the Senate Finance Committee's announced intent to codify the existing judicial position with regard to the deductibility of fines and penalties. See *Tank Truck Rentals, Inc. v. Commissioner*, 356 U.S. at 34. This expressed congressional intent together with the judicial history on this area as previously discussed serves as convincing evidence that section 162(f), in its entirety, represents a codification of preexisting decisional law concerning fines and penalties. See *Trucker v. Commissioner*, 69 T.C. 675,

---

[177]We recognize that statements in congressional committee reports issued subsequent to a statutory enactment are not necessarily controlling in inferring the intent of Congress at the time of the enactment. See *Estate of Stoll v. Commissioner*, 38 T.C. 223, 247 (1962). Cf. *Key Buick Co. v. Commissioner*, 68 T.C. 178, 183 (1977), affd. 613 F.2d 1306 (5th Cir. 1980). Nevertheless, in view of the fact that the contemporaneous committee report (S. Rept. 91–552, 91st Cong., 1st Sess. (1969), 1969–3 C.B. 596) states Congress was attempting to codify the then-existing judicial position regarding the deductibility of fines and penalties, and in view of the fact that the statements in the 1971 committee report are consistent with the pre–1969 court decisions, we believe the latter committee report accurately reflects the intent of Congress in enacting sec. 162(f).

679 n. 4 (1978); *Adolf Meller Co. v. United States*, 220 Ct. Cl.___ , 600 F.2d 1360 (1979).

The question remains whether petitioner's civil violations are "similar" to fines within the meaning of section 162(f) so as to prohibit their deduction. Petitioner believes that, in order for a civil penalty to be "similar" to a fine and thus within the scope of the statute, the penalty must be one imposed on account of the commission of an act which evidences that "reprehensible conduct" which normally accompanies the violation of a criminal law. Petitioner further believes that the actions or omissions which resulted in the imposition of the penalties involved herein, such as the failure to detect and correct defective safety or operating equipment or the retention of animals in railroad cars beyond the statutory time limitation because of scheduling priorities, do not constitute such reprehensible conduct. We must disabuse petitioner.

It is clear from the 1971 Senate Report[178] and the Supreme Court decisions discussed above that penalties imposed by civil statutes for purposes of enforcing the law and punishing violations thereof are not permitted to be deducted in determining net income. Thus, the appropriate consideration is not the type of conduct which gives rise to the violation resulting in the penal imposition but is the purpose which the statutory penalty is to serve.[179] To interpret the meaning of "similar" in the manner proposed by the petitioner would introduce a totally new test of questionable application to the Commissioner, taxpayers, and the courts which is not justified by a reading of either prior Supreme Court cases or the legislative history and would add confusion to an area Congress specifically sought to clarify.

Petitioner also contends herein that the penalties it incurred fall outside the scope of the public policy doctrine and conse-

---

[178]S. Rept. 92-437, *supra*.

[179]Petitioner's proposed distinction based on the type of conduct constituting the violation may not prove to be determinative in any particular case and would permit the characterization given to a particular statute by the enacting body to be determinative of the deductibility of an expense under Federal tax law. For example, if one locality characterized parking violations as misdemeanors while another characterized them as civil violations, a taxpayer in the first locality would be precluded from deducting the fine by sec. 162(f) while a taxpayer in the second locality would be permitted to deduct the penalty under sec. 162(a) since this type of conduct clearly cannot be categorized as inherently evil or reprehensible. Yet, it is exactly the same conduct engaged in by the taxpayer in the first locality.

quently outside the scope of section 162(f) because the purpose of the penalties was simply to *promote compliance* with the Federal statutes and because the infractions it committed were not violative of sharply defined public policies which would be frustrated if petitioner were permitted to deduct the costs of its acts. Assuming, arguendo, the public policy doctrine is still viable in this context, we disagree.

As we pointed out in our discussion above, petitioner committed violations of both the Safety Appliance Act and the Twenty-Eight Hour Act. Each statute evidences a defined public policy and imposes a civil penalty as retribution for a violation of that policy. If a deduction of the penalties were allowed for tax purposes, it would take some of the sting out of the penalties and would frustrate the public policy. Thus, the penalties incurred by petitioner fall precisely within the scope of the public policy doctrine finally enunciated by the Supreme Court (see *Commissioner v. Tellier*, 383 U.S. at 694), and, as above discussed, within the ambit of sec. 162(f).[180] See *Tucker v. Commissioner, supra*; *Uhlenbrock v. Commissioner*, 67 T.C. 818, 824 (1977); *May v. Commissioner*, 65 T.C. 1114, 1116–1117 (1976). See also *Patton v. Commissioner*, 71 T.C. 389, 390–391 (1978). Cf. *Great Northern Railway Co. v. Commissioner*, 40 F.2d 372, 373 (8th Cir. 1930), cert. denied 282 U.S. 855 (1930).[181]

The penalties at issue are therefore not properly deductible under section 162.

We decide this issue for respondent.

---

[180]See, in this regard, the statement in S. Rept. 92–437, quoted above in the text, asserting that penalties which "encourage prompt compliance" with statutory requirements are not within the scope of sec. 162(f). This language is not supportive of petitioner's contentions, as petitioner suggests, in view of our conclusion herein that the instant penalties were imposed to enforce the law and to punish violations thereof. They were not imposed merely to "encourage prompt compliance."

[181]Unlike *S & B Restaurant, Inc. v. Commissioner*, 73 T.C. 1226 (1980), this is not a case where "the payments in question * * * were made by petitioner in consideration of being allowed to continue" the proscribed conduct. See 73 T.C. at 1232. Furthermore, there has been no showing that the Safety Appliance Act or the Twenty-Eight Hour Act served a dual purpose as did the statutes involved in the *S & B Restaurant* case and in *Middle Atlantic Distributors, Inc. v. Commissioner*, 72 T.C. 1136, 1145 (1979), and *Grossman & Sons, Inc. v. Commissioner*, 48 T.C. 15 (1967).

## VIII.  Freight Car Useful Life[182]

This issue presents the following question for our consideration:

Whether, for purposes of the depreciation deduction under section 167, the useful life of the freight cars acquired by petitioner after 1944 was 30 years, as claimed by petitioner on its tax returns for the years at issue, or 20 years, as claimed herein.

### FINDINGS OF FACT

### *Issue (ll)*

Some of the facts relating to this issue have been stipulated by the parties, and those facts, with associated exhibits, are incorporated herein by this reference.

This issue involves the freight cars of the predecessor Southern Pacific Co., the former Southern Pacific Co., the Central Pacific Railway Co., and the Texas & New Orleans Railroad Co., hereinafter sometimes referred to collectively as petitioner.

In 1953 and 1954, the Revenue Service conducted an audit of the consolidated income tax returns filed by the predecessor Southern Pacific Co. for 1945, 1946, and the period ending September 30, 1947, and by the former Southern Pacific Co. for the periods ending December 31, 1947 and 1948. In the course of the audit of these returns, it was agreed that petitioner would segregate its freight car acquisitions since 1944 into a new grouping (group 5) and depreciate these cars at 3 percent, allowing a 10-percent salvage. This rate translated into a 30-year useful life. Prior to that time, petitioner had employed a 30-year useful life for its freight cars acquired before 1945 (group 1 through group 4), and this practice was continued for those cars.

The use of a 30-year useful life for the group 5 freight cars (sometimes hereinafter referred to as the "postwar" cars) resulted from discussions, in 1953, between Revenue Service engineer, G. V. Robinson, and petitioner's representatives, Cyril M. Bill, of petitioner's accounting department, and Spencer S. Wemett, petitioner's auditor of capital expenditures. It was their combined considered judgment that a 30-year useful life, excluding casualties, with 10 percent salvage for the postwar

---

[182]In trying and briefing this case, this issue was referred to by the parties as "*Issue (ll).*"

freight cars was reasonable. Petitioner's representatives believed the 30-year life to be correct.

Petitioner continued to employ a 30-year life for its postwar freight cars on its consolidated income tax returns for the years 1949 through 1961, and no adjustment was made by respondent to this claimed life for these years.[183] It was important to petitioner's management to file Federal income tax returns for each of the years 1949 through 1961 which set forth a determined amount of tax which they could reasonably rely upon in their management decisions as close to the final answer.

In 1948, petitioner's chief engineer and superintendent of motive power were of the view that a service (useful) life of 20 to 25 years for freight cars might be justifiable and proposed that petitioner depreciate its cars on that basis. However, contemporaneous data did not support this estimate, and the Interstate Commerce Commission indicated it would not approve a change in petitioner's depreciation rates. Petitioner's management did not formally adopt or propose a lower useful life.

In 1951, petitioner's management proposed a 27-year useful life for freight cars to the ICC, an estimate which the ICC accepted. In 1954, a 25-year life for the freight cars of the Texas & New Orleans Railroad Co. was proposed. The ICC rejected this claim as unsubstantiated and prescribed a 28-year life.[184]

In 1957, petitioner's accounting department suggested to the Association of American Railroads that the AAR should propose a 25-year useful life for freight cars to the Revenue Service in connection with a useful life study being undertaken by the Service.

During the years at issue, Cyril M. Bill was assistant income tax auditor for petitioner. By that time, he had come to believe that a 30-year useful life was too high. Bill did not have the responsibility for preparing petitioner's income tax returns for those years, and his views were not adopted by the management officials, who did have that responsibility when they made their claim as to useful life.

---

[183]The propriety of the use of the 30-year life for such cars is presently in controversy for the years after 1953. We deal herein with the years 1959, 1960, and 1961.

[184]Since 1933, the service (useful) life authorized by the ICC has been shorter than the useful life used by petitioner for tax purposes.

After World War II, petitioner's freight cars carried increased loads. Shippers began to demand longer freight cars with wider doors. The postwar freight cars acquired by petitioner were generally larger, with stronger decking and supporting structure to accommodate larger loads. Because of the increased capacity, the component parts of the freight cars, including the truck frames, were stronger.

During the postwar years, various factors affected the useful life of freight cars, some factors tending to increase useful life and some tending to decrease it.

During that period, the following improvements made to petitioner's freight cars tended, for the most part, to make the cars or their components stronger and more durable:

1. Trucks with longer spring travel and snubbing devices.
2. Stronger truck side frames and floors.
3. Steel wheels.
4. Higher capacity draft gears and improved couplers.
5. Higher capacity brake beams and improved airbrake equipment.
6. Roller bearings and improved lubricators.
7. Improved cushioning throughout.

On the other hand, the following postwar factors produced some increased physical deterioration of petitioner's freight cars and thus tended to make them less durable:

1. Increased daily mileage.
2. Increased loadings.
3. Increased impacts (e.g., in switching and connecting the cars).
4. Changes in method of loading and unloading cars.

Increased utilization is not a major factor in the life of a freight car, and petitioner did not retire cars on the basis of mileage per se, but rather on the basis of the cars' condition.

The factors tending to decrease useful life and the factors tending to increase useful life counteracted each other and, together, had a minimal net impact on the useful life of the postwar cars during the years at issue.

During the mid–1950's, petitioner began a gradual process of reducing the extent to which it rebuilt its freight cars. By the late 1950's, rehabilitation work was limited and repairs were

made for purposes of general overhaul and to keep the cars in safe operating condition. During the same period, running maintenance facilities were improved. The ultimate impact of this change of repair policy on the useful lives of the postwar cars was not clearly established during the years at issue.

During the years 1959, 1960, and 1961, petitioner's mechanical department was scheduling retirements of freight cars that were approximately 27 years old. Such scheduling was merely a recommendation by the mechanical department to the management officials. In practice, a freight car would not be retired until such time that its physical condition necessitated that it be taken out of service. A car could continue in service for a number of years even though it was part of a class that had been put on a retirement schedule.

While economic or financial considerations played some role in retirement decisions, such considerations were not as significant during and prior to the years at issue as was the actual condition of the freight cars. However, when the Revenue Service in 1962 adopted more liberal depreciation guidelines and promulgated Rev. Proc. 62–21, 1962–2 C.B. 418,[185] it became more profitable for petitioner to retire or replace freight cars than to rehabilitate them. Other events occurring subsequent to the years at issue had a similar effect.

A study prepared by petitioners and submitted to the ICC in 1962 showed that, during the period 1935–61, petitioner retired 22,849 freight cars. Those cars had been in service for a total of 685,582 years. The study thus shows an average life of 30 years.

For years after 1961, the ICC permitted petitioner to use a lower service (useful) life, but in so doing, the ICC did not determine that petitioner had been using too low a rate of depreciation during the years 1959, 1960, and 1961. This change of ICC position was promulgated in 1963, and it was based in part on data furnished by petitioner in that year.

In 1974, a study was conducted for petitioner by A. V. Fend of the Stanford Research Institute. Fend used data from petitioner's submissions to the Interstate Commerce Commission (Form A) through the year 1973. Fend's method of statistical analysis

---

[185]Effective for returns filed on or after July 12, 1962, this promulgated a guideline class life for machinery and equipment of railroads (including "Freight-train cars") of 14 years. Petitioner adopted the guideline life for its machinery and equipment after 1961.

(using the Iowa curves) produced "an estimate of average service life" for petitioner's postwar freight cars—a "rough approximation" of 20 years. The validity of this estimate depended upon the history of retirements during the years 1962–73. It, therefore, was not based upon information available to petitioner's management officials who had to exercise judgment on the useful life of petitioner's freight cars at the end of 1959, 1960, and 1961. Fend was unable to approximate useful life for the postwar freight cars under his method using solely data available during the years at issue.

In an attempt to ascertain a factual basis for Fend's 20-year estimate, Fred A. Schooley, also of the Stanford Research Institute, made additional studies for petitioner in 1974. One such analysis indicated that during a period of increased mileage there were increased freight car retirements and suggested there might be a causal relationship. Another such analysis indicated that during a period of decreased maintenance expenditures there were increased freight car retirements and suggested a causal relationship. Both of these studies (and supporting material) used data from years subsequent to 1961, not available to petitioner's management officials who estimated a 30-year life on the pertinent tax returns. Without the post–1961 data, Schooley was unable to establish the suggested correlations.

In another analysis, Schooley attempted to show that a 30-year useful life for petitioner's postwar freight cars was too high, using a modification of the "reserve ratio test" of Rev. Proc. 65–13, 1965–1 C.B. 759. That test, in conjunction with an examination of other factors, has been used to illustrate trends in depreciation, but it is not by itself a suitable means for making an estimate of useful life or for determining with certainty the propriety of petitioner's depreciation practices.

Subsequent to the years at issue, respondent used a method of statistical analysis known as the "retirement rate" or "annual rate" method in an attempt to confirm the 30-year life claimed on petitioner's returns.[186] This method essentially involves a process of averaging retirements over a number of years, taking into account the ages of cars retired as well as the ages of cars

---

[186]Several "retirement rate" method analyses were made by the Interstate Commerce Commission for use by respondent in trying this issue.

on hand. It is recognized that the "retirement rate" method will yield valid estimates of the life of a freight car where the retirement patterns have stabilized over a sufficient period of time. However, because it is an averaging technique, some applications of the method can be insensitive to changes in those patterns (or to trends affecting those patterns) which commence at the end of the time period being examined.

In filing petitioner's consolidated Federal income tax returns for the years at issue, the management officials responsible for preparing the returns selected a 30-year useful life for freight cars. In view of the information available to these officials concerning the past life of the cars and the conditions affecting the cars at the end of the years 1959, 1960, and 1961, their estimate of a 30-year life for the postwar freight cars was reasonable. There was no clear and convincing indication as of the end of these years that anything had occurred that would significantly shorten the useful life of the postwar cars.[187]

OPINION

*Issue (ll)*

This issue arises during the years 1959, 1960, and 1961, and involves claims under section 167 for additional depreciation with respect to freight cars acquired by petitioner subsequent to 1944. (These cars are sometimes referred to herein as the "postwar" freight cars.) In an amendment to petition, petitioner claims that the postwar cars had a useful life of 20 years, rather than the 30-year life which served as the basis for its depreciation deductions in its tax returns for the years at issue.[188] Obviously, if petitioner is correct in its assertion that these freight cars are to be depreciated over a shorter span of years,

---

[187]During the years at issue, petitioner's postwar freight cars had a salvage value of 10 percent.

[188]On its consolidated income tax returns for the years at issue, petitioner depreciated its postwar freight cars based on a 30-year useful life for the cars. The claim for additional depreciation in the petition is premised on a 22-year useful life for the postwar cars. This claim was revised in an amendment to petition, filed Mar. 13, 1975 (subsequent to the trial of this issue), in which petitioner asserts that the evidence adduced at trial supports a 20-year useful life for the cars. As revised, this issue involves petitioner's claim for additional depreciation deductions of $5,153,886 for 1959, $5,406,727 for 1960, and $5,856,561 for 1961, producing a total claimed overpayment of tax of $8,536,930.48 for the 3 years in controversy.

petitioner will be entitled to increased annual deductions under section 167.[189]

In considering petitioner's contentions herein, we are guided by section 1.167(a)–1(b), Income Tax Regs., which provides (in part):

The estimated remaining useful life may be subject to modification by reason of conditions known to exist at the end of the taxable year and shall be redetermined when necessary regardless of the method of computing depreciation. However, estimated remaining useful life shall be redetermined only when the change in the useful life is significant and there is a clear and convincing basis for the redetermination.

To a similar effect, see section 1.167(b)-O(a), Income Tax Regs., which provides:

The reasonableness of any claim for depreciation shall be determined upon the basis of conditions known to exist at the end of the period for which the return is made. It is the responsibility of the taxpayer to establish the reasonableness of the deduction for depreciation claimed. Generally, depreciation deductions so claimed will be changed only where there is a clear and convincing basis for a change.

Despite the wording of the regulations, petitioner insists that it is not required to show a "clear and convincing basis" for changing the 30-year useful life which it claimed on its returns. Petitioner believes it can satisfy its burden of proof as to this issue merely by producing evidence which would "reasonably support" the 20-year useful life it now claims. In taking this position, petitioner relies on the "reasonable approximation" language of *Burnet v. Niagara Falls Brewing Co.*, 282 U.S. 648, 655 (1931), and the reference to that case in *Western Terminal Co. v. United States*, 412 F.2d 826 (9th Cir. 1969). See also *Ames v. Commissioner*, 626 F.2d 693 (9th Cir. 1980), affg. T.C. Memo. 1977–249.

We believe petitioner is confusing a standard that has been used by the courts at times in deciding whether a taxpayer has carried his burden of proving that the useful life he has claimed is a "reasonable approximation" (see, for example, *Spartanburg Terminal Co. v. Commissioner*, 66 T.C. 916, 929 (1976), and *Chesapeake & Ohio Railway Co. v. Commissioner*, 64 T.C. 352,

---

[189]Sec. 167(a) provides in part that "there shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) * * * of property used in the trade or business."

379 (1975), applying the *Niagara Falls Brewing Co.* test, and see also *Durovic v. Commissioner*, 65 T.C. 480, 505 (1975), affd. 542 F.2d 1328 (7th Cir. 1976)), with the standard used in the regulations for changing the useful life previously used, which requires a "clear and convincing basis" for such a change.

The above-quoted language from the two sections of the regulations first appeared in section 1.167, Income Tax Regs., promulgated in 1956 (see T.D. 6182), subsequent to the enactment of the 1954 Code. Section 1.167(a)–1, Income Tax Regs., deals with depreciation in general, and subparagraph (b) thereof deals with the useful life in particular. Section 1.167(b)-O, Income Tax Regs., relates to methods of computing depreciation, and subparagraph (a) thereof provides in general that any reasonable and consistently applied method of computing depreciation may be used or continued in use under section 167. Paragraph (a)–1(b) provides that useful life may be redetermined, and paragraph (b)-O(a) provides that the method may be changed, only where there is a "clear and convincing basis" for the redetermination or change. We surmise that his language was predicated on and intended to reflect the Commissioner's policy with respect to depreciation adjustments announced in Rev. Rul. 90, 1953–1 C.B. 43, clarified by Rev. Proc. 57–18, 1957–1 C.B. 748. In Rev. Rul. 90, after discussing the judgmental nature of depreciation, the Commissioner stated that effective May 12, 1953, it would be the policy of the Service, generally, not to disturb depreciation deductions, and he instructed Revenue employees to propose adjustments in depreciation deductions only where there was a "clear and convincing basis" for a change. While the revenue ruling was directed primarily to Revenue employees, the language in the two sections of the regulations quoted above is not limited to the Revenue Service. It clearly supplies a standard for making *changes* in the methods for computing depreciation and the useful lives of the assets previously used in such computations, whether proposed by the taxpayer or the Revenue Service.

Under the circumstances here, where petitioner is attempting to *re*determine the useful life of certain freight cars, it must first prove there is a "clear and convincing basis" for such a change. If petitioner can cross that hurdle, it would then have the normal burden of proving a more reasonable approximation of useful life than the 30-year life claimed on its returns by

providing sufficient evidence to permit a reasonable determination of what the shorter life should be.

Petitioner would be correct in applying the reasonable approximation standard herein if it were merely trying to establish the appropriateness of the useful life it had claimed on its returns. But the instant case does not present a situation where the Commissioner has issued a statutory notice asserting a greater useful life than that used by the taxpayer. Instead, we have before us a case in which the petitioner has based a refund claim on its contention that the useful life which it employed on its tax returns was incorrect and should be decreased. Thus, petitioner is seeking a *redetermination* of useful life (and not merely attempting to support its initial determination), and petitioner therefore falls precisely within the purview of the above-quoted regulatory provisions. See *Estate of Bryan v. Commissioner*, 364 F.2d 751, 754 n. 4 (4th Cir. 1966), affg. T.C. Memo. 1963–182; *Cohn v. United States*, 259 F.2d 371, 377–378 (6th Cir. 1958).[190]

Accordingly, the cases discussing the evidentiary standard for supporting a taxpayer's initial determination are not on point.[191] Petitioner, seeking to change its initial determination, must show the asserted "change in the useful life is significant" and must prove "there is a clear and convincing basis for the redetermination." Sec. 1.167(a)–1(b), Income Tax Regs.; see also sec. 1.167(b)–0(a), Income Tax Regs. Petitioner has cited no authority, and we have found none, which would negate this regulatory standard.

This requirement that petitioner must show a clear and convincing basis for a change in useful life is appropriate for an additional reason. While the useful life which petitioner claimed on its tax returns is not binding on petitioners, we view such a claim as constituting evidence against petitioner which must be rebutted. See *Leonard Refineries, Inc. v. Commissioner*, 11 T.C.

---

[190]See also *Offshore Operations Trust v. Commissioner*, T.C. Memo. 1973–212.

[191]*Spartanburg Terminal Co. v. Commissioner*, 66 T.C. 916, 929 (1976), and *Chesapeake & Ohio Railway Co. v. Commissioner*, 64 T.C. 352, 379 (1975), cited in the text as applying the "reasonable approximation" standard, do not involve redeterminations of useful life. The taxpayers in those cases had assumed the assets were not depreciable and thus had not addressed themselves to the matter of useful life on their returns. Thus, there had been no prior determination of useful life by the taxpayer and no attempt to change any previously claimed life. See also the portion of this opinion entitled, "*Issue (pp)*: Grading and Tunnel Bore Useful Life."

1000, 1008, (1948); *United States v. Farrell*, 35 F.2d 38, 41 (D. Conn. 1929).[192] When this factor is added to petitioner's normal burden of proof herein, the "clear and convincing" evidentiary standard seems amply justified.

Petitioner contends that the position taken on its tax returns is of minimal significance herein because "the determination of a 30-year life was not made by the former Southern Pacific Company but rather by one of respondent's agents." Our analysis of the record, as shown in our findings, discloses that the corporate management was in agreement with the use of a 30-year life for its postwar cars and that petitioner was in no manner compelled to employ a useful life as determined by respondent's agents. Although the evidence does not adequately explain the thinking of the corporate management responsible for filing petitioner's returns, it must be concluded that these officials considered all relevant factors and determined that 30 years was an acceptable estimate of the useful life of the postwar freight cars. The contrary conclusion urged by petitioner is not warranted by the evidence of record.[193] We therefore regard the claims on petitioner's tax returns as some evidence of a 30-year useful life for the postwar freight cars. *Leonard Refineries, Inc. v. Commissioner, supra.* See note 192 *supra.*

Having set forth the extent of petitioner's burden of proof as to this issue, we must now consider whether petitioner has met that burden.

We cannot find on the record before us that there is a clear and convincing basis for changing the useful life. While there is

---

[192]Such claims on the tax returns are regarded by the cited cases as admissions against interest. To the same effect, see *Estate of Kreis v. Commissioner*, T.C. Memo. 1954–139, affd. 227 F.2d 753 (6th Cir. 1955), and *Atlanta Biltmore Hotel Corp. v. Commissioner*, T.C. Memo. 1963–255, modified 349 F.2d 677 (5th Cir. 1965). See also the following cases which, while not specifically labeling the claims on the returns as "admissions," nevertheless give them some evidentiary weight: *Casey v. Commissioner*, 38 T.C. 357, 384 (1962); *Carzis v. Commissioner*, T.C. Memo. 1971–73; *Smith v. Commissioner*, T.C. Memo. 1976–114. Cf. *Estate of Bryan v. Commissioner*, T.C. Memo. 1963–182, affd. 364 F.2d 751 (4th Cir. 1966).

[193]While the record does contain some information regarding the views of certain of petitioner's lower level employees, these individuals did not prepare the tax returns for the years at issue. Such evidence is obviously of no assistance in any inquiry into the motivations of the officials who had the responsibility of making the determination of useful life. Clearly, evidence concerning the specific factors that were considered by these latter officials would have been helpful to show that their contemporaneous determination of a 30-year life, based on the conditions known to exist at the end of each year, was in error. See *Estate of Bryan v. Commissioner, supra; Carzis v. Commissioner, supra; Smith v. Commissioner, supra.*

evidence that would suggest that by the years here involved some changes in the use of the freight cars were occurring, we do not find that evidence sufficient to determine a more reasonable approximation of the useful life of the cars than the 30 years used, or that any decline in the useful life was significant.

Petitioner contends that during the 1950's it increased the operating speed of its freight cars, put heavier loads on the cars, changed its loading and unloading practices, and discontinued the making of heavy repairs to the cars. These circumstances, argues petitioner, caused the postwar freight cars to have a useful life shorter than 30 years.

Unfortunately, we are only concerned with freight cars that were put in service after 1944 so that, during the tax years here involved, petitioner had had only 14 to 16 years' actual experience with those cars, a shorter period than the useful life claimed by either party. To adequately analyze the retirement experience of petitioner with these cars, we would have to look to the retirements subsequent to the years here involved. That retirement experience would be of doubtful reliability, not only because such information was not available to anyone by the end of 1961, but also because the economics of repairing or replacing freight cars changed radically in 1962 with the adoption by petitioner of the shorter guideline lives established by respondent in that year.

As can be seen from our findings, there were various factors which had an effect on the useful life of the freight cars acquired by petitioner after the war. Some of these factors tended to decrease useful life, while others had the opposite effect. For example, increased daily mileage, increased loadings, and increased impacts in switching yards were all factors which, we are told, had a negative impact on the life of the cars. On the other hand, the postwar cars were generally larger than the earlier versions, accommodating larger loads, and they were constructed with stronger decking and supporting structure and with other more durable component parts. These improvements had a positive impact on freight car life. Considered together, these positive and negative factors tended to counteract each other, and their net impact on useful life was minimal. Even if it could be said that these various factual elements weighed slightly on the side of decreasing useful life, petitioner has not

shown that they operated to produce a substantial net decrease in the life of the postwar cars, as petitioner contends.

During the late 1950's, petitioner limited the rehabilitation work on its freight cars and concentrated instead on general overhaul and improved running maintenance. Petitioner asserts that this policy change adversely affected useful life. Our scrutiny of the record in this regard does not convince us that, during the years here pertinent, the changes in petitioner's rebuilding program substantially reduced freight car life. Evidence concerning the effects of the policy shift was fairly general in nature and not based on specific information pertaining to the years 1959, 1960, and 1961. There appears to be insufficient data upon which to base any firm conclusions with respect to the results of the reduced rehabilitation work during this period. Petitioner has failed to establish that its change in repair policy had any significant negative impact on the useful life of the postwar cars during the years at issue.

The same can be said with respect to much of the evidence offered by petitioner to prove that any of the factors relied on by petitioner caused a significant reduction in the useful life of the freight cars acquired after World War II. Many of the factors relied upon were phased in over the period 1945 to 1961 and not enough experience was gained during that period to abstract a meaningful prognosis of just what effect those factors would actually have on the useful life of the cars. Some of petitioner's employee-witnesses surmised that some of the factors would shorten the useful life of the cars, while others testified that certain improvements in design would tend to extend the useful life of the cars. We are convinced from the record as a whole that, while there was a belief on the part of some of the employees that the newer cars would have a shorter useful life, there was no consensus as of December 31, 1961, on the part of the management officials responsible for making the final decisions on the rate of depreciation that the post-war cars had a significantly shorter useful life than the 30 years used for the freight car fleet in the past; nor was there a consensus as to what a reasonable life expectancy for the postwar cars might be. We are in a similar position, viewing the evidence as of 1961. While we believe that on the whole the heavier use of, and the reduction in major overhaul of, the postwar cars more than offset the improvements made in the cars and reduced their

useful life to some extent, we are unable to determine that the reduction was significant or what useful life would be more reasonable than that used on the returns.

Petitioner appears to be of the view that, even where there are no concrete changes currently affecting the life of an asset, expectations for the future can have a bearing on useful life. Petitioner relies on *Burnet v. Niagara Falls Brewing Co.*, *supra*, and *Moise v. Burnet*, 52 F.2d 1071 (9th Cir. 1931). In the unique circumstances presented by those obsolescence cases, future expectations were taken into account by the courts where the taxpayers knew, in the year of the deductions, that their businesses would probably be terminated by virtue of a constitutional amendment.

Neither of these cases bears a sufficient similarity to the present case to warrant its application to the present circumstances. We have found no authority which would, on the facts of this case, warrant the reliance by petitioner solely on its future expectations. To the contrary, it is clear that before petitioner can prevail herein, it must justify the additional depreciation it now claims by showing the conditions during the years at issue which accelerated the exhaustion of its equipment and by showing that such conditions did actually reduce the life of the equipment during those years. *Roundup Coal Mining Co. v. Commissioner*, 20 T.C. 388, 396–397 (1953); *H. E. Harman Coal Corp. v. Commissioner*, 16 T.C. 787, 803 (1951), affd. on this point 200 F.2d 415 (4th Cir. 1952); *Sherin v. Commissioner*, 13 T.C. 221 (1949); *Copifyer Lithograph Corp. v. Commissioner* 12 T.C. 728 (1949).

Petitioner devotes considerable discussion on brief to the views of A. V. Fend of the Stanford Research Institute. Using data from petitioner's ICC submissions through the year 1973, Fend made a statistical analysis in 1974 which petitioner believes offers some support to its contention that the freight cars at issue had a 20-year useful life.[194] We do not attribute to this analysis the significance that petitioner seems to attach to it, and our findings reflect this fact.

At the trial of this issue, it was made amply clear by petitioner that Fend's analysis and testimony were not being offered as

[194]The accuracy of the data taken by Fend from petitioner's "Form A" submissions to the ICC is open to some question.

proof of a 20-year life. Indeed, this evidence is singularly unsuitable for the purpose of proving useful life in this case for the reason that Fend admittedly employed data in his study from the years 1962 to 1973. Fend testified that, without the data from these years, he would not have been able to reach any specific conclusions as to useful life of the postwar cars at the end of 1959, 1960, and 1961.[195] Since the information relied on by Fend in making his analysis was not available for consideration at the end of the years at issue, his conclusions cannot be relied on herein. The post–1961 statistics which Fend employed were obviously not available to petitioner for the making of its contemporaneous determination of useful life.

In our analysis of the extensive record as to this issue, we must limit our consideration to those facts which were actually known to petitioner or were reasonably ascertainable at the close of the years 1959, 1960, and 1961. *Airport Building Development Corp. v. Commissioner*, 58 T.C. 538, 541 (1972); *Morganton Full Fashioned Hosiery Co. v. Commissioner*, 14 T.C. 695, 703 (1950); secs. 1.167(b)-O(a) and 1.167(a)–1(b), Income Tax Regs. To the extent that petitioner's reevaluation of useful life is not based on such facts but is instead based on facts relating to events occurring subsequent to the years at issue, it is not relevant for our present purposes. Clearly, any estimation of useful life which makes use of hindsight does not provide an appropriate basis upon which to make a redetermination. *Western Terminal Co. v. United States, supra*; *Johnson v. Commissioner*, 302 F.2d 86, 88 (4th Cir. 1962), cert. denied 371 U.S. 904 (1962), affg. T.C. Memo. 1961–205; *Durovic v. Commissioner*, 65 T.C. at 505.

Not the least of the difficulties with hindsight reevaluations is the fact that changes in conditions in subsequent years can make evidence relating to those years particularly misleading. Economic factors tending to induce retirements became more significant in the years subsequent to 1961. For example, when

---

[195]On brief, petitioner seems to be of the view that, even without the post–1961 data, Fend could still produce a reliable estimate of useful life under his method. Based on Fend's own testimony and the state of the record with respect thereto, it is our conclusion that he could not do so. While Fend saw some suggestion of a downward trend in freight car life without using the post–1961 data, he testified that the information available during the years at issue was inadequate, under his method, to permit computation of the extent to which useful life may have been affected.

the Revenue Service in 1962 promulgated Rev. Proc. 62–21, 1962–2 C.B. 418, it may have become more profitable for petitioner to retire or replace freight cars than to rehabilitate them. Prior to that time, the physical condition of the cars was the predominant consideration in petitioner's retirement decisions. As a result, any hindsight studies which take into consideration the post–1961 retirements may produce a distortion of useful life as of the end of 1959, 1960, and 1961.

While petitioner acknowledges that useful life may not be determined on the basis of hindsight, petitioner asserts that evidence relating to subsequent events may be considered for the purpose of corroborating the soundness of prior estimates.

Regardless of the validity of this premise, it is of little help to petitioner in the case at bar. Petitioner's argument assumes that its management officials had in fact estimated a useful life during the years at issue that was lower than the life they chose to use on the tax returns. This assumption is not supported by the evidence of record. The only prior estimate shown by the record to have been made by these officials for tax purposes is the 30-year useful life on petitioner's returns. See note 198 *infra.* If we were to consider evidence relating to subsequent events, we would not be doing so to *corroborate* the estimate on petitioner's returns but to *change* that estimate. The use of hindsight for such a purpose is plainly inappropriate. On the facts of this case, reliance on Fend's analysis and conclusions, for even corroborative purposes, would not be compatible with the requirement that we limit our consideration to "conditions known to exist" at the end of the taxable year. Secs. 1.167(b)-0(a) and 1.167(a)–1(b), Income Tax Regs.[196]

In support of some of its factual conclusions, petitioner relies in part on certain statistical analyses prepared in 1974 by Fred A. Schooley, also of the Stanford Research Institute. Schooley, who based his studies on data in petitioner's records, made no attempt to estimate useful life. Instead, he sought to correlate

---

[196]Petitioner also asserts that facts relating to subsequent years, such as the data employed by Fend in his study, can be pertinent for the purpose of corroborating other evidence of a 20-year life. This argument assumes that there is evidence in this record (not involving the use of hindsight) which shows a 20-year useful life. We have found no such evidence. Further, we do not believe hindsight evidence can, in effect, be added to other evidence to create a totality of evidence that would prove the lesser useful life. Such a process would still necessitate the use of hindsight to prove useful life and would therefore be prohibited.

various factual data "to determine a mathematical relationship which might provide a rational explanation for a decrease in service life." Petitioner believes Schooley's analyses lend credence to the view that the useful life of the postwar freight cars was less than 30 years. However, because Schooley also employed data from years subsequent to those at issue and because the validity of his studies was dependent upon such hindsight data, Schooley's analyses and conclusions, like those of Fend, provide no assistance to petitioner.[197]

Petitioner points to certain acts of the Interstate Commerce Commission to support its contentions herein, particularly to actions taken subsequent to the years at issue. Even assuming that we could look to post–1961 events, we would not view as helpful to petitioner's case the fact that in 1963 the ICC authorized petitioner to use a shorter life for its freight cars. The ICC at no time stated that the useful life used by petitioner during 1959, 1960, and 1961 was too high, and the ICC did not permit any change to useful life in those years. Moreover, the factors which the ICC takes into account for rate-making purposes and the factors which this Court must take into account for tax purposes do not necessarily comport in all particulars, nor are the controlling principles and legislative objectives in computing depreciation necessarily the same. Cf. *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 541–543 (1979); *Louisville & Nashville Railroad Co. v. Commissioner*, 66 T.C. 962, 1001 (1976), on appeal (6th Cir., June 2, 1978).[198]

Given the factors which we must take into consideration, and

---

[197]Schooley's analyses can be of only limited value for our present purposes. In the first place, it is admitted that his studies, at best, may only suggest certain causal relationships; they do not prove any such relationships. Second, Schooley's studies employed data from years subsequent to 1961 and, when that data is eliminated, the analyses tend not to show the suggested correlations. Third, while Schooley did draw the conclusion that a 30-year useful life was too high, in doing so he employed a modification of the "reserve ratio test" of Rev. Proc. 62–21, 1962–2 C.B. 418. We do not regard that test, by itself, as a reliable means of determining with any accuracy the useful life of petitioner's freight cars. See *Estate of Bryan v. Commissioner*, 364 F.2d 751, 753 (4th Cir. 1966); Rev. Proc. 62–21, *supra*, 1962–2 C.B. at 435. Cf. Rev. Proc. 65–13, 1965–1 C.B. 759.

[198]For similar reasons, estimates of service (useful) life made by petitioner in its submissions to the ICC must be viewed in that context and cannot automatically be treated as though they were estimates of useful life for tax purposes. To be so treated, there must be a showing that such estimates were based solely on pertinent tax principles. The same can be said of estimates for book purposes and of the ostensibly self-serving estimate made by petitioner's accounting department to the Association of American Railroads. The only estimates of useful life in this record shown to have been made by petitioner's management for tax purposes, and therefore

limiting our analysis to facts in the record arising in and prior to the years at issue, we believe that for tax purposes, applying tax principles, it has not been shown that there is a clear and convincing basis for redetermining the useful lives of these freight cars.

Finally, petitioner argues that the statistical approach relied on by respondent to confirm the 30-year life claimed on petitioner's returns was not an acceptable method for calculating the useful life of the postwar freight cars. We recognize that the "retirement rate" method used by respondent and the other statistical methods discussed at trial all have their faults and their virtues.[199] The "retirement rate" method, for example, is most reliable when retirement patterns have stabilized, but it can at times be insensitive to recent changes in policy affecting retirements.

Respondent presented the testimony of experts who, taking into consideration the policy changes which petitioner claims reduced the useful life of its postwar freight cars, but basing their opinions largely on factual data obtained from petitioner, were of the view that the 30-year life used by petitioner on its tax returns was a reasonable estimate of the useful lives of the cars in question.

While we are not convinced from this record that petitioner's policy changes affected its retirement patterns to such an extent as to render the "retirement rate" method ineffective for our present purposes, we have nevertheless not relied on respondent's statistical analyses. None of the various statistical studies discussed by the parties controls the outcome herein.[200] The result we reach as to this issue is dictated by the fact that the evidence adduced at trial concerning the conditions at the end of 1959, 1960, and 1961 was simply insufficient, under the applicable standard, to establish that the useful life claimed on petitioner's returns was erroneous.

---

relevant to our consideration of useful life for the purpose of sec. 167 of the Code, are those made in petitioner's tax returns for 1959, 1960, and 1961.

[199]Petitioner acknowledges on brief that "no [actuarial] technique is preferable over others in every situation" and that "everyone knowledgeable on the subject knows there are limits to the usability of the results of actuarial studies." This statement seems amply justified by the record as to this issue.

[200]We note that even respondent's analyses are not totally free of hindsight taint, having been prepared subsequent to the years at issue and using, at least to a limited extent, some post–1961 data.

Accordingly, we must conclude that petitioner has not established a clear and convincing basis for a significant modification of the 30-year life for freight cars claimed on its returns for the years 1959, 1960, and 1961, by reason of conditions known to exist or reasonably ascertainable at the end of each of these years.

We decide this issue for respondent.

## IX. DEDUCTION OF EMBANKMENT EXPENDITURES[201]

This issue presents the following two questions for our consideration:

Whether the retroactive deduction by petitioner of expenditures to maintain and protect railroad embankments and other railroad facilities during the years 1959, 1960, and 1961, which expenditures were capitalized on petitioner's returns for those years, constitutes a change in petitioner's method of accounting, requiring the consent of the Commissioner of Internal Revenue under section 446(e).

Whether expenditures by petitioner to maintain and protect railroad embankments and other railroad facilities during the years 1959, 1960, and 1961 are deductible as ordinary and necessary business expenses under section 162 or whether such expenditures are nondeductible under section 263(a) and must be capitalized.

### FINDINGS OF FACT

#### *Issue (yy)*

Some of the facts relating to this issue have been stipulated by the parties, and those facts, with associated exhibits, are incorporated herein by this reference.

This issue involves amounts expended by the former Southern Pacific Co. and the Texas & New Orleans Railroad Co., hereinafter sometimes referred to collectively as petitioner.

During the years 1959, 1960, and 1961, the former Southern Pacific Co. completed work projects at various locations. The amounts expended on these projects are shown in the listing below, along with the number of the Authority for Expenditure

---

[201]In trying and briefing this case, this issue was referred to by the parties as "*Issue (yy).*"

(also sometimes referred to as a "GMO," standing for "General Manager's Order") issued for each project and the location of the project:

| GMO No. | Location | Amount expended |
| --- | --- | --- |
| 1959 | | |
| 68653 | Cochran, Ore. | $3,922 |
| 73366 | Ilmon, Calif. | 2,559 |
| 74264 | Serrano, Calif. | 2,792 |
| 74526 | Livermore, Calif. | 3,092 |
| 74744 | Montalvo-El Rio, Calif. | 25,983 |
| 75349 | Nacimiento, Calif. | 1,699 |
| 76653 | Verdi, Nev. | 3,542 |
| 76818 | Ligurta, Ariz. | 3,012 |
| 76819 | Ligurta, Ariz. | 1,306 |
| 76820 | Ligurta, Ariz. | 1,805 |
| 76966 | Ligurta, Ariz. | 1,741 |
| 77439 | Ligurta, Ariz. | 2,098 |
| 1960 | | |
| 74270 | Drake, Calif. | 10,105 |
| 77292 | Gaviota, Calif. | 7,467 |
| 78065 | Ligurta, Ariz. | 1,493 |
| 79409 | Coyote Largo, N. Mex. | 2,007 |
| 79474 | Canby, Calif. | 373 |
| 80182 | Granite Spur, Ariz. | 1,751 |
| 80613 | Gold Run, Calif. | 734 |
| 1961 | | |
| 80482 | Hilt, Calif. | 498 |
| 81405 | West Palm Springs, Calif. | 735 |
| 81682 | Wymala-Red Rock, Ariz. | 1,449 |
| 82040 | Santa Margarita, Calif. | 1,358 |
| 82700 | Manhattan, Oreg. | 2,673 |
| 82871 | Liberal, Oreg. | 3,811 |

During the years 1959, 1960, and 1961, the Texas & New Orleans Railroad Co. completed work projects at various locations. The amounts expended on these projects are shown in the listing below, along with the number of the Authority for Expenditure for each project and the location of the project:

| GMO No. | Location | Amount expended |
| --- | --- | --- |
| 1959 | | |
| 580960 | Lull, Tex. | $6,291 |
| 590019 | Falfurrias, Tex. | 731 |

| | | |
|---|---|---|
| 590111 | Schulenberg, Tex. | $2,084 |
| 590703 | Flatonia, Tex. | 2,642 |
| **1960** | | |
| 600193 | Eurnice, La. | 865 |
| 600248 | Zavalla, Tex. | 2,203 |
| 600309 | Lake Charles, La. | 2,368 |
| 600387 | Osman, Tex. | 1,185 |
| **1961** | | |
| 590126 | San Antonio, Tex. | 3,353 |
| 600873 | Collado, Tex. | 1,796 |
| 610024 | San Antonio, Tex. | 2,719 |
| 610274 | Longfellow, Tex. | 898 |
| 610425 | Longfellow, Tex. | 2,246 |
| 610462 | Liberty, Tex. | 773 |
| 610480 | Kenedy, Tex. | 1,318 |
| 610536 | Mathis, Tex. | 1,021 |
| 610580 | Beaumont, Tex. | 1,781 |

Each of these work projects of the former Southern Pacific Co. and the Texas & New Orleans Railroad Co. during the years at issue was directed at repairing damage to rail lines, embankments, and related facilities or at correcting defective conditions posing an imminent threat to the rail lines, embankments, and related facilities. The conditions which necessitated these work projects and the damage or potential damage resulting from these conditions are, in summary, as follows:

Changed waterflow patterns and concentrated water runoff eroding embankments and flooding tracks (caused, e.g., by the changed course of a river or creek or by the construction of highways, buildings, dikes, storm drains, etc.);

Water currents (frequently a new or more rapid pattern) exposing and weakening the footings of bridges and trestles and eroding the embankments at the ends of such structures;

Wave action and ship propeller wash and other erosive factors weakening seawalls and embankments and battering trestles;

Defective drainage boxes and drainage ditches and other factors causing water pockets and the settling of fill with resultant settling of track;

Storms eroding embankments or blocking culverts;

Earthquakes causing culverts to sag; and

Drifting sand covering and blocking tracks.

The actual work performed by the former Southern Pacific

Co. and the former Texas & New Orleans Railroad Co. to correct these conditions and repair the damage may be summarized as follows:

Repairing and extending existing culverts, pipes, boxes, drainage ditches, tunnel liners, etc., and construction of new ones;[202]

Repairing existing seawalls, dikes, bulkheads, jetties, revetments, etc., and construction of new ones;

Reinforcing existing bridges and trestles by the paving of stream beds, the erection of protective walls, and the addition of supports and extensions to trestles; and

Erecting of sand fence.

None of the work projects described above undertaken during the years 1959, 1960, and 1961 would have been undertaken if a railroad embankment, bridge, or other facility needing protection had not been in existence. None of the projects involved the installation of protective materials at the time of initial construction of the railroad facilities.

The protective facilities discussed herein were expected to continue functioning for more than 1 year. Although the work projects produced items or benefits that extended beyond the year of construction, they were undertaken only to preserve the integrity and operating condition of the existing railroad facility and not to produce assets of independent value and utility.

All of the work projects currently at issue can be placed in two general categories. The first category covers those projects basically falling within the classification of repairs. Such repairs, including extending and strengthening existing culverts and other protective structures, were made when storms, earthquakes, and other natural forces caused damage affecting the stability and security of the rail line and its related facilities. The second category covers those projects basically falling within the classification of preventative maintenance. Such maintenance was undertaken to forestall predictable damage that was about to result from changed waterflow conditions or other natural causes or from manmade changes to the terrain. In this situation, the originally constructed protective features

[202]In one instance, where highway construction concentrated water runoff, a culvert was replaced with a trestle.

became inadequate when the conditions changed, and premature loss of the rail facilities was threatened.

Some of the projects at issue clearly fall into the first category and some clearly fall into the second. A substantial portion of the projects, however, contain elements of both categories.

All of the projects described above, whether falling in the first category, in the second, or in both, were directed at correcting an existing defective condition, and failure to perform the work (falling into either or both categories) would have resulted, within a relatively brief period of time, in the serious undermining of the rail line and the disruption of rail service.

The work projects did not improve the railroad facilities. The projects merely restored the facilities to their prior state of utility by reinstating the usual efficient operations that existed prior to the change of conditions. The work projects did not serve to increase the value of the railroad lines; instead, they prevented the premature loss of value that would have resulted had the defective conditions which gave rise to the projects been left unattended.

Work projects similar to the ones described above are a continuing activity on petitioner's railroad lines. There were similar projects in years prior to the years at issue, and there have been further similar projects in subsequent years.[203]

Interstate Commerce Commission (ICC) accounting rules have, for a number of years, required capitalization of expenditures for work projects such as those here in issue, and, as to such expenditures in years prior to 1959, petitioner (and its predecessors) followed the requirements of ICC accounting for both book and income tax purposes.[204] In filing its consolidated income tax returns for the years 1959, 1960, and 1961, petitioner followed book accounting[205] and did not deduct the expenditures here in issue.

---

[203]In docketed cases currently before this Court, petitioner is seeking to deduct amounts expended on work projects which, in the preparation of the consolidated income tax returns for the years 1962 through 1968, were charged to capital accounts.

[204]On those prior work projects which were subject to depreciation, the former Southern Pacific Co. and its affiliates took deductions for depreciation on the consolidated returns filed for the years here in issue.

[205]The expenditures in issue were charged to the following ICC property (capital) accounts: Account No. 3, "Grading"; Account No. 6, "Bridges, Trestles and Culverts"; Account No. 13, "Fences, Snowsheds and Signs"; and Account No. 27, "Signals and Interlockers." Amounts in

In its petition filed with the Court on July 9, 1969, petitioner did not claim the work project expenditures as a deduction. However, in an amendment to petition, filed with the Court on May 23, 1973, the petitioner stated (in part):

(yy) The Commissioner erred in failing to allow deductions in the aggregate amounts of $70,022.00, $31,498.00 and $26,430.00 for the taxable years ended December 31, 1959, 1960, and 1961, respectively, by reason of expenditures by the former Southern Pacific Company and Texas and New Orleans Railroad Company for rail embankment protection."

\* \* \* \* \* \* \*

(1) The former Southern Pacific Company and its railroad subsidiaries, in filing consolidated returns for the taxable years ended December 31, 1959, 1960, and 1961, did not deduct costs incurred by them in projects to modify existing culverts, trestles, walls and pipes to alter or divert water flow which erodes rail embankments.

At the trial of this issue in December 1974, respondent, for the first time, formally made the assertion that the deduction of the work project expenditures during the years at issue would constitute a change in petitioner's method of accounting, which change petitioner could not effect without the consent of the Commissioner of Internal Revenue. No such consent has been requested or obtained. Petitioner has not sought the Commissioner's permission since petitioner does not view the deduction of the work project expenses as a change in its method of accounting.

At the time of trial, the parties stipulated to the amounts of the deductions at issue, as follows: [206]

| Year | Former Southern Pacific | Texas & New Orleans | Totals |
|------|------|------|------|
| 1959 | $58,274 | $11,748 | $70,022 |
| 1960 | 24,875 | 6,621 | 31,496 |
| 1961 | 10,524 | 15,905 | 26,429 |
| Total | 93,673 | 34,274 | 127,947 |

On brief, petitioner has abandoned its claims as to two projects involving detector devices at Jasper, Oreg., and Dixie,

issue charged to Accounts 6, 13, and 27, and possibly some charged to Account No. 3 were subject to ratable depreciation. Subsequent to completion of the projects, depreciation was taken by the former Southern Pacific Co. and the Texas & New Orleans Railroad Co. on these items for both book and tax purposes. Petitioner has stipulated that it recognizes that if the deductions as claimed are allowed, the depreciation as to such deducted amounts will not be allowed for tax purposes.

[206]Arithmetical errors in the stipulation of facts have been corrected.

Ariz. The Jasper project involved an expenditure by the former Southern Pacific Co. of $4,723 in 1959. The Dixie project involved an expenditure by the former Southern Pacific Co. of $945 in 1960. Accordingly, the claimed deduction for 1959, relating to the former Southern Pacific Co., is reduced by $4,723 (from $58,274 to $53,551), and the claimed deduction for 1960, relating to the former Southern Pacific Co., is reduced by $945 (from $24,875 to $23,930).

The schedule on page 679, covering the years 1959, 1960, 1961, and subsequent years, shows total railway operating revenues, capital expenditures, total investments, net taxable income, railway operating expenses, and depreciation of the former Southern Pacific Co. (designated "SPCo." on the schedule) and the former Texas & New Orleans Railroad Co. (designated "T & NO" on the schedule). These amounts are shown in comparison with amounts claimed as deductions.[207]

The amounts claimed herein as deductions for each of the years 1959, 1960, and 1961 are relatively insubstantial when compared with the total railway operating revenues, the capital expenditures, the total investment, the net taxable income, the total railway operating expenses, and the total claimed deprecia-

---

[207]At the trial of this issue, the schedule was used as a basis for testimony regarding the relationship of the amounts claimed as deductions herein to other amounts appearing in petitioner's accounting records during the years at issue.

The figures on the schedule above show that, for the years 1959, 1960, and 1961, the amounts claimed as deductions represent only 0.01 percent, 0.006 percent, and 0.005 percent of the yearly operating expenses, respectively. The figures further show that for the years 1959, 1960, and 1961, the amounts claimed as deductions represent only 0.2 percent, 0.06 percent, and 0.009 percent of the respective yearly depreciation deductions.

It is also apparent from the schedule that for the 10-year period 1959–68, the amounts claimed as deductions averaged only 0.2 percent of total capital expenditures and 0.01 percent of total investment. Furthermore, if income had been reported with the claimed deductions (with consideration given to the reduction in depreciation necessitated by expensing the amounts at issue), taxable income would have been reduced by 0.2 percent in 1959, by 0.1 percent in 1960, and by 0.05 percent in 1961.

The figures shown on the schedule as amounts claimed as deductions are at slight variance with the amounts presently claimed by the petitioner. The difference is due in substantial part to the abandonment on brief of certain claims and to mathematical errors. The amounts presently claimed as deductions for the years 1959 and 1960 are slightly smaller than the amounts shown for those years on the schedule. The amount presently claimed as a deduction for the year 1961 is slightly larger than the amount shown for that year on the schedule.

In our analysis of the facts in this case, we have regarded the comparisons on the schedule as useful since the comparisons are not significantly altered by the slight variance in figures, and their import is not diminished by the minimal discrepancy.

| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) |
|---|---|---|---|---|---|---|---|---|
| Company | Year | Total railway operating revenues | Capital expenditures | Total investment as of end of year | Net taxable income | Total railway operating expenses | Total depreciation claimed | Amounts claimed |
| SPCo. | 1959 | $550,081,406 | $65,349,198 | $1,887,630,449 | $30,091,388 | $433,065,340 | $29,250,749 | $58,274 |
| T & NO | | 140,234,646 | 8,879,194 | 334,573,883 | 6,931,192 | 106,881,068 | 4,535,309 | 11,748 |
| Total | | 690,316,052 | 74,228,392 | 2,222,204,332 | 37,022,580 | 539,946,408 | 33,786,058 | 70,022 |
| SPCo. | 1960 | 535,774,107 | 51,961,368 | 1,911,215,902 | 20,697,278 | 425,642,955 | 31,007,591 | 24,875 |
| T & NO | | 130,857,888 | 4,000,429 | 333,954,821 | 669,364 | 101,570,129 | 4,749,596 | 6,622 |
| Total | | 666,631,995 | 55,961,797 | 2,245,170,723 | 21,366,642 | 527,213,084 | 35,757,187 | 31,497 |
| SPCo. | 1961 | 565,532,706 | 50,873,462 | 2,272,197,245 | 39,472,433 | 437,194,515 | 34,977,736 | 9,789 |
| T & NO | (10 mos.)[1] | 109,280,499 | 2,725,915 | (Inc. in SPCo.) | [454,712] | 84,949,553 | 4,133,067 | 15,907 |
| Total | | 674,813,205 | 53,599,377 | 2,272,197,245 | 39,017,721 | 522,144,068 | 39,110,803 | 25,696 |
| SPCo. | 1962 | 701,878,944 | 68,676,820 | 2,263,734,489 | 35,496,198 | 548,758,698 | 67,758,740 | 6,393 |
| SPCo. | 1963 | 704,488,237 | 93,996,384 | 2,304,688,422 | 35,914,087 | 553,259,954 | 66,645,543 | 67,799 |
| SPCo. | 1964 | 728,577,557 | 123,625,919 | 2,305,524,852 | 38,382,123 | 582,286,898 | 73,510,066 | 192,518 |
| SPCo. | 1965 | 786,295,827 | 113,642,968 | 2,342,652,147 | 45,095,214 | 611,710,573 | 81,640,949 | 527,936 |
| SPCo. | 1966 | 822,355,410 | 125,036,361 | 2,425,093,208 | 46,783,040 | 641,467,728 | 88,641,455 | 254,683 |
| SPCo. | 1967 | 799,308,681 | 89,800,690 | 2,468,278,272 | 18,452,277 | 626,185,127 | 93,793,040 | 233,908 |
| SPCo. | 1968 | 860,168,211 | 65,618,924 | 2,474,639,802 | 31,616,957 | 672,007,778 | 89,006,756 | 104,991 |
| Total | | 7,434,834,119 | 864,187,632 | 23,324,183,472 | 349,146,839 | 5,824,980,316 | 669,650,597 | 1,515,443 |

[1] T & NO was merged with former SPCo. on Oct. 31, 1961.

tion of the former Southern Pacific Co. and the Texas & New Orleans Railroad Co. during each of those years.

OPINION

*Issue (yy)*

During the years 1959, 1960, and 1961, petitioner expended various amounts on work projects that were directed at maintaining and protecting railroad embankments and bridges and related rail facilities. These work projects involved repairing damage caused by storms, earthquakes, and other natural forces, and they involved preventative maintenance to forestall predictable damage resulting from changed waterflow conditions or other natural causes or from manmade changes to the terrain.

In its consolidated tax returns for the years 1959, 1960, and 1961, petitioner, following the requirements of the Interstate Commerce Commission for book accounting, capitalized the amounts expended on these work projects.

Petitioner has now concluded that these amounts should properly have been expensed during 1959, 1960, and 1961, and, in an amendment to petition, petitioner has asked the Court to permit their deduction.

Respondent argues that this requested change from capitalization to deduction of the amounts expended on the work projects amounts to a change in petitioner's method of accounting. Respondent contends that petitioner has not obtained the required consent of the Commissioner for this change and is therefore not entitled to the sought deductions.

The question of the deductibility of the expenditures at issue was raised by petitioner in its amendment to petition, filed in May 1973. In his answer to the amendment to petition, filed in June 1973, respondent merely denied the assignment of error and the allegations of fact covering this issue and did not raise as a matter in controversy the question of whether the taking of these deductions would constitute a change in petitioner's method of accounting. Petitioner's first formal notification that the change-of-accounting-method question would be raised by respondent came at the time of the trial of this issue. Petitioner argues that the burden of proof as to this new theory should therefore be upon respondent. Under the circumstances de-

scribed above, we would agree with petitioner that the burden should be upon respondent to show the asserted change of accounting method. *Schuster's Express, Inc. v. Commissioner*, 66 T.C. 588, 593–594 (1976), affd. 562 F.2d 39 (2d Cir. 1977). *Estate of Falese v. Commissioner*, 58 T.C. 895, 898–899 (1972); *McSpadden v. Commissioner*, 50 T.C. 478, 491–494 (1968). However, as petitioner acknowledges, the placement of burden of proof is of little practical importance in this instance. Our conclusion as to this issue would be the same regardless of which party has the burden of proof. See *Considine v. Commissioner*, 74 T.C. 955 (1980).

Respondent's position is based on section 446(e). That section provides:

Except as otherwise expressly provided in this chapter, a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary or his delegate.

This principle is reflected in section 1.446–1(e)(2)(i), Income Tax Regs., which provides that—

a taxpayer who changes the method of accounting employed in keeping his books shall, before computing his income upon such new method for purposes of taxation, secure the consent of the Commissioner. Consent must be secured whether or not such method is proper or is permitted under the Internal Revenue Code or the regulations thereunder.

Court decisions dealing with the above-cited provisions and their predecessor sections have recognized the broad authority that is given to the Commissioner. The Commissioner has wide discretion to permit or deny a requested change. *Brown v. Helvering*, 291 U.S. 193, 204 (1934). In view of this wide discretionary power, the failure of the Commissioner to grant permission can only be challenged by a showing that the Commissioner's decision was arbitrary or an abuse of discretion. *Schram v. United States*, 118 F.2d 541, 544 (6th Cir. 1941); *Casey v. Commissioner*, 38 T.C. 357, 386 (1962); *Advertisers Exchange, Inc. v. Commissioner*, 25 T.C. 1086, 1093 (1956), affd. per curiam 240 F.2d 958 (2d Cir. 1957). It is not sufficient for a taxpayer merely to show the correctness of the new method; that fact alone cannot justify a change without the Commissioner's consent. *Wright Contracting Co. v. Commissioner*, 316 F.2d 249 (5th Cir. 1963), affg. 36 T.C. 620 (1961). Moreover, even where a taxpayer's new method of accounting would be more correct

than his prior method, the consent of the Commissioner is essential in order to effect a change. *H. F. Campbell Co. v. Commissioner*, 53 T.C. 439, 448 (1969), affd. 443 F.2d 965 (6th Cir. 1971).[208]

In addition, consent is required when a taxpayer, in a court proceeding, retroactively attempts to alter the manner in which he accounted for an item on his tax return. If the alteration constitutes a change in the taxpayer's method of accounting, the taxpayer cannot prevail if consent for the change has not been secured. *Casey v. Commissioner, supra* at 385–386; *Cubic Corp. v. United States*, an unreported case (S.D. Cal. 1974, 34 AFTR 2d 74–5895, 74–2 USTC par. 9667), affd. per curiam 541 F.2d 829 (9th Cir. 1976).

In the case at bar, it is undisputed that consent has been neither requested nor obtained. Additionally, there is no indication of any abuse of discretion by the Commissioner.

The question before us, therefore, is whether, on the facts of this case, the petitioner's attempt to deduct items which it had previously capitalized on its tax returns for the years at issue amounts to a change in the petitioner's method of accounting. If the deduction of these items would constitute such a change, then the respondent's position must be upheld in view of the consent requirement of the statute and regulations. *Casey v. Commissioner, supra*; *Cubic Corp. v. United States, supra*.

Section 1.446–1(e) (2) (ii) (*a*), Income Tax Regs., provides that "a change in the method of accounting includes a change in the overall plan of accounting for gross income or deductions or a change in the treatment of any material item used in such overall plan." It is also pointed out therein that "A material item is any item which involves the proper time for the inclusion of the item in income or the taking of a deduction."

---

[208]On the question of whether consent is necessary to change from a clearly incorrect accounting method, some Courts of Appeals have adopted a fairly strict approach. See, for example, *Witte v. Commissioner*, 513 F.2d 391 (D.C. Cir. 1975), remanding T.C. Memo. 1972–232; *American Can Co. v. Commissioner*, 317 F.2d 604, 606 (2d Cir. 1963), revg. on this point 37 T.C. 198 (1961); *Commissioner v. O. Liquidating Corp.*, 292 F.2d 225, 230 (3d Cir. 1961), revg. T.C. Memo. 1960–29, cert. denied 368 U.S. 898 (1961). In each of the appellate decisions cited above, the Court of Appeals held that the consent of the Commissioner is necessary for a change even where the taxpayer's old method is shown to be wrong. This Court has tended not to require consent in such situations. In addition to the above-cited Tax Court opinions, see *Underhill v. Commissioner*, 45 T.C. 489, 496–497 (1966). Compare *H. F. Campbell Co. v. Commissioner*, 53 T.C. 439, 448 (1969), affd. 443 F.2d 965 (6th Cir. 1971); *Bongiovanni v. Commissioner*, T.C. Memo. 1971–262; and sec. 1.446–1(e)(2)(i), Income Tax Regs.

Section 1.446–1(e) (2) (ii) (*b*), Income Tax Regs., provides, inter alia, that the term "change in method of accounting" does *not* include (1) the "adjustment of any item of income or deduction which does not involve the proper time for the inclusion of the item of income or the taking of a deduction," and (2) "a change in treatment resulting from a change in underlying facts." It is also stated therein that—

a correction to require depreciation in lieu of a deduction for the cost of a class of depreciable assets which had been consistently treated as an expense in the year of purchase involves the question of the proper timing of an item, and is to be treated as a change in method of accounting.[209]

An examination of the statutory and regulatory provisions and of the pertinent case law leads us to the conclusion that a change in the treatment of the expenditures at issue would constitute a change in petitioner's "method of accounting" for these items.[210] It is clear that, over the years, these expenditures have been treated by both the Interstate Commerce Commission and petitioner as "the cost of a class of depreciable assets," within the purview of section 1.446–1(e) (2) (ii) (*b*), Income Tax Regs. Under that regulatory provision, a change from capitalizing and depreciating such a class of assets to expensing them "involves the question of proper timing."[211] It follows, therefore, that the expenses in controversy fit the definition of "material item" under section 1.446–1(e)(2)(ii)(*a*), Income Tax Regs. Accordingly, the deductions sought herein by petitioner would effect a change in its "method of accounting" under section 446(e). Such a change cannot be made without the requisite consent.

---

[209]The quoted material became part of the regulations when T.D. 7073 was promulgated in 1970 and elaborates on the Commissioner's interpretation of sec. 446, which section was in effect during the years at issue. Although this provision of the regulations postdates the years at issue, it can still be pertinent to our inquiry. Cf. *Pollack v. Commissioner*, 47 T.C. 92, 110–111 (1966), affd. 392 F.2d 409 (5th Cir. 1968). Furthermore, the issue of the deductibility of the rail embankment expenditures was not raised until 1973 when the amendment to petition was filed.

[210]See, generally, the discussion of sec. 446(e) in the portion of this opinion entitled, "*Issues (l) and (ccc)*: Relay Rail."

[211]Petitioner contends that the provision in sec. 1.446–1(e)(2)(ii)(*b*), Income Tax Regs., discussing a correction to require capitalization and depreciation of certain assets in lieu of expensing them should not have application in this case because here petitioner is attempting to change from capitalizing the work project expenditures to expensing them, the reverse of the situation described in the regulations. We are not convinced of the merit of this distinction and regard both situations as examples of changes which involve the timing of a deduction.

Petitioner believes the fact that the expenditures at issue were relatively small in amount should have a bearing on the "material item" question. In addition to the factors enumerated in the regulations, various courts, including this Court, have considered an inquiry into comparable dollar amounts as pertinent to a determination of the materiality of an expenditure. See *Witte v. Commissioner*, 513 F.2d 391 (D.C. Cir. 1975), and the cases cited therein at note 4; and see *Cincinnati, New Orleans & Texas Pac. Ry. Co. v. United States*, 191 Ct. Cl. 572, 424 F.2d 563 (1970).[212] Moreover, this Court has suggested that an expenditure can be of such a substantial nature that it can be viewed as "material" under the regulations, irrespective of its size in comparison to other items. See *Dorr-Oliver, Inc. v. Commissioner*, 40 T.C. 50, 55 (1963).

We do not think the expenditures involved herein can escape classification as a "material item" merely by virtue of their relative insubstantiality. We find it hard to view the claimed deductions of $65,299, $30,551, and $26,429 during the years at issue as immaterial, despite the fact that they may be overshadowed by much larger figures appearing on petitioner's accounting statements. Such amounts must be viewed as material in any context.[213] While the claimed deductions may be small when compared to petitioner's total income and expenditures, the tax dollars involved cannot be considered minimal.

If we were to adopt petitioner's view that the amounts involved herein are not a "material item," then we would be granting the petitioner a license to change back and forth from capitalizing to expensing when to do so would work to its tax advantage. As we point out below, such a practice would not properly reflect income and would impose unacceptable uncertainties in the area of tax administration.

Petitioner makes reference to *Chicago, Burlington & Quincy Railroad Co. v. United States*, 197 Ct. Cl. 264, 455 F.2d 993 (1972), revd. on another issue 412 U.S. 401 (1973), in which the Court of Claims allowed the deduction expenses similar to those involved

---

[212]Cases touching on the question of whether a given item is "material" have recognized the absence of a definite standard in this area. See *Witte v. Commissioner, supra*, quoting from *Carlson v. Commissioner*, T.C. Memo. 1967–116.

[213]We note that in subsequent years, petitioner expended even larger amounts on similar work projects.

in the case at bar. Petitioner argues that the *Chicago, Burlington & Quincy* opinion amounts to a "change in underlying facts," as that term is used in section 1.446–1(e)(2)(ii)(*b*), Income Tax Regs., making it permissible for petitioner to alter its treatment of the work project expenditures without having such new treatment fall within the scope of the term "change in method of accounting."

We do not regard the issuance of the *Chicago, Burlington & Quincy* opinion as being within the purview of the term "change in underlying facts." The *Chicago, Burlington & Quincy* case involved a court determination as to the treatment by another taxpayer of certain items under the tax law. The promulgation of that opinion did not create a change in the factual circumstances surrounding the making of the expenditures by petitioner during the years at issue. See examples (*3*) & (*4*), sec. 1.446–1(e)(2)(iii), Income Tax Regs. We find no change in underlying facts which justifies a change from capitalizing to expensing the expenditures involved herein, and we find nothing in the *Chicago, Burlington & Quincy* opinion which requires a conclusion that petitioner's proposed alteration in the treatment of the work project expenses would not be a change in its method of accounting.[214]

This is not a case where a taxpayer is attempting to change from an accounting procedure which is clearly wrong to one which is clearly right. Were that the case, we might be inclined, under some decisions of this Court, to regard the change as one not requiring the Commissioner's consent. See the Tax Court opinions cited above in note 208. To the contrary, this is a case in which each of the suggested methods for accounting for the work project expenses has merit.

On the facts before us, we might be inclined to agree with the holding in *Chicago, Burlington & Quincy Railroad v. United States, supra*, and conclude that expenses of the nature incurred

---

[214]Some courts have stated that where both the taxpayer and the Commissioner are specifically required by law (e.g., a new Code section or an opinion by the Supreme Court) to effect a change, the consent of the Commissioner is not required. *Douthit v. United States*, 299 F. Supp. 397, 403 (W.D. Tenn. 1969), revd. and remanded on other grounds 432 F.2d 83 (6th Cir. 1970); *Woodward Iron Co. v. United States*, 254 F. Supp. 835, 837 (N.D. Ala. 1966) (dictum); *North Carolina Granite Corp. v. Commissioner*, 43 T.C. 149, 167–168 (1964) (dictum). Nothing in these cases suggests that an opinion of the Court of Claims imposes a specific legal requirement which can serve as a basis for negating the clear dictates of sec. 446(e).

by petitioner are properly viewed as a whole and are classifiable as expenditures for repairs and preventative maintenance. As such, they would be currently deductible under section 162. See, e.g., *American Bemberg Corp. v. Commissioner*, 10 T.C. 361, 375–377 (1948); *Illinois Merchants Trust Co. v. Commissioner*, 4 B.T.A. 103 (1926). See also *Oberman Manufacturing Co. v. Commissioner*, 47 T.C. 471, 482–483 (1967); *Plainfield-Union Water Co. v. Commissioner*, 39 T.C. 333 (1962). Nevertheless, we can recognize that many of the work projects involved herein, when viewed separately, can be regarded as producing assets of independent value. In such event, a reasoned argument can be made for the capitalization of the costs incurred in creating these assets. See, e.g., *Wolfsen Land & Cattle Co. v. Commissioner*, 72 T.C. 1, 12–18 (1979).

Neither method of accounting for the expenditures at issue can, therefore, be regarded as clearly wrong. As a result, it would seem in this case that either the capitalization or the expensing of the work project costs can properly reflect petitioner's income during the years at issue, as long as one method is consistently applied. "Consistency is the key and is required regardless of the method or system of accounting used." *Advertisers Exchange, Inc. v. Commissioner, supra* at 1092. See also *H. F. Campbell Co. v. Commissioner, supra* at 447, wherein we state that, under section 446, "the term 'method of accounting' includes the *consistent* treatment of a recurring, material item, whether that treatment be correct or incorrect." (Emphasis added.) It is readily apparent from the foregoing that where, as here, a taxpayer seeks to alter the manner in which it has regularly treated a recurring material item, it is changing its "method of accounting" for purposes of section 446.

We regard consistency of treatment as essential if income is to be adequately reflected and distortions avoided. In *Lord v. United States*, 296 F.2d 333 (9th Cir. 1961), the Court of Appeals rejected the taxpayer's position that it could report its income under one method of accounting and then, after the termination of a long-term contract, change to another method of accounting if that would be to his financial advantage. The court, pointing out that "such a course of conduct is repugnant to our system of taxation," stated (296 F.2d at 335):

If * * * [taxpayers] were allowed to report income in one manner and then freely change to some other manner, the resulting confusion would be exactly

that which was to be alleviated by requiring permission to change accounting methods. An appropriate statement of the reasons for requiring such permission is found in Pacific National Co. v. Welch, 304 U.S. 191 * * * (1938):

"Change from one method to the other, as petitioner seeks, would require recomputation and readjustment of tax liability for subsequent years and impose burdensome uncertainties upon the administration of the revenue laws. It would operate to enlarge the statutory period for filing returns * * * to include the period allowed for recovering overpayments * * * . There is nothing to suggest that Congress intended to permit a taxpayer, after expiration of the time within which return is to be made, to have his tax liability computed and settled according to the other method."

We hold that for petitioner herein to deduct the work project expenditures which it had capitalized on its returns for the years at issue would amount to a change in petitioner's "method of accounting" and that such a change is impermissible under section 446(e) where permission of the Commissioner of Internal Revenue has not been obtained.[215]

In view of this holding, we do not reach the question of whether the amounts expended to protect and maintain petitioner's railroad embankments and other railroad facilities are deductible as business expenses under section 162 or nondeductible as capital expenditures under section 263(a). Regardless of the position we would adopt in connection with this question, petitioner cannot deduct these amounts in the years here involved.

We decide this issue for respondent.

## X. Diesel Locomotive Useful Life[216]

This issue presents the following questions for our consideration:

Whether, for purposes of the depreciation deduction under section 167, the useful lives of petitioner's diesel locomotives were 20 years (road diesels) and 25 years (switch diesels), as claimed by petitioner on its tax returns for the years at issue, or

---

[215]We note that the Government did not raise this accounting issue in litigating *Chicago, Burlington & Quincy Railroad Co. v. United States*, 197 Ct. Cl. 264, 455 F.2d 993 (1972). We further note that, in light of this opinion by the Court of Claims, there might be some justification for a claim of arbitrariness should the Commissioner refuse a change to expensing as to future years. In the present case, petitioner has made no such request as to the years 1959, 1960, and 1961.

[216]In trying and briefing this case, this issue was referred to by the parties as *"Issue (mm)."*

15 years (road diesels) and 18 years (switch diesels), as claimed herein.

Assuming a change in the useful lives, whether petitioner may continue to use the salvage values claimed on the returns to compute depreciation for its diesel locomotives under section 167.

## FINDINGS OF FACT

### *Issue (mm)*

Some of the facts relating to this issue have been stipulated by the parties, and those facts, with associated exhibits, are incorporated herein by this reference.

This issue involves the diesel locomotives of the predecessor Southern Pacific Co., the former Southern Pacific Co., the Central Pacific Railway Co., the Texas & New Orleans Railroad Co., and the St. Louis Southwestern Railway Co., hereinafter sometimes referred to collectively as petitioner.

Petitioner acquired its first diesel locomotives in 1939. These first diesel acquisitions were primarily switch locomotives (i.e., locomotives that were used to move equipment around in switching yards.) In 1947, petitioner began its acquisition of road diesels (i.e, locomotives that were used for transporting equipment over distances).

In 1943, the Interstate Commerce Commission (ICC) prescribed, for book depreciation purposes, depreciation rates for the predecessor Southern Pacific Co. which reflected a 15-year service (useful life) for road diesels and a 25-year service (useful life) for switch diesels.

In 1950, the former Southern Pacific Co. was informally advised by the ICC that it would soon prescribe a 20-year life for road diesels consistent with what the ICC had prescribed that year for the Texas & New Orleans Railroad Co. (a subsidiary). In a 1951 submission to the ICC, petitioner stated its preference for a 15-year life for road diesels. It was decided to make no comment to the ICC respecting the 25-year life for switch diesels. In May of 1951, the ICC formally prescribed 20- and 25-year lives for the road and switch diesels, respectively. In 1956, the same lives were prescribed by the ICC for the St. Louis Southwestern Railway Co.

The ICC depreciation rates of 4.90 percent for road diesels

(reflecting a 20-year life with 2-percent salvage) and 3.88 percent for switch diesels (reflecting a 25-year life with 3-percent salvage) were used by petitioner through 1961 for ICC reporting purposes.

In 1951, in connection with an audit of petitioner's consolidated income tax returns, beginning with the taxable year 1945, Revenue Service engineer, G. V. Robinson, suggested to Cyril M. Bill, of petitioner's accounting department, that petitioner employ on its tax returns a 20-year life for depreciating road diesels and continue to use a 25-year life for depreciating switch diesels. Bill knew that petitioner did not have sufficient experience with diesel locomotives to support the 15-year life which had generally been used on the returns to depreciate road diesels. As part of the settlement of engineering issues, the Revenue Service and petitioner agreed on the use of the 20-year life for road diesels, along with the 25-year life for switch diesels. (These figures were used in the settlement of tax questions arising in all years through 1953.) Petitioner's management decided to adopt the 20-year life for road diesels beginning with the filing of its consolidated income tax returns for 1950. Petitioner continued to use the 20- and 25-year useful lives through the years at issue.

Petitioner's mechanical department issued instructions to appropriate personnel with respect to inspection and repair of diesel locomotives. These were called mechanical circulars. The earlier circulars pertinent to the years in question provided for daily and weekly inspection of switch diesel locomotives, and trip maintenance and semi-monthly inspection of road diesel locomotives, and then for all diesel locomotives—

> Monthly inspection
> Quarterly inspection
> Semiannual inspection
> Annual inspection
> Class C repairs—every 2 years
> Class B repairs—every 4 years
> Class A repairs—every 8 years

Repairs to units requiring 5 or less calendar days to complete, including daily, weekly, trip maintenance, semimonthly, monthly, quarterly, semiannual, and annual inspections were to be designated as "Running Repairs." Repairs requiring 6 or more

calendar days to complete, not designated class A, B, or C, were to be designated as "Unclassified Repairs." The most extensive repairs were those designated class A. The class C were light repairs, and the class B were somewhat heavier repairs.

By about 1947, petitioner's mechanical department concluded that, generally, the making of class A repairs every 8 years was neither economical nor necessary, and petitioner began to make fewer of such extensive repairs in the late 1940's. Petitioner's Assistant Chief Mechanical Officer, Norman L. McCracken, came to the view during the 1950's that, generally, class A repairs should not be made on old diesel locomotives, and he expressed this view to petitioner's management. Petitioner continued to make some class A repairs through the years at issue. The less extensive class B and class C repairs also continued to be made. The diesels received repairs when inspections indicated they were needed and repair shop capacity permitted. To last 20 years, a diesel locomotive required at least one class A repair.

Since petitioner began acquiring diesel locomotives in quantity beginning in 1947, only a relatively few diesels had reached the point, during the years at issue, where it was necessary for petitioner to decide whether to make a class A repair to a particular locomotive or to retire and replace it.

The mechanical condition of a diesel was just one factor affecting the decision to retire it. Petitioner's financial position had to be taken into consideration in deciding whether old locomotives should be repaired or whether they should be retired and replaced by new locomotives.

In some instances, retirements were effected without regard for the availability of funds for replacement. Such retirements occurred when inspection showed deterioration of electrical wiring and of other critical parts of the locomotive. In other instances, a class A repair could obviate the need for retirement.

In order to determine the amount of locomotive power needed each year to meet the demands of shippers, petitioner established a System Power Committee, comprised of petitioner's high level mechanical and operating officers. The Power Committee considered the feasibility of effecting repairs in order to meet petitioner's power needs and made recommendations regarding annual locomotive retirements and acquisitions. Additionally, it made forecasts of future locomotive retirements.

The recommendations of the Power Committee were subject to approval (and modification) by petitioner's executive department. Recommended acquisitions were subject to review as to financial feasibility, and at times, the Power Committee was asked to modify its suggested retirement schedules so as not to exceed funds available for replacements. When the financing of acquisitions was determined not to be feasible, planned retirements were sometimes deferred for a year.

On November 26, 1956, P. J. Kendall, vice president and general auditor of petitioner's accounting department, signed a letter addressed to D. J. Russell, president of the company, to inform him that other railroads had reported they were being allowed by respondent to use a 15-year life for road diesel locomotives and a 20-year life for switch diesel locomotives:

In connection with depreciation rates allowable for income tax purposes on diesel locomotives, Southern Pacific Company rates are calculated on basis of 20-year life for road diesels and 25-year life for switching diesels. These lives are generally used by most of the major railroads for both accounting and income tax purposes.

At meeting I recently attended of the A.A.R. Joint Law and Accounting Committee, general discussion was had as to possibility of obtaining approval for higher depreciation rates. Mr. Kauffman, Vice President of Chesapeake and Ohio Railway Company, stated that his Company had obtained approval of Internal Revenue Service for using 15-year life for road diesels and 20-year life for switching diesels. This approval was obtained after their Management had made a strong representation backed by a resolution of their Board of Directors stating that it would be their policy to replace diesel locomotives within the 15–20 year period. It was not made clear as to why C & O adopted this policy, but apparently they do not plan to make extensive repairs to diesels and the possibility that such locomotives would be outmoded by substantial improvements in motive power over a 15–20 year period.

Mr. Davison, Vice President of Southern Railway Company, indicated they had also filed for the 15–20 year lives on diesels, although he did not indicate it was covered by Board resolution.

This subject was also discussed at a recent meeting of the Western Railroads Income Tax Accounting Conference held in St. Louis at which over 25 railroads were represented. General discussion brought out that no road represented at the meeting was following or contemplating a policy similar to that of the C & O. Consensus was that based on present experience the 20–25 year life now generally allowed for tax purposes is about the best that can be obtained at this time, unless Management indicates the adoption of a policy which would replace locomotives prior to the expiration of their normal useful life.

We have no evidence that SP Co. could advantageously adopt such a policy. However, am calling your attention to the action taken by the C & O for your general information in the matter.

Upon receipt of the foregoing letter, Russell addressed a letter, dated November 28, 1956, to J. W. Corbett, petitioner's chief operating officer, reading as follows:

Attached is copy of Mr. Kendall's letter of Nov. 26th, file N–001 (2), in connection with depreciation rates allowable for income tax purposes on diesel locomotives.

For some time I have been concerned as to our policy for the future. While I realize that the first road diesels we acquired have been rebuilt and improved with a substantial increase in capitalization, am wondering if we want to continue that policy. There is a great deal of merit in the policy of accelerated depreciation and retirement rather than continued repair policy. In the old steam locomotive days we spent too much money for repairing and hanging on to locomotives too long. I have spoken to Mr. L. B. Young about our policy in connection with trucks. There is a great deal of merit in reasonable turnover in this type of equipment with its attendant improvement in the quality of our motive power and the decrease in expenditures for maintenance.

As I pointed out to you under separate cover the other day, locomotive repairs on the Southern Pacific are among the highest in the country. I think it is timely that we place this whole question under study with the objective of reaching a determination as to our future policy on maintenance of diesels, retirement age and replacement policy. This warrants very careful and thorough analysis by the best people we have available to assign to this subject.

Beginning in 1956, at least three articles appeared in trade publications in which it was suggested that a shorter useful life for diesel locomotives was appropriate.

After Russell wrote his November 28, 1956, letter, the subject of diesel locomotive maintenance and retirements was referred to the System Power Committee for study. On December 21, 1956, a subcommittee was appointed to proceed with a study. By the end of 1957, a draft study was prepared by petitioner's Bureau of Transportation Research (BTR) in collaboration with petitioner's mechanical department and was circulated for comment.

In 1957, the Association of American Railroads (AAR) suggested to the Revenue Service, in connection with a useful-life study being undertaken by respondent, that road diesels should have a useful life of 15 years and switch diesels, 20 years. Petitioner's accounting department had recommended to the AAR that it suggest 15- and 20-year lives to the Revenue Service in connection with the study.

On March 18, 1958, a formal "Study for Policy on Maintenance of Diesel Locomotives, Retirement Age, and Replacement Poli-

cy" was issued on behalf of the subcommittee of the System Power Committee (hereinafter the 1958 BTR report).

The 1958 BTR report arrived at the following conclusions concerning the economics of reducing the life of road diesel locomotives from 20 years to 15 years for depreciation purposes:

From a cost viewpoint, we could justify shortening the retirement age to 15 years only if the companies' capital were so short as to provide an internal return on investment of 40 percent before taxes. Further, from the cost standpoint, the present twenty-year life can be justified over a twenty-five year life only with an internal rate of return of 30 percent before taxes. These figures do not include an allowance for technological advances.

\* \* \* \* \* \* \*

As stated in the precis of the report, the company would have to be realizing a return of 40 percent before taxes to justify shortening the life from 20 years to 15; also, from a pure cost viewpoint to justify the present 20-year policy over a 25-year one, the company should be realizing a 30 percent internal return on investment before taxes.

\* \* \* \* \* \* \*

The present retirement policy of 20 years is not the most economical from a study of the cost. However, this must be weighed against the possibility of technological change. If the income tax laws are lowered, then the 20-year period becomes even more disadvantageous compared to the 25-year policy.

On July 22, 1958, J. W. Corbett, a vice president of petitioner, wrote to petitioner's president, stating:

In reviewing the report it will be noted that the maintenance costs contained therein are based on the best information available. In view of a lack of significant unit cost data covering diesel repairs it was necessary to analyze and estimate costs statistically. It is Mr. Houston's recommendation, in which I concur, that we should continue our present policy for maintaining diesel locomotives, i.e., that they shall be repaired in kind.

Regarding retirement age and replacement policy, we are not now in a position to recommend that any changes be made [in "the present retirement policy of 20 years"] \* \* \*

Partly because petitioner was not satisfied with the adequacy of the 1958 BTR report, petitioner engaged a firm of consultants, the Emerson Engineers, later called the Emerson Consultants, Inc., to perform a survey of petitioner's mechanical department. That firm (hereinafter sometimes referred to as Emerson) began its studies during the latter part of 1958, and it produced a progress report on March 30, 1959, setting forth some specific recommendations for improving the shops, the organization, and the utilization of labor of petitioner's mechanical department.

On April 24, 1959, Vice President Corbett advised Russell, petitioner's president, of plans to make various repairs (including some that were rather extensive) to the diesel locomotives, as well as to increase the power of certain types of diesels. In reply, Russell wrote Corbett on April 28, 1959, as follows:

> In connection with the maintenance and repair policy outlined in memorandum which accompanied your letter, I would like to see our people in the General Manager's office, as well as those in the Mechanical Department, who know the most about our power requirements and maintenance practices work in close cooperation with the Bureau of Transportation Research to the end that we would set up a motive power policy that would be most advantageous to us from a system standpoint, and one which would take into consideration all of the physical and economic factors involved. Will you please arrange to have this done.

In response to this letter, the general manager's office, the mechanical department, and the Bureau of Transportation Research of petitioner were advised to cooperate in the development of suitable maintenance policies for the diesel locomotives.

The mechanical department issued a study on July 22, 1959, discussing the higher horsepower available in newly designed locomotives and pointing out the possibility of converting some existing locomotives into greater horsepower units.[217]

On August 28, 1959, Russell wrote Corbett, as follows:

> Some time ago I asked that you make a detailed analysis of our maintenance and repair practices to determine at what stage it is more economical to purchase new diesel units in lieu of continuing to repair them indefinitely. It seems to me that the current committee should either have the results of this study or have it included in their assignment.
>
> I would hope that at this time we could undertake a really comprehensive study and come up with plans and recommendations that will not only permit a substantial reduction in the cost of maintaining our motive power but will also improve the efficiency and availability of our power. There is much to be accomplished in this direction and we should arrange to get the job under way as quickly as possible.

On August 4, 1959, the System Power Committee made various recommendations to petitioner's executive department, including the following:

---

[217]During the 1950's, the average speeds of freight trains had increased and, by the end of the decade, petitioner was seeking to enhance the ability of its diesel locomotives to pull more tonnage. It did so by increasing the horsepower on some of its diesels and by adding dead weight (ballast) to some of them. Some of petitioner's employees believed these factors would have a negative impact on useful life.

1. We agree definitely that any power that is purchased in 1960 for the Cotton Belt, T & NO or Pacific Lines for high speed freight traffic should be 2400 H.P. and capable of 75 to 77 miles per hour top speed.

2. Careful consideration has been given to possibility of upgrading older type EMD, Alco and Baldwin units of the three properties. Generally we do not feel that upgrading our older units is desirable or economical. We feel that the better policy is to run our older units, such as the older EMD "F" types, Baldwins and Alcos, to their maximum life before requiring major overhaul and then retire them and purchase new power, rather than modernize and rebuild them. The maximum life of these units is considered something in excess of sixteen years.

The T & NO have a program of upgrading 64 F–3's from 1500 H.P. to 1750 H.P. and four units remain to be completed on this program in 1959. We recommend that this program be concluded and no additional "F" types be upgraded, except on experimental basis as later mentioned.

The Cotton Belt have twenty FT's of 1350 H.P. These were the original "F" type freight units and were built in 1944. Consideration has been given to rebuilding and upgrading these units to 1750 H.P. but it is not considered desirable. It is our recommendation that these units be maintained in kind at minimum expense until they become due for major overhaul, which will be in 1962 and 1963, at which time we recommend they be retired, except that their life may be extended by utilizing them only for spare power in peak service which might extend shopping date beyond 1963.

The minutes of the meeting of the Power Committee indicate that "detail support for the recommendations" would subsequently be provided. The 1959 Power Committee recommendations were not fully implemented during the years at issue.

On March 7, 1960, Emerson Consultants, Inc., issued a progress report on its Survey of System Mechanical Departments, which stated on page 17:

Work in the field is now complete and the Bureau of Transportation Research is consolidating and summarizing the data. Representative costs for performing the various classes of maintenance and repair work from trip inspections to heavy classified repairs will soon be available. Cost data will be developed by locomotive builder and type of power. When such representative costs are available, they will serve as a basis for further decisions respecting future shopping cycles, shop layouts and consolidations, locomotive assignments, retirement programs and other evaluations.

An August 1, 1960, progress report from Emerson stated on page 23:

Systematic and continuous study should be made of the locomotive fleet to constantly weed out poor performers and replace with units which will:

1. Increase power available to protect increased traffic demands.
2. Have a longer service life without heavy repairs.
3. Permit consists [sic] of fewer units.

4. Conserve units through improved utilization as outlined in this report.

On August 15, 1960, after 10 months of study, Emerson submitted its formal report to petitioner, entitled "A Program for the Disposition and Retention of Power" (hereinafter sometimes called the Emerson report). The Emerson report contained Emerson's recommendations for a comprehensive program to improve utilization and reduce the maintenance costs of petitioner's locomotives, and it contained a suggested procedure for the disposition of the locomotives.

The voluminous Emerson report made extensive recommendations to petitioner's management. The report drew attention to the locomotives that were the most costly to maintain and suggested alternate, less strenuous uses for this equipment. The report recommended that petitioner "dispose of inefficient power as soon as possible." As to the most troublesome locomotives, the Emerson report suggested that petitioner reconsider its "present program of heavy repairs (class 'A')" or discontinue such repairs.[218] As to various other locomotives, petitioner was advised to use the equipment until major repairs were needed, at which time the locomotives were to be surveyed for disposition. It was also recommended that the "depreciation period should not be longer than service life up to major repairs (Class 'A')."

Citing examples of certain troublesome types of locomotives which required early class A repairs, the Emerson report concluded that "it is obvious that the mechanical life of most if not all classes of power is far shorter than the amortization period" and recommended that the period of depreciation "should be revised to conform with the facts." However, in reaching this conclusion and making this recommendation, the preparers of the Emerson report considered that a locomotive's useful life had ended when it needed a class A repair. In fact, the making of class A repairs *extended* useful life; the locomotives, thus repaired, continued to be used in petitioner's business.

---

[218]In this regard, the Emerson report made particular note of the need to review repairs to the "F" type of locomotive. The report states:

"Using 15 years as the period of useful life and an estimated 'A' repair cost of $68,000 per unit, it is expected that additional funds will be required starting in 1963 to carry out a major repair program for 'F' type units."

On August 22, 1960, W. D. Lamprecht stated in a letter to W. M. Jaekle (both vice presidents of petitioner):

In line with our conversation today, you should designate some individual to keep us informed of current status of the Emerson reports. We should either adopt, defer, or discard each and every recommendation. Do not wish any of them filed or forgotten. Whomever you designate should submit to us regular reports on the status of the various recommendations.

A status report on the Emerson recommendations prepared for petitioner's management on September 15, 1960, stated that the Emerson suggestion for the disposition of certain unsatisfactory equipment was "under consideration," adding: "BTR developing economics." As to the recommendation for revising the depreciation schedule for diesel locomotives, the status report read: "Under consideration." However, petitioner's accounting department had not been given a copy of the Emerson report and had not been advised of its recommendations. No attempt was made by petitioner's management officials to have the accounting department change the depreciation schedules for diesel locomotives.

The System Power Committee meeting on September 21, 1960, had for its objective, "the study and decision as to recommendations for power requirements for the System for 1961." The August 1960 Emerson report for future years' programs was considered by the Power Committee in making specific recommendations for the conversion, transfer, acquisition, and disposition of diesel locomotives. No recommendation was made by the committee that petitioner adopt a policy of disposing of its road diesels before 20 years of use or its switching diesels before 25 years of use. The minutes of the meeting contain the following concluding paragraph:

As previously mentioned, the Emerson report for future years' programs was considered in making these recommendations for 1961. In this connection, thinking is that for 1962 and succeeding years the Baldwin 1600 HP and probably some of our older switchers will be progressively retired or set back to lighter service and be replaced in horsepower by the acquisition of new units or conversion of F units as conditions may dictate.

On October 12, 1960, Vice President Jaekle wrote to S. M. Houston, the general superintendent of petitioner's mechanical department, stating in part:

It is understood you are undertaking studies with Treasury Department and with Bureau of Transportation Research, looking toward possibility of

changing depreciation basis for diesel locomotives and establishing new limits of repairs for freight equipment which would affect depreciation. * * *

Houston advised Jaekle on October 17, 1960, that the studies were "still continuing."

On December 8, 1960, Vice President Lamprecht was advised that the officers of the subsidiary Texas & New Orleans Railroad Co. had considered the 1960 Emerson report and had concluded that any benefits accruing from the elimination of inefficient power "must be weighed against fact many of these locomotives are relatively new, with an economic life still available for reassignment to lighter service rather than scrapping or modifying."

At the end of 1960, petitioner's officers wrote various letters indicating that no firm decision had been reached concerning a retirement policy for the diesel locomotives. At that date, some officers were discussing the financial and tax consequences ensuing from the prospective adoption of a suggested retirement program involving less than 20-year lives for certain diesels.

Petitioner's report entitled "Status of Recommendations Contained in Reports of The Emerson Consultants, Inc.," dated April 27, 1961, states on the last page as item 130:

| Description: | Reconsider revision of depreciation schedules for diesel locomotives |
|---|---|
| Status and remarks: | In process. Basic cash flow data being worked up by Mechanical Planning group through BTR. Suggested schedule has been prepared. |

On August 9, 1961, Houston wrote Jaekle, discussing the development of "a type of motive power which would be compatible with future operating requirements and would also accommodate itself to our overall repair and replacement program" and pointing out:

Moreover, the fact that we will shortly be forced to make some major decision respecting repair or replacement of our existing diesel fleet makes it particularly important that we assure ourselves of the best thinking and engineering analysis.

During the years 1942–61, petitioner had the following numbers of diesel units in service and incurred the following repair costs per unit (adjusted for wage and price inflation):

| Year | Diesel units in service | Cost per unit |
|------|------------------------|---------------|
| 1942 | 68 | $21,200 |
| 1943 | 102 | 18,000 |
| 1944 | 128 | 23,700 |
| 1945 | 128 | 27,500 |
| 1946 | 128 | 27,700 |
| 1947 | 193 | 24,100 |
| 1948 | 357 | 23,000 |
| 1949 | 681 | 16,700 |
| 1950 | 830 | 20,600 |
| 1951 | 990 | 23,800 |
| 1952 | 1,171 | 22,800 |
| 1953 | 1,367 | 25,600 |
| 1954 | 1,464 | 32,200 |
| 1955 | 1,570 | 35,300 |
| 1956 | 1,804 | 32,500 |
| 1957 | 1,890 | 29,300 |
| 1958 | 1,948 | 27,800 |
| 1959 | 2,053 | 28,900 |
| 1960 | 2,033 | 28,400 |
| 1961 | 2,052 | 25,500 |

The Interstate Commerce Commission did not receive a request from petitioner for a change in the depreciation rate on its diesel locomotives during the years 1954 through 1961. The ICC received requests for changes in depreciation rates on other assets in 1956 and 1957.

During the years 1954 through 1961, the ICC did not receive a definite schedule of retirements of diesel locomotives that petitioner committed itself to follow in future years. Nor did the ICC receive during these years any resolution of the board of directors of petitioner committing the company to a 16-year life for road diesels and a 20-year life for switch diesels or to any shorter periods.

On August 31, 1962, petitioner submitted a request to the ICC for a change in the depreciation rates retroactive to January 1, 1962, based upon a proposed retirement schedule. On December 17, 1962, the ICC prescribed a 4.50-percent rate for petitioner's switcher locomotives reflecting a 20-year life and a 10-percent salvage, and a 6-percent rate for its road diesels, reflecting a 16-

year service life and a 4-percent salvage. The ICC action was based on petitioner's proposed retirement schedule and not on an analysis of historical data. The ICC did not determine that petitioner had used too low a rate of depreciation on its diesel locomotives for the years 1954 through 1961.

Beginning with the year 1962, petitioner has used the Guideline Group Four, Class 9(a) guideline life of 14 years for all locomotives (and various other types of equipment falling within such group and class). Respondent adopted his more liberal depreciation guidelines in Rev. Proc. 62–21, 1962–2 C.B. 418. The promulgation of the 1962 guideline rules, as well as other post-1961 factors, enhanced the economic desirability of retiring and replacing old equipment with new equipment, rather than rebuilding or rehabilitating the old.

In 1975, a study was conducted for petitioner by A. V. Fend of the Stanford Research Institute, in which Fend stated "the recommended estimate of average service [useful] life for road locomotives is 16.1 years and for switch locomotives the estimate is 18.3 years."[219]

Using data obtained from petitioner's files relating to retirements through the year 1969, Fend applied the "retirement rate" method of statistical analysis in making his estimates. Fend assumed that maintenance and retirement policies had stabilized during the 1950's and that his use of the "retirement rate" method was thereby justified. The validity of Fend's estimates depended upon the history of retirements during the years after 1962. The estimates of useful (service) life were therefore not based upon information available to petitioner's management officials who had to exercise judgment on the useful life of petitioner's diesel locomotives at the end of 1959, 1960, and 1961. Fend was unable to approximate useful life for petitioner's diesel locomotives using solely data available during the years at issue.

In 1975, a study was conducted for respondent by Ronald J. Lenart at the Interstate Commerce Commission, in which Lenart made use of the "simulated plant record" method to estimate the lives of petitioner's diesel locomotives. This method was first used by the ICC during the 1970's as a means for

---

[219]As we point out in the opinion, petitioner does not rely on Fend's study or his conclusions to prove useful life during the years here at issue.

estimating the service (useful) life of road properties when there was insufficient data for making such an estimate under recognized methods.[220]

Lenart chose the "simulated plant records" approach for petitioner's diesels because of the lack of data necessary to apply the "retirement rate" method, although he viewed the approach as "second best." Most of the depreciation rates calculated by the ICC in this way have been found reasonable by the railroads.

The "simulated plant records" method employs computers to analyze annual additions and retirements and to compare actual balances with theoretical balances predicated on 18 Iowa curves (known patterns of asset life). By matching such balances, an Iowa curve is selected by the computer to be used to estimate useful life. The method is purely mathematical and does not make use of judgment factors. It is an averaging technique.

Lenart applied the computer program for road property (fixed assets) to petitioner's diesels, believing the nature of the asset to be irrelevant under the "simulated plant records" method (although the ICC does not use the method to calculate equipment life). Using data relating to petitioner's locomotives through the year 1961, Lenart arrived at an estimate of an 18- to 21-year life for road diesels and an estimate of a 26- to 30-year life for switch diesels. Shorter lives were obtained using data through 1966. Lenart was doubtful about the reliability of the 26- to 30-year estimate of switch diesel life.

Petitioner claimed depreciation deductions on its diesel locomotives in its consolidated Federal income tax returns filed for the years 1959, 1960, and 1961 based upon the following useful lives, salvage values, and rates of depreciation:

|  | Switch diesels | Road diesels |
|---|---|---|
| Useful lives | 25 years | 20 years |
| Salvage values | 3 percent | 2 percent |
| Depreciation rates | 3.88 percent | 4.90 percent |

No adjustment was made by respondent to the depreciation rates on diesel locomotives claimed by petitioner on its returns.

In its petition, dated July 9, 1969, petitioner made claims for

---

[220]The Interstate Commerce Commission first used the "retirement rate" method during the mid–1960's. Prior to that time, the ICC based its service (useful) life determinations on the materials submitted by carriers and, after some negotiation, the ICC frequently followed the carriers' recommendations.

additional depreciation deductions for the years 1959, 1960, and 1961, based upon the following useful lives, salvage values, and rates of depreciation:

|  | Switch diesels | Road diesels |
|---|---|---|
| Useful lives | 20 years | 16 years |
| Salvage values | 10 percent | 4 percent |
| Depreciation rates | 4.5 percent | 6 percent |

Respondent denied these claims.

These claims were revised in an amendment to petition filed February 9, 1979 (subsequent to the trial of this issue), based upon the following useful lives, salvage values, and rates of depreciation:

|  | Switch diesels | Road diesels |
|---|---|---|
| Useful lives | 18 years | 15 years |
| Salvage values | 3 percent | 2 percent |
| Depreciation rates | 5.39 percent | 6.53 percent |

There was no clear and convincing indication as of the end of 1959, 1960, or 1961 that petitioner had adopted a policy which would result in significantly shorter useful lives for its diesel locomotives. At the end of the years at issue, the 20- and 25-year estimates claimed by petitioner's management officials on the pertinent tax returns were reasonable approximations of the useful lives of the diesel locomotives.

OPINION

*Issue (mm)*

This issue arises during the years 1959, 1960, and 1961, and involves claims under section 167 for additional depreciation with respect to petitioner's diesel locomotives.[221] In an amendment to petition, petitioner claims that its road locomotives had a useful life of 15 years and its switch locomotives had a useful life of 18 years, rather than the 20-year life (road) and the 25-year life (switch) which served as the basis for its depreciation deductions in its tax returns for the years at issue. If petitioner

---

[221]Sec. 167(a) provides in part that "There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) * * * of property used in the trade or business."

As revised by amendment to the petition, this issue involves petitioner's claims for additional depreciation deductions of $8,083,702 for 1959, $8,128,851 for 1960, and $7,799,591 for 1961.

is correct in this assertion, we must also consider the parties' contentions regarding salvage value.

In considering petitioner's claim as to useful life, we are guided by the same principles that we applied in the portion of this opinion entitled, "*Issue (ll)*: Freight Car Useful Life," and it is unnecessary herein to repeat that discussion at any length. As was the case in *Issue (ll)*, in order for petitioner to change its initial determination as to useful life it must show the asserted "change in useful life is significant" and must prove "there is a clear and convincing basis for the redetermination." Sec. 1.167(a)–1(b), Income Tax Regs.; see also sec. 1.167(b)-O(a), Income Tax Regs.[222] If petitioner is able to meet this regulatory requirement, it then must satisfy its burden of proving a more reasonable approximation of the useful lives of its locomotives than those claimed on its returns.[223]

Petitioner argues that its use of 20- and 25-year lives on its tax returns "is irrelevant to the present question." Petitioner claims that, in the audit for its tax returns for the years 1945–49, respondent's agents "insisted" that petitioner use a 20-year life for its road diesels. (Petitioner had assigned a 15-year useful life to road diesels.) As a result, petitioner apparently believes it was compelled to use 20- and 25-year lives on its returns for 1959–61.

Our findings show petitioner was in agreement with the 20-year life for road diesels at the time of the audit of the 1945–49 returns. Petitioner had no data which would warrant a shorter life. Petitioner contends it knew during the years at issue that these lives were too long and implies it was prevented by respondent from changing them. However, while the evidence does not show precisely what the factors were which influenced the management officials who prepared the pertinent tax returns, we can only conclude, as discussed more fully below, that they considered all relevant factors and made an informed

---

[222]See *Estate of Bryan v. Commissioner*, 364 F.2d 751, 754, n.4 (4th Cir. 1966), affg. T.C. Memo. 1963–182; *Cohn v. United States*, 259 F.2d 371, 377–378 (6th Cir. 1958). See also *Offshore Operations Trust v. Commissioner*, T.C. Memo. 1973–212.

[223]See *Western Terminal Co. v. United States*, 412 F.2d 826 (9th Cir. 1969); *Burnet v. Niagara Falls Brewing Co.*, 282 U.S. 648, 655 (1931). See also *Ames v. Commissioner*, 626 F.2d 693 (9th Cir. 1980), affg. T.C. Memo. 1977–249, and see the discussion of this point in the portion of this opinion entitled, "*Issue (ll)*: Freight Car Useful Life."

estimate of an acceptable useful life for purposes of the section 167 deduction.[224] There is nothing in the record to suggest that respondent prevented petitioner from using any useful life it felt was warranted on its returns for these years. Petitioner's argument to the contrary is not supported by the evidence of record.

Therefore, consistent with the authority discussed in our consideration of *Issue (ll)*, we will treat the claims on petitioner's tax returns as some evidence of the useful lives of its diesel locomotives.[225]

Petitioner's primary argument is that, during the years at issue, petitioner adopted a policy of not performing major repairs (class A) on its older diesel locomotives, choosing instead to retire and replace them.[226] Petitioner contends that this policy was in effect during 1959 with the result that a reduced useful life was reasonably ascertainable at the end of 1959, 1960, and 1961. Had petitioner actually adopted a policy of not making major repairs to its locomotives and adhered to it, there is evidence to support an estimated useful life of 15 to 16 years for the road diesels. But the evidence clearly supports a useful life of at least 20 years if extensive repairs were made. If petitioner is to prevail herein, it must show not only that a replacement rather than repair policy was in fact adopted prior to or during the years in issue but also that such a policy was in fact implemented in these years and resulted in shorter lives for its locomotives during these years.[227] See the discussion of this point in our Opinion in *Issue (ll)*.

---

[224] See, in this regard, *Carzis v. Commissioner*, T.C. Memo. 1971–73; *Smith v. Commissioner*, T.C. Memo. 1976–114; cf. *Estate of Bryan v. Commissioner*, T.C. Memo. 1963–182, affd. 364 F.2d 751 (4th Cir. 1966).

[225] See *Leonard Refineries, Inc. v. Commissioner*, 11 T.C. 1000, 1008 (1948); *United States v. Farrell*, 35 F.2d 38, 41 (D. Conn. 1929); *Estate of Kreis v. Commissioner*, T.C. Memo. 1954–139, affd. 227 F.2d 753 (6th Cir. 1955); *Atlanta Biltmore Hotel Corp. v. Commissioner*, T.C. Memo. 1963–255, modified 349 F.2d 677 (5th Cir. 1965). See also *Casey v. Commissioner*, 38 T.C. 357, 384 (1962).

[226] Sec. 1.167(a)–1(b), Income Tax Regs., provides that the determination of useful life should "[take] into account present conditions and probable future developments," including "the taxpayer's policy as to repairs, renewals, and replacements."

Unlike *Issue (ll)*, petitioner does not here base its arguments on increased utilization of the equipment or changes in repair practices. The evidence in the record regarding those factors is inadequate to establish shorter useful lives.

[227] *Roundup Coal Mining Co. v. Commissioner*, 20 T.C. 388, 396–397 (1953); *H. E. Harman Coal Corp. v. Commissioner*, 16 T.C. 787, 803 (1951), affd. on this point 200 F.2d 415 (4th Cir.

After a careful analysis of all the evidence pertaining to this issue, it is our conclusion that petitioner has not established clearly and convincingly that the asserted policy was formally adopted by petitioner's management and actually implemented during the years at issue. While some of petitioner's witnesses did testify to that effect, our scrutiny of the extensive documentary evidence submitted by the parties shows that petitioner's management was still uncertain about, and was still studying the questions of, repair and retirement policy and depreciation. No decision has been made to stop class A repairs, and such repairs continued, although perhaps not on a regular 8-year schedule. Regular maintenance and class B and C repairs also continued.

Nothing in these many documents gives any indication that any firm decision had been reached by management as to most of the diesel locomotives. At best, the evidence shows the asserted policy was adopted only as to some of the more troublesome locomotives. As to the rest, the record shows that, although various recommendations were made, petitioner's management chose to study these recommendations further.

It seems to us that if the management had in fact reached the conclusions during 1959–61 which petitioner now claims that it did, petitioner would have been able to produce some authoritative documentation to that effect. The fact that no such documentation exists in the record and that petitioner, to some extent, is basing its argument herein on what it believes is suggested or implied by certain correspondence or reports, indicates to us that the management had not resolved the repair and retirement question and had taken no formal action.

It is not surprising that the pertinent recommendations were not formally adopted during 1959–61. The most extensive diesel acquisitions began after 1947 with the result that most of the locomotives during the years 1959, 1960, and 1961 were relatively new[228] and not in need of heavy rebuilding, and it was not critical during those years for the management to resolve all questions regarding major repairs and retirements.

---

1952); *Sherin v. Commissioner*, 13 T.C. 221 (1949); *Copifyer Lithograph Corp. v. Commissioner*, 12 T.C. 728 (1949).

[228]In this regard, it should be noted that petitioner's contentions herein relate to an asserted policy not to perform class A repairs on *older* diesel locomotives.

Petitioner asks us to ignore the evidence which shows that its Bureau of Transportation Research (BTR) was continuing to review the recommendation of the Emerson report throughout the years at issue. Petitioner seems to suggest the BTR was made up of academic economists who would have no practical impact on any policy decision that its management would reach. Our careful examination of the record does not bear out this contention. It is noteworthy that petitioner chose the BTR to make the first study of locomotive maintenance and retirements when petitioner's president made his initial inquiry in 1956, and that as a result of the 1958 BTR report, petitioner determined it would not at that time make any change in its retirement policy. It is also significant that, as to the 1960 Emerson recommendations here pertinent, petitioner's management officials, according to their contemporaneous correspondence in the record, chose to have the BTR study the Emerson report before taking any definitive action with respect thereto. In fact, the management officials wanted the views of the BTR even before consulting with the accounting department. Accordingly, the record convinces us that this evidence bears directly on the question of whether the asserted policy had been adopted during those years and is relevant.

Given the facts of which petitioner's management officials were aware at the end of 1959, 1960, and 1961, they apparently did not have an adequate reason to change the useful lives they had been using to depreciate the locomotives for tax purposes. The ongoing studies were so inconclusive that the officials were not even moved to broach the subject with their tax accountants. If petitioner's management officials had actually made a clear-cut policy change, it seems unlikely they would have been hesitant about seeking the resultant tax benefits. Petitioner's management did have knowledge of the excessive repair requirements of certain problem equipment (discussed in the 1960 Emerson report), but this experience was not representative of the bulk of petitioner's locomotives.

The management officials also believed that the Emerson recommendations as to service (useful) life required further scrutiny. While the Emerson report suggested a reduced "depreciation period," it did so on the assumption that a locomotive's useful life had ended when it became necessary to make a class

A repair. The officials knew such major repairs *extended* the lives of the diesels.

In sum, the claim of 20- and 25-year lives on petitioner's tax returns for the years at issue reflected the realization of the management officials that there was no substantial reason to change those lives.[229]

Petitioner believes the views of A. V. Fend of the Stanford Research Institute offer some support to petitioner's contentions herein. Applying the "retirement rate" method of statistical analysis to retirement data through the year 1969, Fend made estimates of the lives of petitioner's road diesels (16.1 years) and switch diesels (18.3 years). Fend was unable to make any life estimates under his method unless he used data from years subsequent to those here at issue; the data available at the end of 1961 was inadequate for this purpose.

Clearly, Fend's conclusions regarding petitioner's diesel locomotives cannot serve herein as proof of the useful lives of these assets, and petitioner acknowledges this fact. The use of data from years subsequent to those at issue is inconsistent with the requirement that we limit our consideration to facts actually known or reasonably ascertainable to petitioner at the close of the years 1959, 1960, and 1961.[230] An estimate which makes use of hindsight is not an appropriate basis for redetermining useful life.[231] See *Issue (ll)* on this point. This is particularly true under the circumstances here where petitioner adopted guideline lives for its locomotives in 1962 which made it more reasonable economically for petitioner to replace than to repair.

However, petitioner contends that Fend's conclusions, although based on hindsight, may be considered for various corroborative purposes.[232] For example, petitioner believes

---

[229]For the reasons expressed in our opinion in *Issue (ll)*, we do not give any weight to actions taken by the Interstate Commerce Commission subsequent to the years at issue or to the self-serving estimate of useful life made by petitioner's accounting department to the Association of American Railroads.

[230]*Airport Building Development Corp. v. Commissioner*, 58 T.C. 538, 541 (1972); *Morganton Full Fashioned Hosiery Co. v. Commissioner*, 14 T.C. 695, 703 (1950); secs. 1.167(b)–0(a) and 1.167(a)–1(b), Income Tax Regs.

[231]*Western Terminal Co. v. United States*, 412 F.2d 826 (9th Cir. 1969); *Johnson v. Commissioner*, 302 F.2d 86, 88 (4th Cir. 1962), cert. denied 371 U.S. 904 (1962), affg. T.C. Memo. 1961–205; *Durovic v. Commissioner*, 65 T.C. 480, 505 (1975), affd. 542 F.2d 1328 (7th Cir. 1976).

[232]As authority for this use of hindsight, petitioner cites *Atlanta Biltmore Hotel Corp. v. Commissioner*, T.C. Memo. 1963–255, modified 349 F.2d 677 (5th Cir. 1965). In that case, the

Fend's conclusions corroborate estimates of useful life made during and prior to the years at issue.[233] Even if such estimates were clearly shown by the record to have been made by petitioner's management officials, for the reasons mentioned above, we can give Fend's views little weight. Petitioner also believes that Fend's hindsight conclusions can be used to corroborate the existence of a policy to retire and replace diesels, rather than rebuild them. If such a policy had been in existence in 1959–61, we believe there would be more concrete evidence of its existence than a study based in part on facts that occurred after 1961. In any event, we do not believe that Fend has shown with any specificity that a new policy was in effect during the years 1959, 1960, and 1961.[234] Therefore, the conclusions of this witness hardly serve even a corroborative function.[235]

We conclude that the evidence adduced at trial concerning the conditions at the end of 1959, 1960, and 1961 was insufficient,

---

taxpayer claimed on its 1956 tax return a 50-year useful life for a hotel (constructed in 1924) and a 35-year useful life for an associated exhibition hall (constructed in 1951). These determinations of useful life were not questioned by the Commissioner. In an amendment to petition filed in 1963, the taxpayer claimed for the first time that the hotel and exhibition hall had remaining lives of only 7 years in 1956, alleging that economic factors caused these properties to become "completely obsolete at the end of 1962." This claim was rejected because of the taxpayer's failure to meet its burden of proof.

While both this Court and the Court of Appeals discussed, to some extent, events occurring after 1956, these events were not considered for the purpose of establishing or corroborating a specific useful life. Rather, it appears that the post–1956 events were pointed to as showing that, based on information of which the taxpayer was aware when it filed its amendment in 1963, the properties were not "completely obsolete at the end of 1962" and the taxpayer's allegations to that effect were "so grossly overstated as to be self-defeating" (349 F.2d at 681). Nothing in the opinion of this Court or the Court of Appeals suggests that a taxpayer seeking to change the useful life claimed on its return can resort to hindsight to support or corroborate its revised estimates. In fact, the opinion of this Court is implicitly critical of "a belated contention seek[ing] hindsight re-evaluation of the useful life estimate."

[233]While petitioner did claim a 15-year useful life to depreciate road diesels on its early tax returns, petitioner at that time had minimal experience with such equipment and therefore could not justify the use of the 15-year life. Fend made no attempt to support the useful-life claim in the early returns based on the information then available, nor could he have done so.

[234]It is not clear, for example, the extent to which Fend's conclusions may reflect the impact of post–1961 events which induced diesel retirements. The discussion in our opinion in *Issue (ll)*, regarding the impact on retirements of Rev. Proc. 62–21, 1962–2 C.B. 418, has equal pertinence here.

[235]Petitioner also claims to find support for its useful life contentions in the study made for respondent by Ronald J. Lenart of the Interstate Commerce Commission. As can be seen from our findings, we found Lenart's analysis under the "simulated plant records" method to be more supportive of respondent's position than of petitioner's, although, based on the record herein, we are unable to ascribe to it a high degree of reliability for our present purposes.

under the applicable standard, to show that the useful lives claimed on petitioner's returns were erroneous.[236] Petitioner has not established a clear and convincing basis for a significant modification of the useful lives for diesel locomotives claimed on its returns, by reason of conditions known to exist or reasonably ascertainable at the end of each of the years at issue.[237]

We decide this issue for respondent.

## XI.  WELDED RAIL[238]

This issue presents the following question for our consideration:

Whether the welding of 39-foot segments of rail into continuous lengths of rail effected a betterment so that the welding costs incurred by petitioner are capital expenditures pursuant to section 263.

### FINDINGS OF FACT

#### Issue (g)

Some of the facts relating to this issue have been stipulated by the parties, and those facts, with associated exhibits, are incorporated herein by this reference.

This issue involves welding costs incurred by the former Southern Pacific Co. and the Texas & New Orleans Railroad Co., hereinafter sometimes referred to collectively as petitioner.

Railroad track consists of rail, tie plates, cross ties, and ballast which are installed on a subgrade (grading). Rail is the portion of the railroad track structure which carries the wheels of railroad rolling stock; it is the load-carrying steel member of the track. The weight of the loads is transmitted from the rail through tie plates to the ties and ballast and eventually to the grading.

New rail is rolled by steel mills, and delivered in 39-foot lengths which are then assembled by the railroad and installed as part of the track. In the United States, rail manufacturers

---

[236]In neither this opinion nor the opinion in *Issue (ll)* have we found it necessary to refer to every one of the cases cited by the parties since many of them are decided on their peculiar facts and have no direct application to the factual circumstances presented in the instant case.

[237]In view of this conclusion, we do not reach the question of salvage value.

[238]In trying and briefing this case, this issue was referred to by the parties as "*Issue (g)*."

have traditionally delivered 39-foot lengths of rail to the railroads and have not been set up to manufacture longer lengths. The 39-foot limitation was dictated by the length of the freight car (gondola) used to deliver the rail and, to some extent, by economic factors.

Two methods of connecting 39-foot rail segments were employed by petitioner during the years in controversy. One method involved the joining of the segments mechanically with angle bars, bolts, and other materials. (The term "jointed rail" is used herein to refer to the rail connected in this manner.) The other method, which petitioner began using with some frequency in 1956,[239] involved the joining of the segments by means of a welding process. (The term "welded rail" is used herein to refer to the rail connected in this manner.)

Two methods of welding rail were employed by petitioner during the years at issue. In the gas-welding process, two rail segments are heated by gas flames and are then pressed together to fuse them. In the electric-welding process, the ends of two rail segments are heated by causing them to act as electrodes and are then pressed together to fuse them.[240]

When petitioner first began the practice of welding rail into longer lengths in 1956, it used a gas-welding process. By 1958, petitioner was also using an electric-welding process. Petitioner found the latter process to be a cleaner method, providing better control during welding and producing fewer weld failures.[241] This ability of the electric process to produce superior welds was widely known in the railroad industry, and petitioner soon stopped using the gas process. By 1961, petitioner was using electric welding exclusively.

During the years 1959 through 1961, the shortest lengths of rail welded by petitioner were 78 feet (for use on sharp curves) and the longest lengths were 1,440 feet.[242] Petitioner adopted

---

[239]Some earlier attempts at welding had not been successful. Petitioner first began the practice of welding rail in 1956 in installing main-line tracks.

[240]In the welding of rail under both the gas and electric processes, the pressing of the two heated rail ends together results in some molten metal being extruded beyond the contours of the rail. This small amount of metal "upset" is removed to prevent kinking at the weld point.

[241]Weld failures occurred much more frequently in the gas-welding process when it was not performed properly. The connections were tested at the welding plant, and any weld failures detected at that time were corrected.

[242]The Committee on Rail of the Association of American Railway Engineers proposed to use

1,440 feet as a standard length of welded rail. This length was based on the number of flatcars which could conveniently be put together to handle the long strings of rail.

Beginning in 1947, the Atchison, Topeka & Santa Fe Railway (hereinafter Santa Fe) conducted studies of welded rail. Five miles of test track were installed at Cedar Point, Kans., on a high-density mainline freight and passenger route. Through 1955, the Santa Fe's engineering division made continual observations of the test track and compared it with jointed rail laid on either side of it. These observations showed that the welded rail required less maintenance than the accompanying jointed rail (by 150 to 200 man hours per mile per year).

In 1955, as a result of the recommendations of its engineering staff, the Santa Fe decided to install all new rail as welded rail.

All American railroads, including petitioner, were aware of the Santa Fe studies and of the results being obtained on the test track. The Santa Fe engineering division reported its observations to the American Railway Engineering Association (AREA) on a continuing basis. One AREA committee (No. 31) was charged with the duty of studying welded rail. Many railroads, including petitioner, had representatives on the committee.

As a result of its studies, the Santa Fe determined that electric welding (the electric flash-butt process or Schlatter process) was the best method of welding rail since it was acceptably strong and free of defects and eliminated problems of primary and secondary batter.[243] The Santa Fe had experimented with gas welding (the oxy-acetylene pressure-butt process) but, by 1956, had determined the superiority of electric welding.

The Santa Fe freely and continually made available to AREA Committee No. 31 all of its observations and test results. The committee regularly published informational materials on welded rail and made annual reports in which it recommended the adoption of welded rail by the industry.

During the Santa Fe's test period, employees of petitioner's

---

the term "welded rail" to define four (or fewer) 39-foot lengths of rail welded together for a total of no more than 156 feet, and to use the term "continuous welded rail" to define rail welded into lengths longer than 156 feet. During the years at issue, petitioner welded its rail into lengths both shorter and longer than 156 feet, and the term "welded rail," as used herein, applies to all of the rail at issue.

[243]The subject of rail batter is discussed later in our findings.

engineering department consulted with employees of the Santa Fe concerning welded rail.

By 1959, petitioner had adopted a policy of laying welded rail, rather than jointed rail, to the extent that it had the facilities to do so. Gradually, petitioner reached the point where it laid only welded rail. Even before 1959, much of the newly laid rail installed by petitioner was welded. In each of the years 1956–71, petitioner laid welded rail, as follows: [244]

| Year | Track miles newly laid | Cumulative track miles |
|------|------------------------|------------------------|
| 1956 | 16.73 | 16.73 |
| 1957 | 63.41 | 80.14 |
| 1958 | 97.80 | 177.94 |
| 1959 | 143.02 | 320.96 |
| 1960 | 83.48 | 404.44 |
| 1961 | 199.80 | 604.24 |
| 1962 | 157.45 | 761.69 |
| 1963 | 232.76 | 994.45 |
| 1964 | 366.69 | 1,361.14 |
| 1965 | 307.58 | 1,668.72 |
| 1966 | 505.34 | 2,174.06 |
| 1967 | 262.60 | 2,436.66 |
| 1968 | 383.00 | 2,819.66 |
| 1969 | 359.28 | 3,178.94 |
| 1970 | 273.18 | 3,452.12 |
| 1971 | 483.70 | 3,935.82 |

The welded rail laid by petitioner was installed at various locations throughout its track system and incorporated into its general track structure. Petitioner had no test program similar to that of the Santa Fe; no portion of its track system was ever set up as a test track or subjected to the kinds of observations and comparisons of welded rail with jointed rail made by the Santa Fe.[245]

All of the welded rail installed by petitioner during the years

---

[244]The mileage figures in the table are drawn from an exhibit which includes welded rail statistics for the subsidiary St. Louis & Southwestern Railroad Co., in addition to those for the former Southern Pacific Co. and the Texas & New Orleans Railroad Co.

[245]At the beginning of its welding program, petitioner conducted some experimentation to ascertain the suitability of welding more than four segments of rail together.

at issue was newly manufactured rail. It was not used (relay) rail picked up from one location and relaid in another.[246]

From an engineering standpoint, welded rail has many advantages over jointed rail:

(1) The use of continuous lengths of welded rail eliminates joints which are connected with angle bars and bolts. In those areas where petitioner laid 1,440-foot lengths of welded rail to replace jointed rail, the number of bolted joints was reduced from 272 per mile to 16. The elimination of bolted joints provides many benefits.

(2) Because of the mechanical nature of a bolted joint, it tends to "work" or wear as heavy trains pass over it and become loose. Ultimately, the component parts of the joint become worn. Maintenance is required to tighten the joint (or to replace it when it becomes too worn to be tightened). Furthermore, the action of the joint as each load goes over it also causes the displacement of the ballast and the subgrade beneath the track. Therefore, maintenance is required to tamp up the ballast again underneath the crossties and sometimes it is necessary to replace the crossties.[247] By welding rails instead of joining them with angle bars and bolts, the track tends to stay stable. No maintenance is required to tighten bolts, and less maintenance is required with respect to the ballast and the crossties. Thus, with welded rail, the track structure remains in acceptable condition for a longer period of time. Moreover, welded rail can last substantially longer than jointed rail before requiring resurfacing.[248]

(3) When a wheel of a railroad car hits the discontinuity of a bolted joint, the wheel bounces. At the point where the wheel first hits after the bounce, the rail starts to dish out, or flatten out, and that dishing out or flattening out is called "primary

---

[246]In subsequent years, when petitioner welded used (relay) rail that had previously been bolted, it was necessary to crop off the ends of the rails where the bolt holes were. During the years at issue there was no such cropping.

[247]The working of the joint causes deterioration of four to six crossties at each joint, and they need to be replaced at more frequent intervals than do crossties in the middle of a track. When rail is welded rather than jointed, rapid deterioration of crossties in the area of the joint is reduced. There is also a reduction in the deterioration of the subgrade and ballast, although the level has to be maintained for a period of time after the bolted joint has been removed.

[248]Resurfacing refers to a process whereby the level of the track is raised by putting in additional ballast and tamping up all the crossties. Resurfacing is usually accomplished by automatic machinery. All track must be resurfaced occasionally.

batter." After a while, the primary batter gets deep enough to cause the wheel to bounce a second time and hit and flatten the rail a second time. Where the rail dishes out or flattens out the second time is called "secondary batter." Primary and secondary batter of rail are virtually eliminated where rail is electric-welded.[249]

(4) In jointed rail, because of the difference in stresses on the rail when a wheel on a car crosses from one rail to the next, the rail at the joint has a tendency to move (flow). When flowing occurs, the edge or top of the rail must be ground off so that it does not chip off and chip back into the head of the rail. Welded rail eliminates this problem and eliminates the maintenance involved. Additionally, with welded rail there is a reduction of head and web separation (metal deterioration), which frequently occurs near the bolt holes of jointed rail, and an elimination of bolt-hole failures.

(5) A major advantage of welded rail is that more life can be obtained from the rail at the place where it is initially installed.[250] Welded rail takes longer than jointed rail to reach the point where it is necessary to remove it from high-traffic areas and relay it in low-traffic areas. The picking up and relaying of rail in low-density, low-speed locations occurs when the joints become worn and when high levels of maintenance are required. Lower levels of maintenance are sufficient for the used rail when it is placed on a branch line which has infrequent traffic. One of the drawbacks of relaying rail is that it takes 4 to 10 times as long to get the same amount of service from track laid on a branch line as it does from track laid on a high-density, high-speed, main-line track location. Because welded rail can be left on a main line for more years than can jointed rail (about 10 years), it is able to provide as much service at that location as it would provide in 50 to 60 years if relaid at a branch line.

There are also some engineering disadvantages associated with welded rail:

(1) The principal disadvantage results from thermal expansion and contraction, which can cause rail separation or kinking

---

[249]At times, the gas-welding process produced heat-hardening problems in the rail which could result in some rail batter.

[250]During the years at issue, this advantage was known to petitioner, although it obviously did not have statistical data based on its own experience.

of the rail and misalignment. Welded rail requires a stronger track structure. As a result, it is necessary to install more anchoring near the ends of long strings of welded rail than is installed near the ends of jointed rail. The thermal problems are further controlled by strengthening the ballast and by laying the welded rail at times when the temperatures are not abnormally hot or cold.

(2) Because 39-foot lengths of rail are usually welded into 1,440-foot lengths at the plants maintained by petitioner and are then moved to the actual track-laying site, there are additional handling problems merely due to the longer length. The longer lengths are also more difficult to pick up and relay than are the 39-foot sections of rail.

(3) If a metallurgical defect occurs in welded rail, that part of the rail has to be cut out. On the other hand, if a 39-foot jointed rail has a defect, it is relatively easy to pick it up and replace it with another 39-foot section.

(4) It is more costly to install welded rail rather than jointed rail because specialized equipment has to be used for the longer lengths. A 39-foot rail can be laid in half an hour, whereas a 1,440-foot length of welded rail requires at least 1 hour and 40 minutes to lay. Thus, traffic delays are greater when welded rail is being laid. Similarly, it costs more to replace or remove welded rail than it does to remove jointed rail, again because of the length.[251]

(5) Additionally, welded rail creates some problems in the maintenance of switches unless the rail is laid in such a manner as to eliminate joints in those locations.

The disadvantages associated with welded rail are substantially outweighed by the numerous advantages. The use of welded rail benefited petitioner's track assets by increasing their usefulness, capacity, and durability, and by reducing annual operating costs.

Petitioner employed the retirement-replacement-betterment (RRB) method of accounting. Under this method, when rail is laid to replace equal-weight rail, the cost of the replacement rail

---

[251]It is more difficult to transpose welded rail on curves, i.e., to reverse the positions of the inside and outside rails. Both rails must be turned end to end in transposing, so that the locomotive and freight car wheels run on the same side of the rail as before, and this turning is progressively more difficult as rail length increases. As a result, petitioner limits its use of welded rail on curves.

is properly charged to operating expense. To the extent the replacement constitutes a betterment, the costs attributable to the betterment are capitalized in an asset account.

Under petitioner's chart of accounts (prescribed by the ICC), petitioner made the following entries (among others), during the years at issue, to reflect the replacement of jointed rail with welded rail:

*Account 10* (Other Track Material): Credit (subtract) bolts and angle bars (i.e., the removed track materials) at ledger value.

*Account 267* (Retirements of Road Expenses): Debit (add) bolts and angle bars at ledger value, less salvage value.

*Account 712* (Materials and Supplies): Debit (add) salvage value of bolts and angle bars.

*Account 214* (Rails Expenses): Debit (add) welding costs.

For tax purposes, the effect of this application of the RRB method was to permit petitioner to deduct in each year at issue (1) the costs of the removed bolts and angle bars (less salvage) used to join the rail in previous years (in Account 267), and (2) the costs of the welds used to join the replacement rail in the current year (in Account 214).

Although the published accounting rules of the Interstate Commerce Commission relevant to the years at issue (the Uniform System of Accounts) did not define a betterment or specifically refer to welded rail, the ICC has taken the position that the cost of welding rail is a capital expense because welded rail is a betterment, although its earlier rulings in this regard were not too clear. However, petitioner believed the only way it could effect a rail betterment was to install heavier-weight rail in replacement. It therefore construed the ICC accounting rules to require it to capitalize only those welding costs attributable proportionately to the laying of the heavier-weight rail. Petitioner did not believe the ICC required it to capitalize its welding costs for equal-weight rail laid in replacement.

Under petitioner's application of the RRB method, the following welding costs were expensed on the books of the former Southern Pacific Co. (FSP) and the Texas & New Orleans Railroad Co. (T & NO) from 1956 through 1961:

| *Year* | *FSP* | *T & NO* |
|------|------|------|
| 1956 | $36,512 | --- |
| 1957 | 60,212 | --- |

| 1958 | $213,489 | $89,575 |
| 1959 | 197,889 | 47,050 |
| 1960 | 101,703 | 24,600 |
| 1961 | 160,394 | 57,075 |

This book accounting was followed on petitioner's tax returns for the stated years. The deductions produced by the expensing of the amounts listed above have all been disallowed by respondent on audit. At issue herein are the amounts disallowed for the years 1959, 1960, and 1961.

In the statutory notice of deficiency in the instant case, respondent stated:

It is determined that the cost of welded rail joints constitutes a betterment rather than a replacement. Since you employ the betterment method of accounting for roadway properties, the cost of welded rail joints must be added to the property account instead of being deducted as an expense.

### ULTIMATE FINDING OF FACT

Petitioner effected a betterment, to the full extent of its welding costs, when it laid welded rail in replacement of jointed rail.

### OPINION

### Issue (g)

Under the retirement-replacement-betterment (RRB) method of accounting, when petitioner[252] lays rail to replace equal-weight rail, the cost of the replacement rail is properly charged to operating expense.[253] For income tax purposes, the effect of this accounting procedure is to make the cost of the replacement rail currently deductible.

During the years 1959, 1960, and 1961, petitioner incurred costs in joining 39-foot segments of rail into continuous welded lengths (welded rail). The welded rail replaced 39-foot segments of rail which had been joined together with angle bars and bolts (jointed rail). Petitioner charged the welding costs to operating

---

[252]The present issue, as stipulated by the parties, involves welding costs incurred by the former Southern Pacific Co. and the Texas & New Orleans Railroad Co.

[253]For a fuller discussion of the mechanics of the retirement-replacement-betterment (RRB) method of accounting, see the portion of this opinion entitled, "*Issue (rr)*: Deductions Incident to Relocation Projects."

expense as part of the cost of the replacement rail and, accordingly, deducted these costs on its tax returns. In the statutory notice, respondent disallowed these deductions and claimed welding costs should have been capitalized as a betterment rather than expensed as a replacement.[254]

The issue we must resolve is whether petitioner's welding costs during the years at bar effected a betterment and therefore must be capitalized under section 263.[255] In view of the state of the record herein and the controlling case law pertaining to this question, we agree with respondent that petitioner incorrectly deducted its welding costs and properly should have treated such costs as capital expenditures.

In *Louisville & Nashville Railroad Co. v. Commissioner*, 66 T.C. 962 (1976), on appeal (6th Cir., July 2, 1978), the Commissioner also contended that, under the RRB method of accounting, the costs of welding 39-foot rail lengths into strings of continuous welded rail represented betterments required to be capitalized pursuant to section 263. We concluded that, for the purposes of the RRB method, "a betterment * * * includes an expenditure (with respect to a replacement) which to a substantial extent increases the usefulness, capacity, or efficiency of the property involved, or one which contributes to the durability of the property or increases the life of that property." 66 T.C. at 1000. Such betterments, we pointed out, were to be capitalized under a proper application of the RRB method (see *Missouri Pacific Railroad Co. v. United States*, 204 Ct. Cl. 837, 497 F.2d 1386, 1396 (1974)), as well as under the provisions of section 263. See sec. 1.263(a)–1, Income Tax Regs. We held "on the basis of all the evidence that welded rail, when used to replace jointed rail, is functionally a betterment within the context of the

---

[254]Respondent's position in this regard is set forth in Rev. Rul. 67–22, 1967–1 C.B. 52.

[255]Sec. 263, which concerns capital expenditures, provides that no deduction shall be allowed for any amount paid out for "new buildings or for permanent improvements or betterments made to increase the value of any property or estate."

Some of the witnesses herein, notably accountants, discussed this issue in terms of whether the welding costs, themselves, constituted a betterment. Our findings of fact and opinion reflect this accounting usage, where appropriate. However, the structure of sec. 263 suggests it is more precise for tax purposes to ask whether the welding costs *brought about* a betterment (i.e., the welded rail). In fact, the accountants, too, look to the *effect* of an expenditure in order to determine if there has been a betterment. The decided cases on this issue are not always consistent in their usage, and it is obvious that such matters of semantics have no bearing on the outcome herein.

retirement-replacement-betterment method of accounting and the welding costs for welded rail should be capitalized." 66 T.C. at 1002. Our conclusions in this respect were consistent with the holdings in *Missouri Pacific Railroad Co. v. United States, supra; United States v. St. Louis-San Francisco Railway Co.*, an unreported case (E.D. Mo. 1975, 35 AFTR 2d 75–1317, 75–1 USTC par. 9395), affd. on another issue 537 F.2d 312 (8th Cir. 1976); and *Atchison, Topeka & Santa Fe Railway Co. v. United States*, an unreported case (D. Kan. 1975, 36 AFTR 2d 75–5176, 75–2 USTC par. 9549).

The evidence in the present case supports a similar result. The technical superiority of welded rail is clearly shown by our findings. Welded rail reduces wear and tear on the rail, the cross ties, and the substructure, and it eliminates the need to maintain the angle bars and bolts which it replaces. Track maintenance in general is reduced significantly. Welded rail lasts substantially longer than jointed rail before requiring resurfacing. It provides much more service than jointed rail at the point of initial installation since it can remain in high-traffic areas for longer periods. Costs of removal and relaying (in lower-density areas) are thereby reduced. The expert testimony of record convinces us of the superiority of welded rail, with its numerous advantages far outweighing its disadvantages.

The expert testimony also convinces us that, in view of the fact petitioner's expenditures for welding resulted in an increase in the usefulness and capacity of petitioner's track assets and in a reduction in the annual operating costs of those assets, petitioner was required under generally accepted accounting principles to treat its welding expenditures as betterments in applying the RRB method of accounting.[256]

Petitioner's accounting treatment of the welding costs was

---

[256]Petitioner argues that under the RRB method, as it applies to rails, a railroad effects a betterment only to the extent it lays heavier-weight rail in replacement. Petitioner's assertion that weight is the *only* criterion of a betterment in this context is contrary to the thrust of authoritative testimony herein and the decided cases we have cited. Clearly, welded rail is a betterment as that term is understood in RRB accounting and as that term is used in sec. 263. See *Louisville & Nashville Railroad Co. v. Commissioner*, 66 T.C. 962, 1002 (1976), on appeal (6th Cir., July 2, 1978).

Petitioner's assertion that respondent has stipulated, in connection with *Issue (rr)* "that in the case of rail there is a betterment under the retirement-replacement-betterment method only if rails heavier in pattern weight are installed in replacement of lighter rails," is not borne out by a reading of the pertinent stipulation document.

not compatible with generally accepted accounting principles because the expensing of both (1) angle bars and bolts (less salvage) and (2) welding costs, removed from petitioner's asset accounts all amounts reflecting the joining of the rails, and only the cost of unconnected rail remained in the asset accounts. Since the welding costs added to the usefulness and capacity of petitioner's track assets and reduced the annual operating costs of track assets, those costs should have been treated as a betterment and capitalized rather than deducted as current expense.

A proper application of accepted accounting principles necessitates placing petitioner's welding costs *not* in an expense account, but rather in an asset account. The effect of this proper RRB procedure is to keep an asset on petitioner's books reflecting the connection of the rails; the cost of the welds replaces the cost of the angle bars and bolts which is properly removed from the asset account. The only deduction properly allowable is the cost of the removed bolts and angle bars (less salvage value).

Petitioner readily concedes welded rail is an improvement over jointed rail but claims its management was unaware of this fact during the years at issue because the company was at that time still experimenting with welding. Petitioner states that it did not adopt welding as a standard practice until after 1961 and contends that no betterment could exist until the management discerned it.[257]

We are not convinced that petitioner's management officials were doubtful about the advantages of welded rail during 1959, 1960, and 1961. When it began its welding program in 1956, petitioner had the benefit of the materials made available by the American Railway Engineering Association and of tests conducted by the Santa Fe from 1950–55 which showed the superiority of welded rail. The fact that petitioner, from 1956 through the years at issue (and beyond), laid its welded rail at various locations throughout its track system (and, generally, in increasing amounts) tends to show that the welding program

---

[257]In support of this subjective test, petitioner cites *Missouri Pacific Railroad Co. v. United States*, 204 Ct. Cl. 837, 497 F.2d 1386, 1399 (1974). We are not convinced that the determination of a betterment depends solely upon the intent or understanding of the taxpayer. Nevertheless, as we point out, even under a purely subjective approach, petitioner cannot prevail.

was not experimental. Petitioner set up no test program similar to that of the Santa Fe; instead, it appears that during the years at issue there was a policy of installing welded rail to the full extent of available facilities. We believe the management officials were well aware by 1959 of the nature of welded rail and had sufficient data and experience from which to conclude that welded rail was a betterment.

Petitioner seeks to have us limit our inquiry herein to the question of "whether longer lengths of rail should be regarded as a betterment when compared to shorter [unconnected] lengths of rail." Petitioner contends the present issue does not properly involve the question of whether rail joined together with welds is a betterment when compared to rail joined together with angle bars and bolts. In so framing the question before us, petitioner is at odds with the approach of the decided cases in this area.

Petitioner would have us ignore the actual context in which the costs at issue were incurred. The longer lengths of rail came into being when 39-foot lengths were welded together. In order to ascertain whether the welding costs were incurred to produce a betterment, it is necessary to compare the rail which was removed with the rail which replaced it. To ignore the relative merits of the modes of connection would require overlooking the most critical element differentiating the two types of rail.[258] We therefore have declined to restrict our inquiry in the manner suggested.

Petitioner cites section 446 and section 1.446–1(a), Income Tax Regs., for the proposition that its book accounting should be controlling for tax purposes. We disagree. We do not regard section 446 or the regulations thereunder as supporting petitioner's contention.

---

[258]Petitioner relies on the language in *United States v. St. Louis-San Francisco Railway Co.*, an unreported case (E.D. Mo. 1957, 35 AFTR 2d 75–1317, 75–1 USTC par. 9395), affd. on another issue 537 F.2d 312 (8th Cir. 1976), that "the joint materials are not relevant to this issue." However, that statement was made by the court to show that joint materials which are retired and expensed under the RRB method cannot also be viewed as being the subject of a replacement. Once retired, the joint materials were considered by the court to be out of the picture, and the taxpayer's argument that the welds replaced the joint materials (and could be expensed under the RRB method), was therefore considered to be invalid. At no point in the opinion did the court say that welded rail should not be compared to jointed rail for the purpose of showing a betterment, and, in fact, the court made just such a comparison in reaching its conclusion that the welding costs were to be capitalized.

Section 446(a) states the general rule that "taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." Section 446(b) provides that "if no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the [Commissioner], does clearly reflect income."[259] Sec. 1.446–1(a)(2), Income Tax Regs., provides, inter alia:

A method of accounting which reflects the consistent application of generally accepted accounting principles in a particular trade or business in accordance with accepted conditions or practices in that trade or business will ordinarily be regarded as clearly reflecting income, provided all items of gross income and expense are treated consistently from year to year.

In interpreting the above-quoted statutory and regulatory language, the Supreme Court, in *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522 (1979), stated (p. 540):

Most importantly, the Code and Regulations give the Commissioner broad discretion to set aside the taxpayer's method if, "in [his] opinion," it does not reflect income clearly. * * * [The Commissioner] may prescribe a different practice without having to rebut any presumption running against the Treasury.

Therefore, in those instances where the Commissioner has questioned a practice employed by a taxpayer in keeping his books, it is incumbent upon the taxpayer to show that his accounting procedures are an acceptable method of reflecting his income; "the taxpayer has a heavy burden to show that respondent has clearly abused his discretion so that his determination can be held to be arbitrary." *Seaboard Coast Line Railroad Co. v. Commissioner*, 72 T.C. 855, 875 (1979), on appeal (5th Cir., Mar. 13, 1980). See also *Madison Gas & Electric Co. v. Commissioner*, 72 T.C. 521, 554–555 (1979), affd. on another point 633 F.2d 512 (7th Cir. 1980); *Photo-Sonics, Inc. v. Commissioner*, 42 T.C. 926, 933 (1964), affd. 357 F.2d 656 (9th Cir. 1966).

In the present case, petitioner has shown neither the accept-

---

[259]We note that, under sec. 446(e), a change from expensing a material item to capitalizing it (such as is involved here) is viewed as a change in accounting "method." See the discussion of this point in the portion of this opinion entitled, "*Issue (yy)*: Deduction of Embankment Expenditures." Under sec. 446(e), a determination must be made of whether a taxpayer's accounting procedure constitutes an accounting "method" in order to ascertain whether it is necessary for the taxpayer to secure the Commissioner's consent to change the procedure.

ability of its accounting procedures nor the arbitrariness of respondent's determination.

As discussed above, we view the evidence herein as bearing out respondent's assertion that petitioner's method was an *improper* application of recognized RRB accounting principles. We also believe there is ample justification in the record for respondent's conclusion that petitioner's method did not clearly reflect income in light of the fact that petitioner expensed the cost of the removed joint materials (less salvage) in addition to the cost of the welds. As a result, petitioner's accounting practice gave it current deductions not only for the present costs of welding the rails, but also for the earlier costs of joining them with angle bars and bolts, which was not clearly reflective of petitioner's income.[260]

Petitioner's accounting argument is premised on its further contention that the Interstate Commerce Commission (ICC) required petitioner to account for welding costs as an expense and not as a betterment. However, this asserted accounting principle is not shown by the record herein to have been adopted by the ICC. At trial, a representative of the ICC testified that the ICC had consistently regarded the cost of joining 39-foot segments of rail into continuous lengths as a capital expenditure since such welded rail was considered a betterment. Other evidence in the record indicates petitioner's management was not certain during the years at issue of the ICC accounting rules in this respect and had misinterpreted the ICC position.

In any event, regardless of the position taken by the ICC, our conclusions herein are dictated by the applicable tax principles, as set out in the Revenue Code and pertinent court decisions, and any contrary accounting interpretations prescribed by the ICC would not be controlling for tax purposes. *Louisville & Nashville Railroad Co. v. Commissioner, supra* at 1001; *Seaboard Coast Line Railroad Co. v. Commissioner, supra* at 875. Cf. *Thor Power Tool Co. v. Commissioner, supra* at 541–543.

We therefore conclude that the manner in which petitioner accounted for its welding costs on its books during the years at

---

[260]Petitioner contends that the de minimus amounts of the deductions at issue did not distort its income. We do not agree that the over $500,000 in welding cost deductions during 1959–61 are as "inconsequential" as petitioner claims. Cf. the discussion in the portion of this opinion entitled, "*Issue (yy)*: Deduction of Embankment Expenditures," in which we held that claimed deductions of $65,299, $30,551, and $26,429 were "material items" for purposes of sec. 446(e).

issue is not determinative of the question of the deductibility of those costs.

Petitioner seeks to distinguish the various opinions adverse to its position, believing them to be "afflicted with serious conceptual infirmities."[261] We have carefully considered petitioner's arguments in this regard but we do not find those cases distinguishable in any meaningful way, nor do we find any basic fault with the ultimate conclusions drawn or the legal principles enunciated therein. We see no reason to depart from the views expressed by this Court in the *Louisville & Nashville* case or to question the legal authority relied on in that case, and we therefore reaffirm those views.[262]

We have concluded on the basis of all the evidence that petitioner's welded rail was functionally a betterment within the context of the RRB method of accounting and that the welding costs at issue should be capitalized under section 263.[263] See *Louisville & Nashville Railroad Co. v. Commissioner, supra; Missouri Pacific Railroad Co. v. United States, supra; United States v. St. Louis-San Francisco Railway Co., supra; Atchison, Topeka & Santa Fe Railway Co. v. United States, supra.* As to the amount to be capitalized, the following quotation from the

---

[261]The first time the Court of Claims considered this issue, it concluded that welded rail is not a betterment. See *Chicago, Burlington & Quincy Railroad Co. v. United States,* 197 Ct. Cl. 264, 455 F.2d 993 (1972), revd. on another issue 412 U.S. 401 (1973). However, subsequently, in *Missouri Pacific Railroad Co. v. United States, supra,* the Court of Claims reached the opposite conclusion and pointed to "the limited factual perspective provided the court" in the earlier case. 497 F.2d at 1397. All other cases deciding this issue have, like the *Missouri Pacific* case, held that welded rail is a betterment and must be capitalized. Those cases are cited in the text.

[262]While *Louisville & Nashville Railroad Co. v. Commissioner, supra,* had not been released at the time the briefs as to this issue were filed, both parties had seen the Special Trial Judge's report and discussed that report on reply brief.

[263]On brief, petitioner states that "for the sake of consistency and balance in accounting * * * something should perhaps be written out of the accounts for loss of metal." During the years at issue, petitioner used only newly manufactured rail which did not need to be cropped, and any metal loss was limited to small amounts that were melted in the welding process. Petitioner has not shown how the "write off" for incidental metal loss fits within the workings of the RRB method, nor has petitioner referred us to any authority for the proposition it advances.

It seems highly doubtful to us that, under any recognized method of accounting, the incidental loss of bits of materials used in a construction process will result in a reduction of the amounts required to be capitalized. Even if the contrary were true, in the present case petitioner does not suggest the basis upon which the proposed "write off" is to be calculated, and there is nothing in the record dealing with the quantity, the cost, or the value of the lost metal. Accordingly, we conclude that the welding costs at issue are not subject to any reduction by virtue of metal loss during the years at issue.

*Louisville & Nashville* case (66 T.C. at 1002) has equal pertinence herein:

We find no authority for the suggestion that the welding costs at issue are to be capitalized only to the extent they exceed the costs of joining the same segments of tracks with angle bars and bolts. Since all of the welding activity discussed herein is directed at effecting a betterment, clearly all costs with respect thereto are subject to capitalization under the authorities discussed above. It is the excess of the current cost of welded rail over the current cost of nonwelded, unjoined rail of the same weight which must be capitalized. *Atchison, Topeka & Santa Fe Railway Co. v. United States, supra.* The current cost of the unjoined rail is expensed as a replacement under the retirement-replacement-betterment method. *Missouri Pacific Railroad Co. v. United States, supra,* 497 F.2d at 1396. * * *

Petitioner's final contention is that, in the event it should be necessary to capitalize welding costs, those costs should be amortized over a 20-year period. Plainly, such amortization would not be compatible with the retirement-replacement-betterment method of accounting. See *Boston & Maine Railroad v. Commissioner,* 206 F.2d 617, 619 (1st Cir. 1953), revg. on other grounds 16 T.C. 1517 (1951); *Chesapeake & Ohio Railroad Co. v. Commissioner,* 64 T.C. 352, 361–367 (1975). In none of the decided cases dealing with welded rail has the taxpayer been permitted to amortize costs.

Petitioner points out that the Commissioner has accommodated other similarly situated taxpayers and has permitted amortization in other contexts involving the RRB method. See, e.g., Rev. Proc. 68–46, 1968–2 C.B. 961. Nevertheless, we know of no provision of law which would require respondent to allow petitioner to amortize its welding costs.[264] While we agree as a general proposition that similarly situated taxpayers should be treated the same, we are without authority to grant the requested relief. Cf. *Malinowski v. Commissioner,* 71 T.C. 1120, 1128–1129 (1979).

We decide this issue for respondent.

---

[264]We recognize that it may be a time-consuming and expensive task for petitioner to separate out of its expense accounts all of the welding costs that have been expensed and add them to the capital accounts. The same may be true with respect to many of the issues raised in this proceeding by both respondent and petitioner, because of the time span involved. If the parties can agree on any method to deal with and avoid this problem while correctly reflecting income, we will be happy to approve it. However, we have our doubts that these parties will agree on anything.

## XII. Relay Rail[265]

This issue presents the following questions for our consideration:

Whether the salvage value of the used rail which petitioner recovered for reuse is the fair market value of that rail at the time it was picked up.

Whether respondent's adjustment to salvage value constitutes a change in petitioner's "method of accounting" under section 481.

### FINDINGS OF FACT

#### *Issues (l) and (ccc)*

Some of the facts relating to this issue have been stipulated by the parties, and those facts, with associated exhibits, are incorporated herein by this reference.

This issue involves the rail of the former Southern Pacific Co., the Texas & New Orleans Railroad Co., and the St. Louis Southwestern Railway Co., hereinafter sometimes referred to collectively as petitioner.

Rail is the steel portion of railroad track structure which carries the wheels of railroad rolling stock. Rail wears out in service. It is ground away by the wheels of locomotives and freight cars. The main factor causing wear and tear is the tonnage carried on the rail; other factors are wheel and axle loads, speed, grade, curvature, and the relative support afforded by other elements of the track structure.[266] When rail becomes worn, it is replaced.

New rail is ordinarily installed on high-speed or high-tonnage main lines. On the average, the new rail will carry from 400 million to 800 million tons before needing to be replaced. The foregoing represents about 60 percent of the possible tonnage that the average rail is expected to carry over its entire life. (Petitioner picked up some rail because of line retirements. Rail recovered in line retirements may have carried less than the indicated tonnage.)

---

[265]In trying and briefing this case, this issue was referred to by the parties as "*Issues (l) and (ccc)*."

[266]See, generally, in this regard the findings of fact relating to "*Issue (g)*: Welded Rail."

The used rail that is taken out of main line service is graded by petitioner according to its estimated remaining life, the lowest classification being reserved for rail which cannot be reused. That rail is referred to as "scrap" rail. The rail which is reused is referred to as "relay" rail or "secondhand" rail. Main line use of rail usually does not exceed 20 years. Relay rail relaid in low density areas has on the average an additional 20 years of life.

Petitioner's practice was, generally, not to store relay rail but to transport it to the site where it was going to be relaid.

During 1959, 1960, and 1961, some of the relay rail was relaid in locations where there had been no track (i.e., as an "addition") and some was relaid to replace rail of a lower quality (i.e., as a "betterment"). The total net tons of relay rail laid during the years at issue in additions and betterments by the former Southern Pacific Co. (FSP), the Texas & New Orleans Railroad Co. (T & NO), and the St. Louis Southwestern Railway Co. (StLS) are as follows:

| Company | Year | Additions | Betterments | Total net tons |
|---|---|---|---|---|
| FSP | 1959 | 5,336 | 3,071 | 8,407 |
| | 1960 | 9,728 | 3,814 | 13,542 |
| | 1961 | 6,997 | 1,926 | 8,923 |
| Totals | | 22,061 | 8,811 | 30,872 |
| | | | | |
| T & NO | 1959 | 3,815 | 1,152 | 4,967 |
| | 1960 | 2,496 | 1,469 | 3,965 |
| | 1961 | 3,634 | 2,483 | 6,117 |
| Totals | | 9,945 | 5,104 | 15,049 |
| | | | | |
| StLS | 1959 | 772 | 27 | 799 |
| | 1960 | 835 | 29 | 864 |
| | 1961 | 417 | 89 | 506 |
| Totals | | 2,024 | 201 | 2,169 |
| Grand total | | | | 48,090 |

Petitioner used the retirement-replacement-betterment (RRB) method of accounting in accordance with the accounting requirements of the Interstate Commerce Commission as set

forth in its Uniform System of Accounts for Railroad Companies. Petitioner used this method for both book and tax purposes. Under the RRB method, when rail is replaced with equal-weight rail, the rail capital account is not disturbed and the cost of the replacement rail (and labor) is added to the operating expense account. The amount added to that account is reduced by the salvage value of any recovered rail, and the said salvage value is added to the materials and supplies account. Where the replacement rail is a betterment, the procedure is the same, except that the betterment portion of the cost of the replacement rail is capitalized. When rail is retired without replacement, the amount recorded in the capital account for the rail is removed from the capital account and is added to operating expense, and the salvage value of the recovered rail is applied as outlined above.[267] When relay rail is used as an addition, the salvage value assigned to it is capitalized in the rail account; if it is used as a replacement in kind, the salvage value assigned to it is expensed as above.

In 1952, the Interstate Commerce Commission codified four 1914 classifications, as they had been revised from time to time, into the Uniform System of Accounts for Railroad Companies, Issue of 1952. The definitions of additions and betterments in section 10.01–2 were as follows:

"Additions" are additional facilities, such as additional equipment, tracks (including timber and mine tracks), buildings, bridges, and other structures; additions to such facilities, such as extensions to tracks, buildings, and other structures; additional ties laid in existing tracks; and additional devices applied to facilities, such as air brakes applied to cars not previously thus equipped. When a unit of property is retired from service and replaced with property of like purpose, the newly acquired property shall, for the purpose of this classification, be considered as an addition, and the cost thereof accounted for accordingly. (See § 10.01–7 *Road property retired*.)

"Betterments" are improvements of parts (minor items) of existing facilities through the substitution of superior parts for inferior parts replaced. The cost chargeable to the accounts of this classification is the excess cost of new parts over the cost at current prices of new parts of the kind replaced.

The definitions of additions and betterments in the 1957 issue of

---

[267]For the general principles relating to the retirement-replacement-betterment method of accounting, see the findings of fact and opinion as to "*Issue (rr)*: Deductions Incident to Relocation Projects." For a more detailed discussion of the application of the RRB method in the present context, see our opinion as to this issue, below, and the authority referred to therein.

the Uniform System of Accounts were substantially identical to the above-quoted definitions.

Both the 1952 and 1957 versions of the ICC's Uniform System of Accounts contained the following provision in section 10.01–7(d):

> The term "value of salvage" means the amount received for property retired, or for the material salvaged therefrom if sold; or if retained, the value at which the property or the material salvaged therefrom is chargeable to * * * "Material and supplies," or other accounts of this system of accounts. When such material is retained and again used by the carrier, the value shall be determined by deducting a fair allowance for depreciation from current prices of the material as new. * * *

Section 10.07(d) was a codification of a rule promulgated by the ICC in 1914, requiring the salvage value of materials recovered for reuse to be "computed upon the basis of fair prices for the material in its condition as recovered."[268]

In the chart below are listed, for each of the years 1920 through 1961, the average amounts (rounded to the nearest dollar) paid for new rail and received for scrap rail by the predecessor Southern Pacific Co. (PSP), the former Southern Pacific Co. (FSP), the Texas & New Orleans Railroad Co. (T & NO), and the St. Louis Southwestern Railway Co. (StLS). Also listed are the salvage values used during the years 1955 through 1961, for both book and tax purposes, by the named railroads for relay rail.[269] All amounts are per net ton:

| Year | PSP and FSP | | | T & NO | | | StLS | | |
|------|-----|-------|-------|------|-------|-------|------|-------|-------|
|      | New | Relay | Scrap | New  | Relay | Scrap | New  | Relay | Scrap |
| 1920 | $40 | ---   | $14   | $30  | ---   | $14   | ---  | ---   | ---   |
| 1921 | 56  | ---   | 14    | 45   | ---   | 14    | $40  | ---   | $14   |
| 1922 | 52  | ---   | 14    | 40   | ---   | 14    | 41   | ---   | 14    |
| 1923 | 50  | ---   | 14    | 40   | ---   | 14    | 38   | ---   | 14    |
| 1924 | 49  | ---   | 14    | 41   | ---   | 14    | 37   | ---   | 14    |
| 1925 | 48  | ---   | 14    | 44   | ---   | 14    | 40   | ---   | 14    |
| 1926 | 49  | ---   | 14    | 83   | ---   | 14    | 41   | ---   | 14    |
| 1927 | 44  | ---   | 14    | 41   | ---   | 14    | 42   | ---   | 14    |

---

[268] The 1962 revision of the Uniform System of Accounts provided that the salvage value of materials recovered for reuse "shall be determined by deducting a fair allowance from current prices of the material as new."

[269] While the record does not authoritatively disclose the salvage value for relay rail used before the 1950's, it appears that, during the 1940's, a salvage value of approximately $20 was the norm.

| Year | PSP and FSP | | | T & NO | | | StLS | | |
|---|---|---|---|---|---|---|---|---|---|
| | New | Relay | Scrap | New | Relay | Scrap | New | Relay | Scrap |
| 1928 | $45 | --- | $13 | $42 | --- | $13 | $41 | --- | $13 |
| 1929 | 44 | --- | 11 | 41 | --- | 11 | 42 | --- | 11 |
| 1930 | 44 | --- | 14 | 41 | --- | 14 | 42 | --- | 14 |
| 1931 | 43 | --- | 13 | 41 | --- | 13 | 44 | --- | 13 |
| 1932 | 43 | --- | 7 | 41 | --- | 7 | 42 | --- | 7 |
| 1933 | 42 | --- | 8 | 41 | --- | 8 | 41 | --- | 8 |
| 1934 | 40 | --- | 9 | 41 | --- | 9 | 42 | --- | 9 |
| 1935 | 42 | --- | 9 | 41 | --- | 9 | 44 | --- | 9 |
| 1936 | 39 | --- | 10 | 32 | --- | 10 | 37 | --- | 10 |
| 1937 | 40 | --- | 16 | 36 | --- | 16 | 40 | --- | 16 |
| 1938 | 47 | --- | 13 | 41 | --- | 13 | 40 | --- | 13 |
| 1939 | 46 | --- | 14 | 40 | --- | 14 | 40 | --- | 14 |
| 1940 | 43 | --- | 15 | 40 | --- | 15 | 41 | --- | 15 |
| 1941 | 43 | --- | 17 | 41 | --- | 17 | 39 | --- | 17 |
| 1942 | 42 | --- | 17 | 40 | --- | 17 | 39 | --- | 17 |
| 1943 | 42 | --- | 17 | 40 | --- | 17 | 39 | --- | 17 |
| 1944 | 45 | --- | 16 | 45 | --- | 16 | 39 | --- | 16 |
| 1945 | 45 | --- | 16 | 44 | --- | 16 | 41 | --- | 16 |
| 1946 | 48 | --- | 17 | 50 | --- | 17 | 45 | --- | 17 |
| 1947 | 57 | --- | 26 | 55 | --- | 26 | 52 | --- | 26 |
| 1948 | 67 | --- | 45 | 68 | --- | 47 | 61 | --- | 53 |
| 1949 | 74 | --- | 29 | 74 | --- | 31 | 67 | --- | 35 |
| 1950 | 75 | --- | 36 | 75 | --- | 38 | 71 | --- | 55 |
| 1951 | 78 | --- | 41 | 79 | --- | 41 | 77 | --- | 49 |
| 1952 | 83 | --- | 40 | 83 | --- | 39 | 77 | --- | 47 |
| 1953 | 90 | --- | 38 | 91 | --- | 40 | 87 | --- | 51 |
| 1954 | 97 | --- | 31 | 100 | --- | 29 | 85 | --- | 37 |
| 1955 | 101 | $20 | 39 | 113 | $20 | 39 | 88 | $30 | 22 |
| 1956 | 109 | 20/25 | 58 | 104 | 20/25 | 29 | 107 | 30 | 66 |
| 1957 | 114 | 25 | 61 | 112 | 25 | 51 | 110 | 30 | 59 |
| 1958 | 122 | 30 | 44 | 114 | 30 | 33 | 116 | 30 | 48 |
| 1959 | 125 | 30 | 47 | 128 | 30 | 48 | 97 | 30 | 61 |
| 1960 | 125 | 30 | 48 | 129 | 30 | 47 | 113 | 30 | 56 |
| 1961 | 131 | 30 | 50 | (included in FSP) | | | 129 | 30 | 47 |

Initially, the salvage value of petitioner's relay rail was based, generally, on one-half of its cost when new. Through the early 1940's, a $20 salvage value roughly approximated, in most years, both (1) 50 percent of the cost of the relay rail when it was new, and (2) 50 percent of the cost of new rail at the time the relay rail was picked up. However, by the late 1940's and early 1950's, it became apparent that a $20 figure bore no relationship to the steadily increasing cost of new rail.

In 1952, the Interstate Commerce Commission indicated its concern about petitioner's failure to employ a salvage value for

relay rail which was "a fair and reasonable value * * * based on current prices." However, no action was taken in that year to have petitioner make any changes in its books.

On July 15, 1955, the ICC advised petitioner as follows:

*Exception No. 2: Stock Prices of Scrap and Secondhand Rail.* The stock prices of $5 a net ton for scrap rail and $20 for secondhand relaying rail applied at time rail is released from tracks, were established many years ago when the cost of new rail and the market value of scrap and secondhand rails were far lower. Obviously, such stock prices are now not representative of the value of the rail, and they should, therefore, be increased to more closely conform to actual current values. The low stock prices now in use result in understating the value of material and supplies, the property investment account for heavier relaying rails applied in betterments, and to some extent affect operating expenses by accounting periods. * * *

On May 2, 1956, petitioner's vice president and general auditor, P. J. Kendall, responded to the ICC, as follows:

Effective with our annual inventory to be taken April 30, 1956, stock prices of scrap and secondhand rail are being increased from $5 and $20 a net ton to $10 and $25 a net ton, respectively.

While there is still a difference between the increased stock prices, referred to above, and current values, the current market prices are subject to wide range changes, as experienced in the past. Therefore, we feel that it is best to allow a margin between stock prices and market values in order to avoid continual adjusting of prices with resultant confusion and lack of standardization.

In January of 1957, the ICC advised petitioner:

The prices received by your company for sales of secondhand rail have advanced with the increases in new rail prices. The current price being received for sales of industry grade of relay rail is approximately $55.00 per gross ton and for other grades is approximately $65.00 to $75.00 per gross ton. * * * The stock prices of used other track material also are understated. The continued wide margin between stock prices and actual values results in considerable understatement in asset values. Consideration should be given to increasing stock prices to more nearly represent current values and to meet the requirements of section 7(d) of the general instructions for road and equipment accounts.

In response, petitioner told the ICC it would increase the salvage value of its relay rail from $25 to $30 a net ton.

Petitioner used a $30 salvage value for its relay rail for book and tax purposes during 1959, 1960, and 1961. During the years in controversy, the stipulated market value of the relay rail at issue was as follows:

| Year | FSP | T & NO | StLS |
|------|-----|--------|------|
| 1959 | $69.81 | $71.47 | $68.44 |
| 1960 | 70.73 | 71.08 | 70.84 |
| 1961 | 73.49 | 76.61 | 71.16 |

The statutory notice in this case gives the following as the explanation for the relay rail adjustments in controversy:

> You used Interstate Commerce Commission valuations in determining salvage values for track materials retired or replaced and transferred to supplies or scrap accounts. It is determined that you must use fair market value at the time such materials are replaced or retired in computing salvage value. See Exhibit H, attached, for the detailed computation.

Exhibit H consists of two sets of computations. Pages 257 and 258, therein, show respondent's original approach on audit which was based on cost, and allowing 20-year amortization. Pages 258A through 258C show the adjustment made in the statutory notice which was based on fair market value at the time the rail was picked up, with no amortization.

## OPINION

### *Issues (l) and (ccc)*

Under the retirement-replacement-betterment (RRB) method of accounting, used by petitioner[270] during the years at issue for both book and tax purposes, when petitioner laid original track, it capitalized the costs attributable to the rail and track materials. In the course of its track maintenance, petitioner would remove worn used rail from its track bed with the intention of reusing that rail in areas with lower density traffic. Such rail picked up for reuse is referred to as "relay" rail. Under the RRB method, the cost expensed (and deducted) in connection with the replacement or retirement of the track is reduced by the salvage value of the relay rail.

The question before us is whether the salvage value of the relay rail is determined by reference to its current fair market value,[271] as respondent contends, or by reference to some lesser

---

[270]The present issue involves the relay rail of the former Southern Pacific Co., the Texas & New Orleans Railroad Co., and the St. Louis Southwestern Railway Co.

[271]The fair market value of the relay rail when it was picked up has been stipulated. We

amount,[272] as petitioner contends.

By increasing the salvage value of the relay rail, respondent is obviously reducing petitioner's operating expenses and thereby increasing petitioner's income for the year in which the rail was picked up.

The present issue is raised only as to relay rail which is subsequently laid as an addition or betterment. Under the RRB method, when relay rail is laid in straight replacement, the amount (i.e., salvage value) which had been subtracted from the operating expense account is, at the time of the replacement, added back to the operating expense account. Thus, a "wash" occurs within a short period of time, and it is of no practical importance what figure is used as the salvage value of the relay rail. However, when relay rail is laid as an addition, the salvage value figure is capitalized,[273] and any offsetting increase to operating expense is postponed, often for many years.[274] Because there is no immediate "wash" in the latter situation, when respondent increases the salvage value of relay rail subsequently laid as an addition or betterment, he effectively increases petitioner's income for the year in which that rail was picked up.

This question of the salvage value of relay rail has been the subject of much litigation, and respondent's position, as set forth in Rev. Rul. 67–145, 1967–1 C.B. 54,[275] and Rev. Proc. 68–46, 1968–

---

therefore do not have before us the valuation problem presented in *Chesapeake & Ohio Railway Co. v. Commissioner*, 64 T.C. 352 (1975), and *Seaboard Coast Line Railroad Co. v. Commissioner*, 72 T.C. 855 (1979), on appeal (5th Cir., Feb. 29, 1980).

[272]The stipulated fair market value of the relay rail at issue exceeds the amounts which petitioner employed to reflect the salvage value of that rail during the years at issue. Petitioner states that it used "an assigned value less than its cost" which is "predicated on cost less depreciation." See the discussion below relating to sec. 481. (Petitioner now states that fair market value is a "relevant concept" where such value does not exceed cost.)

[273]When relay rail is laid as a betterment, only the betterment portion is capitalized.

[274]For a more complete discussion of the application of the RRB method in this regard, see *Louisville & Nashville Railroad Co. v. Commissioner*, 66 T.C. 962, 994 (1976), on appeal (6th Cir., July 2, 1978), and *Seaboard Coast Line Railroad Co. v. Commissioner*, *supra* at 869, 883. See also the discussion of the RRB method in our findings of fact and opinion relating to "*Issue (rr)*: Deductions Incident to Relocation Projects."

[275]Rev. Rul. 67–145, 1967–1 C.B. 54, provides that—

"railroads using the 'retirement method' of accounting for depreciation for their track account assets must value their recovered track materials at their fair market values at the time such track materials are replaced or retired and transferred to supplies or scrap accounts (without disposition). In computing the deduction for allowable depreciation for the taxable year on all remaining track account assets, the fair market values of such recovered track materials must be taken into account as offsets against the cost of the replacements and, in the case of

2 C.B. 961,[276] has been consistently upheld. The use of fair market value to determine salvage value in this context has been approved by this Court in *Seaboard Coast Line Railroad Co. v. Commissioner*, 72 T.C. 855 (1979), on appeal (5th Cir., Feb. 29, 1980), and in *Louisville & Nashville Railroad Co. v. Commissioner*, 66 T.C. 962 (1976), on appeal (6th Cir., June 2, 1978);[277] by the Court of Claims in *Missouri Pacific Railroad Co. v. United States*, 204 Ct. Cl. 837, 497 F.2d 1386 (1974), and in *Chicago, Burlington & Quincy Railroad Co. v. United States*, 197 Ct. Cl.

---

retirements, against the basis of the retired assets as reflected in the capital accounts. Such fair market values of the recovered track materials will be reflected in the supplies or scrap accounts as the basis of the recovered track materials transferred to such accounts."

[276]Rev. Proc. 68–46, 1968–2 C.B. 961, provides in part:

Sec. 1. Purpose.

The purpose of this Revenue Procedure is to provide a procedure to make necessary adjustments for tax purposes, to values of recovered railroad track materials in adjusting allowances for depreciation in accordance with Revenue Ruling 67–145, C.B. 1967–1, 54, for taxable years that ended prior to May 8, 1967 (the date when Revenue Ruling 67–145 was published in the Internal Revenue Bulletin).

Sec. 2. Background.

.03 The Internal Revenue Service recognizes that any adjustments to be made in accordance with Revenue Ruling 67–145, for taxable years that ended prior to May 8, 1967, present complex valuation and accounting problems. * * *

Sec. 3. Determinations and Conditions

.01 For taxable years ended prior to May 8, 1967, instead of making fair market value determinations for such years of recovered track materials, taxpayers may determine the value of recovered reusable track materials at an amount equal to the average of the market price for such track materials new, and the market price for such track materials as scrap, as of the taxable year of recovery. Such computed average price will be accepted by the Internal Revenue Service as representing the fair market value of recovered reusable track materials for such taxable years.

.02 [This subsection provides that, instead of recording the changes in the books and records for each year, the taxpayer may include as one adjustment for each taxable year, the difference between the value the taxpayer had been using and the value recomputed pursuant to subsec. .01, *supra*. The amount of each year's adjustment "will then be taken into account ratably over a 20-year period in computing taxable income * * * ."]

The parties have now stipulated "that if in the final disposition of this issue there is an increase in the salvage value * * * for relay rail, the amounts capitalized as a result for tax purposes may be amortized over a 20-year period."

[277]In *Chesapeake & Ohio Railway Co. v. Commissioner, supra*, the parties agreed that fair market value was the proper criterion, and this issue was not before the Court. See 64 T.C. at 389.

*Seaboard Coast Line Railroad Co. v. Commissioner, supra*, and *Louisville & Nashville Railroad Co. v. Commissioner, supra*, were both decided subsequent to the filing of the briefs as to this issue. However, the parties had seen the report of the Special Trial Judge in the *Louisville & Nashville* case and commented on that report in their reply briefs.

264, 455 F.2d 993 (1972), revd. on another issue 412 U.S. 401 (1973);[278] and by the Court of Appeals for the Eighth Circuit in *United States v. St. Louis-San Francisco Railway Co.*, 537 F.2d 312 (8th Cir. 1976), affg. an unreported case (E.D. Mo. 1975, 35 AFTR 2d 75–1317, 75–1 USTC par. 9395).[279]

In view of this extensive authority, we reach the same conclusion herein and hold that the salvage value of petitioner's relay rail is the fair market value of that rail at the time it was picked up. Nothing in the record as to this issue convinces us that a different result should obtain. We do not believe any useful purpose would be served by addressing ourselves to every one of petitioner's many contentions on brief since we believe those arguments are, for the most part, fully discussed (and rejected) in the cited cases. Having carefully considered petitioner's views as to this issue, we see no reason to depart from the position adopted by this Court in the *Seaboard Coast Line* and *Louisville & Nashville* cases. We reaffirm that position.

Petitioner argues unconvincingly that respondent's determination as to this issue was arbitrary and that he therefore has "the burden of coming forward with substantial evidence to make out a prima facie case." Petitioner claims that respondent had no legal rationale for making the adjustments to salvage value and dismisses respondent's position herein as a litigation tactic unsupported by authority. Petitioner also points to some of the (now abandoned) contentions made by respondent in the pretrial stages of this case.

Although the many cases dealing with the relay rail issue were not decided at the time the adjustments at issue were initially made, these cases clearly demonstrate that the position

---

[278]In *Baltimore & Ohio Railroad Co. v. United States*, 221 Ct. Cl. 16, 603 F.2d 165 (1979), the taxpayer did not dispute that fair market value was the proper criterion, and this issue was not before the court. See 603 F.2d at 168.

[279]When an asset is subject to ratable depreciation, it is necessary, at the time the asset is acquired, to estimate its salvage value in the future. However, when an asset is accounted for under the retirement-replacement-betterment method, no such estimate of future salvage value is required. In the case of relay rail, salvage value is determined for RRB purposes at the time the rail is picked up, and the salvage value, under the cited cases, is based on its current market value. Because of this essential difference between ratable depreciation and the RRB method, various authorities relied on by petitioner, which state general principles applicable to the estimation of the future salvage value of ratably depreciable assets, are not applicable to the RRB method. See *Baltimore & Ohio Railroad Co. v. United States*, 603 F.2d at 167 n. 2; *Missouri Pacific Railroad Co. v. United States*, 204 Ct. Cl. 837, 497 F.2d 1386, 1399 n. 18 (1974).

taken by respondent in this case and in Rev. Rul. 67–145, *supra*, is based on a sound legal rationale. They further demonstrate, as we point out herein, that petitioner's application of the RRB method resulted in an overstatement of its operating expenses during each of the years at issue and, therefore, did not clearly reflect income. In such circumstances, respondent has broad discretion to recompute taxable income. See sec. 446(b); *Seaboard Coast Line Railroad Co. v. Commissioner*, *supra* at 875. The fact respondent may not have taken his present position in prior years is not indicative of an abuse of that discretion. *Dixon v. United States*, 381 U.S. 68 (1965); *Seaboard Coast Line Railroad Co. v. Commissioner*, *supra* at 875. Further, to the extent petitioner is suggesting that certain of respondent's pretrial concessions as to this issue place an additional burden on respondent to explain the basis of his actions, petitioner is in error. See *Gobins v. Commissioner*, 18 T.C. 1159, 1168–1169 (1952), affd. per curiam 217 F.2d 952 (9th Cir. 1954). See also *Mills v. Commissioner*, 399 F.2d 744, 749 (4th Cir. 1968), affg. T.C. Memo. 1967–67.[280]

In short, we have been shown no basis for shifting to respondent the burden of going forward with the evidence, and that burden, accordingly, remains on petitioner. Cf. *Figueiredo v. Commissioner*, 54 T.C. 1508, 1513 (1970), affd. by unpublished order (9th Cir. 1973).[281] Even if respondent's motivations and procedures in making the instant adjustments were such as to negate the usual presumption of correctness attaching to his determinations,[282] the result we reach today would be no different. Based on all of the evidence of record and the legal principles applicable thereto, we would still conclude that respondent's determination is correct. See *Nat Harrison Associates, Inc. v. Commissioner*, 42 T.C. 601, 617–618 (1964).

---

[280]*Harris v. Commissioner*, T.C. Memo. 1969–49; *Lovell & Hart, Inc. v. Commissioner*, T.C. Memo. 1970–335.

[281]*Brown v. Commissioner*, T.C. Memo. 1978–234; *Estate of Simkins v. Commissioner*, T.C. Memo. 1978–338.

[282]On the question of the propriety of going behind the statutory notice to examine respondent's motivations and procedures, see generally *Llorente v. Commissioner*, 74 T.C. 260 (1980); *Jackson v. Commissioner*, 73 T.C. 394 (1979), on appeal (2d Cir., June 16, 1980); *Estate of Brim v. Commissioner*, 70 T.C. 15, 22 (1978); *Greenberg's Express, Inc. v. Commissioner*, 62 T.C. 324, 327 (1974); *Suarez v. Commissioner*, 58 T.C. 792, 814 (1972). See also the discussion in *DuBois v. Commissioner*, T.C. Memo. 1980–143.

Additionally, we reject petitioner's contention that its book accounting does not distort income and, therefore, should be controlling for tax purposes. Petitioner relies on section 446(b), which provides that respondent cannot change a regularly used "method of accounting" unless the method "does not clearly reflect income." See the discussion of section 446 in the portion of this opinion entitled "*Issue (g)*: Welded Rail." In view of the fact that petitioner calculated the salvage value of its relay rail in a manner which did *not* clearly reflect its income, we must conclude that the approach followed by petitioner in accounting for the relay rail on its books is not controlling herein. *Louisville & Nashville Railroad Co. v. Commissioner, supra* at 998; *United States v. St. Louis-San Francisco Railway Co., supra.*

Petitioner argues at great length that it applied the RRB method in a manner fully consistent with the accounting requirements of the Interstate Commerce Commission and that respondent should be bound by the ICC rules. However, as we point out in the portions of this opinion entitled "*Issue (g)*: Welded Rail" and "*Issue (ll)*: Freight Car Useful Life," the position of that agency, even if supportive of petitioner's contentions, is not determinative of tax consequences. Our decision herein is controlled by established principles of tax law as articulated in the controlling cases, and the fact that accepted industry accounting practice may suggest a different result does not alter the validity of those principles. See *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522 (1979).

In an alternative argument, petitioner contends that, if respondent's position is upheld, it should be permitted to assign a zero salvage value to its relay rail. Petitioner's argument in this respect is based on a theoretical application of the RRB method which treats rail replacements as mere repairs. Under petitioner's theory, rail replacements would be deductible without having to be reduced by the salvage value of relay rail. This approach is obviously inconsistent with the established rules of the RRB method, and petitioner cites no authority to justify such a radical departure from its customary manner of accounting for replacements. Petitioner simply suggests that, as a consequence of respondent's contentions herein, the Court should decide that salvage value is to be disregarded when replacement costs are deducted.

We find it unnecessary to discuss in detail the theoretical

maze through which petitioner travels to reach this conclusion. Petitioner's strained argument is totally incompatible with the decided cases dealing with relay rail and the RRB method. The cases have consistently held that a *low* salvage value for relay rail (below fair market value) is inappropriate for RRB purposes. Obviously, a *nonexistent* salvage value would be even more objectionable. By the same token, if a *low* salvage value for relay rail does not clearly reflect income under the RRB method, see, e.g., *Louisville & Nashville Railroad Co. v. Commissioner, supra* at 998; *United States v. St. Louis-San Francisco Railway Co., supra,* then a *zero* salvage value would reflect income even less clearly. We have been shown no reason to depart from the rationale of the decided cases in this area, and we decline to do so.

Petitioner bases a further alternative argument on its view that the use of fair market value to determine the salvage value of relay rail will, by virtue of reducing operating expenses, have the indirect effect of taking "appreciation in value" into income during each of the years at issue. As a result, petitioner makes the admittedly "fanciful" contention that this "appreciation in value" should be taxed as a capital gain under the provisions of section 1231.[288] We find no merit in this contention.

Even aside from the problems which necessarily arise in attempting to apply section 1231 to the facts of this case, this alternative argument must fail because it is based on a faulty premise. It is now clear that the use of fair market value in the present context does not create taxable income in the form of unrealized appreciation. In rejecting such a theory in *Seaboard Coast Line Railroad Co. v. Commissioner, supra* at 872, we stated:

---

[288]During the years at issue, sec. 1231, entitled "Property Used in the Trade or Business and Involuntary Conversions," provided in part:

(a) GENERAL RULE. —If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. * * *

This argument has also been considered and decided adversely to petitioner on the ground that what is involved is simply a reduced deduction. *United States v. St. Louis-San Francisco Railway Co.*, 537 F.2d at 315; *Chicago, Burlington & Quincy R. Co. v. United States*, 455 F.2d at 1012.[284]

It follows, therefore, that this is not an appropriate instance in which to discuss the conversion of ordinary income into capital gain. Here, too, we must reject petitioner's alternative argument.[285]

Finally, petitioner argues that, if respondent's position is upheld, he must be viewed as effecting a change in petitioner's "method of accounting," as that term is used in section 481.[286] Section 481 prescribes that certain adjustments are to be made in the computation of taxable income when the "method of accounting" employed to calculate taxable income in a given

---

[284]Although the mere reduction of operating expenses does not create income, note that in *Seaboard Coast Line Railroad Co. v. Commissioner, supra* at 885–886, we held the Commissioner's 1961 adjustment could not exceed the taxpayer's 1961 replacement and retirement deductions.

[285]Petitioner also raises a creation-of-income argument in an attempt to show a flaw in respondent's fair market value approach. Petitioner points out that some relay rail is picked up when a line is retired without being replaced. Under the RRB method, the amount added to the operating expense account in the case of a retirement is not the current high cost of replacement rail, but the capitalized cost of the rail which is picked up. Petitioner argues that, when the cost of the recovered rail is offset by its current fair market value, unrealized appreciation is taxed. While petitioner errs in concluding that taxable income is created (see the discussion in the text), it is true that the salvage value of the rail recovered in a given line retirement may exceed the capitalized cost of that rail. However, the circumstance described by petitioner does not prove any flaw in respondent's theory; it is merely one of the inevitable consequences of the use of the RRB method. It is recognized that not every application of the RRB method will precisely reflect petitioner's income; rather, it is through the "aggregate yearly deductions" that proper balance is achieved. *Chesapeake & Ohio Railway Co. v. Commissioner*, 64 T.C. at 363–365. Cf. *Seaboard Coast Line Railroad Co. v. Commissioner*, 72 T.C. at 883–885. In any event, the situation is ameliorated by the limitation on total offsets during a given taxable year referred to in the preceding footnote.

Furthermore, we would not agree that a different rule for determining salvage value should be applied in this instance, as petitioner suggests, since there is no difference between rail which is recovered when a line is retired and that which is recovered when rail is replaced.

[286]Sec. 481, entitled "Adjustments Required by Changes in Method of Accounting," provides in part:

(a) GENERAL RULE. —In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of the change")—

(1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then

(2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, except there shall not be taken into account any adjustment in respect of any taxable year to which this section does not apply unless the adjustment is attributable to a change in the method of accounting initiated by the taxpayer.

year is different from the one the taxpayer previously used. The purpose of section 481 "is to prevent any income from escaping tax or being doubly taxed solely because of such change in method." *Hanover Insurance Co. v. Commissioner*, 69 T.C. 260, 273 (1977), affd. on another point 598 F.2d 1211 (1st Cir. 1979), cert. denied 444 U.S. 915 (1979). Petitioner believes the application of that Code section in this case will result in adjustments which will produce additional deductions during the years in controversy.

The actual result flowing from the application of section 481 is not apparent from the record. The parties limited their presentation at trial to matters bearing on the salvage value issue, but they did so with the understanding that, if it became necessary, they would be able at a subsequent stage of these proceedings to address themselves to the question of adjustments under section 481. Our discussion is therefore limited to the question of whether petitioner can be regarded, for the purposes of section 481, as being required to use a different "method of accounting" to compute its taxable income when the salvage value of relay rail is determined by reference to its current fair market value. Without such a change of accounting method, section 481 will not apply. See *Schuster's Express, Inc. v. Commissioner*, 66 T.C. 588 (1976), affd. without published opinion 562 F.2d 39 (2d Cir. 1977, 40 AFTR 2d 77–5293, 77–2 USTC par. 9495).

Under the applicable regulations, a "method of accounting" includes not only a taxpayer's overall plan of accounting for gross income or deductions, but also the taxpayer's accounting treatment for any "material item" within the overall plan. Secs. 1.481–1(a)(1) and 1.446–1(e)(2)(ii)(*a*), Income Tax Regs.[287] Where the accounting treatment of a given item involves the proper time to include the item in income or to deduct it, the item is viewed as "material" under the regulations, and any change in the treatment of that item is considered a change in the taxpayer's "method of accounting"; conversely, where the matter of proper timing is not involved, a change in the

---

[287]Sec. 1.481–1(a)(1), Income Tax Regs., refers to sec. 446(e) and the regulations thereunder "for rules relating to changes in methods of accounting." The definition of "method of accounting" under sec. 446 is therefore applicable in cases arising under sec. 481. See, e.g., *Connors, Inc. v. Commissioner*, 71 T.C. 913, 918 (1979). In the portion of this opinion entitled: "*Issue (yy)*: Deduction of Embankment Expenditures," we discuss sec. 446(e), and the regulations dealing with changes in "method of accounting."

accounting treatment of an item will not be considered a change in the taxpayer's "method of accounting." Secs. 1.446–1(e)(2)(ii)(*a*) and 1.446–1(e)(2)(ii)(*b*), Income Tax Regs. See *Schuster's Express , Inc. v. Commissioner, supra* at 597.

There can be little doubt in the present case that respondent is changing the treatment of a "material item." Under the RRB method used by petitioner, an increase in the salvage value of a given quantity of relay rail which is subsequently laid as an addition[288] will, because of the impact on operating expenses, have an effect on the timing of petitioner's deductions.

As we point out above, when petitioner lays rail in replacement, the result of its accounting procedure is to reduce its replacement deduction by the salvage value of the relay rail. That salvage value is subsequently deducted when the relay rail (relaid as an addition) is retired in a later year. When respondent increases the salvage value, he reduces even further the deduction in the first year and, correspondingly, he increases the deduction in the later year in an equal amount. Although respondent's adjustment changes the amount deducted in each of the years, the total amount of petitioner's deductions remains unchanged by the adjustment.[289]

The net effect of respondent's action is to move a portion of the deduction from the first year to the later year. The affected portion is equal to the difference between the salvage value advanced herein by respondent and the salvage value used by petitioner during the years at bar.[290] Thus, to the extent of this difference, the present issue involves a question of the proper year in which to take a deduction, and the regulatory "timing" requirement is satisfied. *Connors, Inc. v. Commissioner*, 71 T.C.

---

[288]The present discussion also has reference to relay rail relaid as a betterment—to the extent of the betterment.

[289]For example, suppose an RRB taxpayer's replacement cost in a project was $1,000, and the salvage value of the relay rail was $200. The taxpayer's replacement deduction in the first year is $800 ($1,000 - $200). In the year in which the relay rail is retired (having been relaid as an addition), the taxpayer deducts $200 (the salvage value amount which had been capitalized). The taxpayer's total deduction is $1,000 ($800 from the first year and $200 from the later year).

Further, suppose that the Commissioner's adjustment increases the salvage value figure to $300. The result is that the first year deduction is now $700 ($1,000 - $300). However, because the later-year deduction is now $300, the total of the two deductions ($700 + $300) is the same as it was before the adjustment ($1,000).

[290]In the example in the previous footnote, the difference is equal to $100 ($300 - $200), and the Commissioner's adjustment has the effect of moving that $100 deduction from the earlier to the later year.

913, 919 (1979); *Schuster's Express, Inc. v. Commissioner, supra* at 596–597.[291]

It is clear, however, that even a change in treatment of a "material item" will not be viewed as a change in the taxpayer's "method of accounting" where the new accounting treatment is the result of "change in underlying facts." Secs. 1.446–1(e)(2)(ii)(*b*) and 1.446–1(e)(2)(iii), examples (*3*) and (*4*), Income Tax Regs. Respondent believes this exception to the general rule is to be applied in the present circumstances. We do not agree.

In the portion of this opinion entitled "*Issue (yy)*: Deduction of Embankment Expenditures," we addressed ourselves to petitioner's argument that the issuance of an opinion by the Court of Claims (in which certain deductions were allowed) made it permissible for petitioner to alter its treatment of a "material item" under section 446. In rejecting petitioner's contention that the promulgation of the opinion was within the purview of the term "change in underlying facts," we observed that the court opinion did not create any change in the factual circumstances surrounding the making of the contested expenditures. We concluded that petitioner had changed its "method of accounting."

Similarly, in connection with the present issue, the new accounting treatment is not the result of a change in any of the factual circumstances relating to the relay rail. We cannot accept respondent's argument that his adjustment to petitioner's salvage value figures is occasioned by a change in the "underlying fact" of fair market value. While it appears true that the market value of relay rail was increasing, we do not view respondent as merely adjusting an estimate of market value in order to account for that increase. Rather, the purpose of respondent's adjustment herein is to establish fair market value as the applicable standard.

Our conclusion in this respect is compatible with the conclusions reached by the Court of Claims in *Baltimore & Ohio Railroad Co. v. United States*, 221 Ct. Cl. 16, 603 F.2d 165 (1979), a case decided subsequent to the filing of the briefs as to this issue. The taxpayer in that case was a railroad which had

---

[291]Note that in *Schuster's Express* we suggested the application of sec. 481 was warranted where the taxpayer's accounting practices properly reflected an item's effect on the taxpayer's *lifetime* income and the only question was the year in which the item was to have an impact.

consistently calculated the salvage value of its relay rail under the RRB method at 75 percent of the price for new rail. However, for the taxable year 1955, the taxpayer decided to use, instead, the fair market value of the relay rail as the measure of its salvage value.[292] The taxpayer initiated this change because during 1955 the fair market value of the used rail was less than 75 percent of the price of new rail. Thus, contrary to what is usually the case, the switch to the fair market value approach resulted in *increased* deductions for the taxpayer when it recovered its relay rail. Although the Government favored the use of fair market value, it argued that the taxpayer could not lawfully make this switch. The Government claimed the taxpayer's change in the manner in which it calculated salvage value was a change in its "method of accounting" under section 446(e). Because the taxpayer had not obtained the required prior approval of the Commissioner for the new "method of accounting," the Government argued the taxpayer was required to continue to value the relay rail in its customary manner.[293]

In deciding that the taxpayer had not used a different accounting method and therefore did not need the Commissioner's consent, the Court of Claims stated (603 F.2d at 170):

The 75 percent of new rail price formula used by plaintiff [taxpayer] on its 1955 books and tax returns, like the valuation formulas in Rev. Proc. 68–46 and *Chesapeake and Ohio Railway Co., supra* [64 T.C. at 392], is a formula designed to reflect fair market value. [Fn. ref. omitted.]

As a result, the court concluded that the taxpayer had simply replaced one method of estimating fair market value with another. "Such a switch," the court held, "is not a change in accounting method, but a mere change in the underlying facts brought about by the adoption of a more accurate valuation formula." 603 F.2d at 170. The court added, however, that if the taxpayer's previous valuation formula had been "based wholly

---

[292]The parties in the *Baltimore & Ohio* case stipulated as to the proper formula to be used in calculating fair market value.

[293]The need for a taxpayer to obtain the Commissioner's consent under sec. 446(e) is discussed in the portion of this opinion entitled: "*Issue (yy)*: Deduction of Embankment Expenditures."

In arguing in the *Baltimore & Ohio* case that the change to the fair market value approach was a change in "method of accounting," the Government appears to have taken a position opposite to the one advanced in other relay rail cases. See *Baltimore & Ohio Railroad Co. v. United States, supra* at 168 n. 5.

or partially on historic cost of rail," the switch to a fair market value approach would *not* be a "change in underlying facts." 603 F.2d at 170 n. 11. In such an instance, the court concluded there would be change in "method of accounting," under section 446.

In the instant case the Commissioner, and not the taxpayer, effected the change in the manner of determining relay rail salvage value, and the question of consent under section 446(e) is obviously irrelevant.[294] However, because a "method of accounting" under section 446 is also a "method of accounting" for the purposes of section 481, the views of the Court of Claims in the *Baltimore & Ohio* case are pertinent to our present inquiry.

The critical distinction between the present case and the *Baltimore & Ohio* case is that, here, the $30 salvage value figure used by petitioner during the years at issue was not an approximation of the fair market value of the relay rail. While it may have been the desire of the ICC during the years at issue that petitioner assign a value to salvage that was more closely in line with current market values,[295] it seems clear that petitioner did not do so.

The salvage value of $30 used by petitioner in the years before us was simply an "assigned value" which was in no way related to fair market value. At the request of the ICC, petitioner increased its assigned salvage value from $20 to $25 and from $25 to $30, but these small increases were obviously not intended to approximate fair market value. While the evidence does not establish with any precision the factors which petitioner considered in making its salvage value computation, the testimony of petitioner's witnesses suggests that petitioner was, initially at least, utilizing a cost-less-depreciation approach, or attempting

---

[294]Where it is the Commissioner who effects a change in accounting method, the focus under sec. 446(b) is on whether the Commissioner has abused his discretion in determining that the taxpayer's method did not clearly reflect income. See "*Issue (g)*: Welded Rail."

[295]The language employed by the ICC in its accounting instructions over the years ("fair prices for the material in its condition as recovered" (1914); "deducting a fair allowance for depreciation from current prices of the material as new" (1952 and 1957); and "deducting a fair allowance from current prices of the material as new" (1962)) shows that the ICC expected salvage value to approximate the price that could currently be received for the reusable rail. This conclusion is bolstered by the communications between the ICC and petitioner, as set forth in our findings of fact.

While the position of the Interstate Commerce Commission may have changed subsequently, our findings herein show the ICC position as it related to petitioner's relay rail during the years at bar.

to estimate the salvage value of the rail when it would ultimately be sold for scrap. Furthermore, petitioner has always contended that salvage value cannot exceed cost, which it could very well do in a period of rapidly rising prices if salvage value is equated with fair market value.[296] But whatever the basis for petitioner's assigned salvage value, it clearly was not based on fair market value of the relay rail when lifted.[297]

In the *Baltimore & Ohio* opinion, the Court expressed the view that a change from a valuation formula based wholly or partially on cost to one based on fair market value would not be a "change in underlying facts" under the regulations. See 603 F.2d at 170 n.11. The court noted that formulas based on cost "are conceptually different in that they are not designed to reflect fair market value," 603 F.2d at 170 n. 9. However, we do not read the opinion of the Court of Claims as suggesting that the only time there would not be a "change in underlying facts" is when there is a switch from a cost figure for salvage to a market value figure. Rather the language in that case makes it clear that the court would have concluded there was no "change in underlying facts" if the taxpayer had been using *any* approach which was not directed at estimating fair market value. The soundness of such a result is readily apparent in a case like the one at bar in which respondent's approach for calculating salvage value is totally inconsistent with petitioner's and in which respondent's use of fair market value does not find its justification in any altered circumstance involving the relay rail.

While we recognize that the accounting procedures for inventories may differ from the accounting procedures for relay rail, several of the examples included in section 1.446–1(e)(2)(iii), Income Tax Regs., are consistent with our conclusion here. Example (5) provides that a change in the basis for valuation of inventories from cost to the lower of cost or market is a change in an overall practice of valuing items of inventory, and is therefore a change in "method of accounting." Example (6) provides that a change requiring appropriate allocation of

---

[296]Prior to the issuance of Rev. Rul. 67–145, *supra*, respondent's position apparently was that the railroad should use the lower of cost or fair market value in valuing relay rail. Respondent so advised the Atchison, Topeka & Santa Fe in a Technical Advice issued in 1965.

[297]The $30 salvage value figure used during 1959, 1960, and 1961 was less than 50 percent of the fair market value of the relay rail during those years, as stipulated by the parties.

overhead is a change in "method of accounting" because it involves a change in the treatment of a "material item" used in the overall practice of identifying or valuing items of inventory.

We conclude that respondent's adjustment is, therefore, not the result of a "change in underlying facts," as that term is used in section 1.446–1(e)(2)(ii)(*b*), Income Tax Regs. Accordingly, we hold that, on the facts of this case, respondent's adjustment to salvage value effects a change in petitioner's "method of accounting" under section 481.

We decide the salvage value question for respondent and (to the limited extent it is before us) the section 481 question for petitioner.

## XIII. DEPRECIATION OF REPLACEMENT FACILITIES[298]

This issue presents the following questions for our consideration:

Whether petitioner received nonshareholder contributions to its capital under section 113(a)(8) of the 1939 Code, justifying depreciation deductions under section 167 of the 1954 Code, when (pursuant to various pre-June 22, 1954, transactions) petitioner acquired replacement railroad facilities which were paid for by governmental bodies.

Whether "terms letter" agreements entered into by the parties prior to the years at issue prevent petitioner from taking the depreciation deductions claimed herein.

### FINDINGS OF FACT

#### *Issue (aaa)*

Some of the facts relating to this issue have been stipulated by the parties, and those facts, with associated exhibits, are incorporated herein by this reference.

This issue relates to various transactions, described below, which involved the predecessor Southern Pacific Co., the former Southern Pacific Co., the Central Pacific Railway Co., the Texas & New Orleans Railroad Co., and the El Paso & Southwestern Railroad Co., hereinafter sometimes referred to individually or collectively as petitioner.

---

[298]In trying and briefing this case, this issue was referred to by the parties as "*Issue (aaa)*."

Subsequent to December 31, 1920, and prior to June 22, 1954, various governmental bodies bore the cost of the construction of assets for each of the above-named railroad companies. This construction at public expense of new railroad facilities was, in the typical case, done to replace facilities retired from service by reason of construction projects by public authorities. Twenty-one transactions are in dispute in which petitioner acquired such facilities. Information pertaining to the relevant projects is provided in the table on pages 748–749.

The amounts shown in the table on pages 748–749 do not include the costs of constructing the elements of grading and tunnel bores covered by *Issue (pp)*[299] in this case, totaling $10,774,722 in ICC Account 3 and $1,390,364 in Account 5. Also not included in the amounts above are further costs involving assets covered by Accounts 8 (ties), 10 (other track material), 11 (ballast), and 12 (tracklaying and surfacing), totaling in the aggregate $5,032,183. Further costs, totaling $2,250,211, pertaining to assets such as land, are also not included in the amounts shown in the table.

Additional information regarding each of the 21 transactions is provided below. In the summary which follows, the word "Government" is used to refer to the governmental entity (or contracting agency) listed in the table as having been involved in the named project, and the word "petitioner" is used to refer to the railroad listed for that project:

*Shasta Dam.*—A dam and reservoir to be constructed by the Government on the Sacramento River was to submerge approximately 36 miles of petitioner's railroad line. The Government transferred new rights-of-way to petitioner, and a new railroad line was constructed, the Government paying for all construction on the substituted line.

*Roseville "Hold Yard" Transfer.*—The Government leased certain land from petitioner and constructed trackage and appurtenances thereon (a "hold yard") at its own expense. Under the lease, petitioner could require restoration of the premises to its original condition. Several years later, the lease was terminated by mutual consent, and petitioner gave notice that it wanted to have the premises restored. Restoring the yard

---

[299] See the portion of this opinion entitled: *"Issue (pp)*: Grading and Tunnel Bore Useful Life."

| Project reference | Railroad involved[1] | Approximate starting and completion dates | Total costs[2] | Governmental entity and/or contracting agency |
|---|---|---|---|---|
| Shasta Dam | CP | 1938–42 | $4,370,027 | U.S. Dept. of Interior, Bureau of Reclamation |
| Roseville "Hold Yard" Transfer | CP | 1943–48 | 3,085 | U.S. Army Corps of Engineers |
| Tinemaha Dam | CP | 1927–31 | 18,906 | City of Los Angeles |
| Davis Monthan Air Force Base | EP & S | 1951–52 | 25,691 | U.S. Army Corps of Engineers |
| Oakland, Calif., crossover | PSP | 1937–39 | 58,344 | State of California |
| Compton Creek channel | PSP | 1933–38 | 74,469 | Los Angeles County Flood Control District (U.S. Army Corps of Engineers) |
| Verdugo Wash channel | PSP | 1938–39 | 46,641 | U.S. Army Corps of Engineers |
| Sepulveda Dam | PSP | 1940–41 | 71,029 | U.S. Army Corps of Engineers |
| Fern Ridge Dam | PSP | 1941 | 7,205 | U.S. Government War Department |
| Eugene, Oreg., highway relocation | PSP | 1945 | 14,282 | Oregon Highway Department U.S. Government |
| Front Street, Coos Bay, Oreg. | FSP | 1950–51 | 512 | Oregon Highway Commission |
| Vail, Ariz. | FSP | 1951–52 | 154,956 | U.S. Army Corps of Engineers |
| Lookout Point (Meridian) Dam | FSP | 1947–52 | 4,190,950 | U.S. Army Corps of Engineers |

| | | | | |
|---|---|---|---|---|
| Santa Clara River Bridge | PSP | 1928 | $22,837 | City of Los Angeles |
| All American Canal Bridge | PSP | 1935–37 | 94,810 | U.S. Dept. of Interior, Bureau of Reclamation |
| Harvey, La., Bridge | T & NO (Successor) | 1931–34 | 101,431 | U.S. Army Corps of Engineers |
| Neches River crossing | T & NO | 1939–40 | 179,338 | U.S. Army Corps of Engineers |
| Baldwin, La., Bridge | T & NO | 1939–41 | 313,518 | U.S. Army Corps of Engineers |
| Wax Lake Outlet | T & NO | 1940–41 | 678,382 | U.S. Army Corps of Engineers |
| Berwick Bay | T & NO | 1941–42 | 113,189 | U.S. Army Corps of Engineers |
| Central Blvd., Dallas, Tex. | T & NO | 1951 | 2,980 | City of Dallas |

[1] The railroad companies involved in the 21 transactions were the predecessor Southern Pacific Co. (PSP), the former Southern Pacific Co. (FSP), the Central Pacific Railway Co. (CP), the Texas & New Orleans Railroad Co. (T&NO), and the El Paso & Southwestern Railroad Co. (EP&S).

[2] These costs have been stipulated by the parties to be at issue. The breakdown of these amounts into the appropriate Interstate Commerce Commission accounts has also been stipulated as have the tax depreciation rates applicable to such accounts and the computation of the additional depreciation pursuant to petitioner's claim herein. In the case of the project designated Roseville "Hold Yard" Transfer, the stipulated amounts reflect value at the time of transfer of ownership rather than cost of construction.

to its original state would have involved considerable expense, and the Government felt it advantageous not to do so. Petitioner and the Government agreed that (1) the Government would transfer the improvements to petitioner for $25,000, and (2) petitioner would accept the improvements (the cost of which exceeded $25,000) in lieu of the performance by the Government of its obligation of restoration.

*Tinemaha Dam.*—A dam and reservoir constructed by the Government in the Owens Valley was to submerge part of petitioner's railroad line. The Government paid for the construction of a replacement for that portion of the railroad line over a new right of way.

*Davis Monthan Air Force Base.*—The construction of new runways by the Government necessitated the relocation of petitioner's railway line. It was the intention of the Government to acquire a portion of the rights-of-way and facilities of petitioner required to construct this project and to make petitioner whole by the construction of new facilities. The parties agreed that the measure of just compensation to petitioner was the cost of physical relocation, alteration, and removal of petitioner's existing facilities and the cost of acquisition of rights-of-way, and the replacement of facilities which existed on the abandoned line. The Government reimbursed petitioner for all costs incurred by petitioner in the performance of this contract. The relocation, rearrangement, or alteration of the facilities was to put petitioner as nearly as practicable in its existing condition as of the date of the contract. Any betterment which petitioner desired to install or construct superior in capacity or in quality to the previously existing facilities was to be at petitioner's own expense.

*Oakland, Calif., Crossover.*—Incident to the construction of a separate grade and crossing where another railroad crossed over petitioner's lines, replacement railroad facilities for petitioner were constructed. The Government paid for this construction.

*Compton Creek Channel.*—An agreement between petitioner and the Government (local) provided for a flowage easement and construction of a trestle over the Compton Creek flood control channel; it further provided that the Government (Federal) would bear the cost of reconstruction of the trestle if the channel were widened. When the channel was later widened, the Government (Federal) paid the cost of replacing the old trestle

with a girder bridge. Additional flowage easements were given to the Government.

*Verdugo Wash Channel.*—The Government deepened the Verdugo Wash flood control channel across which petitioner had a railroad bridge at West Glendale, Calif. The deepening of the channel made it necessary to replace the existing bridge. The Government paid for the replacement, which was a 95-foot deck-plate girder span on concrete abutments.

*Sepulveda Dam.*—The construction of a dam by the Government as part of a flood control project was to result in the flooding of part of petitioner's railroad line. The Government paid for the construction of a replacement of that portion of the line on a new right-of-way.

*Fern Ridge Dam.*—The construction of a dam and reservoir by the Government in Oregon as part of the Willamette River basin flood control project was to submerge a portion of petitioner's railroad line which was below sea level. A 7,000-foot segment of roadbed and embankments was to be inundated by overflow and backwater and it became necessary to raise the line above the water level and to protect the side of the embankment facing the reservoir. The agreement between petitioner and the Government granted the Government the right to overflow all of petitioner's rights-of-way and other property lying below a certain mean sea level. In return, the Government paid to petitioner the cost of elevating sections of track for an aggregate distance of 7,000 feet and to do other necessary work so that the subgrade of the track would not be less than 4 feet above the maximum high water level in the reservoir.

*Eugene, Oreg., Highway Relocation.*—The Government relocated and built the Pacific Highway through eastern Eugene. The highway construction required the removal of petitioner's railroad line and the construction of new railroad line near the Springfield junction. The Government assumed the cost of the new line, except for the cost of concrete abutments for two structures to provide for a second track and other betterments.

*Front Street, Coos Bay, Oreg.*—Because the Government decided to relocate a highway, it became necessary for petitioner to remove part of its railway line and to construct a replacement for the removed portion. Costs were borne by the Government. Additionally, there was an exchange of land.

*Vail, Ariz.*—The Government's expansion of Davis Monthan

Air Force Base necessitated the removal of 14 miles of railroad line and the construction of a new line over a new right-of-way. The costs were paid for by the Government.

*Lookout Point (Meridian) Dam.*—The construction by the Government of a dam and reservoir on the Willamette River in Oregon necessitated the relocation of a portion of petitioner's railroad line and the abandonment of certain of its facilities. In acquiring these assets, it was the Government's intention to make petitioner whole by paying for the construction of the replacement line. By contract, petitioner agreed to convey the indicated assets and to accept the construction payments. The line involved was approximately 22 miles long and ran between Lookout and Jasper, Oreg.

*Santa Clara River Bridge.*—A reservoir owned by the Government broke, and the resultant flood washed out petitioner's bridge across the Santa Clara River. A new bridge was constructed, and the expense was reimbursed by the Government pursuant to a claim filed by petitioner.

*All American Canal Bridge.*—The Government, in constructing the All American Canal, had to cross petitioner's line in California, and it became necessary to construct a railroad bridge over the canal. The Government paid for the construction and was granted an easement under the bridge for the canal.

*Harvey, La., Bridge.*—Owing to the construction of the Louisiana-Texas Intracoastal Waterway by the Government, it became necessary to construct a moveable bridge to permit petitioner's railroad line to cross a new canal. The moveable bridge replaced a draw bridge. The costs of constructing the bridge and raising and realigning the track were paid for by the Government.

*Neches River Crossing.*—Pursuant to an order of the Secretary of War, requiring petitioner to provide improved horizontal and vertical clearance for navigation where its railroad line crossed the Neches River in Texas, an existing swing span was replaced with a 230-foot bascule lift span. This change necessitated new bridge piers, new fenders, a new approach span, and other approach changes. The Government paid for part of the costs involved.

*Baldwin, La., Bridge.*—The Government constructed the new Charenton Drainage and Navigation Canal to provide a navigable connection to the Intracoastal Waterway and to provide for

drainage. As a result, a 204-foot double-track swing bridge with approach girder bridges (together with appurtenances) was constructed to permit petitioner's railroad line to cross the canal. The Government paid for the related costs. (This project is related to the two following projects; all three are covered by the same contract between petitioner and the United States Army Corps of Engineers.)

*Wax Lake Outlet.*—In connection with Government projects for the control of floods along the Mississippi River and some of its tributaries, a single-track bridge (comprised of three 400-foot main spans and two 70-foot approach girder spans), together with appurtenances, was constructed to carry petitioner's railroad line over Wax Lake Outlet in Louisiana. All costs, except for a small section of siding, were paid for by the Government.

*Berwick Bay.*—In connection with the flood control projects mentioned immediately above, it was necessary to raise petitioner's existing railroad bridge over Berwick Bay (Atchafalaya River) by 4 feet and to make changes to the approaches to the bridge. The Government paid for the construction costs.

*Central Boulevard, Dallas, Tex.*—The Government extended Central Boulevard onto petitioner's right-of-way, and it was necessary to construct a replacement for petitioner's railroad line to connect with other lines going into Dallas Union Passenger Station. Costs were borne by the Government.

The new facilities acquired by petitioner as a result of the above-described projects were constructed either by petitioner or on its behalf. The new facilities were owned entirely by petitioner.[300]

In some instances, the newly constructed replacement lines paid for by the Government had advantages over the old lines. In other instances, the new lines had disadvantages when compared to the lines they replaced. For example, the lines constructed in connection with the Shasta Dam project had more advantages for petitioner than disadvantages, while the reverse was true for the lines constructed in connection with the Davis Monthan Air Force Base and Fern Ridge Reservoir projects. In

---

[300]Petitioner has never included in income for Federal income tax purposes the cost or value of the assets, constructed at Government expense, which it acquired as a result of these projects.

still other instances, the advantages and disadvantages were viewed as balancing each other out.

Although new, unseasoned railroad line can require extraordinary maintenance for a period of years, petitioner was generally reimbursed by the governmental bodies for its expenses for extraordinary maintenance for a 5-year period. Ordinary maintenance costs remained the same in most cases.

Many of the public construction projects which gave rise to the transactions at issue involved the U.S. Army Corps of Engineers (hereinafter sometimes referred to as the corps) and, in those transactions, it was the corps with whom petitioner dealt in arranging for the reconstruction of its facilities.

Petitioner and the corps discussed the design and the engineering standards and requirements of the replacement facility. The purpose of these discussions was to assure there would be a replacement in kind of the old facilities, with similar loadings and comparable design criteria. For example, even if a steel trestle was to replace a wooden one, it would be designed for the same load limitation. The new facilities were not designed to produce operational advantages for petitioner (such as allowing for greater speeds), although occasionally such advantages may have been a fortuitous by-product of the reconstruction.

To the extent that the replacement facility would be a betterment (e.g., a two-lane bridge replacing a single-lane bridge, or heavier track replacing lighter track), petitioner would pay for the difference in cost. In this instance, there was bargaining between petitioner and the corps as to dollar amounts. Aside from this bargaining relating to betterments, the negotiating between petitioner and the corps was directed solely at producing railroad facilities with the same characteristics as the one being replaced and not at producing financial benefits or advantages for the respective parties.

Although the corps had a power of condemnation, the corps regarded condemnation as something to be used only as a last resort. In practice, this power was not exercised in railroad relocations.

A War Department circular letter of October 4, 1939, published by the Office of the Chief of Engineers and applicable to the corps, set forth directions for drafting special contracts for relocation or reconstruction of public utilities, including relocation of railroad lines submerged in Federal reservoir areas and

reconstruction of bridges whose original sites were necessarily preempted by the United States. Because of the nature of the construction involved in relocation of railroad lines, it was usually considered to be "to the advantage of both parties that the railway company should itself carry out the rehabilitation in whole or in part, and that the United States should reimburse it for its just expenditures for that purpose." It was noted that title to the facilities newly constructed at the expense of the United States did not pass to the United States, but instead the new facilities were constructed because "the United States has lawfully taken * * * certain tracks of a railway company * * * and is legally obligated to make compensation therefor." Compensation would include reimbursement for "excess maintenance," and this included not only the extra maintenance required while a new line became seasoned, but also the proportionately increased costs of maintenance due to "any increase in length of track." (This last provision was qualified in 1950.) Because the railroad was "entitled only to be restored, as nearly as practicable, to status quo," the cost of any betterments desired by the railroad to be incorporated in the new facilities being constructed to replace those being destroyed by the public project was required by the War Department to be borne by the railroad.

In the case of right-of-way land, as opposed to the structures and equipment, title to the railroad's old right-of-way land had to vest in the United States, and the War Department's circular letter stated that "titles to the new rights-of-way [when] acquired in the name of the United States * * * may be conveyed to the Railway Company upon completion of the relocation, by way of exchange for the company's conveyance to the United States of its abandoned right-of-way."

As to structures and equipment, the War Department's circular letter prescribed that material of value in the old railroad line be salvaged, and because, "As a rule, their value is greater to the Railway Company * * * it is preferable that it salvage and take title to such property * * * and that corresponding credits be made to the United States therefor" by reducing reimbursements by the United States to the railroad for reimbursable costs borne by the railroad. Recent contract

instructions include the remark that, "Of course, in the case of a railroad * * * the owner is entitled to salvage value, if any."[301]

It was never the intention of the Army Corps of Engineers to donate assets as a contribution to petitioner's capital or in any way to improve petitioner's financial state. The corps wanted only to replace in kind the facilities petitioner would no longer be able to use. The corps had no desire or purpose to increase petitioner's business, or to produce a percentage of return on the reconstructed assets, or to decrease petitioner's ordinary maintenance costs. It was never the intention of the corps that the replacement facilities should be compensation or payment for services rendered or should benefit petitioner commensurate with their value. The corps was unconcerned about matters relating to the production of income for petitioner.

In accounting for the transactions on its books, petitioner would subtract from its investment accounts the capitalized amount relating to the facilities retired from service and add to its investment accounts the cost of the new railroad facilities. For tax purposes, however, the total amount which petitioner added to the investment account for the new facilities was equal to the previously capitalized amount relating to the old facilities. Accordingly, there was no net change in petitioner's tax basis by virtue of the construction projects.[302] Petitioner's claim herein relates to the difference between the amounts which it capitalized on its books to reflect the new facilities and the lesser amounts which it capitalized for tax purposes to reflect those facilities.

This issue was raised by petitioner in its "Amendments to Petition," filed on May 23, 1973, and was amended in its "Amendment of Petition to Conform to the Proof at June 1975, May 1976, and July 1977 Trials," filed on February 9, 1979.[303] The 1979 amendment states (in part) as to this issue:

---

[301]In the various public projects involved in this issue, if there was any salvage it was generally retained by the railroad. In several projects, the railroad retained the salvage and gave credit to the public entity for some or all of the value thereof, against costs to be reimbursed by the public entity. Only in one project was any salvage retained by the governmental body—the Tinemaha Dam project. In the Shasta Dam project, the United States could require petitioner to purchase the salvage, and in the Lookout Point (Meridian) Dam project, petitioner was given an option to buy the salvage.

[302]Furthermore, the net effect of petitioner's accounting approach was to produce no deduction for income tax purposes as a result of the retirements.

[303]In requesting the 1979 amendment, petitioner said it was seeking (1) to limit this issue to property that met the requirements enunciated in *United States v. Chicago, Burlington &*

(aaa) The Commissioner erred in failing to allow deductions for depreciation in the amounts of $330,697.00, $334,594.00, and $334,594.00 for the taxable years ended December 31, 1959, 1960, and 1961, respectively, with respect to certain property received by the former Southern Pacific Company and railroad subsidiaries as "donations" prior to June 22, 1954.

## OPINION

### *Issue (aaa)*

This issue involves 21 transactions in which a governmental body, prior to June 22, 1954, paid for assets acquired by petitioner. In the typical case, a Government construction project in the vicinity of one of petitioner's railroad lines necessitated the abandonment or removal of certain of petitioner's facilities and the construction of new facilities to replace them. The costs of the replacement facilities were borne by the governmental body.[304]

Petitioner claims it is entitled to depreciate the cost of these assets.[305] Petitioner premises this claim on its view that it acquired the assets as a result of nonshareholder contributions to its capital. Under section 113(a)(8) of the 1939 Code, the basis for depreciating such assets is "the same as it would be in the hands of the transferor," with adjustments.[306]

---

*Quincy Railroad Co.*, 412 U.S. 401, decided June 4, 1973, and (2) to include assets which were "inadvertently omitted" from the 1973 amendment. The 1979 amendment was permitted by the Court in an order and memorandum sur order, dated Feb. 9, 1979, in view of the fact that the parties, at trial and on brief, had been in agreement as to which assets and transactions were in dispute and, therefore, had dealt with *Issue (aaa)* as though the amendment had already been made.

[304]Some of the transactions at issue differed from the norm, and they are discussed subsequently in this opinion. The discussion which follows relates to the typical transaction described above.

[305]Sec. 23(1) of the 1939 Code and sec. 167(a) of the 1954 Code allow a taxpayer as a depreciation deduction "a reasonable allowance for the exhaustion, wear and tear * * * of property used in the trade or business."

As explained in our findings, petitioner's claim herein is only with reference to the difference between (1) the costs of the new facilities and (2) the amounts which had been capitalized on its books as the investment in the old facilities. (Petitioner believes, however, that the full costs of the new facilities are reflective of a contribution to its capital.)

[306]See also sec. 114(a) of the 1939 Code. Note that, under the 1954 Code, the rule is different. Sec. 362(c) now provides for a zero basis for assets contributed to the capital of a corporation by a nonshareholder after June 22, 1954.

Sec. 113(a)(8) of the 1939 Code provided that if "property was acquired after December 31, 1920, by a corporation * * * as paid in surplus or as a contribution to capital, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made." This rule remains pertinent for our

Respondent's position is that the governmental bodies were not making contributions to petitioner's capital and that, as a result, petitioner has no additional basis in the assets and is not entitled to the claimed depreciation deductions.

The leading case on this issue is *United States v. Chicago, Burlington & Quincy Railroad Co.*, 412 U.S. 401 (1973).[307] There, the taxpayer (CB & Q), prior to June 22, 1954, had constructed facilities at highway-railroad intersections and elsewhere which were paid for out of Government funds appropriated to further public safety and improve highway systems. CB & Q claimed that the governmental subsidies were contributions to CB & Q's capital under section 113(a)(8) of the 1939 Code and that the facilities were therefore depreciable by CB & Q. The Court of Claims had agreed with CB & Q.[308] The Supreme Court, however, held that the governmental subsidies were not contributions to capital and that the assets in question therefore had a zero basis and were not depreciable.

The Supreme Court acknowledged that, in determining whether or not there had been a nonshareholder contribution to capital, prior cases of the Court had examined the transferor's motive or intent. Where the transferor had intended no contribution to capital (intending instead to pay for corporate services), the assets were held to be nondepreciable. *Detroit Edison Co. v. Commissioner*, 319 U.S. 98 (1943). On the other hand, where the transferor *did* intend to make a contribution to capital (seeking advantage for the general community but expecting no direct personal benefit), the assets were held to be depreciable. *Brown Shoe Co. v. Commissioner*, 339 U.S. 583 (1950).

Apparently concluding that the intent of the transferor is not a wholly satisfying independent criterion for determining whether or not there has been a nonshareholder contribution to capital, the Supreme Court observed that other features of such

present purposes by virtue of the provisions of sec. 1052(c) of the 1954 Code, which provides that if property was acquired after Feb. 28, 1913, in a transaction to which the 1939 Code applied, and the basis thereof was prescribed by sec. 113(a)(8) of the 1939 Code, then for purposes of subtitle A the basis shall be the same as the basis therein prescribed by the 1939 Code.

[307]The cited case is sometimes hereinafter referred to as the *CB & Q* case.

[308]*Chicago, Burlington & Quincy Railroad Co. v. United States*, 197 Ct. Cl. 264, 455 F.2d 993 (1972), revd. 412 U.S. 401 (1973).

a contribution were "implicit" from the *Detroit Edison* and *Brown Shoe* opinions:

> We can distill from these two cases some of the characteristics of a nonshareholder contribution to capital under the Internal Revenue Codes. It certainly must become a permanent part of the transferee's working capital structure. It may not be compensation, such as a direct payment for a specific, quantifiable service provided for the transferor by the transferee. It must be bargained for. The asset transferred foreseeably must result in benefit to the transferee in an amount commensurate with its value. And the asset ordinarily, if not always, will be employed in or contribute to the production of additional income and its value assured in that respect. [412 U.S. at 413.]

The Court applied these criteria to the CB & Q assets constructed with public funds. While the Supreme Court recognized that the assets may have possessed some of the characteristics of a contribution to capital (e.g., they were not payments for services provided by the taxpayer), the Court emphasized those characteristics which established the assets were *not* such contributions: (1) The facilities were not in any real sense bargained for and most likely would not have been built had the governmental bodies not required them. (2) Any economic benefit to the railroad was marginal, and no substantial benefit in terms of the production of income was foreseeable or taken into consideration by the governmental bodies. The facilities were constructed for the public benefit to improve safety and highway traffic flow, and the taxpayer's need for capital funds was not considered. (3) The facilities were peripheral to the taxpayer's business and did not materially contribute to the production of additional income. ("They simply replaced existing facilities or provided new, better, and safer ones where none otherwise would have been deemed necessary." 412 U.S. at 414.) Any incremental financial benefits (from lower accident rates, reduced expenses, and higher train speed) were incidental and insubstantial when compared to the amount sought to be depreciated. See 412 U.S. at 413–415. Given these factors, the Court concluded that the governmental bodies had not made a contribution to CB & Q's capital.

A similar contribution-to-capital question presented itself in

*Union Pacific Railroad Co. v. United States*, 208 Ct. Cl. 1, 524 F.2d 1343, 1375–1380 (1975).[309] That case involved, inter alia, "transactions in which the Federal Government paid the plaintiff [railroad] the cost of relocating or protecting such parts of its line as would be flooded or threatened by a rise in water level by reason of a Government dam about to be built," as well as transactions related to highway construction in which a State or city government, "in the interest of public convenience and safety, * * * paid the cost of railroad highway crossings such as a new grade crossing or the replacement of a viaduct with a highway subway under the railroad's line." 524 F.2d at 1376.

The Court held that the latter (highway-related) transactions were "governed by *United States v. Chicago, Burlington & Quincy R. R.*, 412 U.S. 401 * * * (1973), in which substantially identical transfers were held not to effect contributions to capital." 524 F.2d at 1376–1377; fn. ref. omitted. With regard to the dam-related transactions, the court stated (524 F.2d at 1378–1379):

> The transfers in class 1, typified by a transfer by the Federal Government to the plaintiff to replace a portion of the right-of-way to be flooded by a projected dam, were matter-of-fact business transactions in which the parties made an equal exchange, without altruism or donative intent. The closest analogy is a condemnation proceeding; no one would contend that payment of a condemnation judgment or of a sum in settlement to avoid an eminent domain proceeding is a contribution to capital. In the words of the majority opinion in *Chicago, Burlington & Quincy R. R.*, *supra*, the transfers in class 1 "simply replaced existing facilities" and "did not materially contribute to the production of further income by the railroad." 412 U.S. at 414, 93 S. Ct. at 2176.
>
> In *Los Angeles & S. L. R. R. v. United States*, 21 F. Supp. 347, 86 Ct. Cl. 87 (1947), a railroad (actually a subsidiary of the present plaintiff) gave up a portion of its line to a mining company in need of the land for an extension of the mine's tailings dumps and received in return a new line as a replacement. This court said that the new line, though costlier than the old, "was of no more use to the railway company than the old line and would not produce a cent more income" or increase the value of the railroad's assets "by a single dollar." 21 F. Supp. at 353, 86 Ct. Cl. at 99–100.

The court believed the dam-related transactions could be "summarily disposed of in the light of the characteristics of a contribution to capital set out in *Chicago, Burlington & Quincy*

---

[309]The issue arose under the Excess Profits Tax Act of 1940, as amended. See *Union Pacific Railroad Co. v. United States*, 208 Ct. Cl. 1, 524 F.2d 1343, 1375 (1975).

*R. R., supra.*" 524 F.2d at 1378. The court interpreted the *CB & Q* case to preclude from the capital contribution category, transfers which were "essentially an exchange of values or a payment for a specific quid pro quo which left the * * * transferee no better off than before and did not materially contribute to the production of further or additional income." 524 F.2d at 1379.

The issue involved in the instant case also arose in *Louisville & Nashville Railroad Co. v. Commissioner*, 66 T.C. 962 (1976), on appeal (6th Cir., June 2, 1978). In that case, costs of constructing grade separations along the taxpayer's track system and costs of grade-crossing safety devices and protective equipment were paid for by various governmental bodies prior to June 22, 1954. The taxpayer claimed depreciation on these facilities. In denying the deductions, we held there had been no contributions to the taxpayer's capital within the purview of sections 113(a)(8) and 114(a) of the 1939 Code:

> We have here applied the criteria outlined by the Supreme Court in *Chicago, B. & Q. R. Co.* case and conclude that the assets constructed or acquired with public funds do not qualify as contributions to capital. It is readily apparent that the facilities were not actually bargained for by the petitioner. It is also apparent that there was no intention on the part of the governmental bodies to contribute to the capital of petitioner and no consideration was given thereto. Construction of these facilities was prompted by considerations of public safety and the evidence suggests that the impetus for these new facilities generally came from the various States and their political subdivisions. Without such instigation by governmental bodies and absent any governmental subsidies it would appear highly unlikely, especially during some of the financially troubled periods here involved, that these facilities would have been constructed. Negotiations with the public authority generally involved the type of facility which would be constructed and in some instances the allocation, if any, of the cost between the parties. * * *
>
> Any benefits received by the petitioner (such as the probability of lower accident rates and the ability to operate its trains at higher speeds) were incidental in nature and certainly not commensurate with the cost of the facilities. Moreover, it is evident that the grade separations and the grade-crossing safety devices were peripheral to petitioner's business and there is no suggestion in the record that they made any material contribution to the production of income. * * * [66 T.C. at 992; fn. ref. omitted.]

It is apparent from the discussions in the foregoing cases that, if petitioner is to prevail herein, it must show, at least (1) that the transfers from the governmental bodies were bargained for by petitioner; (2) that the governmental bodies intended to contribute to petitioner's capital (see the discussion below); (3)

that it was foreseeable that each transfer would result in a benefit to petitioner commensurate with its value (and not merely a marginal benefit); and (4) that the relevant assets were employed in or contributed to the production of *additional* income in petitioner's business (and did not yield merely incidental financial benefits or produce additional income which was insubstantial when compared with the amount of petitioner's depreciation claim).[310]

From our examination of the documentary and testimonial evidence in the record, we conclude that these characteristics are not present in the instant case.

Here, as in the cases discussed above, the facilities were necessitated by Government action and would not have been constructed or acquired by petitioner in the absence of such action. The only element of meaningful bargaining shown by the record relates to the extent that petitioner would pay for any betterments.[311] Other discussions between petitioner and the governmental bodies were concerned with the details of producing a replacement in kind. There were no negotiations directed at inducing the governmental body to provide a replacement since there was never any question that a replacement would be forthcoming. Petitioner was, therefore, never called upon to bargain for a transfer of property or for the payment of construction costs. As in the *CB & Q* case, the present transfers of property (and the payment of costs) came about as the result of what is in substance unilateral action by the governmental entities. See 412 U.S. at 414. See also *Union Pacific Railroad Co. v. United States, supra* at 1378, wherein the court concluded that "assets granted by a governmental body for replacement of

---

[310]For the purposes of this discussion, we have assumed that the relevant assets became a permanent part of petitioner's capital structure. Further, the parties agree that petitioner was not being paid by the governmental bodies for specific, quantifiable services. Obviously, the presence of some characteristics of a contribution to captial in a given fact pattern is not determinative of the contribution question when those elements are outweighed by contrary characteristics. See *United States v. Chicago, Burlington & Quincy Railroad Co.*, 412 U.S. 401, 413–414 (1973).

As to the need for petitioner to show that the new facilities were employed in or contributed to the production of additional income (see (4) in the text, above), we observe that the Supreme Court has stated that this characteristic is "ordinarily, if not always" an attribute of a nonshareholder contribution to capital. *United States v. Chicago, Burlington & Quincy Railroad Co., supra* at 413.

[311]Betterment costs are not in controversy herein.

existing facilities, where none otherwise would have been deemed necessary, are not contributions to capital" because they were not "bargained for."

Moreover, there was no intent on the part of the governmental bodies to contribute to petitioner's capital and petitioner's need for capital funds was not considered by them. The governmental entities could not have anticipated any substantial economic benefits to petitioner as a result of their actions since nothing they did could foreseeably produce such a result. As can be seen from our findings of fact relating to the Army Corps of Engineers, there was never any intention on the part of the Government to benefit petitioner in any respect. The sole intention was to replace in kind all railroad assets that were adversely affected by a given Government construction project.[312] There was no attempt by the Corps of Engineers to produce a superior railroad line or one which would improve petitioner's operating capabilities, and there was, therefore, no reason to believe the replacement facilities would have any significant beneficial economic effect. Given the fact that the new line was a substitute for one which petitioner would no longer be able to operate, it was clear that any net benefit to petitioner would be minimal and not commensurate with the value of the replacement line.

Furthermore, as in the cited cases, the acquired assets at issue did not materially contribute to the production of any additional income for petitioner. Any benefits inuring fortuitously to petitioner by virtue of the newness of a replacement line (e.g., the ability to increase train speed where curves had been reduced) were merely incidental (see *Louisville & Nashville*

---

[312]The evidence shows the Corps of Engineers did not intend to invest in or contribute assets to petitioner or to improve petitioner's financial well-being in any way; nor did the Corps ever intend to increase petitioner's business or its assets or to decrease its ordinary maintenance costs.

The only detailed information in the record concerning a governmental body relates to the United States Army Corps of Engineers. The parties seem to have regarded such evidence as generally applicable to all of the governmental bodies involved in the 21 transactions in dispute. In any event, because of the limited evidence concerning the other governmental entities, we have so treated the evidence relating to the Corps of Engineers. Since petitioner bears the burden of proof as to this issue under Rule 142(a) of the Rules of Practice and Procedure of this Court, any doubts caused by deficiencies in the record must be resolved in respondent's favor.

*Railroad Co. v. Commissioner, supra* at 992), and do not appear on this record to have substantial financial impact.[313] Petitioner's financial position was basically unchanged by the transactions.

In each instance, there was "essentially an exchange of values or a payment for a specific quid pro quo" which did not contribute to the production of additional income or leave petitioner any better off. *Union Pacific Railroad Co. v. United States, supra* at 1379. In short, we conclude that the transactions at issue herein did not possess sufficient attributes of a nonshareholder contribution to capital to bring them within the scope of section 113(a)(8) of the 1939 Code.

Petitioner argues that the Supreme Court, in the *CB & Q* case, has eliminated the intent of the transferor as a relevant consideration. Our reading of that case indicates to us that it is still important to ascertain whether the transferor intended to make a contribution to the transferee's capital. The *CB & Q* case merely suggests it is necessary to examine several characteristics of a transfer, and not intent alone, to determine its status as a capital contribution. In *Springfield Street Railway Co. v. United States*, 217 Ct. Cl. 89, 577 F.2d 700, 703 (1978), the Court of Claims pointed out that, in *CB & Q*, the Supreme Court "clearly affirmed the viability of the 'intent of the transferor' test. At the same time, however, the Court recognized that more than evidence of a nonshareholder's intent to make a capital contribution is required." To the same effect, see *Louisville & Nashville Railroad Co. v. Commissioner, supra* at 992, wherein we applied the *CB & Q* criteria and found that "there was no intention on the part of the governmental bodies to contribute to the capital of petitioner" and that the assets at issue did not possess other relevant characteristics of a contribution to capital. See also *Union Pacific Railroad Co. v. United States, supra* at 1379, wherein a payment by a town for construction costs of "sanitary privies" was held to be a contribution to the taxpayer's capital

---

[313]The newness of the replacement facility is not a factor tending to prove that a benefit was being bestowed on petitioner. At trial, a former employee of the Army Corps of Engineers, when asked if it was the corps' practice to build an exact replica of the retired facility, replied succinctly: "No, we cannot construct an old bridge." Despite this fact, the corps made every effort to construct a replacement with the same basic characteristics as its predecessor, and no improvements (betterments) were made unless petitioner paid for them.

because, inter alia, "the town intended * * * to confer a benefit upon the railroad."[314] Therefore, although the Supreme Court has moved away from viewing the transferor's motivation as the sole criterion (cf. *State Farm Road Corp. v. Commissioner*, 65 T.C. 217, 226 (1975)), we are unable to agree with petitioner that the transferor's intentions no longer have any pertinence under the *CB & Q* opinion.[315] Accordingly, in concluding above that the governmental bodies made no capital contributions, we relied in part on the evidence of record relating to their motivations.[316]

In an attempt to distinguish the 21 transactions at issue from the transactions in the *CB & Q* case, petitioner points to the fact that the facilities in this case are directly involved in railroad operations while the facilities in *CB & Q* were not. In our view, an inquiry into whether a given asset is directly or indirectly used in business operations would not, by itself, be determinative of the question of whether the asset is a contribution to capital. At most, such an inquiry might be relevant for the purpose of analyzing the nature of the benefit to the recipient and the income-producing potential of the asset. In the present case, our analysis of *all* relevant factors in the record has led us to conclude that the facilities at issue were not capital contributions.

A further attempt by petitioner to show a difference between this case and the *CB & Q* case is based on the assumption that petitioner would have built the new facilities in any event. In contrast to the facilities in the *CB & Q* case, which most likely would not have been built had it not been for governmental action, petitioner asserts that the new railroad lines in the instant case *would* have been built, irrespective of the action of the governmental bodies, by virtue of the fact that petitioner's old lines were about to become unusable. We find this asserted

---

[314]As we have previously noted, the Court of Claims also discussed intent in concluding the dam-related transactions did not involve a capital contribution. Those transfers were viewed as "matter-of-fact business transactions in which the parties made an equal exchange, without altruism or donative intent." *Union Pacific Railroad Co. v. United States, supra* at 1378.

[315]Nor do we find any authority for the proposition advanced by petitioner that, at most, intent is relevant only "to demonstrate the payments were not compensation for specific services rendered and not a gift." Under the cases cited in the text, we find no justification for so narrow an application of the "intent of the transferor" test.

[316]See and compare *Washington Athletic Club v. United States*, 614 F.2d 670 (9th Cir. 1980); *Oakland Hills Country Club v. Commissioner*, 74 T.C. 35 (1980).

distinction to be without merit because it focuses on only one aspect of a total transaction and therefore is completely at odds with the realities of the situation. Petitioner is attempting to gloss over the actual context in which the construction costs at issue were incurred.[317]

The transactions in dispute are similar to the ones discussed in the portion of this opinion entitled, *"Issue (rr)*: Deductions Incident to Relocation Projects,"* which also involved the replacement of segments of railroad lines in connection with public projects. In that issue, petitioner sought deductions under section 165 or section 167 for its cost basis in the track materials removed from the discontinued railroad line.[318] For various purposes, petitioner sought to have us bifurcate the transactions and treat the removal of the old railroad line and its replacement with the new railroad line as separate events with independent tax significance. In denying the claimed deductions, we concluded that it was necessary to look at each relocation project in its entirety and not break it down into its component parts since the removal and replacement were mutually dependent parts of one transaction. We viewed each transaction as involving the exchange of one operating railroad line for another, with petitioner ending up in essentially an unchanged position both operationally and economically.

Petitioner's argument in the present case is also an attempt to bifurcate the projects in a manner inconsistent with the realities of the transactions. For the reasons similar to those given in our discussion of *Issue (rr)*, we must view these transactions, as well, as a unit. It seems obvious that the replacement facilities would not have been constructed were the governmental bodies not about to take action which would destroy the usefulness of the existing railroad lines. The construction of a new line was, therefore, not an independent event, but one which was necessitated by Government action. Here, too, we believe the

---

[317]Petitioner argues that if the payments did not constitute contributions to capital and were not for services rendered, the only category remaining is the gift classification. This overlooks the category in which these payments actually fall, i.e., the replacement of, or making petitioner whole with respect to, existing facilities which were destroyed or made unusable by governmental action and which the governments were obligated to restore.

[318]The removed assets involved in *Issue (rr)* were accounted for under the retirement-replacement-betterment method of accounting and were not subject to ratable depreciation.

facts show there was an exchange of one operating railroad line for another, with no significant change in petitioner's position.[319] Viewed in this light, the instant transactions clearly lacked several significant characteristics of a contribution to capital. See *Union Pacific Railroad Co. v. United States, supra.*

While there may, in fact, be distinctions which can be drawn between the present transactions and the *CB & Q* transactions, we do not believe they are sufficiently substantive to warrant the result petitioner seeks.

Finally, as we noted earlier in this opinion, some of the projects seem to differ somewhat from the typical factual pattern we have been discussing. On brief, the parties dealt with all of the 21 transactions as though they were factually similar. However, the evidence of record, skimpy as it is in this respect, suggests that in at least three instances, the transactions were different. While our general conclusions herein are applicable to those instances as well, we believe some additional comment is necessary.

*Roseville "Hold Yard" Transfer.*—In this transaction, the Government transferred various improvements to petitioner for $25,000 in lieu of complying with a contractual requirement that it restore land leased from petitioner to its original condition. While this transfer seems to have resulted from bargaining, it does not appear from the record that the Government was intending to confer a benefit upon petitioner; rather, it appears the Government was attempting to protect its own interest by reducing its costs. The fact that petitioner was required to pay $25,000 suggests the Government was seeking to transfer property with a value equal to the costs of restoration and not to confer an additional financial benefit or to provide assets for petitioner to use in the production of additional income.

---

[319]As we did in *Issue (rr)*, we also reject petitioner's contention that only real property was exchanged.

It is unnecessary for us to consider whether the instant transactions, like those in *Issue (rr)*, fall within the scope of sec. 1031 (or its predecessor sections under the 1939 Code). It is sufficient for our present purpose to note the interrelationship between the retirement from service of a given railroad facility and its replacement. Sec. 1031 provides, inter alia, that property acquired in a like-kind exchange shall have the same basis as the property which was exchanged (with adjustments). See also sec. 113(a)(6) of the 1939 Code. As we explained in our findings, there is no disagreement between the parties that petitioner's tax basis in the new facilities should (at least) be equal to its tax basis in the old facilities. Petitioner's claim herein relates only to amounts in excess of that figure.

We conclude that the Government was merely making petitioner whole for injuries sustained as a result of the failure to comply with contractual obligations. Here, as in the other transactions, there was a specific quid pro quo which did not improve petitioner's economic position. As a result, this transaction, as well, possesses attributes which are fatal to the characterization of the transferred facility as a contribution to petitioner's capital.

*Neches River Crossing.*—Here, an existing bridge was replaced with a bridge that had greater clearance for navigation, pursuant to an order of the Secretary of War. Some of the costs were paid for by the Government. The record as to this transaction is inadequate for us to conclude that it had the characteristics of a contribution to capital. The fact that the contracting agency was the Army Corps of Engineers strongly suggests the contrary. Furthermore, the bridge construction does not appear to be significantly distinguishable from projects involving the installation of safety equipment at Government expense. Under the authority of the decided cases dealing with such equipment, we hold that this transaction did not involve a contribution to capital.

*Santa Clara River Bridge.*—When a dam owned by the city of Los Angeles broke and washed out petitioner's bridge, petitioner filed a claim against the city. As a result, the city paid for the construction of a new bridge. The main distinction between this project and the typical transaction at issue is that, here, the construction of the replacement asset was not planned in advance. In all other respects, the transaction does not appear to differ from the others in any meaningful way, and the result for tax purposes should be the same. Moreover, to the extent petitioner was being made whole by the governmental body, this project is similar to the Roseville "Hold Yard" Transfer, and our discussion relating to that transaction has pertinence here as well.

In sum, we hold that petitioner did not acquire any of the property at issue as a nonshareholder contribution to capital under section 113(a)(8) of the 1939 Code and therefore is not entitled to the depreciation deductions it claims herein.[320]

---

[320]We find this case to be clearly distinguishable from *Wolfers v. Commissioner*, 69 T.C. 975 (1978), a case decided after the briefs on this issue were filed in this case. There this Court

We decide this issue for respondent.[321]

## XIV. GRADING AND TUNNEL BORE USEFUL LIFE [322]

This issue presents the following questions for our consideration:

Whether petitioner has established that the useful lives of its grading and tunnel bores were reasonably ascertainable in 1954 so that it is entitled to ratable deductions under section 167 during the years in controversy.

Whether the grading and tunnel bores at issue had any salvage value.

Whether petitioner, in commencing ratable depreciation, requires the consent of the Commissioner because it is changing its method of accounting under section 446(e).

### FINDINGS OF FACT

#### *Issue (pp)*

The parties filed no stipulation of facts pertaining specifically to this issue. To the extent that the stipulations of the parties pertaining to other issues in this case and to general matters are relevant to the questions raised by this issue, such stipulated facts (with associated exhibits) are incorporated herein by this reference.

This issue involves the grading and tunnel bores of various predecessor and subsidiary companies whose railroad lines comprised the Southern Pacific Lines, as well as the grading and tunnel bores of the St. Louis Southwestern Railway Co. and its subsidiaries. These lines are more fully described in the general findings of fact. All of the relevant railroad companies are hereinafter referred to collectively as petitioner, and all of the

---

found that certain amounts received by the taxpayer under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, Pub. L. 91–646, 84 Stat. 1894 (1971), qualified as nonshareholder contributions to capital under sec. 362(c), thereby providing taxpayer with a zero basis for depreciation. No analysis of how the facts in that case fell within the characteristics of contributions to capital as spelled out by the Supreme Court in the *CB & Q* case was made in the opinion, and the facts and circumstances under which the payments were received in that case were quite different from the facts and circumstances of the payments received in this case.

[321]In view of our holding above, it is unnecessary for us to consider respondent's alternative argument that petitioner is barred from depreciating the assets in question by virtue of its "terms letter" agreements.

[322]In trying and briefing this case, this issue was referred to by the parties as *"Issue (pp)."*

relevant railroad lines are hereinafter referred to collectively as petitioner's lines.

As of the years in controversy, petitioner's lines consisted of several connected routes. The terrain traversed by the Southern Pacific Lines was of great variety, crossing a number of mountain ranges. In passing through mountainous country, the lines often ran through canyons. Portions of the lines ran along ocean bluffs. Further, the lines ran partly through foothills, plateaus, deserts, salt flats, valleys, and other low level areas. The lines crossed over the Great Salt Lake in Utah. In western Texas, the lines wound and twisted through mountainous country after leaving the Rio Grande Valley, and then ran through rolling hill country and the Texas and Louisiana coastal plain. In Louisiana, there were severe swamp conditions. The terrain traversed by the St. Louis Southwestern lines was comparable to that in Texas and Louisiana.

Railroad line is constructed on right-of-way land, long strips of land which vary in width from 100 to 400 feet.[323] Grading, comprising open cuts (excavations) or fills (embankments), or both, provides a smooth and shaped roadbed for the railroad track or tracks. Grading can also involve clearing and construction of drainage ditches, water channel changes, and the sloping of unstable ground. The roadbed constructed by grading is narrower than the right-of-way and constitutes an improvement placed upon the land.

The railroad track consists of rail secured to ties placed upon ballast (granular material). Items of other track material, such as track spikes, affix the rail to the ties and hold the rail properly aligned in place. The ballast rests upon the roadbed and is significantly narrower than the roadbed, e.g., 14 feet wide, compared with a roadbed section 26 feet wide.

Tunnels are subsurface structures in the nature of improvements similar to grading. Where it is impracticable in hilly or mountainous terrain to make an open cut, a tunnel is bored through the hill or mountain. The result of this excavation of rock and earth, without more, is called a tunnel bore. The tunnel bore may or may not be reinforced with a lining, depending upon

---

[323]Some of the right-of-way land was held in fee and some was held in a variety of limited titles (including some claimed simply by possession). Petitioner is not making any claims in this case with respect to its costs in acquiring such land.

such conditions as the stability of the material through which the bore is driven. The floor of the tunnel serves as roadbed upon which railroad track is placed in a manner similar to its placement upon grading. Like roadbed, tunnels are narrow in comparison with the width of the right-of-way.

There were numerous tunnels at various points on the Southern Pacific Lines in Oregon, California, Nevada, Arizona, and New Mexico where the lines ran through mountainous terrain. As of the years in controversy, all tunnels were located west of El Paso.

The Interstate Commerce Commission's Uniform System of Accounts for Railroads prescribes that investment in right-of-way land, grading, tunnels, and the track elements be charged to separate accounts, each with its own instructions. The right-of-way land is covered by Account 2, to which is charged the cost of all land acquired for transportation purposes. The grading is covered by Account 3, to which is charged the cost of clearing and grading the roadbed, and constructing protection for the roadbed. Tunnels are covered by Account 5, to which is charged the cost of constructing tunnels, including the cutting of the bore and the placing of portals at the entrances to and lining within the tunnels. The track elements are covered separately by Accounts 8 to 12. The foregoing investment accounts generally cover investment attributed, roughly speaking, to the physical assets themselves. Related investment amounts are charged to other accounts.[324] Repairs to grading are charged to operating expense Account 202, and repairs to tunnels are charged to operating expense Account 206. While there have been some changes in the details, the general intent of the Interstate Commerce Commission's accounting rules has been carried forward from the inception thereof—from at least as far back as 1914.

Over the years, petitioner's grading and tunnel bores have been retired in order to make railway line improvements which would increase traffic capacity and speed, reduce operating and maintenance costs, eliminate grade crossings, improve struc-

---

[324]As of the years in controversy, the Interstate Commerce Commission's Uniform System of Accounts provided that, generally, the costs of original road, road extensions, additions, and betterments were to be charged to property accounts (such as those listed above), while costs of less than $500 for property changes, additions, or betterments were to be expenses.

tures and restrictive clearances, and decrease service interruptions owing to the poor quality of the roadbed. These improvements have involved physical changes such as (1) reduced curvature and grade; (2) shortened alignments; (3) added sidings; (4) double tracking; (5) new structures; and (6) enlarged, daylighted or eliminated tunnels. Additional causes of retirements of grading and tunnel bores have included the discontinuation of service on a line for economic reasons, the providing of service to customers over alternate routes, and the abandonment of unneeded portions of a line.

One of the most frequent causes for retirements of grading and tunnel bores by petitioner is a line change. A line change often involves building an improved new segment of a line at a new location on a new roadbed, and retirement of the inadequate old segment which the new supplants. The new segment of the line generally is improved by a reduction in curves or grades, or both. Some line changes are made in order to shorten the length of the same line; some are made when it becomes difficult to accommodate traffic over the old line; and some are made as an alternative to reconstructing some part of an existing line. While it is generally possible to increase line capacity by widening the existing grading to accommodate the further tracks, it is not always feasible to do so where, for example, the soil is unstable.

Wide loads have sometimes necessitated line changes, though wider loads have also been accommodated by enlarging tunnels, or by constructing additional line, without necessarily retiring old line. Larger and heavier cars and locomotives are likely to result in future tunnel retirements, incident to line changes to avoid the inadequate tunnels.

Some line changes occur due to public construction projects such as those described in the portions of this opinion entitled, "*Issue (rr)*: Deductions Incident to Relocation Projects" and "*Issue (aaa)*: Depreciation of Replacement Facilities."

Service over petitioner's railroad lines is sometimes terminated and the lines abandoned for "economic" reasons, i.e., when costs of operation and maintenance exceed revenues. Every line that is potentially a candidate for abandonment of service is subjected to profit ability analysis (a comparison of revenues and costs). The initial decision to list a line as a prospective candidate for abandonment of service is usually made by

personnel in the field. They consider the extent of the traffic on the line and the physical condition of the line.

Grading and tunnels like petitioner's require constant repairs. Filled embankments are vulnerable to washouts due to flooding, and cuts deteriorate from weathering. Tunnel bores similarly suffer from erosion, and from alternative freezing and thawing when they are wet. Operations over the railroad lines can cause physical deterioration. The pounding of trains can cause settlement and it can cause underground moisture to come upward through capillary action and deteriorate the roadbed. In the event of a washout, or some other casualty which causes some grading to disappear, the cost of restoring the grading is charged to the above operating expense Account 202 as a casualty-repair maintenance expense.

Generally, grading improves with use because the fills become more seasoned and compact. In certain problem areas, where soil conditions are poor, petitioner experiences some settling or sliding of the grading with resultant lack of stability. Stability is also a problem where petitioner's railroad lines cross former lake beds or traverse areas with moist clay soil. When there are problems due to unstable soil, they are made greater by increased loads on trains and by increased speed.

Damaging earthquakes are a common experience on the Southern Pacific lines and they are expected to continue. Ordinarily, damage from earthquakes and floods is repaired.

Tunnels present special maintenance problems. If they are timber-lined, the lining must be regularly inspected. Where deteriorated, the wood lining must be replaced or reinforced, or tunnels can be concrete-lined. Track maintenance is more expensive in a tunnel because of constricted work area, and where tunnels are wet, as they often are, the track deteriorates more rapidly. Tunnels in the high mountains also present ice problems, and freezing and thawing will cause some spalling of the rock. Extra maintenance costs result.

Petitioner's railway lines have a variety of grades and curves. Some of the most extreme grades and curves are found in mountainous areas. Curves require increased maintenance. Very long trains sometimes have difficulty maintaining equilibrium on severe curves, and operating costs for trains are greater than on straight and level lines.

With proper maintenance, neither grading nor tunnel bores have determinable *physical* lives.

The decision to retire a line from service must be approved by Federal and State regulatory authorities. In considering an application to abandon service, the Interstate Commerce Commission considers public benefit as well as profitability. In deciding to apply for abandonment of service, possible public opposition is considered.

With the abandonment of service, the grading and tunnel bores (and other facilities) are retired.

Where a tunnel in its dimensions is a constriction in a line, an alternative to a line change or to enlarging the tunnel bore (to accommodate larger loads) is to daylight the tunnel. Tunnels are daylighted also in order to avoid reconstruction or installation of concrete lining. Where the tunnel lining has deteriorated to the point that large repair expenditures are necessary, daylighting will be considered. The process involves the destruction of the tunnel structure by excavating all the overburden. The tunnel sides are removed, and an open cut is made. After daylighting, the former tunnel looks like any open cut, and the tunnel is retired.

Grading and tunnel bores are retired incident to shifting operations to other lines owned by the railroad. For example, a major segment of petitioner's South Line between Tucson, Ariz., and El Paso, Tex., originally constructed by the El Paso & Southwestern Railroad, was retired when, after study, it was concluded that the capacity of one of two main-line segments should be increased to handle all through traffic by installing centralized traffic control (CTC).[325] The retired main-line segment of the South Line thereafter served no further railroad purpose.

Grading and tunnel bores will be retired if railroad line is sold. Railroad lines as such are not sold often. The typical occasion for such a sale would be the sale of a spur line to an industry. The only sale of a major stretch of line by petitioner involved a

---

[325]Centralized traffic control is a system for more efficiently guiding movements by controlling railroad signals and switches by remote control from centralized locations, which are sometimes hundreds of miles from those signals and switches. The effect is to increase greatly the capacity of the railroad line. In petitioner's case, there was never any single tracking of a double-tracked line by reason of the installation of CTC; the objective was to increase further whatever capacity already existed in a line.

California route (from Jojave to Needles) to the Atlantic & Pacific Railroad, now the Sante Fe.

When a railroad line is retired for any of the above or other reasons, all amounts charged to property accounts such as those previously mentioned with respect to the assets in such line must be cleared from those accounts. In the case of Account 2, the previously recorded investment in right-of-way land is cleared from the account, and the amount is transferred to the investment account for miscellaneous physical property, Account 737, to evidence that while still owned the land is no longer used for transportation purposes. In the case of Accounts 3 and 5, the grading and tunnel investment amounts are cleared from those accounts, and the amount is written off by charges to an operating expense account (or in the case of certain elements not here at issue as to which ratable depreciation has been accrued, to a depreciation account).

Under the Interstate Commerce Commission's accounting rules, any amount charged to one of the property accounts must be written off when the asset, the investment in which was the occasion for the charge, is retired, regardless of amount.[326]

When a tunnel is daylighted and the tunnel is retired, the total investment in that tunnel is cleared from Account 5, and the cost of the tunnel bore is charged to an operating expense account. When a tunnel is daylighted, and an open cut is created, the cost of removing the overburden is charged to Account 3, grading, as is an amount equal to what would have been the cost of excavating the tunnel bore area, at current prices. Operating expense is decreased by a credit thereto in the latter amount. Petitioner has not reduced its operating expenses for salvage upon retirement of grading or tunnel bores.

In the case of a line change, in which the old roadbed and tunnels are retired, the investment therein is cleared from the property accounts and charged to operating expenses. The cost of new roadbed, and any new tunnel, located elsewhere, is capitalized by a charge to property Account 3 and Account 5.

Retirements of grading and tunnel bores have been a constant

---

[326]Small dollar amounts being retired from the investment accounts can be expected. Grading for a spur line serving an industry, for example, could entail only a few cubic yards of material, which would have been capitalized when the spur line was constructed, and would have to be retired when the spur was abandoned.

feature in the life of railroads. Petitioner has retired grading every year. From 1916–73, petitioner had retirements out of investment for most vintage years, beginning with grading constructed and placed in service in 1853.[327]

Retirements of tunnels have also not been uncommon. Of all 334 railroad tunnels which had ever existed on petitioner's lines, 111 had been entirely retired from railroad service by the end of 1973, and there had been retirements of portions of 33 other tunnels. The oldest of the tunnels had been placed in service in 1866. As in the case of grading, tunnels of various vintages have been retired, including an 1866 vintage tunnel.[328]

The several railroads of which petitioner is now comprised, and which represented the preponderance of the Southern Pacific lines, continued to grow physically as a railroad system until 1929, when they peaked in size with 13,848 route miles.[329] As of June 30, 1916, the same railroads had only 10,956 route miles. By the end of 1961, the comparable route mileage had declined to 12,017 miles.

The route mileage figures show the net effect of railroad line construction and railroad line retirements and abandonments. Petitioner has had retirements of railroad line from virtually its beginning, but such retirements have become greater in recent years. Petitioner has had some railroad construction in every year, but the construction was principally in the earlier years. Prior to the date of valuation, which generally was June 30, 1916, for petitioner's lines, about 800 route miles of railroad line had been retired. There were only limited retirements from June

---

[327]Out of over $253,599,000 total investment shown for grading, the balance remaining in Account 3 as of the end of 1973 was about $223,634,000, with about $29,965,000 investment having been retired over the years 1916–73.

[328]The foregoing data on tunnels include 38 tunnels in Mexico, and one short-lived tunnel which served only temporarily while the Shasta Dam was being constructed. These 39 tunnels were not considered for life-analysis purposes, as described below, and if excluded here the total investment charged to Account 5 for the 295 tunnels which were considered was $31,837,509, while the same $24,295,410 as above remained as a balance in the account at the end of 1973. Of the total investment, $7,542,099 had been retired.

For purposes of comparison only, petitioner uses cost figures which it claims to have obtained, mainly, from old company records. Interstate Commerce Commission valuations were not available for all tunnels. We express no opinion at this point as to the propriety of using these figures for other purposes. See "*Issue (gg)*: Historical Costs as Tax Basis."

[329]Route mileage (sometimes called first main track) consists of the distances between points. Track miles will be greater. For example, if a line is double-tracked, track mileage will be double the route mileage.

30, 1916, to 1929. From 1929 through 1961 there were 1,831 net route miles retired. From 1962 through 1975, a further 1,042 net route miles were retired. For the railroad industry as a whole, retirements of line since 1916 have been greater than construction.

The retirements of petitioner's lines prior to 1929 were virtually all due to line changes intended to improve curvature and grade, or where operating problems called for line relocation. From 1929 on, line changes continued to be made, but line abandonments accounted for many of the retirements.

Railroad transportation service is closely tied to the economic activity in the territory being served. Despite attempts at innovative change, much freight traffic has been lost by the railroads to other modes of transportation.

After World War I, highway trucks began to perform short-haul transportation services. This activity, involving the transportation of small loads over short distances, increased as roads and highways improved throughout the Country. After World War II, motor carrier activity grew at a very rapid rate, and by the early 1950's, highway vehicles were emerging as a dominant mode of transportation.

Truckers were able, generally, to render more prompt service than railroads and to cause less damage to cargo. Because of the ease of entry into the trucking industry, there has been a proliferation of trucking competitors. Relatively low capital investment is required, though there are high labor costs. When, in 1935, truck transportation was subjected to regulation, certain agricultural commodities were exempted, and truckers were able ultimately to make severe inroads into rail traffic, undercutting railroads in charging for movement of agricultural products. This competitive advantage permitted truckers to enjoy fairly stable operations in moving agricultural products, and railroads tended to share in that traffic mainly during seasonal peaks when truckers could not handle the loads. The result was spotty and uneconomic utilization of freight cars.

Motor carrier transportation evolved after World War II from the short-haul activity of the 1930's into long-haul transportation, partly because in the late 1940's and early 1950's motor carrier transportation began to change from mainly small-scale activity by individuals and many small firms into large firms with extensive route networks. State regulations on use of

highways were progressively being relaxed during the 1940's and 1950's, permitting highway motor carriers to haul larger and heavier loads. As a result, truckers were encouraged to travel greater distances.

In the early and mid–1950's, plans for major new interstate highway construction and improved truck equipment promised increased opportunity for long-haul motor carrier transportation. Development of the turbo super charger in the early 1950's enabled truckers to haul heavier loads. Motor carriers provided strong competition in virtually the entire territory served by petitioner. Abandonments of railroad lines, particularly shorter lines, due to competition by trucking companies occurred throughout petitioner's railroad system.

After World War II, rail passenger service began to diminish substantially, with intercity passenger services being handled by other modes of transportation, particularly the airplane.

Pipelines represent still a further mode of conveyance. Products conveyed today by pipeline were previously carried by railroad tank cars. There have been virtually no new petroleum tank cars built since World War II. Pipeline transportation is economical mainly in the area of high-volume liquid-bulk traffic, but even solids can be so transported. Research and development of slurry pipelines was underway in the early 1950's, and a coal slurry pipeline went into service in the east in 1956. Coal, and other solids moved as slurry, would be transported by railroad if they were not moved by pipeline.[330]

Water transportation, while no longer the dominant mode of transportation it was in the early 19th Century, has nevertheless continued. Steamship lines and barge lines have continued to compete with railroads for certain types of traffic. There was growth in river and canal transportation. Water transportation, where available, could be provided at lower cost than railroad transportation, and competition from water transportation has been particularly significant in the case of bulk products such as coal, grain, and various chemicals.

The opening of the Panama Canal early in the 20th Century greatly affected petitioner's transcontinental operations. There was also competition by water carriers along the Pacific Coast,

---

[330]As with motor carrier competition, Southern Pacific reacted to pipeline competition by going into the pipeline business itself.

and there has always been competition from water carriers operating on the Mississippi River and other inland waterways in the Midwest and Gulf states. Competition from water carriers had substantial impact on petitioner's operations in the San Joaquin and Sacramento Valleys when, first in 1933, a ship channel was extended into Stockton, Calif., bringing water transportation into the heart of those agricultural areas. The inroads made by water transportation caused petitioner to retire some of its shorter railroad lines.

Many shippers turned to other modes of transportation. The transportation service offered by railroads was generally a little cheaper but slower than that of trucks, while faster but more costly than that of water transportation. Railroad transportation occasioned more damage to lading than truck transportation. Railroad costs were higher than pipeline costs.

In addition to being confronted with competition from other modes of transportation, railroads in the United States competed with each other. In the mid–1950's, petitioner was confronted with increased competition from both the Union Pacific and the Santa Fe when those roads shortened the scheduled time for freight service between Chicago and Los Angeles by 24 hours.

Competition by other railroads and by other modes of transportation caused petitioner to seek further to improve its rail lines. Petitioner had improved its lines every year from the time they were first built in order better to meet competition. Improvements to the lines included line changes. Line improvements, including line changes, can be expected to continue to be made.

The year 1954 stands as a sort of pivotal year insofar as the long-time role of railroads as the dominant mode of transportation is concerned, for in that year it was clear that such dominance was ending. Statistics on intercity tonnage of freight show that, following World War II, there was a general downward trend in the tonnage carried by rail. The tonnage carried by nonregulated trucking, on the other hand, increased very rapidly. Similarly, tonnage carried by regulated truckers increased rapidly. The same growth in tonnage developed in oil pipeline transportation and water transportation on rivers and canals. By the early 1950's, railroad transportation was declining at a rapid rate. While total tonnage carried by all truckers had not reached that carried by railroads in 1954, the trends

indicated that trucker tonnage would soon equal that of the railroads.

By 1954, some emerging new technologies were important. New freight car orders began to be almost uniformly for larger and more modern cars, rather than for mere replacements of the old stock. New 50-foot freight cars were supplanting the old 40-foot freight cars, and a trend towards still larger cars was started. Shippers saw advantages in larger units of haul, and began to insist upon them.

In 1952, petitioner recognized that major changes would be needed to meet the intensifying competition and, under the direction of its president, inaugurated an extensive long-range planning program to identify necessary changes in the system and its operations. This program produced many specific recommendations for line changes that would entail retirements of grading and tunnel bores. These recommendations were in addition to anticipated abandonments and line changes which petitioner had included in its long-range planning over the years.

Line abandonments became a standing project for petitioner after World War II, and monthly progress reports were prepared for authorized abandonments of lines which had ceased to be useful or had become uneconomical to operate. In addition, petitioner maintained running lists of proposed line changes, showing location, length of the line to be changed, present curvature and proposed curvature, present speeds and proposed speeds, and approximate cost of the line-change project. Even where line changes have been made in the past, additional line changes could be made in the same location to achieve further improvement of the railroad lines.

In 1954, it was becoming clear that the railroads were rapidly passing to a more specialized support role as a result of competition, and it was foreseeable that there would have to be many changes in railroad service.[331] These changes would both directly and indirectly lead to the retirement by petitioner of grading and tunnel bores as a consequence of improvements to existing lines and the outright abandonment of lines which no longer served a useful economic purpose.

While a trend toward larger freight cars began during the

---

[331]Petitioner believed the expected incremental use in its annual capital expenditures would be within manageable bounds.

1950's, certain factors were limiting the size of such cars: tunnel dimensions, bridge and overpass clearances, track curvatures, and the inner space distance between parallel tracks. Because of the need for larger cars, it was foreseeable to petitioner in 1954 that there would be substantial new railroad construction and retirement of old line.[332]

Although petitioner's lines were located in areas generally favorable for rail traffic, the rapid growth of competitive forces made it apparent in 1954 that the pace of its grading and tunnel bore retirements would increase.

In its book accounting, petitioner has never assigned a salvage value to grading and tunnel bores upon their retirement. (Salvage value would reduce the charge to the operating expense account upon retirement.) For tax purposes, however, ordinary deductions have been disallowed by respondent where there was incidental use of retired grading, and in one instance, the disallowance was upon the theory that there was some salvage value.

It is rare for railroad service to be reintroduced once it is terminated, and it is therefore rare for railroad track to be reinstalled on grading once the grading is retired. The circumstances surrounding these rare instances of reuse have been unique and involved minimal amounts of grading.[333] Typically, retired grading is left in place without any further use of any sort after service over the line is terminated.

Railroad grading and tunnels have real value only as elements of a railroad line as support for track. If railroad transportation service is discontinued, the grading and tunnels typically have little or no value. In most instances, grading has a negative value when railroad transportation service ends, for it generally must be removed in order to put the land to another use.

When grading and tunnels are retired on right-of-way land owned by petitioner, petitioner continues to have the responsibility to maintain drainage and to control brush and weeds on the

---

[332]It was also foreseeable in 1954 that there would be a growth in the practice of "piggybacking" (carrying trucks and containers by train) and that this practice would require changes which would require some retirements of railroad line.

[333]Only one episode was recalled at trial, and in that case, regrading was necessary.

land. In the case of retired tunnels, the continuing responsibility can be very costly.[334]

There have been isolated instances of tunnels being used incidentally for other purposes after the retirement of a line. In one such instance, a portion of the right-of-way land including that on which the tunnel was located was sold to a third party and the third party has been using the tunnel as an atomic-safe vault for storage of records and microfilms. Another tunnel has been leased to the city of Brisbane to serve as the city's corporation yard, for storage of city machinery. In the cases of both the above tunnels, the incidental use after retirement occurred some time after the abandonment of railroad service.

Although some salvage value may exist when alternative use is made of a tunnel, it would generally be minimal when compared to the cost of the tunnel. Only where the alternative use is for (nonrailroad) transportation purposes (as was the case when, after the years in controversy, petitioner donated retired grading to the State of New Mexico for use as a highway) will there be substantial value.

Studies were made in an effort to determine a reasonable estimate of salvage value of grading and tunnels for purposes of this issue. These studies included the grading and tunnels of which incidental use was made for various purposes, after their retirement from railroad transportation service, as described above. In these studies detriment from the presence of grading and tunnel bores in many instances was ignored.

As to grading, data was first accumulated with respect to sales of railroad line and to the portion of the sales price attributed to grading from 1916 through 1973. The total amount received from sales of grading was $153,581, compared to total investment in grading retired for the same years of $29,966,246. The salvage value obtained upon this basis was 0.51 percent.[335]

The similar study on tunnels disclosed only three instances in

[334]For the sake of safety, petitioner has been required to move people residing over a tunnel, to fill the tunnel with concrete, and to plug up tunnel entrances with earth and rock.

[335]Further data was accumulated on donations of grading to public entities, after rail service had been abandoned and lines retired. There were three such donations, in 1972, 1974 and 1975, after the years in controversy, including the above-mentioned donation to the State of New Mexico of a portion of the old South Line for use as a highway, and the value claimed for said donations in the consolidated returns for those years totaled $1,167,504. If this value is added to the above $153,581 amount received from sales, a 4.41 percent salvage value is obtained. It is

which consideration was received or value was determined for tunnels which were sold, leased, or donated after rail service was abandoned and lines retired. The amount received upon one sale with respect to the tunnel, and the value of the one tunnel leased (value determined by capitalizing rentals at 10 percent), totaled $12,600. When that figure is compared with the $4,760,226 total investment in tunnels retired, the salvage value obtained is 0.26 percent.[336]

In 1976, a study was conducted for petitioner by A. V. Fend, a mathematician and statistician employed by the Stanford Research Institute. Fend made a life analysis of the investments in Accounts 3 and 5 that are currently not being depreciated, for purposes of the trial of this issue. Fend used various data retrieved from petitioner's files, including investment and retirement amounts, and other data from open literature, with the objective of determining an expected life and a remaining life for petitioner's investments in grading and tunnel bores. Fend applied the "retirement rate" method of statistical analysis in making his estimates.[337] The procedure requires a data base which lists total dollar investments by vintage year, with each retirement classified by the calendar year of retirement and the vintage year of investment. A continuous band of calendar years, called the experience band, is selected and analysis is restricted to the retirements which occur during this period. The "retirement rate" method then provides a straightforward mathematical algorithm which determines the annual rate at which investments were retired, and from this, a frequency function or empirical survivor curve may be constructed. It is possible, through the use of this method, to make reasonably acceptable estimates of the useful lives of assets such as petitioner's grading and tunnel bores.

---

not known at this point whether respondent will accept the donation values claimed in the returns.

[336]A third tunnel was donated to a public entity, again after the years in controversy, and the tunnel bore portion was valued at $201,314 for donation deduction purposes. If this value is added to the above $12,600, a salvage value of 4.49 percent results. Respondent, on audit, has disallowed the entire deduction claimed in the consolidated return with respect to this donated tunnel.

[337]This method is described in *Chesapeake & Ohio Railway Co. v. Commissioner*, 64 T.C. 352, 372–375 (1975), hereinafter referred to as "*C & O*." See also "*Issue (ll)*: Freight Car Useful Life." The *C & O* case refers to this procedure of predicting probable service (useful) life as the "actuarial" or "annual rate" method.

.

Fend's estimates of expected useful life and of remaining life were made as of 1954. The conclusions reached from the "retirement rate" life analysis were that, as of 1954, the expected whole life for grading was 95 years, with a remaining life of 54 years, and the expected whole life for tunnel bores was 85 years, with a remaining life of 45 years.

The life analysis which resulted in the above conclusions entailed five sometimes-overlapping steps:

(1) Fend analyzed the investment and retirement data which reflected petitioner's actual past experience to 1954 in order to quantify past retirement patterns in terms both of annual retirement numbers and retirement rates, and then to identify any trends that might exist. This quantification would serve as the base for determining an average life.

(2) From the preceding analysis, Fend generated a stub survivor curve. A number of actuarial procedures are available for doing this, and several were reviewed. He considered the "retirement rate" method most appropriate. The survivor curve under that method shows the percentage of original investments surviving as of the ages and years already experienced. The survivor curve generated was a stub (partial) curve, showing that less than a complete life cycle had been experienced up to 1954.

(3) Fend then selected a family of theoretical complete survivor curves. There are various families of curves available, and the choice is made by considering which family of curves is most compatible with (a) the past as evidenced by the stub curve and (b) reasoned future expectations. Fend chose the standard Iowa family of curves as the most suitable for petitioner's grading and tunnel bores.[338]

(4) Fend then selected the specific complete curve within the Iowa group which best fit his stub curve. This fitting can be done visually or by the mathematical procedure known as "least squares." (The R2 curve was chosen as best fitting the stub curves for both grading and tunnel bores.)

---

[338]The Iowa mathematical curves were developed empirically from experience with industrial property of various kinds, and they have been validated over the years by observed actual results as to various properties for which there is already experience covering a full life cycle. Fend, upon review of the matter, concluded that grading and tunnel bores were comparable to types of industrial property with reference to which the Iowa curves were developed, such as highway and utility assets.

(5) Fend then arithmetically calculated the expected whole life and the remaining life of the investments. The expected whole life is the arithmetic mean of the theoretical complete curve which was chosen as best fitting the stub curve. The remaining life at any given age is calculated from standard conditional probability formulas.

In the foregoing procedures, there was application of judgment throughout, although some steps were more mathematical in nature. The selection of a complete survivor curve to which to fit the stub curve involved primarily informed judgment. For example, a curve which mathematically "fit" the stub curve perfectly could still yield absurd results. A purely retrospective analysis can lead to obviously unreasonable estimates for the future. Such estimates are avoided by studying the factors that have caused the patterns displayed in the data on past experience, appraising likely changes in circumstances which would occasion shifts from the past patterns, and choosing a curve consistent with the logical constraints and the expected changes. If there are logical or factual reasons for concluding that the best fitting curve will yield an unrealistic result, the second or third best fit may be selected if one of these falls close to the life and dispersion which is dictated by informed judgment.

Fend was required to make a reasoned assessment of the future. He looked to three sources to find probable future retirements of investments in grading and tunnel bores which would serve as boundaries to his statistical analysis of past retirements and help him select an appropriate curve: (1) The several projections of retirements of grading and tunnel bores made by petitioner;[339] (2) an independent study by Stanford Research Institute evaluating past economic, technological, regulatory, and public policy factors and forecasting probable future changes in such factors and their impact on retirements in the future;[340] and (3) the work already done by other analysts

---

[339]Fend did not take these projections at face value and excluded those which he regarded as less certain. Fend concluded that the rate of petitioner's retirements would increase after 1954. He took into account developments affecting petitioner, principally increased competition from other modes of transportation, and concluded that retirements due to line changes and due to abandonments (for reasons of economics) would accelerate.

[340]In making its study, the Stanford Research Institute examined literature on railroad and transportation history, studied a variety of petitioner's internal and public documents

in evaluating grading and tunnel bores and also other assets having similar retirement patterns.[341]

The average age of grading investments on hand in 1954 was 49.5 years. By coincidence, 49.5 years was also the average age of existing tunnel bores in that year. In reaching the conclusion that the remaining useful lives in 1954 were 54 years (grading) and 45 years (tunnel bores), Fend did not merely subtract the average ages of the assets from their full useful lives. To produce a more accurate statistical projection of remaining life, Fend used a procedure which involved the fitting of a new mathematical curve and produced estimates which exceeded the arithmetical difference between whole life and average age.

The retirement data furnished to Fend showed all retirements by vintage year for the period 1916 through 1973 in the case of grading, and for the period 1865 through 1973 in the case of the tunnel bores, but Fend chose the period 1930–54 as the experience band in his final life analyses in the cases of both the grading and the tunnel bores.[342]

Fend screened all the data furnished to him on past retirements to see if any retirements should be eliminated as "outliers." In the case of the tunnel bores, he eliminated for life-analysis purposes the retirement of one tunnel which had survived only 4 years as a temporary tunnel built in connection with the construction of the Shasta Dam. He also eliminated all tunnels located in Mexico. Fend found nothing in the data furnished to him on past grading retirements which he considered to be an "outlier" to be eliminated for life-analysis purposes. He did not eliminate any retirements due to public construction projects.

---

(including reports produced by a long-range planning study initiated in 1952), and interviewed petitioner's personnel.

[341]Without the benefit of petitioner's projections and the Stanford study to inform his judgment, Fend applied an R1 curve and obtained an estimated whole life of 100 years for grading. Fend did not use these materials to provide data for his final analysis but merely to assist him in determining the pace of retirements. Because it appeared that retirement rates would increase, Fend in his final life analysis chose an R2 curve instead of the R1 curve he had previously chosen. The R2 curve was then applied to the data on actual past retirements through 1954.

[342]Fend concluded that the experience band used in final analysis for vantage points between 1954 and 1961 should not include any retirements for the years preceding 1930, but should be limited to the later years, so that the experience band would be most representative of current and probable future policies. This was because railroad transportation peaked in 1929 and then started to decline.

In preparation for this trial, a depreciation study was made for respondent by Harold Heidrick, a depreciation engineer. He concluded it was not possible to arrive at a reliable determination of service (useful) lives for petitioner's grading and tunnel bores. Heidrick used the vintage data prepared by petitioner and applied the "retirement rate" method. Using a purely mathematical process of curve-fitting, Heidrick came up with widely divergent useful lives and concluded the "retirement rate" method used by Fend to estimate the lives of the assets at issue was inappropriate for that purpose.[343]

Petitioner has filed claims for refund, predicated on deductions with respect to its grading and tunnel bores, beginning with the year 1954. Claims for years prior to those at issue herein remain pending. On February 9, 1979,[344] petitioner amended the portion of its petition relating to this issue to read in part as follows:

> (3) Life analysis based on a great quantity of data showing retirements and other information now has established that as of 1954 for grading the expected whole life was 95 years, with a remaining life of 54 years, and for tunnel bores the expected whole life was 85 years, with a remaining life of 45 years. There was no salvage value.

> \*    \*    \*    \*    \*    \*    \*

> (5) The Commissioner has failed to allow claims by the former Southern Pacific Company and the other railroad members of the consolidated group for depreciation deductions with respect to grading and tunnel bores upon the basis of the foregoing lives \* \* \*

### ULTIMATE FINDINGS OF FACT

The useful lives of petitioner's grading and tunnel bores were reasonably ascertainable in 1954 by reason of their anticipated obsolescence.

As of 1954, the useful lives of petitioner's grading and tunnel bores were as follows:

---

[343]When Heidrick eliminated from the data base retirements occasioned by the termination of service on unprofitable lines and by "condemnations," he estimated a useful life for grading of 360 to 480 years.

[344]By our order dated Feb. 9, 1979, petitioner was permitted to amend its pleadings to comport with its view of what was established by the evidence at trial as to this issue.

| Account | Average whole useful life | Average remaining useful life (1954) |
|---|---|---|
| No. 3 Grading | 100 years | 59 years |
| No. 5 Tunnel bores | 90 years | 50 years |

The grading and tunnel bores in issue had no salvage value.

## OPINION

### Issue (pp)

This issue involves petitioner's claim for ratable deductions under section 167 for its grading and tunnel bores by reason of their anticipated obsolescence. In filing its Federal income tax returns for the years 1959, 1960, and 1961, petitioner claimed no depreciation deductions with respect to its grading and tunnel bores. However, petitioner now contends that, by the year 1954, it was possible to ascribe useful lives to these assets and that petitioner is therefore entitled to an annual ratable allowance for depreciation during the years at issue.[345]

Section 167(a) states:

There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, * * *

Section 1.167(a)–1, Income Tax Regs., states:

(a) *Reasonable allowance.* Section 167(a) provides that a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in the trade or business or of property held by the taxpayer for the production of income shall be allowed as a depreciation deduction. The allowance is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate), so that the aggregate of the amounts set aside, plus the salvage value, will, at the end of

---

[345]In the Tax Reform Act of 1969, Congress added sec. 185 to the 1954 Code in order to permit railroads to amortize over a 50-year period the cost of grading and tunnel bores whose original use commenced after Dec. 31, 1968. Pub. L. 91–172, sec. 705(a), 83 Stat. 487. In the Tax Reform Act of 1976, Congress amended sec. 185 to permit such amortization after 1974 with respect to grading and tunnel bores acquired prior to 1969. Pub. L. 94–455, sec. 1702(a), 90 Stat. 1520. The relevant committee reports point out that, prior to the legislation, taxpayers had been unable to depreciate these assets unless they could establish their useful lives. S. Rept. 91–552, 91st Cong., 1st Sess. (1969), 1969–3 C.B. 423, 582–584. S. Rept. 94–938, 94th Cong., 2d Sess. (1976), 1976–3 C.B. (Vol. 3) 521–523. Neither sec. 185 nor the committee reports serve to preclude petitioner from making its claims herein as to useful life. See S. Rept. 94–938, *supra*, and *Chesapeake & Ohio Railway Co. v. Commissioner*, 64 T.C. 352, 382–383 (1975).

the estimated useful life of the depreciable property, equal the cost or other basis of the property as provided in section 167(g) and sec. 1.167(g)–1. * * *

(b) *Useful life.* For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions, and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. * * * If the taxpayer's experience is inadequate, the general experience in the industry may be used until such time as the taxpayer's own experience forms an adequate basis for making the determination. The estimated remaining useful life may be subject to modification by reason of conditions known to exist at the end of the taxable year and shall be redetermined when necessary regardless of the method of computing depreciation. * * *

## Section 1.167(a)–9, Income Tax Regs., states:

*Obsolescence.*

The depreciation allowance includes an allowance for normal obsolescence which should be taken into account to the extent that the expected useful life of property will be shortened by reason thereof. Obsolescence may render an asset economically useless to the taxpayer regardless of its physical condition. Obsolescence is attributable to many causes, including technological improvements and reasonably foreseeable economic changes. Among these causes are normal progress of the arts and sciences, supersession or inadequacy brought about by developments in the industry, products, methods, markets, sources of supply, and other like changes, and legislative or regulatory action. In any case in which the taxpayer shows that the estimated useful life previously used should be shortened by reason of obsolescence greater than had been assumed in computing such estimated useful life, a change to a new and shorter estimated useful life computed in accordance with such showing will be permitted. No such change will be permitted merely because in the unsupported opinion of the taxpayer the property may become obsolete at some later date. * * *

The instant issue presents the question we dealt with in *Chesapeake & Ohio Railway Co. v. Commissioner*, 64 T.C. 352 (1975),[346] wherein we held that the taxpayer's grading and tunnel bores could be ratably depreciated under section 167 because these assets had reasonably determinable useful lives

---

[346]The cited case is sometimes hereinafter referred to as the *C & O* case.

over which their costs could be allocated. Here, as in *C & O*, "the critical threshold inquiry is whether petitioner has demonstrated with adequate proof that its claimed deductions * * * embody sufficiently 'accurate estimation[s]' of their useful lives so as to render the resultant allocations 'meaningful.' *Massey Motors, Inc. v. United States*, 364 U.S. [92] at 104." *Chesapeake & Ohio Railway Co. v. Commissioner, supra* at 378–379.

As we pointed out in the *C & O* case (64 T.C. at 379):

> The difficulty of such a showing [of useful lives] is compounded where, as here, the alleged exhaustion is wholly the result of obsolescence rather than physical deterioration. As explained by the Supreme Court in *U.S. Cartridge Co. v. United States*, 284 U.S. 511, 516:
>
> "Obsolescence may arise from changes in the art, shifting of business centers, loss of trade, inadequacy, supersession, prohibitory laws, and other things which, apart from physical deterioration, operate to cause plant elements or the plant as a whole to suffer diminution in value."
>
> See also *Real Estate Title Co. v. United States*, 309 U.S. 13, 16. Unlike physical exhaustion through use which more readily lends itself to empirical study and follows more predictable patterns, exhaustion through obsolescence often defies observation while in progress, succumbing to certainty only in retrospect. This is in part a reflection of the fact that obsolescence is to some extent a function of managerial policy rather than a physical phenomenon. Yet it is clear that, by including obsolescence within the ambit of section 167, the statutory scheme which demands to know the useful life of property prior to its expiration is sufficiently flexible to accommodate some degree of uncertainty and its concomitant inaccuracy. * * *

Given the inherent flexibility of the statutory scheme, we need not look for precision in petitioner's estimates. For petitioner to prevail in its position that its grading and tunnel bores are ratably depreciable, the record herein need only establish that these assets have reasonably determinable useful lives. See *Chesapeake & Ohio Railway Co. v. Commissioner, supra* at 376–377, 383, and see *Spartanburg Terminal Co. v. Commissioner*, 66 T.C. 916, 929, 932 (1976), a case which also involved claimed depreciation deductions for grading and tunnel bores. Clearly, "it would be unreasonable * * * to put upon the taxpayer the burden of proving to a reasonable certainty the existence and amount of obsolescence. * * * A reasonable approximation of the amount that fairly may be included in the

accounts of any year is all that is required." *Burnet v. Niagara Falls Brewing Co.*, 282 U.S. 648, 654–655 (1931).[347]

In the *C & O* case, we were able to estimate the useful lives from the detailed evidence of record and thus make a reasonable approximation of the allowable annual deductions. The *C & O* case differs markedly from the *Spartanburg Terminal* case in this respect. In *Spartanburg*, we disallowed the claimed depreciation deductions because the taxpayer—

presented virtually no evidence of the useful life of its tunnel or grading. * * * In contrast, the taxpayer in [the *C & O* case] presented extensive expert testimony, charts, graphs, studies, and evidence of its past history, giving the Court a reasonable indication of when its grading and tunnels would be retired. [66 T.C. at 928.]

Although our opinion in the *C & O* case does not provide "a general rule in respect of the depreciability of other railroads' grading and tunnel bores" (64 T.C. at 384), the evidence presented in this case is sufficiently similar to that presented in the *C & O* case to warrant a similar result. For the reasons given below, we believe petitioner, like the taxpayer in *C & O*, has established that its grading and tunnel bores have reasonably determinable useful lives and can properly be ratably depreciated.[348]

Respondent appears to be of the view that deductions for obsolescence can be allowed in this case only if petitioner can show that it will cease using grading and tunnel bores entirely. Respondent argues that petitioner's continued use of and investment in these assets are incompatible with obsolescence. We do not believe it is necessary for the evidence to establish that grading and tunnel bores will, at some future time, be eliminated completely from railroad operations. This point should be clear from our holding in the *C & O* case. Petitioner has shown that its existing grading and tunnel bores will in the

---

[347]See also *United States v. Ludey*, 274 U.S. 295, 302 (1927), applying a "rough estimate" standard in a related situation.

It is significant that petitioner is seeking to assign useful lives to these assets for the first time and is not seeking to change useful lives previously claimed. In the latter circumstance, a taxpayer is required to show "a clear and convincing basis" for the redetermination. Sec. 1.167(a)–1(b) and sec. 1.167(b)–0(a), Income Tax Regs. See the discussion of this point in the portion of this opinion entitled "*Issue (ll)*: Freight Car Useful Life."

[348]On the question of tax basis, see "*Issues (pp) and (qq)*: Historical Costs as Tax Basis." Basis is not considered in the discussion of the present issue.

course of time lose utility and be retired from service, as has been the case in the past. The fact that petitioner will continue to use similar assets in its future operations does not suggest that its present grading and tunnel bores will not become obsolete.

The *C & O* case also makes it clear, contrary to respondent's contention herein, that it is not necessary for petitioner to identify the specific assets which will be retired. In that case, we held that "statistical studies of the sort presented here may form the basis for making acceptable predictions of future retirements." (64 T.C. at 380). This holding is consistent with the position of two Court of Claims cases cited and relied on in the *C & O* opinion: *Pennsylvania Power & Light Co. v. United States*, 188 Ct. Cl. 76, 411 F.2d 1300 (1969), and *Virginia Electric & Power Co. v. United States*, 188 Ct. Cl. 120, 411 F.2d 1314 (1969).[349] In the *Pennsylvania Power case*, the court stated (411 F.2d at 1307):

Despite the impreciseness of taxpayer's estimates of useful lives, they are reasonable, and their application will result in spreading the recapture of the pertinent capital costs over the very substantial periods of time above-stated. The fact that taxpayer has not established a useful life for each of its easements and for each item of initial clearing costs, but rather a useful life for the mass properties in each of the pertinent accounts, does not detract from the reasonableness of its estimates. * * *

We agree with respondent that in certain factual settings some additional specificity may be required concerning the properties involved in a claim for obsolescence. See, e.g., *Zimmerman v. Commissioner*, 67 T.C. 94 (1976), and *Dunn v. Commissioner*, 42 T.C. 490, 494 (1964). However, we see no inconsistency between cases such as *Zimmerman* and *Dunn* and the *C & O*, *Pennsylvania Power*, and *Virginia Electric* cases. In the latter group of cases, the use of statistical methods for analyzing prior retirements and for projecting future retire-

---

[349]In Rev. Rul. 72–403, 1972–2 C.B. 102, the Commissioner acquiesced in the holdings of these Court of Claims cases.

Cf. *RCA Corp. v. United States*, 499 F. Supp. 507 (S.D. N.Y. 1980), holding that an accrual basis taxpayer could use "adequately supported statistical projections" to defer a portion of prepaid income.

We take note of the report of the trial judge in *Burlington Northern, Inc. v. United States*, docket No. 30–72 (Opinion of Trial Judge, Ct. Cl. 1980, 46 AFTR 2d 80–6004, 80–2 USTC par. 9781), containing the trial judge's recommended conclusion of law in accordance with Court of Claims rule 134(h). See also Court of Claims rule 147(b).

ments added an element of predictability that is not generally available in the usual obsolescence case. Some factors which may not lend themselves to reasonable prediction in the usual case (such as the effect of competition) can be given greater weight when a reliable statistical study establishes a predictable pattern. In the absence of statistical data, it is necessary for a court to look for (and limit its consideration to) specific facts which reasonably establish obsolescence in the future. See, e.g., *Ames v. Commissioner*, 626 F.2d 693 (9th Cir. 1980), affg. T.C. Memo. 1977–249.[350]

We do not view *Zimmerman* and *Dunn* as setting forth a stricter standard than that applied in the *C & O* case. We believe the requirement in *Zimmerman* that the taxpayer "must show both that the properties are becoming obsolete and that they will be obsolete * * * [or, stated differently] must prove what the normal useful lives of the [properties] are and that each will become obsolete prior to the expiration thereof" (67 T.C. at 107), was fully satisfied in the *C & O* case. The nature of the proof needed to support the claimed deductions was necessarily different in *Zimmerman* and in *C & O* because of (1) the inherent difference between the *Zimmerman* assets (three motel buildings) and the *C & O* assets (considerable amounts of grading and tunnel bores) and (2) the ability in *C & O* of the taxpayer to rely on an extensive retirement history for purposes of statistical analysis.

Respondent's arguments seem to imply that estimates of useful life made through the use of statistical projections, such as those made herein for petitioner, cannot pass muster under the test set forth in *Zimmerman*. Respondent is in error. As we have observed, petitioner, in the present case, need only establish that its grading and tunnel bores have reasonably determinable useful lives, and, whether we follow *C & O* or *Zimmerman*, we believe petitioner has put forth evidence which is adequate to permit the Court to make a reasonable estimate of those lives.

In reaching our conclusion, we have given considerable weight to the statistical study and the projections made by petitioner's expert witness, A. V. Fend of the Stanford Research Institute.

---

[350]See also *Fort Howard Paper Co. v. Commissioner*, T.C. Memo. 1977–422 (Issue 1 in that case).

Fend, in making his life analysis, relied on investment and retirement data reflecting petitioner's experience through 1954 in order to determine patterns and trends. He plotted a partial survivor curve (pattern of asset life) and fitted it to a complete survivor curve within the Iowa family of curves (known patterns of asset life). Fend was then able to compute arithmetically the expected whole life and the remaining life for each of the types of assets at issue. The above process is more fully set forth in our findings of fact. See also *Chesapeake & Ohio Railway Co. v. Commissioner, supra* at 372–375. Fend's procedures were similar to those employed by the expert witness in the *C & O* case.

As we have explained, it is necessary in using the "retirement rate" method for the analyst to employ his judgment at certain points in the procedure. In the present case, Fend was called upon to use his judgment in selecting a statistical method and applying it to the available data, in selecting a family of completed survivor curves, and in selecting the specific curve within that family to fit to his stub curve. After a careful scrutiny of the record, we are basically in accord with the manner in which he exercised his judgment in each instance.[351]

Considerable attention is paid on brief to the process by which Fend chose a completed survivor curve. When he made this selection, Fend took into account informed projections and analyses by petitioner and by others of factors affecting petitioner's railroad business and their future impact on petitioner's retirements of grading and tunnel bores. Fend determined that the pace of such retirements would increase in the years subsequent to 1954, and he chose a survivor curve (within the range of those applicable to his stub curve) which was compatible with such a trend.

Our findings set forth the various causes for petitioner's retirements through 1954. Essentially, these retirements came about by virtue of line changes (necessitated by various factors) and the termination of service on railroad lines (necessitated by

---

[351]As we discuss below, we do take exception to the use by Fend of past data relating to grading and tunnel bores which were made unusable in connection with public construction projects. The elimination of these "retirements" from his data base does not substantially alter his conclusions. Fend's inclusion of such "retirements" in his study does not deter us from finding that his procedures and his judgment were essentially sound. Even though we have found it appropriate to modify his projections somewhat, we see no major fault in his basic approach.

economic factors). Our findings further show that the causes for retirements would continue for the foreseeable future, and our findings set forth various developments, known to petitioner in 1954, which provided a reasonable basis for assuming that retirements of grading and tunnel bores would occur with somewhat greater frequency in the ensuing years. We believe Fend correctly assessed the available data, and in light of all of the evidence of record, we do not believe he was unreasonable in the selection of a curve for the making of his projections.[352]

Respondent argues at length that Fend's procedures were inappropriate for the purpose of estimating the useful lives of grading and tunnel bores. To some extent, respondent seems to be arguing that various conclusions reached by the Court in the C & O case were incorrect and should not be followed in this case. For example, respondent appears to be rearguing that estimates which rely on statistical analyses of past retirement data are not reliable and that, even if such estimates could be made, the "retirement rate" method used by Fend is not a suitable procedure for doing so. Clearly these contentions are at odds with the position adopted by this Court in C & O. We have been shown no reason to depart from that position.

Respondent also appears to be of the view that the past data used by Fend related to retirements which were not occasioned by obsolescence for purposes of section 167. However, the retirements scrutinized by Fend in this case seem similar in all significant respects to those involved in C & O, and in that case we concluded the taxpayer properly analyzed its past retirements in establishing its entitlement to obsolescence deductions under section 167.

Respondent states that the past data relied on by Fend included retirements due to a lack of profitability and argues that such retirements do not establish functional obsolescence. While it is true "a reduction in or an absence of profits is not sufficient to sustain a deduction for obsolescence" (*Zimmerman v. Commissioner, supra* at 107), the facts in this case show that petitioner regularly discontinued the use of grading and tunnel bores when it terminated operations on unprofitable railroad

---

[352]Our conclusion in this regard should not be construed as implying that we accept Fend's projections without reservation. We believe a proper exercise of judgment requires some adjustment in his projected useful lives. This point is addressed subsequently in our opinion.

lines. Petitioner has thus established that one of the reasons why grading and tunnel bores lose their utility in its business (i.e., become obsolete) is the abandonment of service on lines which have become too costly to maintain in light of the revenues they produce. See, e.g., sec. 1.167(a)–9, Income Tax Regs., which states: "Obsolescence is attributable to many causes, including technological improvements and reasonably foreseeable economic changes." Petitioner is not claiming obsolescence merely because of reduced profits; petitioner's claim relates to actual retirements due to changes in the economics of its operations. Similar retirements were involved in the *C & O* case. See 64 T.C. at 370–371. In connection with a claim for obsolescence, a taxpayer may properly scrutinize its history of such retirements for the purpose of predicting, statistically, the likelihood of their reoccurrence.[353]

We were not persuaded by the expert testimony offered by respondent to show Fend's procedures and conclusions were in error. That testimony was primarily concerned with attempting to establish the impossibility of proving useful lives for petitioner's grading and tunnel bores. Such testimony was not convincing, given the similarity of the record herein to that of the *C & O* case. Respondent's witness, Harold Heidrick, a depreciation engineer, used a purely mathematical process to show that the "retirement rate" method could produce widely divergent results. We regard the approach adopted by Heidrick to be unrealistically mechanical, and we view the long useful lives indicated by his procedures to be excessive. We were more convinced by the testimony offered by petitioner, establishing that the "retirement rate" method, with proper application and with the exercise of informed judgment, is capable of producing an acceptable estimate of asset life.

Moreover, we do not agree the evidence advanced by petitioner was flawed in other respects, as respondent asserts. For example, we do not believe Fend relied on petitioner's projec-

---

[353]Respondent also argues that Fend erroneously considered wear and tear as a factor bearing on retirements. Respondent points out that a claim premised on obsolescence cannot be supported with evidence relating to physical deterioration. See *Zimmerman v. Commissioner*, 67 T.C. 94, 106 (1976). The short answer to this contention is that Fend considered physical deterioration only insofar as it related to the question of whether repair costs would make continuation of a line uneconomical. There was no consideration of wear and tear as a factor with a direct bearing on useful life.

tions of future retirements in a manner which would suggest his results are unreliable. Fend used those projections not as part of his statistical data base but as an indication, along with other information, of the likely trends in the frequency of retirements. They were merely helpful, although not essential, in the selection of a completed survivor curve. The projections, and the other information relied on by Fend for this purpose, reflected the views of petitioner's employees and of individuals knowledgeable with the developments in the industry. If Fend did not personally have such knowledge, it was essential that he obtain the information from these sources.[354] It is significant that Fend used his expertise as a statistician to modify petitioner's projections and that, in any event, he regarded those projections as merely confirmatory of other data. In addition, Fend confirmed his conclusions by analyzing the available data using various statistical approaches.

Respondent also contends that Fend's results are suspect because most of the prior retirements of grading and tunnel bores came about when branch lines were retired. Those retirements, says respondent, resulted when early overexpansion led to reduced profitability of branch lines. Respondent asserts that, because most of petitioner's grading and tunnel bores are on main lines, the earlier retirement pattern is not indicative of the future. The problem with this contention is that it is difficult to square with the evidence.

The record shows that the terms "main line" and "branch line" are not terms of art in the railroad industry but are loosely used expressions, the meanings of which vary depending on the circumstances of their usage. The terms have particular meaning when one line is being contrasted to another in order to show their relative importance or the dependency of one line upon another. In railroad usage, therefore, what is a main line in one

---

[354]We do not agree with respondent that Fend was not qualified to determine useful life because he was not an economist or a depreciation engineer or otherwise experienced with the railroad business. When, in applying his mathematical and statistical skills, Fend needed to have specialized knowledge to permit the exercise of judgment, he sought out and obtained the requisite information from those who were informed. We believe Fend was reliably advised by these sources. As a result, contrary to respondent's assertions, we do not consider Fend's study and views to be any less authoritative than those of the expert witness in the *C & O* case. On these facts, it is *statistical* expertise which must be regarded as of paramount importance. Moreover, we are unable to regard Fend as totally unfamiliar with the railroad business, given the many studies he has conducted for petitioner in connection with this case.

context might be a branch line in another context, and vice versa.[355] The distinction between the two terms remains very blurred.

Based on the entire record, we have concluded that the retirements under discussion do not readily segregate themselves into categories suggested by respondent, and we believe no useful purpose would be served in our attempting to do so. The evidence indicates that these retirements occur throughout petitioner's system without regard to the relative importance or dependency of a line. Further, the record does not support respondent's contention that these retirements were due to overexpansion or that the past pattern of such retirements would not be reflected in the future.[356]

One of respondent's criticisms of Fend's procedures has merit. Respondent correctly asserts that Fend should not have used data concerning grading and tunnel bores which petitioner ceased using as a result of certain public projects.[357]

Petitioner states that Fend's statistical analysis includes some grading and tunnel bores which became unusable by virtue of governmental action in public construction projects, such as those described in *"Issue (rr):* Deductions Incident to Relocation Projects."* See also *"Issue (aaa):* Depreciation of Replacement Facilities."*

We do not regard the replacement of grading and tunnel bores in a Government construction project as tantamount to a retirement for obsolescence. The assets involved in *Issue (rr)* and *Issue (aaa)* did not become obsolete, in any sense of the term.

---

[355]Obviously, main trunklines would not be referred to as "branch lines" and spurs (serving, e.g., a factory or a farming area) would not be referred to as "main lines." But beyond that, it is often difficult to be precise.

Employing a somewhat arbitrary breakdown of petitioner's past retirements, Fend attempted a preliminary actuarial analysis and concluded that such differences as may exist between "main line" retirements and "branch line" retirements were not sufficient to warrant separate treatment.

[356]Nor does the record support the notion that the past line changes were due to faults in the original construction of the railroad and, therefore, are not indicative of the need for similar changes in the future. There were many causes for line changes, and the evidence indicates such changes will continue to occur.

[357]Contrary to respondent's contentions, the record shows that the public projects at issue in this case did not entail "condemnations" by governmental authorities. In any event, we doubt respondent's mischaracterization is of any practical importance for our present purposes. See *Keller Street Development Co. v. Commissioner*, 37 T.C. 559, 565–566 (1961), affd. on this issue 323 F.2d 166 (9th Cir. 1963).

Construction activity by governmental bodies merely prevented their continued use in petitioner's operations. Had this activity not taken place, petitioner would not have ceased operations or made a line change but would have continued employing the facilities as it had in the past. Accordingly, we do not believe the history of grading and tunnel bores replaced in such projects can properly serve as a basis for the calculation of future retirements for obsolescence.[358]

The exclusion of these items from petitioner's statistical analysis adds about 5 years to its estimate of the useful life of grading and has minimal impact on petitioner's estimate of the useful life of tunnel bores.

Additional arguments made by respondent concerning Fend's methodology do not convince us that we should ignore the conclusions of petitioner's expert. We believe Fend has satisfactorily established that, in 1954, petitioner was able to ascertain the useful lives of the properties at issue.[359]

In deciding petitioner has established that its grading and tunnel bores have reasonably determinable useful lives, we acknowledge that, in a case like the present one, the luxury of absolute certainty is not always attainable. The following comments by this Court in the *C & O* opinion have application here as well:

> Without here addressing ourselves to the relative bearing of all of the considerable amount of evidence before us, we think, on the basis of the entire record, that the actuarial ["retirement rate"] method of life analysis is, in the circumstances of this case, an acceptable means by which to extrapolate from petitioner's relevant experience with retirements. While we are acutely aware of the limitations of such a statistical approach as well as the critical importance of applying informed judgment to its results, we are nonetheless inclined to accept the explanations and conclusions of petitioner's highly

---

[358]We realize that the statistical analysis in the *C & O* case seems to have included "condemnations" to a limited extent. See 64 T.C. at 371. Whether such "condemnations" are similar in all pertinent respects to the public construction projects discussed herein is not apparent from the opinion. It appears respondent did not raise the question in that case that he has raised herein, and the *C & O* opinion contains no discussion of the propriety of including retirements from "condemnations" in the taxpayer's analysis. In any event, it does not appear from the findings in the *C & O* case that such retirements were a significant factor in the taxpayer's projections of useful life.

[359]Because the position of the Interstate Commerce Commission is not determinative of tax consequences, we have given no consideration to the views of that agency relative to the issues here presented. See *"Issue (g): Welded Rail"* and *"Issue (ll): Freight Car Useful Life"*; *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522 (1979).

qualified expert witnesses. Thus petitioner has presented a reasonable case, soundly based upon the 80 or more years of its carefully recorded retirement experience. And notwithstanding the borderline character of the reliability of an extrapolation in such circumstances we conclude, albeit without strong confidence, that the statistical studies of the sort presented here may form the basis for making acceptable predictions of future retirements. In so concluding, we are mindful that the risk of error is implicit in such projections, "but prediction is the very essence of depreciation accounting." *Massey Motors v. United States*, 364 U.S. 92, 105. [64 T.C. at 380.]

We must now determine the useful lives of the properties in controversy. As a consequence of his study for petitioner, Fend estimated that in 1954 the average whole useful life of petitioner's grading was 95 years and that of petitioner's tunnel bores was 85 years. Fend further estimated that the average remaining useful life of grading in service in 1954 was 54 years and the average remaining useful life for tunnel bores then in service was 45 years. We believe these estimates must be adjusted upward. Fend's estimates for grading, as we have discussed, were based in part on the history of past retirements occasioned by public construction projects. Without such retirements as part of his data base, Fend's projections for grading would increase by about 5 years. Additionally, Fend's estimates for tunnel bores assume that an average tunnel in service in 1954 will terminate its useful life substantially sooner than an average segment of grading. After a careful consideration of the voluminous evidence as to this issue, we believe Fend's projections as to tunnel bores are understated and should be increased by 5 years.

As explained in our finding of fact, the use of the "retirement rate" method requires the exercise of judgment at various stages of its application, particularly in the determination of retirement trends. In making our adjustments to Fend's estimates, we have exercised such judgment in a manner we feel is required by the evidence herein. See *Chesapeake & Ohio Railway Co. v. Commissioner, supra* at 383. Based on the entire record, we conclude that in 1954 petitioner's grading and tunnel bores had useful lives as follows:

| Account | Average whole useful life | Average remaining useful life (1954) |
|---|---|---|
| No. 3 Grading | 100 years | 59 years |
| No. 5 Tunnel bores | 90 years | 50 years |

As in *C & O*, the decision we reach today is based on the evidence in this case and should not be construed as suggesting a general rule or as requiring a similar result in a case presenting a similar issue. 64 T.C. at 383–384.

Respondent has advanced the additional argument that, before petitioner can ratably depreciate the grading and tunnel bores, it must establish the salvage value (or lack thereof) of these assets. Respondent acknowledges our finding in *Chesapeake & Ohio* that "neither grading nor tunnel bores have any salvage value upon retirement" (64 T.C. at 369), but he insists that the record in the present case is "too contradictory" to warrant a similar finding. In this regard, both parties direct our attention to the provisions of section 1.167(a)–1(c), Income Tax Regs., which provides in pertinent part:

(1) Salvage value is the amount (determined at the time of acquisition) which is estimated will be realizable upon sale or other disposition of an asset when it is no longer useful in the taxpayer's trade or business or in the production of his income and is to be retired from service by the taxpayer. Salvage value shall not be changed at any time after the determination made at the time of acquisition merely because of changes in price levels. However, if there is a redetermination of useful life under the rules of paragraph (b) of this section, salvage value may be redetermined based upon facts known at the time of such redetermination of useful life. Salvage, when reduced by the cost of removal, is referred to as net salvage. The time at which an asset is retired from service may vary according to the policy of the taxpayer. If the taxpayer's policy is to dispose of assets which are still in good operating condition, the salvage value may represent a relatively large proportion of the original basis of the asset. However, if the taxpayer customarily uses an asset until its inherent useful life has been substantially exhausted, salvage value may represent no more than junk value. Salvage value must be taken into account in determining the depreciation deduction either by a reduction of the amount subject to depreciation or by a reduction in the rate of depreciation, but in no event shall an asset (or an account) be depreciated below a reasonable salvage value. * * *

In 1954, the information available to petitioner indicated that its grading and tunnel bores had (and would continue to have) only nominal salvage value when they were retired. Little, if anything, could be realized from the sale or other disposition of these assets after they were no longer useful for railroad transportation purposes. While the evidence shows a few unusual instances when the grading and tunnel bores had some

use or value, for the most part it shows that the assets had no value or alternative use.[360] In some cases, the continued existence of petitioner's grading and tunnel bores after their retirement necessitated some additional expenditures, and there was a net detriment to petitioner.

Respondent argues that compensation received for grading and tunnel bores retired in "condemnations" must be considered in any calculation for salvage value. However, as we point out above, there were no retirements occasioned by "condemnations," as such, in this case. To the extent reimbursement was received for grading and tunnels replaced in public construction projects, the relevant assets were not considered by us in reaching our conclusions herein as to useful life. We view the public projects as neutral events which left petitioner's position unchanged, and the existence of such projects, accordingly, has had no impact on our determination with respect to salvage value.

Respondent points to a few instances where petitioner claimed, for charitable deduction purposes, that some grading and tunnel bores had a value equal to their replacement cost. We are not convinced that assertions made by petitioner in an entirely different context should in any way control the result herein. We note that respondent did not accept these values based on cost. In any event, respondent is referring to claims made by petitioner subsequent to the years in controversy and thus is relying on events which we cannot consider in determining value from a 1954 vantage point.

Looking at the evidence in its entirety, we must find that, on balance, the grading and tunnel bores had only a nominal value upon cessation of use, and we conclude that petitioner is justified in its contention herein that the properties at issue would have no salvage value upon their retirement. See *Massey Motors v. United States*, 364 U.S. 92 (1960); sec. 1.167(a)–1(c), Income Tax Regs.

Finally, respondent argues that if petitioner is permitted to depreciate its grading and tunnel bores, petitioner will be

---

[360]We do not have before us the question of whether continued use precludes an abandonment or retirement deduction, as in *Seaboard Coast Line Railroad Co. v. Commissioner*, 72 T.C. 855, 891–896 (1979), on appeal (5th Cir., Feb. 29, 1980), and *Louisville & Nashville Railroad Co. v. Commissioner*, 66 T.C. 962, 1004–1008 (1976), on appeal (6th Cir., June 2, 1978). Minimal use is not determinative of the question of salvage value.

making an unauthorized change in its method of accounting. Under section 446(e), a taxpayer desiring to change its accounting method must secure the prior consent of the Commissioner. See "*Issue (yy )*: Deduction of Embankment Expenditures."

A similar accounting method argument was made by respondent in the *Chesapeake & Ohio* case in connection with the track-structure issue involved therein. 64 T.C. at 361. In *C & O*, the taxpayer, which had accounted for its track assets under the retirement-replacement-betterment (RRB) method of depreciation accounting, claimed that it became foreseeable by 1954 that these assets would be obsolete within 50 years. As a result, the taxpayer sought ratable depreciation deductions for the track assets under section 167. Given the nature of the RRB method, we agreed with the Commissioner that the introduction of ratable depreciation would be a change in the taxpayer's method of accounting for its track structure, which change could not be made without the Commissioner's consent. See 64 T.C. at 365–366. See also *St. Paul Union Depot Co. v. Commissioner*, 123 F.2d 235 (8th Cir. 1941).[361]

Respondent made no accounting method argument in connection with the grading and tunnel bores issue in the *C & O* case. Despite that fact, respondent seeks to have us conclude that section 446(e) would apply if petitioner is allowed to ratably depreciate such assets in the instant case. He makes no attempt to distinguish *C & O* on this point or to explain why his present argument was not advanced therein.

The parties agree that petitioner's grading and tunnel bores, unlike its track assets, have not been accounted for under the RRB method and have not been treated by petitioner as depreciable assets. While the costs relating to both types of assets are ultimately deductible, "the deduction which petitioner may be entitled to on abandonment or retirement of its tunnel bore[s] and grading is more in the nature of a loss deduction under section 165 than a depreciation deduction under section 167." *Spartanburg Terminal Co. v. Commissioner, supra* at 938.[362] In the *Spartanburg* case, we pointed out that the

---

[361] Note that, as to comparable assets accounted for under the RRB method, the Commissioner now appears to require a taxpayer to change to ratable depreciation when useful life is determinable. Rev. Rul. 80–187, 1980–29 I.R.B. 5.

[362] Compare *Seaboard Coast Line Railroad Co. v. Commissioner, supra* at 892–893.

retirement deduction for grading and tunnel bores "does not fit within the theoretical framework" of the RRB method of accounting for depreciation, and we held that when such assets have indeterminate useful lives, they are not depreciable under sections 167 and 38. 66 T.C. at 938.

In view of the holding in *Spartanburg*, it cannot be said that petitioner's accounting procedure relating to the assets at issue has been the equivalent of depreciation. In this significant respect, the present issue differs from the track-structure issue in *C & O*. As a result, it cannot be claimed by respondent that petitioner is changing its method of accounting by adopting a depreciation method which is different from the one it had previously been using.

Nor can respondent claim that a change of method is effected when a taxpayer holding an asset with an indeterminate useful life takes account of changing facts and circumstances and assigns a useful life to the asset. Respondent concedes that, in such event, "the taxpayer may commence depreciating the asset without incurring any change in method of accounting." Respondent's concession is consistent with section 1.446–1(e)(2)(ii)(*b*), Income Tax Regs., which provides in part:

A change in method of accounting * * * does not include adjustment of any item of income or deduction which does not involve the proper time for the inclusion of the item of income or the taking of a deduction. * * * In addition, a change in the method of accounting does not include an adjustment with respect to the addition to a reserve for bad debts or an adjustment in the useful life of a depreciable asset. Although such adjustments may involve the question of the proper time for the taking of a deduction, such items are traditionally corrected by adjustments in the current and future years. * * * A change in the method of accounting also does not include a change in treatment resulting from a change in underlying facts. * * *

What respondent does argue is that, should petitioner ratably depreciate its grading and tunnel bores, it will be changing its accounting treatment of a "material item," as that term is used in section 1.446–1(e)(2)(ii), Income Tax Regs. See the discussion of "material item" in the portion of this opinion entitled: "*Issues (l) and (ccc)*: Relay Rail." Respondent has specific reference to "current maintenance cost expenditures required to restore physical damages to these assets due to casualties or routine operations." Respondent points out that, under petitioner's current accounting procedures, such expenditures are currently deducted, even the costs of "Repairs in the nature of replace-

ments to the extent that they arrest deterioration and appreciably prolong the life of the property." When petitioner ratably depreciates its grading and tunnel bores, such costs will be handled pursuant to the rules prescribed by section 1.162–4, Income Tax Regs., claims respondent, and "shall either be capitalized and depreciated in accordance with section 167 or charged against the depreciation reserve, if such an account is kept."

In sum, respondent's position is that the change from expensing to capitalizing these repair expenditures "in the nature of replacements" is a change in the treatment of a "material item." See sec. 1.446–1(e)(2)(ii), Income Tax Regs. Respondent concludes that a change to ratable depreciation is therefore a change in petitioner's method of accounting for its grading and tunnel bores.

Initially, we should point out that respondent did not articulate his specific argument under section 446(e) until he filed his opening brief as to this issue. Prior to that time, respondent made only vague reference to the change of accounting method question, although he had been asked by petitioner and by the Court for his precise position. Under such circumstances, it might be argued (and petitioner does argue) that this accounting issue is not properly before us. See, e.g., *Estate of Horvath v. Commissioner*, 59 T.C. 551, 555–557 (1973). However, the question is strictly a legal one and has been addressed by petitioner on reply brief. Given the circumstances of this case, petitioner is not prejudiced by our consideration of respondent's theory. See *Schuster's Express v. Commissioner*, 66 T.C. 588, 593–594 (1976), affd. 562 F.2d 39 (2d Cir. 1977).[363]

We have some difficulty with the notion that petitioner has been deducting the cost of "replacements" to its grading and tunnel bores, as respondent contends. If that were the case, there would be essentially no difference between those assets and assets which are accounted for under the RRB method. Clearly, a difference *does* exist (*Spartanburg Terminal Co. v. Commissioner*, *supra* at 937–938; cf. sec. 1.48–1(b), Income Tax Regs.), and the basic point of distinction is that assets covered by

---

[363]See also the discussion of a similar point in the portion of this opinion entitled, "*Issue (yy)*: Deduction of Embankment Expenditures." In the present issue, as in *Issue (yy)*, our conclusion would be the same regardless of which party has the burden of proof.

the RRB method are replaced from time to time, and the costs of those replacements are currently deductible even though such costs are in fact capital expenditures. Repairs to grading and tunnel bores, on the other hand, are directed at keeping a railroad line in its original operating condition, and we are doubtful that repairs made for that purpose will rise to the level of "replacements" or will otherwise be capital in nature.[364] See *Chicago, Burlington & Quincy Railroad Co. v. United States,* 197 Ct. Cl. 264, 455 F.2d 993, 1014–1018 (1972), revd. on another issue 412 U.S. 401 (1973); *American Bemberg Corp. v. Commissioner,* 10 T.C. 361, 375–377 (1948); *Illinois Merchants Trust Co. v. Commissioner,* 4 B.T.A. 103 (1926). See also *Oberman Manufacturing Co. v. Commissioner,* 47 T.C. 471, 482–483 (1967); *Plainfield-Union Water Co. v. Commissioner,* 39 T.C. 333 (1962). Compare *Wolfsen Land & Cattle Co. v. Commissioner,* 72 T.C. 1, 12–18 (1979). As a result, we are unable to agree with respondent that petitioner's change to ratable depreciation necessarily means that petitioner will be capitalizing some of the repair expenses that it previously has expensed.

However, respondent cannot prevail on his accounting method argument for a much more basic reason. The repair expenses to which he refers are plainly not at issue herein. Petitioner's claim relates to an annual allowance for depreciating its tax bases in its grading and tunnel bores; it is these annual amounts which must be scrutinized to determine if there is a change in method of accounting, not the possible treatment of amounts which may be paid in the future for repairs.

Petitioner is not seeking to change its accounting procedures for repair expenses. The only possible amounts which could constitute a "material item" herein are the amounts reflecting the tax bases of the grading and tunnel bores at issue. Respondent would have a sounder argument if it followed automatically from the ratable depreciation of grading and tunnel bores that petitioner would alter its treatment of related

---

[364]Such repair costs are to be distinguished from the expenditures for maintaining and protecting railroad embankments and related facilities which are involved in *Issue (yy).* In our opinion as to that issue, we stated we were inclined to view those expenditures as currently deductible, although we recognized a reasoned argument could be made to the contrary. The types of expenses to which respondent appears to be alluding in this issue seem even less likely than the *Issue (yy)* expenses to be directed at producing separate assets of independent value.

expenses in such a manner as would effect an accounting method change. But that is not the present case.

Limiting our examination to the actual deductions at issue herein, we must conclude that petitioner, in deducting these amounts, is not altering its accounting method. Under the applicable regulations, a taxpayer like petitioner is not regarded as changing its method when, based on a change in underlying facts, it assigns a useful life to an asset whose life was previously indeterminate and deducts an annual allowance for depreciation. Sec. 1.446–1(e)(2)(ii)(*b*), Income Tax Regs. Respondent concedes as much.

Accordingly, petitioner is not required to obtain the consent of the Commissioner pursuant to section 446(e).

To the extent indicated herein, we decide this issue for petitioner.

## XV. Historical Costs as Tax Basis[365]

This issue presents the following question for our consideration:

Whether, under section 1053, petitioner may establish its tax basis in certain grading, tunnel bores, and track assets acquired prior to 1914 with "historical costs" rather than with the Interstate Commerce Commission valuation amounts it used on its tax returns.

This issue contains various corollary questions, including (1) whether petitioner's "historical costs" are adequate to establish its tax basis in these assets; (2) whether "historical costs" can reflect tax basis when such costs relate to assets which were acquired by a predecessor corporation and transferred to a successor corporation prior to January 1, 1918; and (3) whether, on the facts of this case, petitioner is estopped or otherwise precluded from using "historical costs" to establish the tax basis of the assets at issue.[366]

---

[365]In trying and briefing this case, this issue was referred to by the parties as "*Issues (pp) and (qq)*."

[366]These and related questions are discussed in the course of our opinion. Other questions raised by the parties which were not necessary to consider in reaching our conclusion herein are not discussed.

Certain arguments made by respondent on brief relate to questions that are not properly

## FINDINGS OF FACT

### Issues (pp) and (qq)

Some of the facts relating to this issue have been stipulated by the parties, and those facts, with associated exhibits, are incorporated herein by this reference.[367]

This issue involves grading, tunnel bores, and track assets acquired by petitioner[368] prior to 1914.

On July 1, 1914, the Interstate Commerce Commission (ICC) promulgated orders in which it directed, among other things, that amounts expended for property devoted to transportation services should be classified on the accounting records of railroads in specific categories. This "investment in road and equipment" was to be broken down into "road" accounts, "equipment" accounts, and "general expenditure" accounts. These orders also provided a uniform classification of the general ledger and balance sheet accounts. From time to time over the years, the ICC has modified its system of classifications.[369] Because petitioner is subject to the jurisdiction of the ICC, it has kept its books in accordance with these ICC requirements.

Under the ICC classifications, amounts relating to grading, tunnel bores, and track assets are entered into particular accounts. As a result, since 1914, the costs relating to these assets have been reflected in specific accounts on petitioner's books.

Prior to 1914, many railroads, including petitioner, kept no detailed accounting records of the cost of their properties (including grading, tunnel bores, and track assets). To remedy

---

before us since respondent did not raise these matters in an amended pleading, as directed by the Court. See *Lysek v. Commissioner*, 583 F.2d 1088, 1093 (9th Cir. 1978), affg. T.C. Memo. 1975–293.

[367]The record, in connection with this issue alone, consists of many hundreds of exhibits and more than 2,500 pages of transcript, the product of a 3-week trial. The briefs filed by the parties were voluminous. (Petitioner's opening brief, for example, contained 781 pages, not counting the extensive appendices.) As a matter of necessity, we have summarized much of the evidence and have stated our conclusions as to what the evidence tends to prove. To keep our findings within manageable bounds, we have been selective in the materials we have discussed. Nevertheless, we have carefully considered all evidence of record in deciding this issue.

[368]The term "petitioner" is used herein to include, in context, the relevant predecessor corporations discussed in these findings. Additional pertinent findings, outlining corporate history, are contained in our general findings of fact.

[369]See, generally, the findings of fact in the portion of this opinion entitled, "*Issues (l) and (ccc): Relay Rail.*"

various problems caused by the lack of reliable records, Congress enacted the Physical Valuation of Property Act of 1913, now 49 USCA sec. 19a, pursuant to which the Interstate Commerce Commission was directed to ascertain the cost of and report the value of all property owned by railroads subject to ICC jurisdiction. In part, the cited legislation provides:

The Commission shall * * * make an inventory which shall list the property of every common carrier subject to the provisions of this Act in detail, and show the value thereof as hereinafter provided, and shall classify the physical property, as nearly as practicable, in conformity with the classification of expenditures for road and equipment, as prescribed by the Interstate Commerce Commission.

* * * * * * *

* * * First. In such investigation said commission shall ascertain and report in detail as to each piece of property, other than land owned or used by said common carrier for its purposes as a common carrier, the original cost to date, the cost of reproduction new, the cost of reproduction less depreciation, and an analysis of the methods by which these several costs are obtained, and the reason for their differences, if any. The commission shall in like manner ascertain and report separately other values, and elements of value, if any, of the property of such common carrier, and an analysis of the methods of valuation employed, and of the reasons for any differences between any such value and each of the foregoing cost values.

Second. Such investigation and report shall state in detail and separately from improvements the original cost of all lands, rights of way, and terminals owned or used for the purpose of a common carrier, and ascertained as of the time of dedication to public use, and the present value of the same.

Third. Such investigation and report shall show separately the property held for purposes other than those of a common carrier, and the original cost and present value of the same, together with an analysis of the methods of valuation employed.

In compliance with this directive, the ICC conducted extended proceedings and made an intensive examination of each railroad company under its jurisdiction. The ICC published many reports containing its detailed findings. Each published final report included a description and inventory of the railroad's property, its cost of reproduction new,[370] and other pertinent information. In most cases, the ICC could not determine the original cost to date of the railroads' properties from an examination of their accounting records. Books of account relating to original con-

---

[370]As to reproduction cost new, see the portion of this opinion entitled, "*Issue (p)*: Adjustment for Interest and Taxes During Construction."

struction could not be located. Those that were found did not use uniform accounting procedures and did not adequately or reliably set forth construction costs. Attempts to reconstruct costs from original invoices and vouchers were to no avail since those records were not sufficiently informative.

The foregoing applies to the railroad companies here pertinent; the ICC could not determine the original cost of the relevant assets from their accounting records. Those records were inadequate to show the total outlay (by the railroad or a predecessor) for property existing on the ICC valuation date at the time that property was initially dedicated to public use, including the net cost of additions and betterments. The ICC could not ascertain the amounts paid for original construction (i.e., the cash paid to the constructors plus the cash value of securities issued to the constructors).

Where the ICC was unable to determine original cost, it set forth the investment in various properties, including land, shown on each railroad's accounting records as of the ICC valuation date.

Below is a list of all railroad companies whose assets are the subject of the present claim, along with the ICC valuation date for each:

| *Company* | *Valuation date* |
|---|---|
| Predecessor Southern Pacific Company | June 30, 1916 |
| Beaverton & Willsburg Railroad Company | June 30, 1916 |
| Dawson Railway Company | June 30, 1917 |
| El Paso & Southwestern Railroad Company of Texas | June 30, 1917 |
| El Paso & Northeastern Railroad Company | June 30, 1917 |
| Inter-California Railway Company | June 30, 1916 |
| Oregon & California Railroad Company | June 30, 1916 |
| Phoenix & Eastern Railroad Company | July 1, 1915 |
| Porterville Northeastern Railway Company | June 30, 1916 |
| South Pacific Coast Railway Company | June 30, 1916 |
| Southern Pacific Terminal Company | June 30, 1918 |
| Central Pacific Railway Company | June 30, 1916 |
| Southern Pacific Railroad Company | June 30, 1916 |
| Coast Line Railway Company | June 30, 1916 |
| El Paso & Rock Island Railway Company | June 30, 1917 |
| Hanford & Summit Lake Railway Company | June 30, 1916 |
| New Mexico & Arizona Railroad Company | June 30, 1916 |
| Tucson & Nogales Railroad Company | June 30, 1916 |

Arizona Eastern Railroad Company......................June 30, 1915
El Paso & Southwestern Company.......................June 30, 1917
El Paso & Southwestern Railroad Company ...........June 30, 1917
Alamagordo & Sacramento Mountain Railway
  Company......................................................June 30, 1917
Arizona & New Mexico Railway Company .............June 30, 1917
Burro Mountain Railroad Company ......................June 30, 1917
El Paso & Northeastern Railway Company ............June 30, 1917
Texas & New Orleans Railroad Company...............June 30, 1918
Dayton-Goose Creek Railway Company ..................Dec. 31, 1920
Franklin & Abbeville Railway Company ................June 30, 1919
Galveston, Harrisburg & San Antonio Railway
  Company......................................................June 30, 1918
Houston & Shreveport Railroad Company ..............June 30, 1918
Houston & Texas Central Railroad Company..........June 30, 1918
Houston East & West Texas Railway Company ......June 30, 1918
Iberia & Vermillion Railroad Company ..................June 30, 1918
Lake Charles & Northern Railroad Company..........June 30, 1918
Louisiana Western Railroad Company....................June 30, 1918
Morgan's Louisiana & Texas Railroad &
  Steamship Company .......................................June 30, 1918
San Antonio & Arkansas Pass Railway Company ....June 30, 1919
Texas Midland Railroad......................................June 30, 1914
San Diego & Arizona Railway Company ................June 30, 1921

In its officially published valuation reports relating to the above-named railroad companies,[371] the ICC listed the amounts that each company showed on its books as its investment in assets (including, but not limited to, grading, tunnel bores, and track assets). The amounts listed were stated in lump sums and not broken down. The combined total shown for all of the named companies is $1,060,977,263. The ICC also listed its determination of the reproduction cost new of each company's assets. These

---

[371]Covered by this issue are the grading, tunnel bores, and track assets of the former Southern Pacific Co. (including its subsidiaries) as it existed at the end of the years in controversy, and of the San Diego & Arizona Eastern Railway Co. (The San Diego & Arizona Eastern Railway Co. was and has remained a separate entity.) Not covered by this issue among the railroad affiliates operating in the United States are the St. Louis Southwestern Railway Co., the St. Louis Southwestern Railway Co. of Texas, the Dallas Terminal Railway & Union Depot Co., the Northwestern Pacific Railroad Co., the Petaluma & Santa Rosa Railroad Co., the Holton Inter-Urban Railway Co., the Visalia Electric Railroad Co., and the Pacific Electric Railway Co. Also not covered are the Southern Pacific Railroad Co. of Mexico, the Nacozari Rail Road Co., and the Tijuana & Tecate Railway Co., all of which operated solely in the Republic of Mexico. The Inter-California Railway Co. is also not covered to the extent that it operated in the Republic of Mexico.

costs were broken down. The combined total of the ICC-determined reproduction costs for all of the named companies is $832,323,883. In some instances, the ICC cost of reproduction new for a given railroad company exceeds the amount found by the ICC as the investment in assets shown on that company's books. In most instances, the reverse is true.

Petitioner did not distribute the balances in its accounting records as of the valuation date to the primary accounts established in the ICC classification for road and equipment. Petitioner had no record of construction costs or investment expenditures in sufficient detail to make such a distribution based on actual expenditures. For 28 years, petitioner carried these balances in its accounting records as "unassigned." In the meantime, petitioner's valuation department maintained records of the original ICC inventory and subsequent modifications (i.e., additions and retirements). In accounting for additions after the valuation date, petitioner entered in its accounting records the appropriate charges and credits prescribed by the ICC classification. In accounting for retirements of property in existence on the valuation date, petitioner used the value (reproduction cost new) determined by the ICC, with adjustments for subsequent additions or retirements.[372] Where improvements had been made to retired property after the valuation date, petitioner's general practice was to add the betterment portion of the improvement to the ICC valuation in determining the amount of the retirement. In this manner, petitioner calculated on its Federal income tax returns the retirement (abandonment) deductions for its pre–1914 grading, tunnel bores, and track assets.[373] Petitioner followed this approach on its tax returns for the years at issue.

Accounting historians acknowledge that the pre–1914 accounting records of American railroads were unreliable. Ac-

---

[372]In those instances where the cost of the assets retired could be determined from accounting records, those records would be used. For the most part, petitioner has accounted for retirements of grading, tunnel bores, and track assets by using the ICC valuation, as adjusted.

[373]Note that, under the retirement-replacement-betterment method of accounting, replacement costs of track assets would be currently expensed and would not enter into the computation of the retirement deduction. See, generally, the portion of this opinion entitled, "*Issues (l) and (ccc)*: Relay Rail."

Note further that, to facilitate discussion, we sometimes refer to the ICC reproduction cost new as the measure of the retirement deductions taken by petitioner during the years at issue. As indicated in the text, those amounts were modified where appropriate.

counting procedures of that period lacked consistency. Statements and records from different years often could not be readily compared. Those regulatory agencies which existed did not set up recognized accounting rules and standards. No audits of railroads were required, and no uniform audit standards existed. As a result, it is not clear what the amounts appearing in railroad asset accounts of that period represent. This is particularly true in the present case.

Prior to the trial of this issue, respondent audited the books and records of many of the predecessor corporations which during the years at issue comprised, in part, the former Southern Pacific Co. The books and records related to years prior to the ICC valuation date. Respondent was seeking to verify the balances shown in the investment accounts and to determine if these balances reflected the actual or original cost of assets. Respondent was also seeking to ascertain whether investment account balances could be allocated to the ICC road accounts, such as grading, tunnel bores, and track accounts. Respondent examined journals, ledgers, annual reports, reports to the ICC, ICC accounting schedules, and other documentation.

Respondent's audit showed that, to a substantial degree, petitioner's books and records were inadequate to verify investment amounts or to determine if they showed original cost. Nor were the records adequate for allocation purposes. These books and records were deficient in many respects:

(1) When assets were acquired through construction or by purchase, there was no contemporaneous accounting for the cash or cash equivalent of noncash consideration paid. Moreover, the records did not show the quantity of assets which were received. Virtually all asset transactions were posted to a lump-sum account, an asset account which contains all the equipment and operating assets of a railroad. The documentation examined did not provide a basis for allocating the lump-sum account to the primary road accounts.

(2) As a general matter, where securities were issued in exchange for properties, the par value of the securities was capitalized as the cost of the properties acquired, although the assets did not necessarily have a value equal to the par value of the stock issued. In addition, the records reviewed did not show any contemporaneous determination of the fair market value of the stocks or securities issued in exchange for assets, nor was

there a contemporaneous determination as to the value of the assets received.

(3) Where operating railroads were purchased, there was no indication on the books that any amounts were classified for going concern or for franchise value. When railroad facilities were purchased or constructed by related entities, it could not be determined whether these transactions between related parties were bargained for in arm's-length agreements.

(4) The investment accounts on the corporate books contained all the operating assets of the line. For example, the investment account would, among other things, record consideration paid for railroads, bridges, trestles, culverts, all depreciable property (including equipment), and overhead. There was no allocation at the time of acquisition which would identify the specific dollar amounts which were expended for grading, tunnel bores, or track assets.

(5) Without the underlying source documents (such as vouchers, bills, contracts, and other documents),[374] it was not possible to identify the cash or cash value of noncash consideration expended for the assets acquired nor could the quantity or type of assets acquired in any particular transaction be determined. Generally, each asset acquisition or purchase was charged to the lump-sum investment account. It was not possible to determine whether retirement-replacement-betterment (RRB) accounting was being employed or some other method. It could not be determined whether there was any consistent method of accounting being employed for retirements, replacements, or additions and betterments. Most of the assets which were retired were identified in very general terms; retirements of track account assets were seldom identified.

(6) Respondent's audit showed numerous instances of expenditures for additions and betterments being expensed during one accounting period and being capitalized into the investment account in a subsequent accounting period. There was insufficient information in the books and records to determine whether

---

[374]Since the persons who made the general journal entries and ledger postings are no longer available to explain the transactions behind their entries, source documents are required: (1) To verify their accounting entries to determine the cost and quantity of assets charged to the investment account; (2) to identify the assets being capitalized; (3) to identify the consideration expended, and (4) to determine whether a posting to the investment account was a proper charge when entered.

amounts capitalized as additions and betterments were actually for additions and betterments or whether they were for ordinary maintenance expense. Moreover, some replacements were being capitalized.

(7) In the case of 10 of the corporations, some records showed that assets were being retired at salvage value rather than at the adjusted basis or at the original cost of the asset. Most of the retirements that were noted on the books and records for the earlier periods, namely, from the date of incorporation through 1910, were recorded at salvage value. It was not clear that there were any retirements for grading recorded on the books and records, although grading had, in fact, been retired. Moreover, many specific items were improperly capitalized to the investment accounts.

(8) Respondent found there was no appraisal of the property received nor a valuation of any securities issued when assets were being acquired by a successor corporation through a merger or consolidation or by purchase, and respondent could not determine by ICC accounts the quantity of assets received, the fair market value of securities issued for the assets, nor the appraised value of assets received. In many instances, there were no records of previous owners of corporate property.

Prior to the trial of this issue, an analysis was made for petitioner of some of the stock issued by predecessor railroad companies to identify which of such stock was issued (at par value) for the acquisition or construction of relevant assets or otherwise was reflected in book amounts as investment in such assets.[375] That study identified $263,256,000 (par value) of stock, for the period 1861 to 1903.[376] Also prior to the trial, an appraisal of the fair market value of the identified stock was made for petitioner. The appraisers estimated a total value of $121,122,000 at the dates of issuance. The appraisers did not always have complete or authoritative information and were not always consistent in their approach. Furthermore, they made certain

---

[375]When a predecessor railroad issued stock as consideration for the acquisition or construction of a railroad line, the par value of that stock was entered on the predecessor's books to reflect the cost of the assets so acquired. Generally, the par value of such stock was substantially greater than its fair market value.

[376]The record does not establish that all pertinent stock was identified; it suggests, instead, that identification was not always possible.

factual assumptions which were at odds with the realities of the period being scrutinized. Given the inherent difficulty of valuing the common stock of that era, the procedures employed by the appraisers were not adequate to produce reliable estimates of the fair market value of the stock of the various railroad companies.

Starting in 1966, a group of petitioner's employees known as the Southern Pacific Research Team (hereinafter SPRT or the team)[377] were involved in a project in which the employees sought to allocate lump-sum amounts on pre–1914 accounting records to specific grading, tunnel bores, and track assets.

For the most part, the assets at issue herein were acquired by a predecessor corporation when a railroad line was constructed by a contractor or was purchased from another railroad. In those instances, a lump-sum price was charged and the old books and records show no details. In many other instances as well, detail is minimal. The SPRT addressed itself in its work principally to developing the lump-sum book data, which related to most of the predecessor companies' railroad lines.

The lump-sum amounts appearing on petitioner's records contain figures which today would be broken down into approximately 50 accounts established by the ICC. Only a portion of the lump-sum amounts is attributable to grading, tunnel bores, and track assets, and the SPRT devised a method by which it believed it could determine which portions of the total figures would be attributable to such assets.

The SPRT conducted a review of the books and records of the various relevant railroad corporations, to the extent such material existed and could be located. When the records showed a specific amount which the SPRT regarded as representing grading, tunnel bores, or track assets, the amount was labeled "T." When the SPRT regarded a specific amount as representing other assets, it was labeled "O." Other amounts, which the SPRT was unable to label "T" or "O," were apportioned between those two designations.

In selecting a "T" or an "O" designation for amounts on the

---

[377]We make no attempt herein to set out in detail the activities and procedures of the SPRT. To do so would make our findings inordinately long. We have made only those findings which are sufficient to show the inherent unreliability of the SPRT work product for the purposes of this case.

books and records which it scrutinized, the SPRT had to "visualize" the events which took place at the time of the original construction of the properties at issue. Furthermore, it was necessary for the SPRT to make certain presumptions regarding accounting procedures and industry practices and to call on present-day experience.

This SPRT allocating technique was in essence a method of approximation involving much personal judgment.[378] In some instances, the exercise of this judgment was completely unsupported by any underlying materials. (In one such instance, SPRT's allocation was 90 percent to "T" and 10 percent to "O.") The amounts designated for proration were not inconsequential, and on one occasion the SPRT apportioned 43.8 percent of the total investment account. The SPRT's method of broad estimation sometimes resulted in rounding off to the nearest $100,000.

In sum, the method employed by the SPRT to breakout the "T" amount from the lump-sum investment account was based upon certain available documentary evidence, samplings, and mathematical formulas, the results of which were applied to particular situations based upon the personal judgment of the SPRT. The SPRT did not make an analysis of the accounting methods employed in establishing or maintaining the books and records which were reviewed. Nor did the SPRT consider whether amounts included in the lump-sum investment accounts at the valuation date might have been attributable to expenditures treated as profit-and-loss items, or expense items, under the ICC uniform classification after July 1, 1914. The method employed by the SPRT imparted a false sense of precision; implicit statistical presumptions were made with no statistical bases for these assumptions. Other inferences were drawn from very scant information.[379]

As a result of the foregoing efforts, the SPRT divided the lump-sum investment accounts into two parts. The part with which we are presently concerned (the "T" amount) was

---

[378]The SPRT would sometimes equate sections of a railroad for which some records existed with other sections of the railroad for which no record existed, if the SPRT thought the sections were similar.

[379]Moreover, the SPRT assumed that the book entries reflected arm's-length costs, an uncertain proposition at best in view of the fact that much of the construction work was performed by related companies.

regarded by the SPRT as reflecting the *combined* totals of book entries relating to grading, tunnel bores, and track assets. These allocation efforts by the SPRT did not, standing alone, produce a breakdown of the "T" amounts into their components.

The SPRT also conducted a study in which it sought to develop specific cost figures[380] for grading, tunnel bores, and track assets on hand as of the ICC valuation date.[381]

Beginning in 1966, the SPRT searched for old cash and journal vouchers and other old records which could give some indication of the relevant costs. Some of these materials were in the custody of the State of California, but they were not classified or indexed and contained only incomplete data relating to some of petitioner's predecessors. Many vouchers were in such poor condition that they could not be examined. The SPRT searched in libraries, museums, and archives for additional materials. Additionally, the SPRT looked for contemporaneous information concerning construction techniques and materials and the work habits of the employees who constructed the early railroads.

In arriving at a methodology for estimating the original cost of grading, the SPRT developed a set of "general exhibits" (i.e., documents explaining the estimation techniques). The general exhibits set forth formulas or guidelines for assigning unit costs for each increment of work or expense that the SPRT determined went into an excavation or embankment. In determining the amount of materials involved, the SPRT largely relied upon the grading inventory made by the ICC as of the valuation date, but it added to that inventory certain properties which the ICC had not classified as grading.

The SPRT used the "incremental cost" approach to estimate the cost of approximately 85 percent of the grading. Under this method, the SPRT assigned a cost per cubic yard for each

---

[380]The SPRT attempted to estimate the likely cost of the assets existing on the valuation date at the time they were first placed in service. Petitioner indicates the purpose of the study was to produce cost figures which could serve as a verification of the allocations described above. However, as we subsequently explain in more detail, petitioner used those cost figures to separate each lump-sum "T" amount into its components. Aside from serving the validating function alleged by petitioner, the SPRT cost figures were thus used to develop the amounts claimed herein as the basis of the assets at issue.

[381]We note that the ICC valuation date was selected by the SPRT and not the date of the accounting entries reflected in the lump-sum accounts. We also note that in making the apportionment of the lump sum, discussed above, the SPRT at times "visualized" assets on hand in a given year and not at the time of the ICC inventory.

element of work which it estimated had occurred during a particular construction period (such as loading, hauling, dumping, etc.). The assigned costs were based on estimates of the daily wage of a laborer, the amount of work performed by a laborer in a day, and the materials being handled. None of the costs attributable to labor functions were taken from the books of the companies involved. Instead, they were based on formulas taken from engineering texts, as modified by the SPRT. The team was required to make many assumptions in the selection and application of these formulas.[382] The SPRT consulted additional sources in this regard. Estimates were made of average labor rates for 5-year periods.

In calculating its labor costs, the SPRT attempted to estimate the average distance grading material was hauled during the construction of the early railroads. Hauling was one of the most expensive work functions under the SPRT's incremental cost approach. Using a computer-generated profile of the land which the railroads traversed and applying judgment to that profile, the SPRT came up with estimates of relevant distances. The team also applied judgment in determining the method of haul (e.g., shovel, wheelbarrow, cart, wagon, etc.) that, in its view, was most likely employed. With this data, the SPRT estimated the amount of material which could be hauled in a given time period. In reaching its conclusions in this respect, the SPRT failed to take into account many factors bearing on productivity. Furthermore, the team made assumptions which conflicted with the views of 19th century engineers whose works were consulted. In some instances, the SPRT arbitrarily employed assumptions which produced higher costs.

The SPRT also attempted to calculate the labor costs associated with loosening the material to be placed in a grade. The team determined that, depending on the type of material to be loosened, the work was normally done by plowing, scraping, picking, or blasting.[383] In arriving at a plowing formula, the SPRT made assumptions about the soil which led it to conclude

---

[382]For example, the SPRT assumed an average workday of 10 hours for construction laborers. (The evidence casts considerable doubt on the accuracy of this assumption. Furthermore, the evidence strongly suggests the formulas, themselves, were not very reliable and that estimates based on them would be overstated.)

[383]In estimating the costs of blasting materials, the SPRT assumed that dynamite was used

that a two-man, two-horse plow team could loosen only 300 cubic yards per day. No analysis was made of the specific types of soil relating to the grading presently at issue. Engineering authorities of that era suggested that, in "average" soil, such a plow team could have loosened 400 cubic yards per day.

There were other instances in which the incremental cost approach resulted in an overstatement of costs. For each cubic yard of material excavated, the SPRT assumed the maximum cost for spreading (1.5 cents per cubic yard), as had been estimated by engineering authorities. This assumption was based in part on the SPRT's view that the grading materials were spread in layers. In fact, it was a common practice for such materials to be dumped in place without extensive layering. Moreover, the SPRT assumed that there was spreading of waste materials not used in the grading and that all soils were plowed before being placed in a grade. These assumptions also do not comport with actual practice.

After the SPRT made its determination of labor costs, it estimated additional expenses which it felt should be added on under the incremental-cost approach. These additives were expressed as percentage increases to base costs and were cumulative.[384] Among the additives were those for supervision, miscellaneous grading expenses, transportation, contractor's profit, conversion of gold to dollars, and wagonroads. In general, the SPRT's estimates relating to these additives were premised on scant information and were not fully justified. The team erred in favor of increased costs.[385]

After the SPRT determined all the grading base costs and various additives, it added a flat 10 percent for deferred construction, thereby increasing its grading costs by tens of millions of dollars. These costs were occasioned by the settling or "seasoning" of new roadbeds during the first several years after construction and were incurred to keep the roadbeds in operat-

---

only 20 percent of the time during the period 1881–1900 and that a more expensive explosive was preferred. Evidence of record points to a wider use of dynamite and indicates the SPRT overstated its costs in this respect.

[384]For example, if the base cost were $100 and the additives were each stated as 10 percent, the first additive would add $10 in cost (10 percent of $100), and the second additive would add $11 in cost (10 percent of $100 + $10).

[385]Furthermore, the record does not clearly establish that the substantial additive for conversion of gold was warranted.

ing condition. No new quantities of grading material were added in making repairs occasioned by such settling.[386] The SPRT made no determination as to whether such costs were in fact capitalized by the predecessor corporations. The SPRT based its 10-percent figure on a claim made to the ICC regarding such costs, a claim the ICC had rejected.

Aside from the incremental cost approach, the SPRT estimated the cost of some grading by comparing certain segments, for which it had some cost information, with the ICC costs of reproduction new for those segments. The resulting ratio was multiplied by the ICC costs of reproduction new for other construction to yield cost estimates.

The SPRT also attempted to calculate costs for subsequent additions to the original roadbed (bank-widening). To estimate costs for such projects occurring during the 19th and early 20th centuries, the team analyzed 408 bank-widening projects between 1906 and 1930.[387] Some of the costs shown for these latter projects were based on estimates. Other costs taken from the latter projects reflected construction of new railroad track on a new roadbed and were therefore higher than costs for ordinary bank-widening.

After estimating grading costs using the various assumptions and estimates discussed above, the SPRT then proceeded to add on its estimates of various overhead items. As to engineering overhead, for example, the team studied certain construction projects which showed that engineering costs varied from 0.9 percent to 18 percent of total grading costs. The SPRT concluded that it would use 6.38 percent of estimated cost to reflect overhead costs for engineering. This percentage exceeded similar estimates which had been made by the ICC and by an engineering authority.

In the course of making its estimates relating to grading, the SPRT made thousands of mathematical computations. A random check[388] by respondent's agents of these computations showed

---

[386]When the predecessors made such repairs, it is likely they treated them as normal maintenance expenses.

[387]The later projects were not shown to be similar to the early projects. Moreover, the record does not adequately explain the estimation procedure that the SPRT employed.

[388]To thoroughly check all of the computations made by the SPRT in this regard would have required an examination of approximately 300,000 computations.

many major errors, producing cost overstatements in hundreds of thousands of dollars.

In estimating the cost of tunnel bores, the SPRT examined cost information to the extent it was available.[389] Such information, when it could be found, was in the form of a total figure for a given portion of line on which a tunnel was located.[390] The SPRT assumed the total figure included the cost of excavating the tunnel. In fact, the SPRT had no way of knowing what the total figure represented.[391] Nevertheless, the team attempted to determine the costs of all items which they believed went into that figure. This exercise would enable the team to come up with the portion of the total amount that could be claimed as being attributable to the excavation. To arrive at the item costs, the SPRT made various estimates and assumptions, many based on very incomplete data. When it obtained a figure for the tunnel excavation, the team increased that figure by several additives.[392]

In estimating the cost of track assets, the SPRT relied principally on the incremental-cost approach described above. Additionally, the SPRT employed the "comparable method" and the "ratio method."

The comparable method was used to estimate the track assets on two segments of line constructed in the 19th century by one of petitioner's predecessors. The SPRT found some cost records relating to another segment of line constructed by the same railroad (the "comparable"). The team determined that the total cost for the "comparable" was approximately twice its ICC

---

[389]At trial, petitioner presented evidence showing how the SPRT based its estimates on cost information that was available for one tunnel (Tunnel "O"). Given the state of the record, we must view this evidence as representative of all tunnels for which the SPRT had some cost information. Where cost data could not be found for given tunnels, the SPRT based its conclusions on the estimates it made relating to tunnels like Tunnel "O".

[390]In the case of Tunnel "O", the SPRT obtained a figure from a Government report in the National Archives. The team also found, in an annual corporate report, a figure believed to reflect the amount of materials excavated in boring Tunnel "O."

[391]Even where the SPRT found some information relating to possible costs comprising parts of the total, many gaps remained and the team's knowledge was essentially incomplete. Moreover, the SPRT did not know whether overhead payments were included in the total figure, and the SPRT did not know whether the related construction company was paid in stock and, if so, whether the total figure included such payment at the par value of the stock.

[392]See our previous findings dealing with the SPRT's additives.

In the case of Tunnel "O," the SPRT also added an estimation of the cost of a subsequent enlargement which, according to petitioner, "appears to have been made in about 1894."

reproduction cost new. The ratio was then applied, by account, to the two segments in question. In effect, the SPRT approximately doubled the ICC reproduction cost new to arrive at its cost estimate for these segments. The cost records for the "comparable" were based on amounts paid in stocks and bonds of the predecessor corporation to the contractor.[393] The SPRT used this same technique to estimate the cost of another segment of line constructed in 1906–07 by another of petitioner's predecessors.

In one instance, the SPRT used the ratio method after it obtained a schedule purporting to reflect costs incurred by two of petitioner's predecessors in constructing a railroad line.[394] To determine the costs for a segment of that line for which no cost figures were available, the SPRT compared the figures it did have with the ICC cost of reproduction new for the same construction. The ratio obtained was applied to the ICC cost of reproduction new of the segment in question. Other ratios were applied to bring this estimate forward to the date of retirement.

The costs for the remaining track assets were estimated under the incremental-cost approach. The SPRT found some cost information in sample cash vouchers found in museums, in letters, and in similar documents. These figures served as the basis for the estimates (although in one instance, the team used a higher figure found in a Government report). Estimated overhead charges were added on, although they did not necessarily reflect actual costs.[395]

In estimating the costs for track assets, the SPRT applied a theoretical retirement-replacement-betterment method of accounting.[396] As a result, the SPRT determination of cost as of the ICC valuation date does not reflect an estimate of the cost of the assets in place at that time. Instead, it shows the cost of the original assets prior to replacement. In this respect, the SPRT

---

[393]The SPRT relied on these cost figures without knowing whether they reflected the fair market value of the stocks and bonds of the predecessor. We note that a few years later, the corporation went into receivership.

[394]The record does not show how these costs were paid and does not indicate that these costs were ever capitalized on the books of the predecessors.

[395]The record does not show the extent to which these expenses were incurred or, if incurred, the extent to which they were capitalized.

[396]See, in general, the discussion in the portion of this opinion entitled, "*Issues (l) and (cc)*: Relay Rail." The record does not establish that this method of accounting was in fact consistently used by petitioner's predecessors.

cost estimate for track assets differs from the SPRT cost estimate for grading and tunnel bores.

In sum, the SPRT's reconstructed costs were not accurate reflections of the actual costs incurred by the predecessor corporations. The team's estimates were based on inadequate information. The SPRT was very often required to draw conclusions regarding significant dollar amounts for which there was no (or, at best, a minimal) factual foundation. And the SPRT frequently made dubious, if not arbitrary, assumptions which favored increased costs for the relevant assets. Additional overstatements were caused by computational errors. For these and other reasons, the SPRT estimates were not reliable reconstructions of the pertinent costs.

The SPRT used its reconstructed cost estimate to arrive at basis figures for the assets at issue herein. By company, it determined the percentages of reconstructed cost attributable to grading, to tunnel bores, and to track assets. The SPRT then applied these percentages to the "T" amount it had determined for each company (i.e., to that portion of each company's lump-sum book account which the team had estimated was attributable to such assets).[397] In this manner, basically, the SPRT produced figures which petitioner is employing in an attempt to establish the bases of the relevant grading, tunnel bores, and track assets as of the valuation date. Accordingly, the basis amounts claimed herein are the product of combining two unreliable and mutually exclusive[398] estimates.

---

[397]For example, if the SPRT estimated the costs as follows:

| | |
|---|---:|
| Grading | $2,000 |
| Tunnel bores | 1,000 |
| Track assets | 1,000 |
| Total | 4,000 |

it would arrive at the following percentages:

| | |
|---|---|
| Grading | 50 percent ($2,000/$4,000) |
| Tunnel bores | 25 percent ($1,000/$4,000) |
| Track assets | 25 percent (1,000/$4,000) |

Then, the SPRT would apply the percentages to the lump-sum "T" amount (e.g., $5,000) as follows:

| | |
|---|---|
| Grading | (50 percent of $5,000) $2,500 |
| Tunnel bores | (25 percent of $5,000) 1,250 |
| Track assets | (25 percent of $5,000) 1,250 |

[398]To illustrate the incompatibility of the estimates, we provide two examples (although others could be given):

On its tax returns for the years here in issue, petitioner claimed deductions for railroad line retirements based on the use of the ICC reproduction cost new as the tax basis of the assets retired. In the statutory notice of deficiency, respondent accepted this approach. The sections of the petition relating to this issue were amended on February 9, 1979.[399] In assignment of error 4(pp), entitled, "Commissioner's failure to allow claims for depreciation deductions with respect to grading and tunnel bores," petitioner states (in part):

The tax basis of the grading and tunnel bores for depreciation purposes is the greater of historical book recorded costs or Interstate Commerce Commission reproduction costs at valuation date serving as March 1, 1913, values, as under assignment of error 4(qq). * * *

In assignment of error 4(qq), entitled, "Commissioner's failure to allow claims to deduct additional amounts upon railroad line retirements because of tax basis in excess of I.C.C. valuation amounts," petitioner points to retirements of properties associated with various railroad lines for which, on its tax returns for the years at issue, petitioner claimed retirement deductions "using as basis the Interstate Commerce Commission valuation figures therefor." Petitioner further states (in part):

(2) Upon subsequent study it has developed that historical costs were greater than such Interstate Commerce Commission valuation figures with respect to said branch and line retirements as follows—

---

(1) The "T" amount estimate purports to show book amounts attributable to grading, tunnel bores, and track assets. The book amounts, to a substantial degree, reflect the par value of stock issued for the construction or acquisition of the relevant railroad lines. That par value was generally not at all reflective of fair market value. On the other hand, the SPRT cost estimate purports to show the actual costs of these assets when they were first put in service. Assuming that the "T" amount estimate and the cost estimate show what petitioner contends they show (which they do not), we fail to see how one estimate can serve to verify another or can be used to separate the other estimate into its components.

(2) The SPRT cost estimate for track assets involved an application of the retirement-replacement-betterment (RRB) method of accounting now used by petitioner. The record does not establish that the RRB method was consistently applied by the predecessor companies and we are unable to find that any portion of the lump-sum book amounts at issue reflects the costs that would be shown under a proper application of that method. As a result, we fail to see how applying percentages derived from the SPRT cost estimate to the "T" amount estimate will produce any figures that are useful for our present purposes.

[399] Prior to Feb. 9, 1979, the petition had not raised this issue as to the grading and tunnel bores involved in "*Issue (pp)*: Grading and Tunnel Bore Useful Life." On that date, the petition was formally amended to raise this issue in connection with the *Issue (pp)* assets, although the parties and the Court had been aware for some time prior thereto that the present claim would be made, and the trial was conducted with that understanding.

| Year | Retired lines | Claimed book cost | Deduction allowed | Additional deduction claimed |
|------|---------------|-------------------|-------------------|------------------------------|
| 1959 | Vasona Junction to Los Gatos | $124,595 | $52,765 | $71,830 |
| 1959 | San Bruno Branch | 181,104 | 68,594 | 112,510 |
| 1959 | Etholen to Small, Finlay | 662,022 | 364,061 | 297,961 |
| 1959 | Arnaudville to Leonville | 68,240 | 58,299 | 9,941 |
| 1959 | Sheridan to Yoakum | 840,131 | 480,779 | 359,352 |
| 1959 | Giddings to Cameron | 951,075 | 541,098 | 409,977 |
|      |               | 2,827,167 | 1,565,596 | 1,261,571 |
| 1960 | Lokern to McKittrick | 410,166 | 169,806 | 240,360 |
| 1960 | Hendricks to Hyland | 254,726 | 146,055 | 108,671 |
| 1960 | Fairbank to Tombstone | 220,034 | 175,470 | 44,564 |
| 1960 | Stockdale to Salado Junction | 691,997 | 377,603 | 314,394 |
|      |               | 1,576,923 | 868,934 | 707,989 |
| 1961 | Winkleman to Christmas | 938,996 | 681,796 | 257,200 |
| 1961 | Hempstead to Brenham | 351,980 | 285,184 | 66,796 |
| 1961 | Beaumont to Loeb | 109,946 | 95,544 | 14,402 |
|      |               | 1,400,922 | 1,062,524 | 338,398 |

In the chart above, the term "Claimed book cost" has reference to the basis of the retired assets as developed by the Southern Pacific Research Team; the term "Deduction allowed" has reference to the deductions taken by petitioner on its tax returns for the years at issue based on the ICC cost of reproduction new of the retired assets; and the term "Additional deduction claimed" has reference to petitioner's present claim for additional deductions, equal to the difference between the SPRT amounts, above, and the ICC amounts, above.

OPINION

*Issues (pp) and (qq)*

This issue involves the question of what amounts petitioner may properly use to reflect its tax basis in certain grading, tunnel bores, and track assets.

Our focus here is on assets acquired prior to 1914. Track assets from that period were no longer in service during 1959, 1960, and 1961. However, petitioner retired various railroad lines during those years, and petitioner's basis in the original pre–1914 track assets on those lines continues to be significant because petitioner now uses the retirement-replacement-betterment method of accounting. On its tax returns, petitioner followed its customary

practice and used as the tax basis of the retired assets, the reproduction costs new developed by the Interstate Commerce Commission (ICC) pursuant to the 1913 Valuation Act. See 49 USCA sec. 19a. (Such costs are sometimes hereinafter referred to as the ICC amounts.) In its petition, petitioner alleges that "upon subsequent study, it has developed that historical costs were greater than such I.C.C. valuation figures with respect to said * * * retirements." Petitioner claims an increase in tax basis and additional deductions, measured by the difference between the asserted "historical costs" and the ICC amounts used on the returns.

Some of the pre–1914 grading and tunnel bores were still in service during the years in controversy. In the portion of this opinion entitled, *"Issue (pp):* Grading and Tunnel Bore Useful Life," we upheld petitioner's claim for ratable depreciation. As we pointed out in *Issue (pp)*, petitioner has previously not depreciated its grading and tunnel bores. Instead, petitioner has deducted its basis in those assets upon their retirement or abandonment. As with its track assets, petitioner has used the ICC amounts to serve as the measure of the deduction on its tax returns. Now petitioner is attempting to depart from its customary practice and use "historical costs" to establish its basis in pre–1914 grading and tunnel bores (where such costs are greater than the ICC amounts). Obviously, this use of "historical costs" would produce larger ratable depreciation deductions than would the continued use of the ICC amounts to reflect tax basis.

We must decide whether petitioner is entitled to the increased basis and deductions. Various sections of the 1954 Code are pertinent to the instant basis question. Section 167(g) provides:

The basis on which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 1011 for the purpose of determining the gain on the sale or other disposition of such property.[400]

Section 1011 provides in part:

---

[400]See also sec. 165(b) which provides that "the basis for determining the amount of the deduction for any loss [under sec. 165] shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property." It is not necessary for our present purposes to consider whether petitioner's deductions fall within the purview of sec. 165 or within the purview of sec. 167. See the discussion in the portion of this opinion entitled, *"Issue (rr):* Deductions Incident to Relocation Projects," at note 132.

The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis (determined under section 1012 or other applicable sections of this subchapter * * * ), adjusted as provided in section 1016.

Section 1012 provides in part:

The basis of property shall be the cost of such property, except as otherwise provided in this subchapter * * *

Within the same subchapter as sections 1011 and 1012 is section 1053. That section provides in part:

In the case of property acquired before March 1, 1913, if the basis otherwise determined under this subtitle, adjusted (for the period before March 1, 1913) as provided in section 1016, is less than the fair market value of the property as of March 1, 1913, then the basis for determining gain shall be such fair market value. * * *

Under these provisions, petitioner's tax basis is, therefore, equal to the cost of the assets at issue, or, if greater, to their fair market value on March 1, 1913. See also *Goodrich v. Edwards*, 255 U.S. 527 (1921).

There is no dispute as to fair market value. The parties agree that the ICC amounts reflect the fair market value of the assets at issue as of March 1, 1913. Furthermore, it is clear that, where petitioner's records are not adequate to show the cost basis of the assets, the ICC amounts may be used for that purpose. In such circumstances, the ICC amounts are viewed as the "best estimate" of cost. *Boston & Maine Railroad v. Commissioner*, 206 F.2d 617 (1st Cir. 1953), revg. on another point 16 T.C. 1517 (1951); *Southern Railway Co. v. United States*, 218 Ct. Cl. 150, 585 F.2d 466 (1978).[401] Thus, the ICC amounts can serve herein as both (1) a substitute for statutory cost, and (2) a measure of fair market value.

---

[401]Petitioner suggests that the Court, in making such an estimate, should apply *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930), to increase the ICC amounts. Petitioner also suggests the ICC amounts should be revised to reflect *current* reproduction cost new. We decline to follow these suggestions. We believe the "best estimate" rule, as articulated in the cited cases, is sound and we see no reason on the facts of this case to deviate from it. Nor do we see any justification for making the revisions to the ICC amounts suggested herein by petitioner.

Furthermore, the contention regarding *current* reproduction cost new, mentioned for the first time in a document filed on Sept. 15, 1976, caption "Petitioner's Reply to Respondent's Amendment to Amended Answer," was not raised in conformity with Rule 37, Tax Court Rules of Practice and Procedure; petitioner's contention is not in response to any matter raised in respondent's amendment. Rule 37(b). Petitioner has not requested leave of the Court to amend its pleadings in this regard. Rule 41(a). Accordingly, this question is not properly before us.

Petitioner did not know the cost of its pre–1914 grading, tunnel bores, and track assets when it filed its tax returns over the years and, therefore, used the ICC amounts on those returns as a substitute for cost. (If, when it filed its tax returns, petitioner had been in possession of accurate cost information for these assets and had used the ICC amounts to reflect tax basis when the ICC figures were higher, the ICC amounts on petitioner's returns would be serving as fair market value under section 1053. That, of course, is not the present case.)

Petitioner is seeking herein to prove that it now has accurate cost figures and does not need to use substitute figures to establish tax basis. Basically, petitioner's position is that its cost figures (i.e., "historical costs") for most of the assets in question exceed the ICC amounts. However, petitioner does state that it will continue to rely on the ICC amounts in those few instances where the ICC figures exceed the cost figures. (In other words, petitioner will, if it is successful in its present claim, use the ICC amounts as a measure of fair market value for purposes of section 1053.)

The "historical costs" upon which petitioner bases its claim were developed from amounts which petitioner says are recorded on its pre–1914 books as its investment in its grading, tunnel bores, and track assets. Petitioner contends it is able to use these amounts to satisfy the basis requirements of the Code. Petitioner further asserts that its books should be viewed as controlling for tax purposes. It is not completely clear from the parties' briefs whether the term "historical costs" refers to the amounts appearing on petitioner's books or to the amounts which were developed from those book amounts. For convenience, we have adopted the latter usage. Respondent's objections relate to both the reliability of the book amounts and to the accuracy of the manner in which petitioner developed those amounts to obtain the figures it advances herein as its basis in the assets at issue. Respondent seeks to limit petitioner's basis to the ICC amounts,[402] which petitioner has consistently treated as reflective of basis on its tax returns.

In order to satisfy the "cost" requirement of the above-quoted

---

[402]But see the portion of this opinion entitled, "*Issue (p)*: Adjustment for Interest and Taxes During Construction."

basis provisions of the Code, petitioner must show the actual amounts originally paid for the assets at issue.[403] Sec. 1.1012–1(a), Income Tax Regs. ("The cost is the amount paid for such property in cash or other property."); *United States v. General Geophysical Co.*, 296 F.2d 86, 87 (5th Cir. 1961) ("[Cost] requires a determination of when the taxpayer acquired the property and the price he paid for it."); *Edwards v. Commissioner*, 19 T.C. 275, 279 (1952). See also *Mountain Wholesale Co. v. Commissioner*, 17 T.C. 870, 875 (1951), indicating the general rule that, in an arm's-length transaction, cost is "the amount actually paid in acquisition of property."[404] The application of this longstanding axiom of the tax law is clearly shown in *Boston & Maine Railroad v. Commissioner*, 16 T.C. 1517 (1951), revd. on another point 206 F.2d 617 (1st Cir. 1953), a case presenting many of the questions arising in the instant case. In that case the taxpayer's books, kept under the retirement-replacement-betterment method, were held not to establish the amounts of the allowable deductions upon the retirement of railroad property because the books did not show "the actual or original cost" of the retired assets.[405] 16 T.C. at 1528–1529.

In the *Boston & Maine* case, as to most of the property retired during the years there at issue, the taxpayer's accounting records provided—

no way of telling what the original cost—the amount at which under the retirement method of accounting an item of retired property is to be written out of the investment account—was, or whether or to what extent the original cost of the retired item appeared in the investment account at all. [16 T.C. at 1529.]

The opinion points out that, in the ICC's extensive investigation of the taxpayer's records pursuant to the 1913 Valuation Act, the Commission concluded it could not ascertain the original cost of the taxpayer's property because of the insufficiency of accounting records.

---

[403]For the purposes of this discussion, we will assume that the conclusion we reach regarding basis carryover does not preclude the use of the amounts claimed herein as petitioner's basis in the assets at issue.

[404]See generally 3A J. Mertens, Law of Federal Income Taxation, secs. 21.02, 21.10 (1977).

[405]I.e., "statutory cost"; see *Chicago & North Western Railway Co. v. Commissioner*, 29 T.C. 989, 1004–1005 (1958). See also the Court of Appeals opinion in *Boston & Maine Railroad v. Commissioner*, 206 F.2d 617, 625 (1st Cir. 1953).

In the present case, petitioner's pre–1914 records do not appear to have been any better than those of the taxpayer in *Boston & Maine*. Like the taxpayer in *Southern Railway Co. v. United States, supra*, petitioner, through the dates of the ICC valuations, "did not maintain the kind of cost and accounting records required by modern-day tax * * * procedures." 218 Ct. Cl. at ___ , 585 F.2d at 468. Our findings of fact show the incompleteness and unreliability of petitioner's records insofar as they are pertinent to the assets involved herein. Our findings further show that the ICC was unable to ascertain the original cost of petitioner's properties in its examination under the 1913 Valuation Act.[406]

One of the more serious flaws in petitioner's recordkeeping arises in the handling prior to 1914 of acquisitions of fully equipped railroads in exchange for the bonds or capital stock of an acquiring corporation. In accounting for these transactions, the stocks and bonds were not valued at their fair market value. Petitioner has not satisfactorily justified its practice of using a figure based on par value. The law is clear that the total cost of all assets to the acquiring corporation would be limited to the fair market value of the stock or securities given up in exchange for those assets. See, e.g., *Pittsburgh Terminal Corp. v. Commissioner*, 60 T.C. 80, 87 (1973), affd. without published opinion 500 F.2d 1400 (3d Cir. 1974). Petitioner's failure to use such value establishes, perhaps more than anything else, the inadequacy of its accounting records for the purposes of this case.[407]

It is therefore apparent that petitioner's records, standing

---

[406]Petitioner argues that the concept of "original cost," as that term is used in the 1913 Valuation Act, is not relevant to the concept of tax basis and that the ICC's inability to find "original cost" is not relevant to the question of whether petitioner's records are adequate for the purpose of showing cost (which petitioner refers to as "historical cost") under the Internal Revenue Code. We disagree. While there are some differences between "cost" under the Valuation Act and "cost" under the Internal Revenue Code, we believe the matters taken into account by the ICC have, for the most part, considerable pertinence in any inquiry into actual cost for tax purposes. It is not without significance that the ICC's "original cost" concept was considered to be of relevance in the *Boston & Maine* case by both the Tax Court (see *Boston & Maine Railroad v. Commissioner*, 16 T.C. 1517, 1521, 1523, 1528–1530 (1951)), and the Court of Appeals (see 206 F.2d at 623–624). In the present case, it is clear from our findings that the state of petitioner's records made them unreliable for either purpose.

[407]Anticipating that we would so hold, petitioner claims that it has shown the fair market values of the bonds and capital stock at the times of the relevant transactions. We are not able to agree that the evidence authoritatively establishes those values, and we have made no findings with respect thereto. See, for example, the report of the United States Pacific Railway Commission, Senate Executive Document No. 51, 50th Cong., 1st Sess. (1887). Evidence was

alone, cannot serve to establish the actual cost of the assets at issue. *Boston & Maine Railroad v. Commissioner, supra.*

Petitioner makes the argument that "statutory cost" is the investment amount recorded in regularly kept books under accounting rules existing at the time of construction or acquisition (without restatement under current accounting rules). Even if this contention were true, we do not believe petitioner's records were adequate to show authoritatively the investment amounts relating to the properties with which we are concerned. More importantly, however, we are unable to square petitioner's legal premise (that "statutory cost" is the amount on its books) with the authority discussed above (that "statutory cost" is actual cost). And petitioner's strained argument that the "historical costs" developed from its books "represent capital which may not constitutionally be taxed, and therefore must be accepted as cost," finds no support in the cases which it cites. See, generally, the discussion in *Bloch v. Commissioner*, 16 B.T.A. 425 (1929), affd. per curiam 42 F.2d 1013 (4th Cir. 1930).

Petitioner also contends that its records should be determinative on the question of actual cost. Because we do not accept petitioner's assertion that its books were consistently and coherently kept and should be presumed to be correct, we are unable to agree that petitioner's records should be so viewed. The fact that petitioner may have used the retirement-replacement-betterment method of accounting for its track assets does not alter our conclusion, nor does the use of that method endow petitioner's records with greater credibility.[408] This is clearly one of the lessons of the *Boston & Maine* case. To a similar effect, see *Corn Exchange Bank v. Commissioner*, 6 B.T.A. 158 (1927), in which the following statement appears (p. 162):

> The petitioner insists that because it has adhered to a certain method of keeping its accounts over a number of years, its income must be computed solely in accordance with that method of accounting. Bookkeeping entries are significant only as evidence or records of transactions and the legal effect of such transactions and the method employed in keeping the books must be determined from the transactions themselves, and not merely from the book entries affecting them. * * *

---

presented to that Commission that the stock of Central Pacific Railroad Co. issued for construction of some of its lines had no value at the time it was issued.

[408] We are unable to determine from the record that petitioner consistently used the retirement-replacement-betterment method of accounting for its track assets prior to 1914.

See also *Glasgow Village Development Corp. v. Commissioner*, 36 T.C. 691 (1961), in which we stated (p. 703):

The presence of entries upon the books of a taxpayer are not conclusive of the occurrence of the transaction which they purport to reflect. Cf. *Doyle v. Mitchell Bros. Co.*, 247 U.S. 179 (1918). * * *

It is clear that, without additional evidence, petitioner's accounting records cannot be regarded as showing "the actual or original cost" required by the Code.[409]

We thus reach the question of whether petitioner's "historical costs" represent "statutory cost." In other words, do the amounts developed in a recent study conducted by the Southern Pacific Research Team (SPRT), based on petitioner's pre–1914 records and other materials, establish the actual cost of the pre–1914 grading, tunnel bores, and track assets at issue herein? After a careful review of the evidence, we have concluded that, while the SPRT study was impressive in its scope, it was not successful in producing cost figures that can be relied on as the tax basis for these assets.

We will not repeat at this point the details relating to the SPRT efforts which are contained in our findings. But those findings leave no doubt that, if ascertaining the actual cost of the assets at issue was the goal of the SPRT, its procedures were seriously deficient in many respects.

The work of the Southern Pacific Research Team, insofar as it relates to the present issue, can be summarized as follows:

(1) The SPRT scrutinized the lump-sum amounts on the books of the various predecessor companies at the ICC valuation date. (Such amounts did not show actual cost, as discussed above.)

(2) The SPRT attempted to divide these amounts into two parts (also lump sums): (a) The "T" amount—that portion of the total considered to relate to grading, tunnel bores, and track assets; and (b) the "O" amount—that portion of the total considered not to relate to such assets. (This division of the lump-sum amounts was frequently conjectural and thus not reliable.)

(3) The SPRT attempted to reconstruct the actual cost of

---

[409]In addition to the cases cited in the text, see *Petrossi v. Commissioner*, T.C. Memo. 1970–45; *Price v. Commissioner*, a Memorandum Opinion of this Court dated Sept. 22, 1949; *Paulosky v. Commissioner*, a Memorandum Opinion of this Court dated Oct. 29, 1947; *Regina Corp. v. Commissioner*, a Memorandum Opinion of this Court dated May 7, 1947.

grading, tunnel bores, and track assets of the various predecessors on hand at the ICC valuation date. (This procedure was flawed in many of its aspects and did not produce authoritative figures. It was not compatible with procedures known to have been used by the predecessor companies in arriving at the book amounts described in (1), above.)

(4) The SPRT determined the respective percentages of reconstructed costs (in (3), above) for grading, tunnel bores, and track assets.

(5) The SPRT applied the percentages (in (4), above) to the lump-sum "T" amounts (in (2), above).

In this manner, the SPRT produced figures which petitioner claims represent the tax basis of the relevant assets.

Given the limitations of the materials it had to work with, and the lapse of time between the construction or acquisition of the assets and the time SPRT made its study, the SPRT necessarily had to engage in an extensive amount of assumption and approximation, often without a fully authoritative basis for doing so. It is apparent that the amounts claimed as basis herein were obtained by combining two unreliable and mutually exclusive estimates, neither of which reflected the actual costs of the grading, tunnel bores, and track assets at issue. Therefore, we are even able to say that petitioner's "historical costs" are a reasonable *estimate* of actual cost. We simply do not know, and petitioner does not really know, what its costs were nor what the lump-sum figures in its old books actually represented. The extensive evidence relating to the procedures followed by SPRT fails to convince us that petitioner's "historical costs" are anything more than sophisticated guesses. In our view, the statute requires considerably more precision and certainty than are present in the figures produced in the SPRT study.

In sum, we hold that the "historical costs" developed by petitioner are not adequate to establish that the tax basis of the relevant assets was greater in amount than the ICC amounts relating to those properties.

Perhaps we should stop here; but there are two additional reasons advanced by respondent which we believe fortify our conclusion, above, that petitioner's "historical costs" cannot, and may not, be used as the tax basis for the grading, tunnel bores, and track assets discussed herein.

Even assuming that petitioner were able to show the actual

costs incurred to acquire the assets at issue, we would agree with respondent that, where costs were incurred by a predecessor corporation which transferred assets to a successor corporation prior to January 1, 1918, they may not properly be used to establish tax basis.

The statutory provisions providing that the basis of property shall be the cost of such property have reference to the "cost to the taxpayer." *Detroit Edison Co. v. Commissioner*, 319 U.S. 98, 102 (1943). As a result, the cost history of acquired property may be quite different from the taxpayer's cost. *Detroit Edison Co. v. Commissioner, supra*; *Reis v. Commissioner*, 142 F.2d 900, 903 (6th Cir. 1944), affg. 1 T.C. 9 (1942). Under the general rule, therefore, a successor corporation's tax basis in an asset acquired from a predecessor corporation would be the successor's cost of acquisition and not the predecessor's cost. *Maltine Co. v. Commissioner*, 5 T.C. 1265 (1945) (Court-reviewed).

In certain circumstances, Congress has provided by statute for a carryover or substituted basis from a transferor or predecessor corporation as an exception to the cost basis rule. But, in the absence of such a statutory exception, the general rule is applied. *Maltine Co. v. Commissioner, supra*. The first such provision permitting a carryover basis in a corporate reorganization was section 207(a)(7) of the Revenue Act of 1924 (applying retroactively to acquisitions made after December 31, 1917). See S. Rept. 398, 68th Cong., 1st Sess. (1924), 1939–1 C.B. (Part 2) 266, 278; H. Rept. 179, 68th Cong., 1st Sess. (1924), 1939–1 C.B. (Part 2) 241, 253. See also 3A J. Mertens, Law of Federal Income Taxation, sec. 21.115 (1977 rev.). However, it was necessary for the taxpayer to fit precisely within the terms of the statutory exception if it wished to avoid the usual rule prohibiting basis carryover. See *Republic Steel Corp. v. United States*, 96 Ct. Cl. 555, 40 F.Supp. 1017 (1941).

The courts have consistently recognized the principle that if property is acquired by a corporation in a corporate reorganization, there can be no carryover of basis unless there is a specific statutory provision permitting it. In *Maltine Co. v. Commissioner, supra*, the taxpayer acquired the assets of a predecessor corporation in a reorganization occurring in 1898. We stated (5 T.C. at 1271–1272):

There seems to be no serious doubt that if the transaction had occurred in later years it would have qualified as a tax-free reorganization, and in that

case petitioner would be required to use its transferor's base for the purpose under discussion [the computation of equity invested capital under the World War II excess profits tax]. The immediate question here, then, is whether the fact that the transaction occurred in 1898 leads to a different result.

The opinion carefully scrutinizes the relevant income tax provisions relating to basis (the general rule that "basis * * * shall be the cost," as well as "twenty-two exceptions to this basic rule") and concludes (5 T.C. at 1272):

These exceptions, which do not apply here, are examined because they indicate the degree of precision with which the statute provides for the varying situations for which Congress intended to make special exceptions. The inevitable conclusion is that it meant exactly what it said when it said that the basis, except for the several special situations thereafter specifically set forth, should be cost. To hold petitioner's basis for determining loss to be other than cost would be to create another exception, which we conceive to be properly the task of Congress if it is to be done.

To a similar effect, see *Niagara Mowhawk Power Corp. v. United States*, 207 Ct. Cl. 576, 525 F.2d 1380 (1975),[410] citing *Maltine* and *I. Lewis Corp. v. Commissioner*, T.C. Memo. 1963–13. See also *Unaka & City National Bank v. United States*, 50 F.2d 1031 (6th Cir. 1931), cert. denied 284 U.S. 645 (1931); *Republic Steel Corp. v. United States, supra*; *Reliance Investment Co. v. Commissioner*, 22 B.T.A. 1287 (1931); *Mead Realty Co. v. Commissioner*, 21 B.T.A. 1062 (1931).[411]

We believe the rule of these cases should apply to the assets at issue, to the extent they were transferred to a successor corporation prior to January 1, 1918.[412] As to those assets, the successor corporation could not use the basis of the predecessor corporation because there was no specific statutory authority for such a departure from the normal rule. Statutory exceptions to the general basis rule are strictly construed and not extended by implication. The burden is on the taxpayer to bring himself within the terms of a given exception. *Elmore Milling Co. v.*

---

[410]In *Niagara Mowhawk Power Corp. v. United States*, 207 Ct. Cl. 576, 525 F.2d 1380 (1975), the application of the general basis rule was not negated by the fact that the merger involved therein may have been a mere "change in form" or by the fact that the acquiring corporation obtained the assets at issue by exchanging securities for the transferor corporation's stock. 525 F.2d at 1390 n. 7, 1391.

[411]*Central Paper Co. v. Commissioner*, a Memorandum Opinion of this Court dated Apr. 30, 1945.

[412]Respondent indicates that approximately two-thirds of the retired assets in controversy were so transferred.

*Helvering,* 70 F.2d 736, 737–738 (D.C. Cir. 1934); *Central National Bank v. Commissioner,* 29 B.T.A. 530, 539–541 (1933). Petitioner raises many arguments in an attempt to show why the cited cases would not apply and to establish that the basis of the affected assets is their cost to a predecessor corporation (as developed by petitioner). We find none of petitioner's contentions in this respect to be convincing.

Petitioner seeks to distinguish the cases by pointing to various factual distinctions which petitioner perceives. Yet none of these asserted factual differences appear to have had any bearing on the legal position adopted by the courts in these cases. Additionally, petitioner contends that its book accounting should be controlling. However, for the reasons given earlier in this opinion, we do not agree. Further, we note that in none of the cited cases was book accounting viewed as a decisive factor. Petitioner also argues that all of petitioner's predecessors and subsidiaries operated as a single entity and that "all the consolidations and amalgamations, reincorporations and mergers, in the corporate history of the Southern Pacific System" amounted to "mere changes in identity, form, or place of organization" within the ambit of section 368 (a)(1)(F). Even if the evidence clearly established the facts alleged by petitioner, which it does not, we do not see how that code provision can be given effect during the period in which these transactions took place. In any event, petitioner does not claim that any of the hundred or more corporations here involved were shams, and we do not see how the mere fact of common ownership and operations would justify disregarding distinct corporate entities or otherwise take the present case out of the scope of the cases mentioned above.[413] Other arguments advanced by petitioner as to this question are equally unavailing.

Moreover, we agree with respondent that principles of estoppel are applicable on the facts of this case and that petitioner should be barred at this late date from claiming that the ICC amounts used on its returns do not properly reflect its tax basis

---

[413]Those cases are more closely in point than *Western Maryland Railway Co. v. Commissioner,* 33 F.2d 695 (4th Cir. 1929), a case relied on by petitioner in support of its single entity theory. The facts of that case are considerably different, and the legal premise for which petitioner cites the case is of dubious validity in light of subsequent cases such as *New Colonial Ice Co. v. Helvering,* 292 U.S. 435 (1934), and its progeny.

in the assets at issue but that the data provided by the Southern Pacific Research Team should be used as its tax basis, instead.

Estoppel and its various counterparts, such as quasi-estoppel, equitable estoppel, laches, election, and staleness of claim, are affirmative defenses which must be pleaded and proved. In his amendment to amended answer, filed May 18, 1976, respondent raised estoppel as a defense. While, on brief, respondent discusses only quasi-estoppel (duty of consistency), the language of respondent's pleading appears broad enough to encompass all of the above counterparts of estoppel.[414] We recognize that these various species of estoppel are distinct conceptions but they are similar enough in purpose to at times make attachment of the correct label difficult. Since one of the principal purposes of all of these doctrines is to discourage repetitious litigation and litigation of stale claims, the courts have at least an indirect interest in the application of the doctrines, and we think this issue is very suitable for their application. Compare *Blonder-Tongue Labs., Inc. v. University Foundation*, 402 U.S. 313 (1971). We also recognize that these doctrines are based on equitable principles, but they have been applied by the courts in tax cases. See *Sangers Home for Chronic Patients v. Commissioner*, 72 T.C. 105, 114–115 (1979); *Mayfair Minerals, Inc. v. Commissioner*, 56 T.C. 82 (1971), affd. 456 F.2d 622 (5th Cir. 1972); *Bartel v. Commissioner*, 54 T.C. 25 (1970); *United States v. Matheson*, 532 F.2d 809, 820–821 (2d Cir. 1976); *Beltzer v. United States*, 495 F.2d 211 (8th Cir. 1974).

Estoppel generally applies in tax cases where the taxpayer makes a misrepresentation of fact on which the Commissioner relies to his detriment, and through such reliance and his ignorance of the true facts, the Commissioner is induced not to correct the error before its correction is barred. *Sangers Home for Chronic Patients v. Commissioner, supra* at 114. Quasi-estoppel, or "duty of consistency," is akin to estoppel and has the same effect but is sometime applied when one of the technical elements of estoppel is not present. It is based on the theory that the taxpayer owes the Commissioner the duty to be consistent with his tax treatment of items and will not be permitted to

---

[414]For the purposes of this discussion, we will assume that our conclusion regarding basis carryover does not preclude the use of the amounts claimed herein as petitioner's basis in the assets at issue.

benefit from his own prior error or omission. While these doctrines might be applicable to the circumstances herein[415] we will not apply them because we are not so much concerned with what might be considered to be misrepresentation of facts by petitioner as we are with its delay of more than 50 years in claiming and attempting to prove a cost basis in the assets here involved in excess of the ICC amounts which it used for so many years as a substitute for original or actual cost. This leads us to the other species of estoppel mentioned above; election, laches, and stale claims.

The doctrine of "election" is sometimes invoked as an alternative to estoppel or quasi-estoppel to bind a taxpayer to a choice made by him between two alternative treatments of an item or transaction, both of which are proper, and to act consistently with that choice. Here, petitioner had the choice of using actual cost of the assets here involved, to the extent that it could be proved, as its tax basis in those assets, or to use the March 1, 1913, value as determined by the ICC, if greater. Petitioner had ample opportunity during the ICC investigation to prove its actual original cost, or its "historical cost," but apparently petitioner was unable to prove, or at least the ICC could not determine, the original cost of these assets because the books and records were not adequate for the purpose. Petitioner thereupon chose to use the ICC amounts as its substitute costs for these assets for tax-basis purposes and continued to do so until this case was brought to issue, except for a few occasions when original cost for some item could be established as being greater than the ICC amounts.[416] While petitioner may not have had a free choice of the amount to use as tax basis, it did have a choice to either prove its original cost at the time it first started

---

[415]In *Bartel v. Commissioner*, 54 T.C. 25, 32 (1970), the Court said:

"The respondent's position asks us to rely upon the objective record, but the petitioner would have us take a new look at all the old evidence. Under these circumstances, it seems that not only the equities but the practical administration of the law argue against granting the petitioner's request * * *."

[416]The fact that, in the past, respondent may have at times accepted such cost figures from petitioner's records does not, as petitioner argues, estop respondent from making his present contentions concerning tax basis. *Tollefsen v. Commissioner*, 52 T.C. 671, 681 (1969), affd. 431 F.2d 511 (2d Cir. 1970), cert. denied 401 U.S. 908 (1971). Moreover, it is clear that "respondent is not debarred from self-correction." *Boyter v. Commissioner*, 74 T.C. 989, 997 n. 11 (1980), on appeal (4th Cir., Nov. 6, 1980).

filing tax returns or to use the ICC amounts as its substitute cost. It chose the latter.

The doctrine of "laches" (or staleness of demand or claim) "is based on the injustice which might result from the enforcement of long-neglected rights, the difficulty, if not the impossiblity, of ascertaining the truth of the matters in controversy and doing justice between the parties, and on the grounds of public policy, its aim being the discouragement, for the peace and repose of society, of stale and antiquated demands." (Fns. refs. omitted.) 30A C.J.S., Equity, sec. 113 (1965). See also 10 J. Mertens, Law of Federal Income Taxation, sec. 60.18 (1976 rev.). The determination of whether to apply this doctrine is made in the discretion of the court in light of the facts and circumstances of each case. *Shaffer v. Rector Well Equipment Co.*, 155 F.2d 2d 344 (5th Cir. 1946); *Gardner v. Panama Railroad Co.*, 342 U.S. 29 (1951). See also *Southern Pacific Co. v. Bogert*, 250 U.S. 483 (1919), for a discussion and application of the doctrine of laches. However, the courts invariably look for (1) inexcusable delay (lack of diligence) in asserting a claim by the party against whom the doctrine is to be applied, and (2) prejudice to the party against whom the delayed claim is made (the party raising the defense of laches) caused by his reliance on his adversary's conduct. *Costello v. United States*, 365 U.S. 265, 282 (1961); *Hecht v. Harris, Upham & Co.*, 430 F.2d 1202, 1208 (9th Cir. 1970). See *United States v. Matheson, supra* at 820–821; 2 J. Pomeroy, Equity Jurisprudence, sec. 419d (1941).[417] Where these elements are present, the delayed or stale claim is given no consideration. We think this is such an instance.

In *United States v. Matheson, supra*, the Court of Appeals held that a decedent was a U.S. citizen at the time of her death in 1969 and that her estate was therefore liable for income and gift taxes. In holding that the doctrine of laches applied to bar a claim by her executor, her lawyer of many years, that the decedent lost her citizenship in 1944, the Court stated (532 F.2d at 820–821):

For over 24 years, Mrs. Burns [decedent] and appellant [decedent's lawyer] had many opportunities, when her United States citizenship was questioned, to assent or seek an adjudication that she had expatriated herself. However, on

---

[417]See generally 30A C.J.S. Equity, secs. 112, 115 (1965); 27 Am. Jur. 2d Equity, sec. 162 (1966).

the contrary, she chose not only to represent that she was a United States citizen but to receive the benefits and perform the duties (including payment of taxes) of an American citizen. Having waited until Mrs. Burns' death, thereby preventing the government from calling her as a witness to contradict appellant's present position or even to explain her contrary behavior throughout her lifetime, appellant is precluded by his long delay from now asserting for the first time that she lost her United States citizenship in 1944. * * *

\* \* \* \* \* \* \*

The government is prejudiced because in seeking to collect taxes ordinarily owed it by United States citizens it is compelled to rebut an allegation of expatriation that is now over 30 years stale, with the key witness, Mrs. Burns, unavailable either to contradict this allegation or to explain her inconsistent conduct in the years following 1944. * * *

The present case does not differ from *Matheson* in any significant way. Here, for several decades, petitioner's actions indicated to respondent that petitioner had no additional records relating to tax basis which could be used to modify the ICC amounts appearing on its income tax returns.[418] Petitioner paid taxes based on the correctness of those figures. Now, in connection with the present action, petitioner claims that it has old records which provide better figures than the ICC amounts. Not long before the trial of this issue, petitioner exhibited for respondent the data which SPRT had produced after a study that apparently took about 10 years to complete. Here, as in *Matheson*, the Government is prejudiced by the delay in making this claim. Respondent is compelled to scrutinize materials

---

[418]Petitioner states that, in connection with a settlement of its World War II Excess Profits Tax, it used book amounts instead of the ICC amounts and that respondent accepted those figures as part of the compromise. Nevertheless, we believe respondent was fully warranted in drawing the conclusion outlined in the text. The costs involved in the settlement were clearly not produced by a study like the one conducted herein by the Southern Pacific Research Team and necessarily came from records which fairly readily showed petitioner's cost. We do not view the events surrounding the excess profits tax settlement as alerting respondent to the possibility of a claim such as is involved here. Respondent had no reason to anticipate petitioner's current contentions, and he was justified in concluding from petitioner's actions that the ICC amounts which petitioner used on its income tax returns over many decades were not subject to modification.

Petitioner's Motion To Determine Sufficiency of Respondent's Answer and Supplemental Answer to Petitioner's Request for Admissions, filed Apr. 22, 1976, relates to matters dealt with in this footnote. The motion was discussed at the May 1976 and July 1977 trial sessions. Because the parties indicated they would attempt to agree on a stipulation, the Court took no action with respect to the motion. Respondent made some relevant stipulations on the record at the July 1977 trial session and on brief, and petitioner has not actively pursued the motion since that time. It is now too late for such action. In light of the conclusions reached herein, we do not see how the admissions requested would be of benefit to petitioner in any event. Accordingly, petitioner's motion is hereby denied.

which, owing to the passage of time, the lack of time, the deterioration of records, the murkiness of information relative to transactions and events which took place almost a century ago, and the death of crucial personnel, are extremely difficult, if not impossible, to verify.

It seems clear that petitioner could have conducted its SPRT study and made its present claim many years ago and that petitioner has shown a lack of diligence in not doing so. It seems equally clear that petitioner's inexcusable delay has placed respondent at a distinct disadvantage. Accordingly, we conclude that petitioner should be precluded by the doctrine of laches (or staleness of demand (claim)) from contending herein that its tax basis in the assets at issue is to be determined by reference to "historical costs."[419]

We hold that petitioner's basis in the assets at issue is properly reflected by the ICC amounts serving as substitute cost.

We have carefully considered all of the additional contentions made by petitioner in connection with this issue[420] but do not regard them as supporting a contrary result.

We decide this issue for respondent.

———

[419]Even if respondent were given the time he needed to check out all of the functions and computations of SPRT and all the old records SPRT claims to have found in storage rooms, museums, colleges, etc., it would be an impossible task for this Court to determine with any degree of certainty what the original or historical costs of these assets were. Respondent assigned an experienced agent to examine the SPRT studies not long before this trial. Of course, the agent could not complete a thorough examination—but he did point out numerous errors he claims SPRT made in its computations. It would be an impossible task for this Court, without a staff for the purpose, to examine the documents necessary to settle these disputes. It would also be necessary for the Court to determine the validity of numerous assumptions made by SPRT as to what took place almost a century ago with no records or witnesses available to support the assumptions. Petitioner objected to receipt into evidence of the report of the U.S. Pacific Railway Commission on the grounds that it was hearsay. That report was prepared by a Commission established by Congress in 1887 to investigate the operations of some of the railroads that are now a part of the Southern Pacific Lines. If such a report made contemporaneously with the incurrence of many of the costs at issue herein is not considered reliable evidence of what took place in the early days of the Southern Pacific system, we do not understand how petitioner could expect us to place much reliance on the data produced by SPRT which, perforce, was based largely on hearsay and guesswork.

[420]Reply briefs as to this issue were filed on May 31, 1978. In petitioner's reply brief, petitioner failed to respond to the requests for findings of fact made by respondent in his opening brief. Referring petitioner to Rule 151(e), Tax Court Rules of Practice and Procedure, we asked petitioner to respond to respondent's requests. Petitioner did so in a supplement to its reply brief, filed Sept. 26, 1978. However, petitioner took advantage of that opportunity to include in its supplemental brief, an extensive reply to respondent's reply brief. We regard this action as inappropriate, and we have ignored petitioner's supplemental brief to the extent it seeks to comment on respondent's reply brief and to make additional arguments.

XVI. ADJUSTMENT FOR INTEREST AND TAXES DURING
CONSTRUCTION [421]

This issue presents the following question for our consideration:

Whether, when the Interstate Commerce Commission valuation amounts are used to establish the cost of track assets acquired by petitioner prior to 1914, the ICC amounts are to be reduced to the extent they reflect interest and taxes during construction.

FINDINGS OF FACT

*Issue (p)*

Most of the facts relating to this issue have been stipulated by the parties, and those facts, with associated exhibits, are incorporated herein by this reference.

During the years 1959, 1960, and 1961, the former Southern Pacific Co., the Pacific Electric Railway Co., the Texas & New Orleans Railroad Co., the St. Louis Southwestern Railway Co., and the San Diego & Arizona Eastern Railway Co. retired various railroad track assets from service. These companies are hereinafter sometimes referred to collectively as petitioner. In accordance with the accounting rules of the Interstate Commerce Commission (ICC), and pursuant to the retirement-replacement-betterment method of accounting prescribed by those rules, the recorded capital investments in all the properties involved (with the exception of underlying real property), less the assigned value of recovered track material, were written off by credits to the appropriate property accounts, and the amounts so written off, plus labor costs for removal of recoverable material, were charged to current operating expenses. The same accounting was followed in reporting the retirements in the consolidated returns for the years 1959, 1960, and 1961, and the retirements resulted in deductions from ordinary income.

As to the assets at issue herein, the investment amounts referred to above are the amounts which the ICC determined as the reproduction cost new pursuant to the Physical Valuation of

---

[421]In trying and briefing this case, this issue was referred to by the parties as "*Issue (p)*."

Property Act of 1913. Those amounts are sometimes hereinafter referred to as the ICC amounts.[422]

In determining costs of reproduction new, the ICC used the methods and procedures described in *Texas Midland Railroad*, 75 I.C.C. (Valuation) 1, pp. 29–33, 108 et seq. (1918). In that report, the ICC determined costs of reproduction new as of the valuation date based on 1914 unit prices. In order to establish what might be termed a normal price, the ICC thought that the range of prices over a period of 5 years previous, and in some cases 10 years, should be consulted, and the average thereof served as the basis of the unit prices applied by the ICC. In the course of coming up with an estimate of reproduction cost new, it was necessary for the ICC to make estimates of the various components which comprise such costs. Among the components which the ICC took into account in making its determination were interest and taxes during construction.

On audit of the consolidated returns for the years 1959, 1960, and 1961, respondent disallowed portions of the deductions from ordinary income. The disallowance of portions of the deductions at issue was described in the statutory notice as being due to the inclusion of "theoretical interest in the basis of the property." The notice states that "theoretical interest is not part of the basis of property."[423]

The amounts claimed as deductions but disallowed by respon-

---

[422]Although the ICC amounts were increased by additions and betterments after the valuation date, we will, for convenience of discussion, hereinafter refer to petitioner as having used the ICC amounts as its tax basis in the retired assets.

In the case of the Pacific Electric Railway Co., the amounts involved were those determined by the Railroad Commission of California. The parties appear to be in agreement that the California agency used the same procedures as the ICC and that any conclusions we draw with respect to the ICC amounts shall also apply to the amounts used by the Pacific Electric Railway Co.

[423]The parties have stipulated that the present issue involves respondent's disallowance of interest and taxes during construction. On Feb. 9, 1979, petitioner amended its petition as to this issue to refer to both interest and taxes.

For the purposes of this issue, the parties have stipulated and agreed as follows:

"The parties are agreed that interest and taxes during construction are properly included in tax basis only if they have not previously been treated as deductions against current income. The parties also agree this principle is irrelevant where Interstate Commerce Commission valuation amounts are used as tax basis, either as March 1, 1913, value or as substitute cost figures, and that this principle applies only to the extent that actual historical costs are being used as tax basis, in which event interest and taxes during construction are includible as tax basis only (a) to the extent actually incurred and (b) to the extent not previously expensed with attendant tax benefit."

dent (as to both interest and taxes during construction) were as follows: [424]

| Company | Interest | Taxes | Total |
|---------|---------|-------|-------|
| *1959* | | | |
| FSP | $19,231 | $935 | $20,166 |
| PE | 15,611 | 1,138 | 16,749 |
| T & NO | 77,351 | 2,930 | 80,281 |
| St.LS | 14,528 | 506 | 15,034 |
| | 126,721 | 5,509 | 132,230 |
| *1969* | | | |
| FSP | 119,736 | 5,519 | 125,255 |
| PE | 14,489 | 1,098 | 15,587 |
| T & NO | 1,476 | [184] | 1,292 |
| St.LS | 22,798 | 804 | 23,602 |
| SD & AE | 712 | --- | 712 |
| | 159,211 | 7,237 | 166,448 |
| *1961* | | | |
| FSP | 70,308 | 3,709 | 74,017 |
| PE | 12,448 | 943 | 13,391 |
| T & NO | 50,341 | 1,942 | 52,283 |
| St.LS | 7,271 | 243 | 7,514 |
| | 140,368 | 6,837 | 147,205 |

OPINION

*Issue (p)*

This issue involves respondent's attempt to reduce, for tax basis purposes, the reproduction costs new developed by the Interstate Commerce Commission (ICC) pursuant to the Physical Valuation of Property Act of 1913. See 49 USCA sec. 19a. (Such costs are hereinafter sometimes referred to as the ICC amounts.) We have pointed out that under section 1012 and other provisions of the Code, the ICC amounts may be used to establish the cost of assets acquired prior to 1914, when a

---

[424] In the table, "FSP" refers to the former Southern Pacific Co.; "PE" refers to the Pacific Electric Railway Co.; "T & NO" refers to the Texas & New Orleans Railroad Co.; "St.LS" refers to the St. Louis Southwestern Railway Co.; and "SD & AE" refers to the San Diego & Arizona Eastern Railway Co.

taxpayer's records are inadequate to show the actual or original cost. See the discussion in the portion of this opinion entitled *"Issues (pp) and (qq)*: Historical Costs as Tax Basis."

On its income tax returns for the years 1959, 1960, and 1961, petitioner, in taking retirement deductions, used the ICC amounts to represent its cost[425] in the assets at issue.[426] Respondent now claims that the ICC amounts include "as an element of reproduction costs, theoretical interest and taxes during construction."[427] Respondent contends that because these "theoretical" elements "do not purport to reflect estimated actual expenditures" contributing to the cost of the assets, "they are not part of petitioner's basis" in the retired assets.[428] As support for his position, respondent refers to the procedures described in *Texas Midland Railroad*, 75 I.C.C. (Valuation) 1 (1918), in which the ICC set forth its method for arriving at its estimates of reproduction cost new (for petitioner's assets and those of other carriers). See, e.g., 75 I.C.C. (Valuation) 1 at 151–158.

The Government made much the same argument in *Southern Railway Co. v. United States*, 218 Ct. Cl. 150, 585 F.2d 466 (1978), decided after briefs as to this issue were filed. In that case, the Court of Claims held that the ICC estimates of reproduction cost new were not to be adjusted. The court declined to disregard the interest and taxes components included in the ICC amounts, stating (218 Ct. Cl. at ___ , 585 F.2d at 470):

> Manifestly, the estimates made by the ICC provide the best, and in fact the only, available source for determining the tax bases of the taxpayers' properties. Accordingly, we hold that the *Cohan* rule [*Cohan v. Commissioner*,

---

[425]In the portion of this opinion entitled, *"Issues (pp) and (qq)*: Historical Costs as Tax Basis," we hold that petitioner may not now alter those basis figures.

[426]Respondent limits his present contention to track assets.

[427]The statutory notice refers only to "theoretical interest," but the stipulation and briefs of the parties put "theoretical taxes" at issue as well.

[428]Respondent believes the instant adjustments are warranted when the ICC amounts are used to represent costs. However, the ICC amounts can also be used to represent fair market value (when actual cost is known and it is less than the corresponding ICC amount; see sec. 1053 and *"Issues (pp) and (qq)*: Historical Costs as Tax Basis"). In this latter instance, respondent does not believe the adjustment for interest and taxes would be warranted. He does contend, though, that when the ICC amounts are claimed as value, they should be adjusted to reflect "reproduction cost depreciated rather than reproduction cost new, because reproduction cost depreciated more accurately reflects the fair market value as of March 1, 1913." Since the ICC amounts discussed herein are not being claimed as the fair market value of the retired assets at issue, we need not consider the question of adjusting those amounts for depreciation.

39 F.2d 540 (2d Cir. 1930)] should be applied in these cases with respect to the ICC estimates of taxes and interest during construction. [429]

Addressing itself to the Government's specific contentions based on the *Texas Midland* report, the court said (218 Ct. Cl. at ___ , 585 F.2d at 471):

> With respect to interest during construction, the Government argues that the ICC figures include an amount for nondeductible imputed interest on plaintiff's own funds which were used in construction. This claim is not substantiated in the Government brief, but at oral argument, Government counsel stated that in *Texas Midland, supra*, it is shown that the ICC calculated its estimates of interest during construction on "borrowed capital and equity capital." However, our review of the ICC decision does not uncover any clear statement that the estimates included any imputed interest. There is an isolated statement that "ordinarily a railroad corporation finally obtains the money with which to defray the expense of constructing its property by the sale of stocks and bonds, but the date at which such sale is effected depends upon a variety of circumstances." *Id.* at 153. Aside from this general statement, all other explanation of the "cost of obtaining money" in *Texas Midland* centers on the cost of issuing bonds and the rate of interest which would be needed to cover the entire cost of obtaining money. *Id.* at 153–54. Moreover, the ICC assumed in determining the length of time for which interest should be reckoned, that the carrier would have some funds on hand at the time construction was started. With this in mind, the ICC computed interest for one-half of the assumed construction period of 6 months, plus 3 months. *Id.* at 157. We conclude, therefore, that the Government has not demonstrated that there is any reason to believe that the ICC estimate includes a significant amount of imputed interest, if any, or that its estimate of interest during construction is any more inexact than 44 other estimated components of construction costs which have been accepted by the Commissioner.
>
> The Commission also reported that its estimate of taxes paid was computed on the basis of "individual cases which were believed to be fairly typical of what might be expected under normal conditions * *." Id. at 152.
>
> We do not doubt that plaintiffs paid *ad valorem* taxes to the political subdivisions in which their properties were located. But the Government makes the unsupported suggestion that plaintiffs may never have paid any taxes during construction, because in the late 19th and early 20th Centuries, some states exempted railroads from taxation. The ICC answered this contention in its explanation of its methodology for computing "general expenditures" as follows:
>
> * * * In states where no taxes are levied upon railroad property during construction, *that fact is considered. Id.* at 153 (Emphasis added).

---

[429]The Court of Claims *did* permit an adjustment for the amount of interest and taxes which the taxpayer deducted on its Federal tax returns in the years 1909 through 1916. It did so in order to avoid a double deduction. In the instant case, respondent appears to have conceded that prior deductions of taxes and interest are not relevant for our present purposes.

We concur with the Court of Claim's analysis of the *Texas Midland* report. We believe it is readily apparent that the ICC's reproduction cost new includes reasonable estimates of interest and taxes actually paid during construction. The *Texas Midland* report clearly does not establish, as respondent contends, that the figures for interest and taxes used by the ICC were theoretical and therefore not properly chargeable to the capital account.

The ICC amounts are no more than estimates of cost, and the elements comprising cost, which the courts have found acceptable for tax basis purposes in the absence of superior evidence.[430] We see no benefit to be derived from singling out any of the specific components comprising the total estimate for special scrutiny. There is no logic for any requirement that the various elements comprising reproduction cost new should be more accurate or verifiable than the whole. Nor should one element be required to be more accurate a reflection of actual cost than is any other element. See 585 F.2d at 473. Accordingly, we hold, as did the Court of Claims in *Southern Railway Co. v. United States, supra,* that the ICC amounts used by petitioner on its returns to show the cost of the retired assets at issue are not to be reduced to eliminate interest and taxes during construction.

One further point should be mentioned. Respondent argues that his adjustment for interest and taxes must stand because petitioner has not shown it is entitled to deductions greater in amount than those respondent has allowed. Respondent is, essentially, asking the Court to accept whatever deductions he deems to be acceptable unless petitioner can show that its original costs for the assets at issue exceed respondent's figures. This contention by respondent appears to be based on a statement made in our opinion in *Boston & Maine Railroad v. Commissioner,* 16 T.C. 1517, 1531 (1951), revd. on this point 206 F.2d 617, 625–626 (1st Cir. 1953). In that case, the taxpayer was unable to show its actual costs for retired property, and we

---

[430]In this significant respect, the instant case is distinguishable from *Burnet v. Houston,* 283 U.S. 223 (1931), a case relied on by the Government in *Southern Railway Co. v. United States,* 218 Ct. Cl. 150, 585 F.2d 466 (1978), but not relied on by respondent in this case. Given the availability of a recognized substitute cost, we do not read *Burnet v. Houston* as requiring a showing of actual expenditures in the factual circumstances presently before us. The use of the ICC amounts as a substitute for cost in a case like the one at bar *presupposes* that actual cost cannot be shown.

upheld the use of the ICC amounts for the purpose of measuring the allowable retirement deduction. However, we also upheld the Commissioner's 21-percent reduction of the ICC amounts to cover depreciation sustained to March 1, 1913. In this regard, our opinion states (16 T.C. at 1531):

If [the Commissioner's] starting point had been original cost, then certainly he would not have been permitted to make the adjustment for depreciation, since by the retirement method of accounting depreciation would already have been accounted for. *Commissioner v. Union Pacific Railroad, supra* [188 F.2d 950]. As it is, however, we do not know what original cost was and accordingly we are not able to conclude and find on this record that the deductions for the items retired if correctly determined by the retirement method of accounting would as a whole have exceeded the amounts allowed by [the Commissioner] in his determination.[431]

We do not regard this statement in *Boston & Maine* to be applicable to the present circumstances. Rather, we believe the instant case bears more of a resemblance to *Chicago & North Western Railway Co. v. Commissioner*, 29 T.C. 989 (1958).[432] That case also involved the use of the ICC costs of reproduction new to show cost for tax purposes, and it also involved a claim by the Commissioner that the ICC amounts should be reduced by depreciation sustained prior to March 1, 1913.

In *C & NW*, we agreed with the principle articulated in the *Boston & Maine* case that the Commissioner's asserted reduction for depreciation would result in an improper double adjustment. However, we did not conclude, as we had in *Boston & Maine*, that the taxpayer's inability to prove original cost required us to accept the Commissioner's figures. The critical difference was that, in *C & NW*, the Commissioner stipulated that the ICC reproduction cost new figures were to be accepted as statutory cost. See 29 T.C. at 1003–1004. We concluded that the Commissioner's acceptance of the ICC amounts as statutory cost differentiated the case from *Boston & Maine*, wherein we had

---

[431]On this point, the Court of Appeals reversed, regarding our conclusion above as "tantamount to saying that the Commissioner's determination—no matter how erroneously arrived at—must stand." *Boston & Maine Railroad v. Commissioner*, 206 F.2d 617, 625 (1st Cir. 1953), revg. on this point 16 T.C. 1517, 1531 (1951). See also *Southern Railway Co. v. United States, supra*, in which the Court of Claims adopts the position of the Court of Appeals. We express no opinion herein as to the continued viability of the conclusion reached as to this point in our opinion in *Boston & Maine*.

[432]The cited case is sometimes referred to herein as the *C & NW* case.

"held for the Commissioner because we did not know what the 'statutory cost' of the properties being retired was, and could not, therefore, ascertain from the record whether the Commissioner had erred." 29 T.C. at 1005. Given this difference, we held that, unlike the *Boston & Maine* case, no adjustment of the ICC amounts was to be made for depreciation sustained prior to March 1, 1913.

In the present case, respondent also takes the position that the ICC amounts are to be accepted as statutory cost.[433] As in *C & NW*, respondent is seeking to modify the amounts he acknowledges to be statutory cost with adjustments which are impermissible. The instant case is therefore similar in all significant respects to the *C & NW* case. Accordingly we conclude, as we did in *C & NW*, that we are not required to accept respondent's determination merely because petitioner cannot show its original costs.

In view of our conclusion above that the disputed components are not to be eliminated from the ICC amounts when those estimates are used for tax purposes, we hold that petitioner is entitled to base the deductions at issue on the ICC figures and not on the lesser amounts advanced herein by respondent.

We decide this issue for petitioner.

## CONCLUSION

Owing to concessions by the parties, and in accordance with our opinions above as to various issues in this case,

*Decision will be entered under Rule 155.*

---

[433]In respondent's opening brief in connection with the portion of this opinion entitled "*Issues (pp) and (qq)*: Historical Costs as Tax Basis," respondent states (p. 173):

"In the absence of adequate accounting records, respondent has accepted the I.C.C.'s determination of reproduction costs new as the equivalent of statutory cost, at the valuation dates, for purposes of administering the Internal Revenue Code."

Respondent's statement on brief is, of course, fully consistent with the judicial authority dealing with this question. See the Court of Appeals opinion in *Boston & Maine Railroad v. Commissioner, supra,* and the Court of Claims opinion in *Southern Railway Co. v. United States, supra.*